**IN THE UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| LAVIE CARE CENTERS, LLC, *et al.*[1] | Case No. 24-55507 (PMB) |
| Debtors. | (Joint Administration Requested) |

**DECLARATION OF M. BENJAMIN JONES IN SUPPORT OF
CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

I, M. Benjamin Jones, hereby declare under penalty of perjury that the following is true to the best of my knowledge, information, and belief:

1.     I am the Chief Restructuring Officer ("CRO") of LaVie Care Centers, LLC ("LaVie") and its subsidiaries and affiliates that are debtors and debtors-in-possession (collectively, the "Debtors" or the "Company") in the above-captioned chapter 11 cases (collectively, the "Chapter 11 Cases"). I am a Senior Managing Director at Ankura Consulting Group, LLC ("Ankura") and the Global Co-Head of Ankura's Turnaround & Restructuring Practice.

2.     I have more than 25 years of financial restructuring, interim management, turnaround, and financial advisory experience, with a significant emphasis on the U.S. healthcare industry. I have served as president, chief restructuring officer, and chief financial officer for private and public companies. In addition, I have also played key roles in dozens of other high-profile restructurings, mergers, and acquisitions, assisting clients both in and outside of chapter

---

[1]     The last four digits of LaVie Care Centers, LLC's federal tax identification number are 5592. There are 282 Debtors in these chapter 11 cases, for which the Debtors have requested joint administration. A complete list of the Debtors and the last four digits of their federal tax identification numbers are not provided herein. A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at https://www.kccllc.net/LaVie. The location of LaVie Care Centers, LLC's corporate headquarters and the Debtors' service address is 1040 Crown Pointe Parkway, Suite 600, Atlanta, GA 30338.

11, including, among others, Gulf Coast Health Care, LLC, Balducci's New York LLC, High Ridge Brands Co., Trident Holdings, Mariner Post-Acute Networks, Centennial Healthcare, World Health Alternatives, The Penn Traffic Company, Milacron, Lionel, Caraustar Industries, Golden Books Family Entertainment, and Signature Healthcare.  Prior to joining Ankura, I began my career at Ernst & Young, focusing on valuations and middle-market corporate finance transactions and later joined CDG Group to focus on restructurings and reorganizations.  I hold a Bachelor of Science in Accounting, with distinction, from Wake Forest University.

3.     Ankura is a global consulting firm with approximately 2,000 employees worldwide. Ankura's Turnaround and Restructuring Practice specializes in providing restructuring advisory and interim management services across a range of industries, including healthcare.  Ankura's experience and service expertise includes: (i) liquidity management and enhancement, (ii) business plan development and validation, (iii) performance and profitability improvement, (iv) analysis of strategic options, (v) development and implementation of restructuring plans, (vi) negotiations and dispute resolutions, (vii) chapter 11 planning and case administration, (viii) interim management, including serving as CRO, (ix) post-transaction business stabilization, and (viii) case management services.

4.     Ankura was initially retained to provide the Company with certain financial and restructuring advisory services under a prior engagement letter dated as of February 22, 2023, which contemplated Ankura assisting the Company with, among other things, (a) the creation and review of various financial analyses and corresponding presentations, (b) the evaluation of future cash flows and development of a restructuring plan, and (c) the negotiation and implementation of any agreed-upon restructuring plan.  On May 29, 2024, I was appointed as the Debtors' CRO.  As

CRO, I report to James D. Decker, in his capacity as independent manager of Debtor LV Operations I, LLC and its direct and indirect subsidiaries.

5.      In my capacity as CRO, I have personal knowledge of, and am familiar with, the business affairs, day-to-day operations, books and records, and financial condition of the Debtors, and I am authorized to submit this declaration (the "Declaration") on behalf of the Debtors.  I submit this Declaration to assist the Court and parties-in-interest in understanding the circumstances that led to the commencement of the Chapter 11 Cases and in support of (a) the Debtors' voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and (b) the relief that the Debtors have requested pursuant to the motions and applications (collectively, the "First Day Pleadings") filed on the date hereof (the "Petition Date") in the United States Bankruptcy Court for the Northern District of Georgia (the "Court").

6.      Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, my opinion based upon my experience, knowledge of the industry and of the Debtors' operations and financial condition, and information provided to me by management, advisors, counsel, agents, employees, or other representatives of the Debtors.  If called as a witness, I could and would testify competently to the facts set forth in this Declaration.

## **INTRODUCTION**

7.      At the time of the initial onset of the COVID-19 pandemic, the Company was one of the largest operators of skilled nursing facilities in the nation, operating approximately 140 skilled nursing facilities, assisted living facilities and independent living facilities.  As a result of the impacts of the pandemic, and in order to try to stabilize the Debtors' financial condition, the Company exited operations at more than 90 facilities.  Today, the Debtors operate 43 licensed

facilities across five states that care for more than 3,700 residents on a daily basis, with approximately 3,600 employees. The Debtors' current portfolio of facilities produce positive cash flow; however, the substantial continuing impacts of the pandemic and resulting facility divestitures continue to plague the business.

8.      The COVID-19 pandemic impacted sectors of the U.S. economy in dramatically different ways, with certain industries, like movie theaters, retail, and cruise lines, rebounding despite being impacted severely at the outset. In contrast, skilled nursing, which was among the first sectors impacted at the beginning of the pandemic, has yet to fully recover from the lasting economic impacts of COVID-19. Like many of their peers, the Debtors have been unable to shake the lasting economic effects that have reverberated throughout the sector since that time.

9.      While the industry-wide effects of the pandemic are further described in **Section III** of this Declaration, those economic impacts have varied significantly from state to state depending on, among other things, differing state reimbursement rates, varying access to high-quality nursing staff, incremental state funding and investment in the skilled nursing sector, insurance costs, and the overall landscape of litigation claims (which occur regularly in this industry). Reflective of these factors, post-pandemic many of the Debtors' skilled nursing facilities could be easily classified as either "haves" and "have nots" depending on the state in which they operated.

10.     By way of example, the Debtors were previously the largest skilled nursing facility operator in the state of Florida. The post-pandemic operating environment in Florida was extremely challenging, as a result of a tight labor market and Florida state COVID relief funds that significantly trailed many other states. Moreover, the impact of Florida's statutory minimum staffing requirements, which were put in place prior to COVID, added additional significant costs

for Florida operators.  Compounding these issues, in the years that followed the onset of COVID, the need for skilled labor spiked at the same time that wages substantially increased and significant numbers left the workforce.  This intersection of factors caused the Debtors to suffer a nearly 25% reduction in their total workforce in 2021 and they were forced to substantially increase their reliance on staffing agencies to staff their facilities.  The necessary use of these agencies resulted in a more than 50% premium over prior wage levels.  While some of these staffing issues were felt in other states, due to the minimum staffing requirements and lack of corresponding state relief funds made the situation particularly acute in Florida.  As a result, across 2022 and 2023, the Debtors' Florida facilities generated approximately ***$133* million** in EBITDA losses.  As discussed more fully in **Section III**, the Debtors have since exited operations in all but one facility in the state of Florida.

11.     Although management implemented several initiatives to improve operating and financial performance between 2020 and 2023, the Company found itself unable to fund contractual rent payments to some of their largest landlords.  Given the clear state-by-state disparities that became emblematic of the post-COVID skilled nursing landscape, the Debtors found it necessary to evaluate the viability of their lease portfolio by identifying facilities and/or states that had favorable future prospects and generated positive cash flow, and those—like Florida—that were unsustainable.  Recognizing that the Debtors were at risk of lease terminations as a result of missed lease payments and increasing lease arrearages, the Company engaged with its current landlords to find solutions for the benefit of the residents in the facilities, its employees and the Company as a whole.

12.     Accordingly, the Company began negotiations with many of its existing landlords—including their largest landlord, affiliates of Omega Healthcare Investors, Inc., a

publicly-traded company (together with its affiliates and subsidiaries, "Omega")—regarding potential solutions to the fiscal challenges facing the Company, including potentially exiting operations at many of their unsustainable facilities and helping transition them to new third-party operators. These efforts were not only necessary in order for the Company to stem further losses, but were also driven in part by the respective landlords' needs to find viable go-forward resolutions. As of June 2023 (a year prior to the Petition Date), the Company operated approximately 114 facilities (down from approximately 140 in 2020). Today, the Debtors' current portfolio includes 43 licensed facilities. Other than one remaining facility in Florida, the Debtors' facilities are all located in the favorable operating states of Mississippi, North Carolina, Pennsylvania and Virginia. The Debtor's current portfolio of facilities is leaner and more productive, and for the first time in years, the Company's remaining facilities now generate positive EBITDA.

13.    Although these divestitures have been both necessary and successful from an operational and future performance standpoint by stemming operating losses, they did not address the substantial legacy liabilities at the remaining corporate entities that previously operated the Debtors' now-divested facilities. As facility operators, the Debtors do not own the underlying real property assets at their facilities, but merely operate the facilities as tenants on the applicable facility lease.[2] When the operations of the underperforming facilities were transitioned to new operators with the consent of the landlord, the new operators generally did not assume the liabilities of Company, nor did any material consideration flow to the prior operator. Following transition, the only material asset that remained behind for each of the divested facilities was accounts receivable generated prior to the transition; however, the proceeds from the collection of the

---

[2]    If a skilled nursing facility tenant is unable to pay contractual rent, a landlord can terminate the lease and effectively cut off the ability of the operator to continue operating that facility.

receivables had to be used to pay down the Debtors' Pre-Petition ABL Facility (as defined below). As such, the Debtors do not have any material assets remaining behind at their now-divested facilities. Yet, there remain significant legacy liabilities which were incurred in connection with the prior operations, including, among others, lease liabilities, trade claims, and litigation claims, that were not transferred to their new operators as part of the underlying facility divestitures.

14.    The Company had historically been able to negotiate agreements with certain of these parties through graduated payment plans which provided for discounted amounts and payments over time. But as a result of operating losses incurred, the Company's liquidity decreased along with borrowing availability, meaning substantial outside funding would be required for the Company to achieve broad consensus with its creditors on out-of-court payment plans. Nevertheless, the Company remained focused on pursuing an out-of-court solution because it believed that creditors would be better served by agreeing to substantial discounts with payments over time, compared to the amounts that would be available to them in any chapter 11 process. While certain vendors and key stakeholders remained patient and supportive, other creditors (principally litigation plaintiffs and staffing agencies) opted for litigation that ultimately rendered the Company's restructuring goals untenable absent an in-court process. Over time, the Company became unable to service its existing settlements, and its limited liquidity and inability to pay outstanding amounts forced a negotiation stalemate with these and other creditors. As a result, the Company, with the assistance of its advisors, began to evaluate potential in-court scenarios to ensure that its existing facility portfolio could continue operating without interruption. Accordingly, though chapter 11 was never the Company's preferred restructuring option, it became the only viable alternative that presented the Company with the ability to obtain necessary funding to deal with all outstanding claims and related issues.

15.     Over the weeks and months prior to the commencement of these Chapter 11 Cases, the Debtors worked collaboratively with Omega, who is the Debtors' largest landlord and secured lender.  Because Omega is landlord on 30 of the Debtors' remaining 43 licensed facilities and holds a secured position on substantially all of the Debtors' assets, coupled with the substantial payment arrearage on Omega's lease, any viable restructuring path requires the consent and cooperation of Omega.

16.     Fortunately, the Debtors are entering chapter 11 with the necessary support of Omega, with agreement to co-fund critical DIP financing and a clear path to an effective reorganization or sale process that ultimately protects the interests of their residents.  At core, the Debtors—through their prior divestitures of unprofitable facilities—now find themselves with the ability to emerge from this reorganization as a more nimble, productive, and financially viable enterprise, better suited to continue to provide quality care to the residents that place their trust and confidence in the Debtors on a daily basis.  Accordingly, after exploring multiple alternatives to an in-court restructuring, the Debtors have come to the difficult conclusion that moving forward effectively requires a reorganization that efficiently addresses legacy liabilities.  In this case, the necessary support of Omega is also strengthened with additional support from the Debtors' Pre-Petition ABL Lender, the Debtors' other landlords, the Debtors' key vendor base, as well as a DIP lender with some commonality in beneficial ownership with the Debtors' existing equity investors that—alongside Omega—is co-sponsoring critical **_junior_** debtor-in-possession financing to ensure a smooth landing in chapter 11.  These efforts to forge consensus in advance of the Petition Date allow the Debtors a path forward for these facilities and provide a pathway toward an efficient and value-maximizing chapter 11 process.

17.    To familiarize the Court with the Debtors and the relief the Debtors seek early in the Chapter 11 Cases, this Declaration is organized in four separate sections.  **Section I** provides an introduction to the Debtors and detailed information regarding the Debtors' corporate history and business operations.  **Section II** provides an overview of the Debtors' organizational structure, prepetition capital structure, and debt obligations.  **Section III** describes the circumstances leading to the commencement of the Chapter 11 Cases, the Debtors' efforts to negotiate with key constituencies, and the objectives of the Chapter 11 Cases.  Finally, **Section IV** sets forth the various First Day Pleadings filed in connection with the Chapter 11 Cases, which the Debtors believe are critical to administering the Chapter 11 Cases and preserving and maximizing the value of the Debtors' estates.

## I.    OVERVIEW OF THE DEBTORS' CORPORATE HISTORY AND BUSINESS OPERATIONS

### A.    Corporate History

#### i.    Formation, Acquisition, and Divestitures

18.    The Company was formed through a series of mergers and acquisitions of skilled nursing facilities and related assets in 2011 and 2012 involving a group of Florida-based skilled nursing facility operators under the original LaVie brand, Consulate Health Care, a separate and independent company operating approximately 78 skilled nursing facilities under the Consulate name.

19.    In the years following its formation, the Company continued to expand and, at the height of its operations, was one of the largest operators of skilled nursing and independent living facilities (each, a "Facility" and, collectively, the "Facilities") in the United States.  Since then, the Company has divested or closed many of its former Facilities, including, most recently, the

divestiture of 63 Facilities in 2023, predominantly in Florida (as discussed in greater detail herein), and eight facilities in the first two quarters of 2024:

| # | Detail | 2023 | | | | 2024 | | Total |
|---|--------|------|----|----|----|------|----|-------|
| | | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | |
| 1. | Beg # of Facilities | 114 | 114 | 108 | 81 | 51 | 47 | 114 |
| 2. | (-) Divested | - | (6) | (27) | (30) | (4) | (4) | (71) |
| **3.** | **Ending # of Facilities** | **114** | **108** | **81** | **51** | **47** | **43** | **43** |

20.    As a result of these divestitures, the Debtors' portfolio currently consists of 43 licensed Facilities[3] comprising nearly 4,300 licensed beds across Pennsylvania, Virginia, North Carolina, Mississippi, and Florida.  These facilities are spread across 4 landlord portfolios as described more fully herein: (i) Omega, a publicly-traded corporation taxed as a REIT, with 30 facilities; (ii) affiliates of Welltower Inc., a publicly-traded corporation taxed as a REIT ("Welltower"), a publicly-traded REIT, with nine facilities; (iii) three facilities in North Carolina denoted as the "Elderberry Lease"), and (iv) one remaining facility in Harts Harbor, Florida.  The Debtors' geographic and lease make-up is depicted in the map below.

---

[3]    Forty of the Debtor entities hold 43 licenses to operate 40 skilled nursing facilities ("SNFs"), and three independent living facilities ("ILFs").



### B.    Business Operations

21.    The Company is a leader among skilled nursing operators in the markets in which it operates and provides short-term rehabilitation, comprehensive post-acute skilled care, long-term care, assisted living, and therapy services in each of their Facilities.  As of the Petition Date, the Facilities have approximately 4,300 licensed beds and approximately 3,700 residents.  In operating and managing their Facilities, the Debtors currently employ approximately 3,600 employees, including nurses, certified nursing assistants, other caregivers, maintenance workers, and corporate and administrative personnel.

22.    In the ordinary course of business, the Debtors receive revenue from several sources, including: (a) Medicare reimbursements; (b) Medicaid reimbursements; and (c) other third-party and private payors.  The Debtors use the revenue generated by the receipt of daily rates and service fees to fund their day-to-day operations, pay rent to their landlords, service their liabilities and other debt obligations, and make capital improvements to the Facilities.

23.    Nearly every aspect of the Debtors' operations of the Facilities, including the services provided to residents as well as billing and collections, is subject to rules and regulations promulgated by (a) the United States Department of Health and Human Services' Centers for Medicare & Medicaid Services, (b) the Department of Aging, Office of Health Assurance and Licensing, Bureau of Long Term Care, Bureau of Regulatory Enforcement, and (c) the Department of Medicaid, Department of Health, and Division of Health Services Regulation in each state in which the Facilities operate.

**C.    Intercompany Arrangements**

24.    As is typical in the skilled nursing industry, the Debtors rely on various intercompany services agreements with certain Debtor or non-Debtor affiliates to provide for the management of their day-to-day operations and consolidate certain key functions that are essential to operating the Facilities.

**i.    CMC III**

25.    Debtor Consulate Management Company III, LLC ("CMC III"), provides the Debtors with centralized back office and managerial support and administrative functions in order to achieve economies of scale by consolidating certain key functions necessary for operating the Facilities.  In essence, CMC III provides the infrastructure for coordination and management across the Debtors, which allows the employees at the facilities to focus on prioritizing resident care.  This infrastructure functions in a tiered fashion, with regional leadership overseeing groups of Facilities, divisional leadership overseeing groups of regions, and corporate leadership overseeing all divisions.  Each successive level of management has greater influence on company-wide matters—including, but not limited to, contracting, financial reporting, facility safety protocols, and training initiatives—and less influence on day-to-day operational matters—such as

resident care plans, staffing arrangements, and the execution of company directives, which are implemented at the Facility level.

26.    This relationship between CMC III and the facilities—which is fairly commonplace in the skilled nursing care industry—is evidenced by individual support services agreements (each, a "Support Services Agreement") between each operating facility and CMC III, which provides for certain managerial functions to be provided by, or arranged through CMC III[4] including, among others, (a) operational support, (b) regulatory guidance, (c) licensing, permits, and certifications assistance, (d) legal and compliance services, (e) insurance, taxes, and other consulting services, (f) billing, collection, and accounts payable services, (g) information technology services, and (h) human resources and employee-related services, in exchange for a monthly fee equal to five percent (5%) of the adjusted gross revenues realized by each respective Facility.

### ii.    Synergy

27.    To allow it to focus on critical managerial needs at the Facilities and better maximize its own efficiencies, CMC III subcontracts certain of the services to non-Debtor affiliate Pourlessoins, LLC d/b/a Synergy Healthcare Services ("Synergy Services"), under an *Administrative Services Agreement*, dated as of December 1, 2021 (as subsequently amended or modified from time to time), and non-Debtor affiliate Zomleben, LLC d/b/a Synergy Healthcare Solutions ("Synergy Solutions" and together with Synergy Services, "Synergy") under an *Asset Management Agreement*, dated December 1, 2021, (as subsequently amended or modified from time to time).  Both Synergy Services and Synergy Solutions are revenue-neutral "pass-through" entities that receive from CMC III a portion of the 5% fee paid by the individual facilities to CMC III to consolidate certain key functions necessary for operating the Facilities.

---

[4]    For the avoidance of doubt, CMC III and its employees do not provide direct care to residents and do not directly bill any healthcare payor for reimbursement of their services.

28.     Synergy Services provides certain administrative and back-office services to CMC III, including, but not limited to, (a) accounting, payroll and financial reporting, (b) tax, cost reports and reimbursement services, (c) cash management services, (d) operational financial analytics, (e) labor and employment matters, (f) clinical protocols and educational programming, (g) regulatory compliance, (h) information technology services, (i) physical plant management and safety services, (j) license, permits, and certifications services, (k) communication services, and (l) legal services.  In addition, Synergy Solutions provides asset management services to the Debtors which includes, among other things, (a) corporate compliance services; (b) facility leasing and occupancy matters, (c) loan and covenant compliance; and (d) operating budget creation and compliance.

29.     Lastly, although the Debtors have divested a significant number of facilities, those entities still require ongoing support and administrative services, including billing and collecting, cost reports, legal services, and other services.  Because CMC III does not receive additional revenue from divested facilities, but those facilities still require certain ancillary services, the Debtors also contract with Synergy for administrative transition services on the divested facilities. Because any disruption in Synergy's services to the Debtors (both on account of operating facilities and divested facilities) are necessary to bill and collect, submit cost reports, maintain IT infrastructure and patient records, and otherwise operate in the ordinary course, the Debtors intend to continue these arrangements on a post-petition basis.

## II.     THE DEBTORS' ORGANIZATIONAL STRUCTURE, PREPETITION CAPITAL STRUCTURE, AND DEBT OBLIGATIONS

### A.     Organizational Structure

30.     The Chapter 11 Cases comprise 282 debtor entities as reflected in the organizational chart attached hereto as **Exhibit A**.  Together, the Debtors' organizational structure is typical of the skilled nursing care industry, although given the Company's recent Facility divestitures, many

of the entities reflected on **Exhibit A** are no longer operational, but still hold significant legacy liabilities.   The activities and business affairs of the Debtors generally fall into the following categories:

      (a)    **HoldCos**: holding companies that directly or indirectly hold a portfolio of certain assets (the "HoldCo Debtors");[5]

      (b)    **Tenants**: entities that are tenants (the "Tenant Debtors") under leases with various landlords (the "Active Tenant Debtors")[6] or were previously party to such leases (the "Inactive Tenant Debtors");[7]

      (c)    **Operating**: entities that oversee the operations of the Debtors' Facilities (the "Operating Debtors")[8] or previously oversaw operations of now-divested facilities (the "Prior Operating Debtors");[9]

      (d)    **Management**: entities that provide administrative and management services to the Operating Debtors (the "Management Debtors")[10] or

---

[5]   The HoldCo Debtors are LVE Holdco, LLC; LVLUPH, LLC; Centennial Healthcare Holding Company LLC; Centennial Newco Holding Company, LLC; CHIC Holding Company, LLC; CHMC Holding Company, LLC; CHPC Holding Company, LLC; NENC HealthCare Holding Company, LLC; Rispetto, LLC; Consulate MZHBS Leaseholdings, LLC; Consulate NHCG Leaseholdings, LLC; MA HealthCare Holding Company, LLC; Hilltopper Holding Corp.

[6]   The Active Tenant Debtors are Alpha Health Care Properties, LLC; Epsilon Health Care Properties, LLC; and QCPMT, LLC; and LVE Master Tenant 4, LLC.

[7]   The Inactive Tenant Debtors are Augusta Health Care Properties, LLC; LVE Master Tenant 1, LLC; LVE Master Tenant 2, LLC; LVE Master Tenant 3, LLC; LVFH Master Tenant, LLC; VNTG HD Master Tenant LLC; Consulate EV Master Tenant, LLC; Centennial Five Star Master Tenant, LLC; Consulate EV Master Tenant, LLC; Centennial Master Tenant, LLC; Centennial Master Subtenant, LLC; Centennial SEHC Master Tenant, LLC; LVFH Master Tenant, LLC; North Carolina Master Tenant, LLC; Augusta Health Care Properties, LLC; Canonsburg Property Investors, LLC; Consulate Facility Leasing, LLC; Capital Health Care Associates, LLC.

[8]   The Operating Debtors are LaVie Care Centers, LLC; LV Operations I, LLC; LV Operations II, LLC; Genoa Healthcare Group, LLC; Florida Health Care Properties, LLC; Centennial HealthCare Properties, LLC; and LV CHC Holdings I, LLC.

[9]   The Prior Operating Debtors are Briley Facility Operations, LLC; Carey Facility Operations, LLC; Consulate EV Operations I, LLC; Centennial Professional Therapy Services Corporation; Centennial Service Corporation – Grant Park; Josera, LLC; Lidenskab, LLC; Transitional Health Partners; VAPAMT, LLC; Southpoint Health Care Associates, LLC; Tarpon Health Care Associates, LLC; Transitional Health Services, Inc.; THS Partners I, Inc.; and THS Partners II, Inc.

[10]   The Management Debtors are Consulate Management Company III, LLC and Level Up Staffing, LLC.

previously provided administrative and management services to now-divested facilities (the "Inactive Management Debtors");[11] and

(e)    **Facility**: the Active Facility Debtors (*i.e.*, entities which are currently subtenants under the subleases with the Tenant Debtors and operate the active Facilities) or entities that were either previously subtenants to the Inactive Tenant Debtors and involved with the operations of now-divested facilities (the "Divested Facility Debtors").[12]  Each of the Active Facility

---

[11]    The Inactive Management Debtors are Centennial Employee Management, LLC; Centennial HealthCare Management Corporation; Centennial Management Investment, LLC; Coastline Administrative Services, LLC; Coastal Management Investment, LLC; Envoy Management Company, LLC; Salus Management Investment, LLC; Sea Crest Management Investment, LLC; Shoreline Healthcare Management, LLC; Genoa Healthcare Consulting, LLC; RAC Insurance Investors, LLC; Tosturi, LLC; Onetete, LLC; Envoy Management Company, LLC; LTC Insurance Associates, LLC; Catalina Health Care Associates, LLC; Centennial Acquisition Corporation; Centennial HealthCare Corporation; Centennial HealthCare Investment Corporation; Centennial HealthCare Management Corporation; Centennial Management Investment, LLC; Consulate EV Acquisition, LLC; Cypress Manor Health Care Associates, LLC; D.C. Medical Investors Limited Partnership; Envoy Health Care, LLC; FLLVMT, LLC; Genoa Healthcare Consulting, LLC; Grant Park Nursing Home Limited Partnership; HFLLVMT, LLC; Pinelake HealthCare, LLC;

[12]    The Divested Facility Debtors are 10040 Hillview Road Operations LLC; 1010 Carpenters Way Operations LLC; 1026 Albee Farm Road Operations LLC; 1061 Virginia Street Operations LLC; 1111 Drury Lane Operations LLC; 1120 West Donegan Avenue Operations LLC; 12170 Cortez Boulevard Operations LLC; 125 Alma Boulevard Operations LLC; 1445 Howell Avenue Operations LLC; 1465 Oakfield Drive Operations LLC; 1507 South Tuttle Avenue Operations LLC; 15204 West Colonial Drive Operations LLC; 1550 Jess Parrish Court Operations LLC; 1615 Miami Road Operations LLC; 1820 Shore Drive Operations LLC; 1851 Elkcam Boulevard Operations LLC; 1937 Jenks Avenue Operations LLC; 195 Mattie M. Kelly Boulevard Operations LLC; 216 Santa Barbara Boulevard Operations LLC; 2333 North Brentwood Circle Operations LLC; 2401 NE 2nd Street Operations LLC; 2826 Cleveland Avenue Operations LLC; 2916 Habana Way Operations LLC; 2939 South Haverhill Road Operations LLC; 3001 Palm Coast Parkway Operations LLC; 3101 Ginger Drive Operations LLC; 3110 Oakbridge Boulevard Operations LLC; 3735 Evans Avenue Operations LLC; 3825 Countryside Boulevard Operations LLC; 3920 Rosewood Way Operations LLC; 4200 Washington Street Operations LLC; 4641 Old Canoe Creek Road Operations LLC; 500 South Hospital Drive Operations; 5065 Wallis Road Operations LLC; 518 West Fletcher Avenue Operations LLC; 5405 Babcock Street Operations LLC; 611 South 13th Street Operations LLC; 626 North Tyndall Parkway Operations LLC; 6305 Cortez Road West Operations LLC; 6414 13th Road South Operations LLC; 650 Reed Canal Road Operations LLC; 6700 NW 10th Place Operations LLC; 702 South Kings Avenue Operations LLC; 710 North Sun Drive Operations LLC; 741 South Beneva Road Operations LLC; 777 Ninth Street North Operations LLC; 7950 Lake Underhill Road Operations LLC; 9035 Bryan Dairy Road Operations LLC; 9311 South Orange Blossom Trail Operations LLC; 9355 San Jose Boulevard Operations LLC; Ambassador Ancillary Services, LLC; Ambassador Rehabilitative Services, LLC; Ashton Court HealthCare, LLC; Assisted Living at Frostburg Village Facility Operations, LLC; Baya Nursing and Rehabilitation, LLC; Bayonet Point Facility Operations, LLC; Bossier HealthCare, LLC; Brandon Facility Operations, LLC; Brentwood Meadow Health Care Associates, LLC; Brownsboro Hills HealthCare, LLC; Catalina Gardens Health Care Associates, LLC; Charlwell HealthCare, LLC; Chenal HealthCare, LLC; Cheswick Facility Operations, LLC; Clearwater HealthCare, LLC; Country Meadow Facility Operations, LLC; Crestline Facility Operations, LLC; Cypress Square Health Care Associates, LLC; Donegan Square Health Care Associates, LLC; Down East HealthCare, LLC; Edinborough Square Health Care Associates, LLC; Envoy of Alexandria, LLC; Envoy of Denton, LLC; Envoy of Forest Hills, LLC; Envoy of Fork Union, LLC; Envoy of Goochland, LLC; Envoy of Lawrenceville, LLC; Envoy of Norfolk, LLC; Envoy of Pikesville, LLC; Envoy of Richmond, LLC; Envoy of Somerset, LLC; Envoy of Staunton, LLC; Envoy of Williamsburg, LLC; Envoy of Winchester, LLC; Envoy of Woodbridge, LLC; Ferriday HealthCare, LLC; Floridian Facility Operations, LLC; Franklinton HealthCare, LLC; Frostburg Facility Operations, LLC; Garden Court HealthCare, LLC; Green Cove Facility Operations, LLC; Greenfield Facility Operations, LLC; Harbor Pointe Facility Operations, LLC;

Debtors holds a license to operate a SNF or ILF, as applicable, and is certified to participate in the Medicare and Medicaid programs.

**B.     CMC II Cases**

31.     On March 1, 2021, six entities previously owned by LaVie (collectively, the "CMC II Debtors") filed voluntary petitions for chapter 11 in the United States Bankruptcy Court for the District of Delaware.  The cases were jointly administered under the caption of *In re CMC II, LLC*, Case No. 21-10461 (Bankr. D. Del.) (the "CMC II Cases").

32.     The CMC II Debtors' primary reason for filing the CMC II Cases was the action (the "Ruckh Litigation") brought by Ms. Angela Ruckh under the *qui tam* provisions of the federal False Claims Act (the "FCA"), relating to allegations occurring at certain of the Company's predecessor nursing homes prior to the formation of the Debtors in 2011.  Following a jury trial in January 2017, a jury awarded verdicts against the CMC II Debtors on a successor-in-interest theory

---

Hollywell HealthCare, LLC; Hurstbourne HealthCare, LLC; Jacksonville Facility Operations, LLC; Jennings HealthCare, LLC; KD HealthCare, LLC; Kenton Facility Operations, LLC; Kenwood View HealthCare, LLC; Kimwell HealthCare, LLC; Kissimmee Facility Operations, LLC; Lake Parker Facility Operations, LLC; Lakeland Facility Operations, LLC; Legends Facility Operations, LLC; Libby HealthCare, LLC; Lincoln Center HealthCare, LLC; Lucasville I Facility Operations, LLC; Lucasville II Facility Operations, LLC; Melbourne Facility Operations, LLC; Miami Facility Operations, LLC; Milton HealthCare, LLC; Montclair HealthCare, LLC; Mount Royal Facility Operations, LLC; New Harmonie HealthCare, LLC; New Port Richey Facility Operations, LLC; North Fort Myers Facility Operations, LLC; North Strabane Facility Operations, LLC; Omro HealthCare, LLC; Orange Park Facility Operations, LLC; Osprey Nursing and Rehabilitation, LLC; Paloma Blanca Health Care Associates, LLC; Parkside Facility Operations, LLC; Parkview Facility Operations, LLC; Parkview HealthCare, LLC; Parkview Manor HealthCare, LLC; Parkwell HealthCare, LLC; Pensacola Facility Operations, LLC; Perry Facility Operations, LLC; Perry Village Facility Operations, LLC; Piketon Facility Operations, LLC; Pine River HealthCare, LLC; Pinewood HealthCare, LLC; Port Charlotte Facility Operations, LLC; Reeders Facility Operations, LLC; Retirement Village of North Strabane Facility Operations, LLC; Ridgewood Facility Operations, LLC; Riverbend HealthCare, LLC; Riverview of Ann Arbor HealthCare, LLC; Royal Terrace HealthCare, LLC; Safety Harbor Facility Operations, LLC; Sarasota Facility Operations, LLC; Sheridan Indiana HealthCare, LLC; St. Petersburg Facility Operations, LLC; Stratford Facility Operations, LLC; Summit Facility Operations, LLC; Susquehanna Village Facility Operations, LLC; Swan Pointe Facility Operations, LLC; Tallahassee Facility Operations, LLC; Vero Beach Facility Operations, LLC; Wayne HealthCare, LLC; Wellston Facility Operations, LLC; West Altamonte Facility Operations, LLC; West Palm Beach Facility Operations, LLC; Westerville Facility Operations, LLC; Whispering Hills Facility Operations, LLC; Whitehall of Ann Arbor HealthCare, LLC; Whitehall of Novi HealthCare, LLC; Winter Haven Facility Operations, LLC; and Woodbine Healthcare, LLC.

for damages in the amount of $115,137,095.  After treble damages and penalties were assessed, the court entered judgments totaling $347,864,285.

33.     Following entry of the judgments, the CMC II Debtors successfully moved for judgment as a matter of law notwithstanding the jury verdicts.  The court granted the CMC II Debtors' motion on January 11, 2018, reducing the Debtors' liability to zero and vacating the judgments. On appeal, however, the Eleventh Circuit Court of Appeals reversed in part and reinstated a portion of the jury verdicts as to the Relator's Medicare claims totaling $85,137,095, plus statutory penalties and treble damages.[13]  Given the magnitude of these judgments, the CMC II Debtors had no choice but to file for chapter 11; however, this was a limited bankruptcy filing of only those few entities impacted by that judgment, and did not impact any of the other operating entities of the Debtors.

34.     As part of the CMC II Cases, in an effort to resolve, among other things, the Ruckh litigation, the CMC II Debtors reached a settlement with, CPSTN Operations, LLC ("CPSTN"), as DIP lender, the United States, the official committee of unsecured creditors, and the Relator, through which the United States received more than $3.3 million, the Relator received more than $1.1 million, and the committee received a $500,000 contribution to its professional fees (the "CMC II Settlement").[14]  The six debtors in the CMC II Cases were dissolved pursuant to the order confirming the plan, and therefore, are not Debtor entities in these Chapter 11 Cases; however, certain of the Debtors guarantee the obligations under the CMC II Settlement.  The Debtors intend to pay the amounts owing to the United States under the CMC II Settlement as and when they become due thereunder.

---

[13]  *See Ruckh v. Salus Rehabilitation*, 963 F.3d 1089, 1098-99 (11th Cir. 2020).  In June 2020, the CMC II Debtor defendants petitioned for a rehearing *en banc* but that petition was denied in August 2020.

[14]  *In re CMC II, LLC*, Case No. 21-10461 (Bankr. D. Del. Oct. 6, 2021) [Docket Nos. 591, 592].

### C.      Corporate Governance

35.      As reflected in the organizational chart attached hereto as **<u>Exhibit A</u>**, LaVie is a wholly-owned subsidiary of Debtor LV Operations II, LLC, which is a wholly-owned subsidiary of LV Operations I, LLC ("<u>LVO I</u>").  Debtor LVO I, LLC is a wholly-owned subsidiary of non-Debtor LaVie HoldCo, LLC, whose ultimate parent is non-Debtor FC Investors XXI, LLC ("<u>FC XXI</u>").

36.      On May 19, 2024, the board of directors of FC XXI adopted by unanimous written consent certain resolutions which provided for, among other things, the appointment of James D. Decker as sole independent manager at LVO I (the top-level Debtor entity) and all of its direct and indirect subsidiaries.  As independent manager, Mr. Decker has sole authority to take any "Restructuring Actions"[15] on behalf of LVO I and all of its direct and indirect subsidiaries.  As discussed above, I was appointed as the Debtors' CRO as of May 29, 2024.  As CRO, I report to Mr. Decker, in his capacity as independent manager of LVO I.

### D.      Pre-Petition Capital Structure[16]

#### i.      Secured Debt Obligations

37.      Because the Debtors do not own the underlying real property and hold only leasehold interests in their Facilities, the primary collateralized assets owned by the Debtors are

---

[15]   "Restructuring Actions" is defined as Mr. Decker's authority to "negotiate, consider, review, evaluate, manage, implement or otherwise handle and address all aspects of strategic and/or financial alternatives available to LVO I and its direct and indirect subsidiaries and their respective businesses, assets, properties, and debt obligations, including, without limitation, any financing, refinancing, restructuring, recapitalization, merger, consolidation, sale, reorganization, liquidation or an amendment or modification to the credit facilities of LVO I or its direct and indirect subsidiaries, and/or similar transactions and related matters, and the power to institute proceedings for Bankruptcy protection, consent to the filing of a Bankruptcy proceeding or permit to exist any Bankruptcy with respect to LVO I and its direct and indirect subsidiaries, and to cause any Governing Document of any direct or indirect subsidiary of LVO I to be amended or modified in any manner that the Independent Manager determines to be necessary or advisable in connection with or relating to the foregoing[.]"  FC XII Resolution, at 2.

[16]   A more detailed description of the Debtors' prepetition debt structure is set forth in the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying*

cash and accounts receivable.  As described and defined more fully below, (a) the Prepetition ABL Secured Parties hold a first priority security interest in the Debtors' cash and accounts receivable; (b) the Omega Term Loan Secured Parties hold a second priority security interest in the Debtors' cash and accounts receivable, subject to the priorities in the Intercreditor Agreement (as defined below); and (c) certain of the Debtors' landlords have security interests in certain limited assets of the Debtors that are either subordinated to the interests of the Prepetition ABL Secured Parties and the Omega Term Loan Secured Parties, or are collateralized by the Debtors' otherwise unencumbered personal property.

38.    A summary of the Debtors' prepetition secured debt is as follows:[17]

| ($ in millions) | Balance |
|---|---|
| **Secured Liabilities** | |
| 1.    Prepetition ABL Credit Facility | $ 33.0 |
| 2.    Omega Term Loan Second Lien Credit Facility | 27.0 |
| 3.    Capital Lease Obligations | 622.2 |
| **4.    Total** | **$ 682.2** |

a.        **Prepetition ABL Credit Facility**

39.    The Debtors have outstanding obligations under that certain Second Amended and Restated Credit and Security Agreement, dated as of March 25, 2022 (as otherwise amended, supplemented, or otherwise modified from time to time, the "Prepetition ABL Credit Agreement," and together with any other documents executed and delivered in connection therewith, the "Prepetition ABL Documents"), by and among, LV CHC Holdings I, LLC ("Holdings"), Holdings' affiliates and subsidiaries party thereto as "Borrowers" (collectively with Holdings, the "ABL Borrowers"), the ABL Borrowers' affiliates and subsidiaries party thereto as guarantors (the

_____

the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief, filed contemporaneously herewith.

[17]    Prepetition ABL Credit Facility balance as of May 31, 2024; remaining balances as of April 30, 2024.

"ABL Guarantors," and together with the ABL Borrowers, the "ABL Loan Parties"), MidCap

Funding IV Trust, as lender (the "Prepetition ABL Lender"), MidCap Funding IV Trust, as Agent

for the lender (in such capacity, the "Prepetition ABL Agent," and together with the Prepetition

ABL Lender, the "Prepetition ABL Secured Parties") pursuant to which the Prepetition ABL

Lender provided a first lien asset-based lending credit facility to the ABL Borrowers

(the "Prepetition ABL Credit Facility," and the loans provided thereunder, the "Prepetition ABL

Loans").

40.    Under the Prepetition ABL Loan Documents, the ABL Borrowers and the other

ABL Loan Parties granted to the Prepetition ABL Agent, for the benefit of itself and the Prepetition

ABL Lender, valid and properly perfected continuing liens on and security interests in

(the "Prepetition ABL Liens") all "Collateral" (as defined in the Prepetition ABL Credit

Agreement), which includes a first priority security interest in, and continuing lien on, the Debtors'

cash and accounts receivable (the "Prepetition ABL Collateral").

41.    As of the Petition Date, the Debtors were indebted and liable to the Prepetition ABL

Agent and Prepetition ABL Lender, in the aggregate amount of approximately $33.0 million on

account of the Prepetition ABL Loans outstanding under the Prepetition ABL Documents, plus all

fees, charges and interests as provided in the Prepetition ABL Documents, (collectively, the

"Prepetition ABL Obligations").

## b.    Omega Term Loan Second Lien Credit Facility

42.    The Debtors have obligations under that certain Credit and Security Agreement,

dated as of March 25, 2022 (as otherwise amended, supplemented, or otherwise modified from

time to time, the "Omega Term Loan Credit Agreement," and together with any other documents

executed and delivered in connection therewith, the "Omega Term Loan Documents"), by and

among the Borrowers (as defined in the Omega Term Loan Credit Agreement), the other parties thereto as guarantors, OHI Mezz Lender, LLC and the other financial institutions party thereto from time to time as lenders (the "Omega Term Loan Lenders"), and OHI Mezz Lender, LLC, as agent for the Omega Term Loan Lenders (in such capacity, the "Omega Term Loan Agent," and together with the Omega Term Loan Lenders, the "Omega Term Loan Secured Parties"; the Omega Term Loan Secured Parties, together with the Prepetition ABL Secured Parties, the "Prepetition Secured Parties").  Under the Omega Term Loan Credit Agreement, the Omega Term Loan Lenders provided term loans and other financial accommodations to the Borrowers (the "Omega Term Loan Facility," and the loans provided thereunder, the "Omega Term Loans").

43.    Under the Omega Term Loan Documents, the Borrowers (as defined in the Omega Term Loan Credit Agreement) and the other Omega Loan Parties granted to the Omega Term Loan Agent, second priority valid and properly perfected continuing liens on and security interests in all "Collateral" encumbered by the Prepetition ABL Credit Facility, and a first priority security interest in, and continuing lien on, the equity of all Borrowers, and an all-assets lien in certain of the Borrowers (the "Prepetition Omega Term Loan Collateral").

44.    As of the Petition Date, the Debtors were indebted and liable to the Omega Term Loan Agent and the Omega Term Loan Lenders, in the aggregate amount of approximately $27.0 million on account of Omega Term Loans outstanding under the Omega Term Loan Documents, plus additional fees and charges thereunder (collectively, the "Omega Term Loan Obligations"; the Omega Term Loan Obligations, together with the Prepetition ABL Obligations, the "Prepetition Secured Obligations").

### c.      Intercreditor and Subordination Agreement

45.     The relative contractual rights of the Prepetition Secured Parties are governed by that certain *Intercreditor Agreement*, dated as of March 25, 2022 (as otherwise amended, supplemented, or otherwise modified from time to time, the "Intercreditor Agreement"), among the Prepetition ABL Agent and the Omega Term Loan Agent, and acknowledged by the ABL Loan Parties and the Omega Loan Parties.

### d.      Capital Lease Obligations

46.     As noted above, the Debtors do not own the underlying real property at the Facilities, but rather lease or sublease their respective facilities from four landlords.  Collectively, the Debtors lease (a) 30 Facilities in North Carolina, Virginia, Mississippi, and Pennsylvania (collectively, the "Omega Facilities") from certain indirect affiliates and subsidiaries of Omega (collectively, the "Omega Landlords"); (b) nine Facilities in Virginia (collectively, the "Welltower Facilities") from Welltower NNN Group, LLC (the "Welltower Landlord"); (c) three Facilities in North Carolina (collectively, the "Elderberry Facilities") from Elderberry of Hayesville, LLC, Elderberry of Charlotte, LLC, and Elderberry of Lincolnton, LLC, respectively (collectively, the "Elderberry Landlords"); and (d) one Facility in Florida ("Harts Harbor") from Jacksonville Nursing Home, Ltd. (the "Harts Harbor Landlord").  Certain of the Debtors' lease obligations are also secured, as described below.

### 1.      Omega Master Lease Obligations

47.     The Debtors have outstanding obligations under (a) that certain *Amended and Restated Consolidated Master Lease* dated as of March 25, 2022 (as subsequently amended,

modified, renewed, or restated from time to time, the "Omega Master Lease"),[18] by and among

Debtor Alpha Health Care Properties, LLC ("Alpha") and certain Omega Landlords; and

(b) certain subleases between Alpha and each Active Facility Debtor that operates an Omega

Facility (collectively, the "Omega Facility Debtors").  Information regarding the Omega Facilities

is summarized below:

| Omega Landlord | Facility Name | Facility Debtor | City & State |
|---|---|---|---|
| OHI Asset (VA) Ashland, LLC | Ashland Nursing and Rehabilitation Center | Ashland Facility Operations, LLC | Ashland, Virginia |
| FC Encore Cary, LLC | Cary Health and Rehabilitation Center | Cary HealthCare, LLC | Cary, North Carolina |
| CSE Woodfin LP | Emerald Ridge Rehabilitation and Care Center | Emerald Ridge HealthCare, LLC | Asheville, North Carolina |
| FC Encore Albemarle, LLC | Forrest Oakes Healthcare Center | Forrest Oakes HealthCare, LLC | Albemarle, North Carolina |
| CSE Lenoir LP | Gateway Rehabilitation and Healthcare | Gateway HealthCare, LLC | Lenoir, North Carolina |
| FC Encore Natchez, LLC | Glenburney Health Care and Rehabilitation Center | Glenburney HealthCare, LLC | Natchez, Mississippi |
| FC Encore Union, LLC | Hilltop Manor Health and Rehabilitation Center | Hilltop Mississippi HealthCare, LLC | Union, Mississippi |
| FC Encore Kannapolis, LLC | Transitional Health Services of Kannapolis | Kannapolis HealthCare, LLC | Kannapolis, North Carolina |
| Mifflin Re Owner LLC | Locust Grove Retirement Village | Locust Grove Facility Operations, LLC | Mifflin, Pennsylvania |
| | The Cottage at Locust Grove | | |
| Pottsville Re Owner LLC | Luther Ridge at Seiders Hill | Luther Ridge Facility Operations, LLC | Pottsville, Pennsylvania |
| Hazleton Re Owner LLC | The Manor at St. Luke Village | Manor at St. Luke Village Facility Operations, LLC | Hazleton, Pennsylvania |
| FC Encore McComb, LLC | Courtyard Rehabilitation and Healthcare | McComb HealthCare, LLC | McComb, Mississippi |
| OHI Asset (VA) Norfolk, LLC | Consulate Health Care of Norfolk | Norfolk Facility Operations, LLC | Norfolk, Virginia |

---

[18]    The Omega Master Lease was subsequently amended on August 31, 2022, December 29, 2022, January 31, 2023, April 1, 2023, April 17, 2023, July 31, 2023, September 29, 2023, November 1, 2023, November 30, 2023, December 15, 2023, February 29, 2024, April 1, 2024, and April 30, 2024.

| Omega Landlord | Facility Name | Facility Debtor | City & State |
|---|---|---|---|
| FC Encore Rutherfordton, LLC | Oak Grove Healthcare Center | Oak Grove HealthCare, LLC | Rutherfordton, North Carolina |
| CSE Arden LP | The Oaks at Sweeten Creek | Oaks at Sweeten Creek HealthCare, LLC | Arden, North Carolina |
| Hazleton Re Owner LLC | The Pavilion at St. Luke Village | Pavilion at St. Luke Village Facility Operations, LLC | Hazleton, Pennsylvania |
| | Amity Village | | |
| Selinsgrove Re Owner LLC | The Manor at Penn Village | Penn Village Facility Operations, LLC | Selinsgrove, Pennsylvania |
| | Pennsfield Apartments | | |
| Everett Re Owner LLC | Pennknoll Village | Pennknoll Village Facility Operations, LLC | Everett, Pennsylvania |
| FC Encore Meridian, LLC | The Oaks Rehabilitation and Healthcare Center | Riley HealthCare, LLC | Meridian, Mississippi |
| FC Encore Starkville, LLC | Starkville Manor Health Care and Rehabilitation Center | Starkville Manor HealthCare, LLC | Starkville, Mississippi |
| FC Encore Andrews, LLC | Valley View Care and Rehabilitation Center | Valley View HealthCare, LLC | Andrews, North Carolina |
| CSE Walnut Cove LP | Walnut Cove Health and Rehabilitation Center | Walnut Cove HealthCare, LLC | Walnut Cove, North Carolina |
| CSE Knightdale LP | Wellington Rehabilitation and Healthcare | Wellington HealthCare, LLC | Knightdale, North Carolina |
| FC Encore Archdale, LLC | Westwood Health and Rehabilitation Center | Westwood HealthCare, LLC | Archdale, North Carolina |
| FC Encore Yadkinville, LLC | Willowbrook Rehabilitation and Care Center | Willowbrook HealthCare, LLC | Yadkinville, North Carolina |
| FC Encore Charlotte, LLC | Wilora Lake Healthcare Center | Wilora Lake HealthCare, LLC | Charlotte, North Carolina |
| FC Encore Winona, LLC | Winona Manor Health Care and Rehabilitation Center | Winona Manor HealthCare, LLC | Winona, Mississippi |

48.     The Omega Master Lease expires on December 31, 2037 with two ten-year renewal options.  Current monthly rent under the Omega Master Lease is approximately $3.0 million.  As of the Petition Date, the Debtors owe approximately $47.1 million in outstanding obligations to the Omega Landlords.

49.    The Debtors' outstanding obligations under the Omega Master Lease are secured by second priority liens in favor of the Omega Landlords (the "Prepetition Omega Landlord Liens") on the Omega Facility Debtors' cash, and accounts receivables, and first priority liens with respect to the Omega Facility Debtors' other assets.

### 2.    Welltower Master Lease Obligations

50.    The Welltower Facilities are subject to (a) that certain *Master Lease Agreement* dated as of August 23, 2018 (as subsequently amended, modified, renewed, or restated from time to time, the "Welltower Master Lease"),[19] by and among Debtor QCPMT, LLC ("QCPMT") and the Welltower Landlord; and (b) certain subleases between QCPMT and each Active Facility Debtor that operates a Welltower Facility (collectively, the "Welltower Facility Debtors"). Information regarding the Welltower Facilities is summarized below:

| Welltower Landlord | Facility Name | Facility Debtor | City & State |
|---|---|---|---|
| Welltower NNN Group, LLC | Augusta Nursing & Rehab Center | Augusta Facility Operations, LLC | Fishersville, Virginia |
| | Grayson Rehabilitation and Health Care Center | Grayson Facility Operations, LLC | Independence, Virginia |
| | Kings Daughters Community Health & Rehab | Kings Daughters Facility Operations, LLC | Staunton, Virginia |
| | Newport News Nursing and Rehabilitation Center | Newport News Facility Operations, LLC | Newport News, Virginia |
| | Pheasant Ridge Nursing & Rehab Center | Pheasant Ridge Facility Operations, LLC | Roanoke, Virginia |
| | Skyline Nursing & Rehabilitation Center | Skyline Facility Operations, LLC | Floyd, Virginia |
| | Consulate Health Care of Williamsburg | Williamsburg Facility Operations, LLC | Williamsburg, Virginia |
| | Consulate Health Care of Windsor | Windsor Facility Operations, LLC | Windsor, Virginia |

---

[19]    The Welltower Master Lease was subsequently amended on November 16, 2018 and July 1, 2022.

| Welltower Landlord | Facility Name | Facility Debtor | City & State |
|---|---|---|---|
| | Consulate Health Care of Woodstock | Woodstock Facility Operations, LLC | Woodstock, Virginia |

51.     The Welltower Master Lease expires on June 30, 2037 with two five-year renewal options.  Current monthly rent under the Welltower Master Lease is approximately $1.125 million.  As of the Petition Date, the Debtors are current on rent obligations owed under the Welltower Master Lease.

52.     The Debtors' obligations under the Welltower Master Lease are secured by liens in favor of the Welltower Landlord (the "Prepetition Welltower Landlord Liens") encumbering the "Collateral" as defined in the Welltower Master Lease, including, among other things, the Debtors' personal property, general intangibles, and other assets related to the Welltower Facilities.  Pursuant to that certain *Landlord Agreement* dated September 30, 2022 by and between the Welltower Landlord and the Prepetition ABL Lender, the Prepetition Welltower Landlord Liens do not consist of any liens on the Welltower Facilities' accounts receivable.  Moreover, pursuant to that certain *Intercreditor Agreement* dated September 30, 2022 by and between the Welltower Landlord, the Omega Term Loan Agent, QCMPT, LaVie, and LVO I, the Welltower Landlord agreed to subordinate the Prepetition Welltower Landlord Liens to the Prepetition Omega Term Loan Liens.

### 3.     Elderberry Lease Obligations

53.     Each of the Elderberry Facilities, respectively, is currently subject to a separate lease and security agreement, including (a) that certain *Amended and Restated Lease and Security Agreement* dated February 4, 2016 by and among Elderberry of Lincolnton, LLC, as landlord, and Debtor Centennial Healthcare Holding Company, LLC ("CHHC"), as tenant (as subsequently

amended, modified, renewed, or restated from time to time, the "Elderberry Cardinal Lease");[20]

(b) that certain *Amended and Restated Lease and Security Agreement* dated February 4, 2016 by

and among Elderberry of Hayesville, LLC, as landlord, and CHHC, as tenant (as subsequently

amended, modified, renewed, or restated from time to time, the "Elderberry Clay County

Lease");[21] and (c) that certain *Amended and Restated Lease and Security Agreement* dated

February 4, 2016 by and among Elderberry of Charlotte, LLC, as landlord, and CHHC, as tenant

(as subsequently amended, modified, renewed, or restated from time to time, the "Elderberry

Hunter Woods Lease"[22] and, together with the Elderberry Cardinal Lease and the Elderberry Clay

County Lease, the "Elderberry Leases").  In turn, CHHC subleases the Elderberry Facilities to

certain Active Facility Debtors that operate an Elderberry Facility (collectively, the "Elderberry

Facilities").  Information regarding the Elderberry Facilities is summarized below:

| Elderberry Landlord | Facility Name | Facility Debtor | City & State |
|---|---|---|---|
| Elderberry of Lincolnton, LLC | Cardinal Healthcare and Rehabilitation Center | Cardinal North Carolina HealthCare, LLC | Lincolnton, North Carolina |
| Elderberry of Hayesville, LLC | Clay County Care Center | Clay County HealthCare, LLC | Clay, North Carolina |
| Elderberry of Charlotte, LLC | Hunter Woods Nursing and Rehabilitation Center | Hunter Woods HealthCare, LLC | Mecklenburg, North Carolina |

54.    The Elderberry Leases expire on December 31, 2027 with two five-year renewal

options.  Current monthly rent under the Elderberry Leases is approximately $128,000 in the

aggregate.  As of the Petition Date, the Debtors are current on rent obligations owed under the

Elderberry Leases.

---

[20]    The Elderberry Cardinal Lease was subsequently amended on January 1, 2018.

[21]    The Elderberry Clay County Lease was subsequently amended on January 1, 2018 and May 15, 2023.

[22]    The Elderberry Hunter Woods Lease was subsequently amended on January 1, 2018.

55.     The Debtors' obligations under the Elderberry Leases are secured by contractual liens in favor of the Elderberry Landlords (the "Prepetition Elderberry Landlord Liens") encumbering the Elderberry Facilities' right, title, and interest in and to the "Tenant Personal Property" and the "Intangible Property" as defined in the Elderberry Leases and any and all products and proceeds thereof.  The Prepetition Elderberry Landlord Liens are subordinate to any security interest granted in connection with the financing or leasing of all or any portion of the "Tenant Personal Property."

### 4.     Harts Harbor

56.     Harts Harbor is currently subject to that certain *Lease Agreement* dated August 10, 2017 by and between Debtor Epsilon Health Care Properties, LLC and the Harts Harbor Landlord (as subsequently amended, modified, renewed, or restated from time to time, the "Harts Harbor Lease").  Information regarding Harts Harbor is summarized below:

| Landlord | Facility Name | Facility Debtor | City & State |
|---|---|---|---|
| Jacksonville Nursing Home, Ltd. | Harts Harbor Health Care Center | 11565 Harts Road Operations, LLC | Jacksonville, Florida |

57.     The Harts Harbor Lease expires on December 31, 2025.  Current monthly rent under the Harts Harbor Lease is approximately $45,000.  As of the Petition Date, the Debtors are current on rent obligations owed under the Harts Harbor Lease.

### ii.     Unsecured Debt Obligations

58.     In addition to the *secured* debt obligations described above, the Debtors are liable for other *unsecured* debt obligations, which include, among other things, (a) trade, vendor, and other accrued expenses; (b) litigation claims (including those subject to settlements, those currently in pending litigation, and other incurred but not yet reported claims); and (c) other liabilities, including unsecured term loan obligations.

| ($ in millions) | LaVie | KeepCo | Divested | Total |
|---|---|---|---|---|
| 1.  Unsecured Loans | $ 87.0 | - | - | $ 87.0 |
| 2.  Trade / Accrued Liabilities | 7.9 | 82.8 | 158.7 | 249.4 |
| 3.  Litigation Claims | - | 8.6 | 146.5 | 155.1 |
| 4.  Other Liabilities | 1.9 | 2.5 | 3.0 | 7.4 |
| **5.  Total Unsecured Liabilities** | **$ 96.8** | **$ 93.8** | **$ 308.2** | **$ 498.8** |

**Notes:**
1.  Liabilities as of April 30, 2024.
2.  Excludes intercompany, accrued payroll, and workers' compensation liabilities.
3.  Trade / Accrued Liabilities include vendor AP, real estate, provider, and other taxes, Medicare / Medicaid settlements, deferred rent obligations, and other.
4.  Litigation Claims include unpaid settlements, known claim reserves, and incurred but not yet reported claim estimates.
5.  Unsecured loans include vendor notes and Omega $8.3M Term Note.
6.  Other Liabilities include civil monetary penalties, CMC II Settlement, and resident deposits.

## III.    EVENTS LEADING UP TO THE CHAPTER 11 CASES

### A.    The Challenges of Skilled Nursing Generally

59.     While this industry has been hit particularly hard in recent years, the challenges associated with the skilled nursing sector are not new, as evidenced by the closure of approximately 550 nursing homes in the United States from June 2015 to June 2019, regardless of the facility's quality ratings.[23] Over the same four-year period, occupancy decreased by almost two percentage points across the United States and more than a dozen states saw occupancy rates decrease by three percentage points or more.[24]

60.     It is no surprise then, that the COVID-19 pandemic severely impacted—and continues to have a lasting effect on—SNF operators.  As a result of COVID-19, skilled nursing resident occupancy levels dropped significantly lower than pre-pandemic levels, while operating expenses increased substantially due to, among other things, dramatically higher labor costs and inflationary increases in costs for additional supplies and personal protective equipment. To make

---

[23]    Flinn, B., *Nursing Home Closures and Trends June 2015-2019*, Leading Age (Feb. 2020), at 2, available at https://leadingage.org/wp-content/uploads/2022/09/Nursing-Home-Closures-and-Trends-2.pdf (noting that more than 40% of nursing homes that closed had a 4- or 5-star rating).

[24]    *Id.*

matters worse, skilled labor shortages resulted in increased staff wages and greater reliance on costly agency nurses to supplement facility workforces and care for residents. These trends continued through the duration of the pandemic, making it incredibly challenging for facility operators to address their operating shortfalls, even with concrete steps to improve resident occupancy levels, maximize staffing efficiencies, and reduce operational costs.

### B.    Continuing Impact of Industry Headwinds Post-COVID

61.    While many industries successfully rebounded post-pandemic, the skilled nursing sector has yet to fully recover and facility operators like the Company continue to grapple with its aftermath. Since 2020, an estimated 579 facilities have closed (approximately 162 per year) and 38% of these closures were 4- or 5-star rated facilities.[25]  188 nursing homes shut down permanently across the United States in fiscal 2023, with about 40% of those closed facilities carrying a 4- or 5- star rating.[26]  Last year, SNF closures continually outpaced openings, as financial pressures from inflation, poor reimbursement rates, and staffing shortages led to industry-wide "right sizing" to control cost and mitigate labor shortages.[27]

62.    The Company similarly faced these same macroeconomic trends beyond its control, including, among others, wage inflation and increased costs of equipment and supplies necessary to operate the Facilities. Taken together, these inflationary trends resulted in significant operating

---

[25]    McWatters, G., et. al, *Supply-Side Constraints and Operational Headwinds in Skilled Nursing Valuation*, VMG Health (Mar. 19, 2024), available at https://vmghealth.com/thought-leadership/blog/supply-side-constraints-and-operational-headwinds-in-skilled-nursing-valuation/#:~:text=Inflation%2C%20a%20shaky%20supply%20chain,staffing%20shortages%20and%20weak%20reimbursements.

[26]    Hellmann, J., *Data shows nursing home closure often linked to care issues*, RollCall (Jan. 18, 2024), available at https://rollcall.com/2024/01/18/data-shows-nursing-home-closure-often-linked-to-care-issues/.

[27]    McWatters, G., et. al, *Supply-Side Constraints and Operational Headwinds in Skilled Nursing Valuation*, VMG Health (Mar. 19, 2024), available at https://vmghealth.com/thought-leadership/blog/supply-side-constraints-and-operational-headwinds-in-skilled-nursing-valuation/#:~:text=Inflation%2C%20a%20shaky%20supply%20chain,staffing%20shortages%20and%20weak%20reimbursements.

cost increases for the Company.  Furthermore, the Company continues to face similar issues that plagued it prior to and during the pandemic, including staffing shortages and insufficient government funding, notwithstanding the fact that four years have passed since the pandemic began.  While certain state and federal government agencies attempted to fund the skilled nursing operators' operational shortfalls coming out of COVID, such funding consistently fell far short of the amount needed to maintain the Company's liquidity, particularly in Florida.  Moreover, industry-wide reimbursements rates have not kept pace with increasing operating costs, a direct byproduct of inflation.

### C.    Staffing Issues: Past and Future

63.    Finally, addressing staffing shortages remains one of the most significant problems for SNF operators like the Company.  Unfortunately, this issue has the potential to get worse, not better.  In 2022, for example, "almost **half** of all nursing homes used agency staff, accounting for 11% of all direct care nursing staff hours."[28]  Despite their best efforts to hire more non-agency workers, staffing agencies are often the only option for an SNF operator to ensure residents can receive continuous care.[29]  Particularly in rural areas, where the Company had—and still has—significant exposure, the ability to attract and retain necessary personnel to staff the facilities has been challenging.  Unfortunately, dependency on staffing agencies comes at a steep price, as

---

[28]    Bowblis, John R., et. al, *Nursing Homes Increasingly Rely on Staffing Agencies for Direct Care Nursing*, HealthAffairs Vol. 43, No. 3 (Feb. 14, 2024).

[29]    AHCA/NCAL, *Report: Nursing Homes Increasingly Forced to Use Costly Staffing Agencies to Fill Vacancies* (Feb. 16, 2024), available at https://www.ahcancal.org/News-and-Communications/Press-Releases/Pages/ICYMI-Report-Nursing-Homes-Increasingly-Forced-To-Use-Costly-Staffing-Agencies-To-Fill-Vacancies.aspx.

certain staffing agencies have been known to charge **50-60% more** per hour than the very same employees would be paid if they were directly employed.[30]

64.    Like others in the industry, the Company was forced to utilize various staffing agencies before, during, and after the COVID-19 pandemic to supplement its workforce and ensure continuity of care to its residents.  In fact, the Company is aware that many of their previous employees switched to work at these staffing agencies, who were then deployed to the very same Company facilities at a substantial mark-up.  In sum, the Company incurred over **$277 million** in agency costs between 2020 and 2022, versus approximately $49 million over the preceding two years combined, significantly hampering the Company's ability to meet its other obligations.  This represents an increase of approximately **380%** in average annual agency costs over 2020-2022 in comparison to the costs incurred in 2018 and 2019.

65.    Although the Debtors have become significantly less reliant on costly staffing agencies, to further complicate staffing-related matters for the Company, on May 10, 2024, CMS recently announced its long-awaited minimum staffing rule (the "CMS Staffing Rule").  The CMS Staffing Rule, which is scheduled to go into effect on June 21, 2024 with staggered timelines for implementation, provides a minimum of 3.48 hours of nursing care per resident day, including 0.55 hours of care from a registered nurse per resident day and at least 2.45 hours of care from a nurse aide per resident day, as well as 24/7 onsite RN services.[31]  This new federal mandate has been met with significant opposition from key members of the SNF industry and viewed as an inadequate solution to the current staffing crisis in this sector: [32]

---

[30]    Bowblis, John R., et. al, *Nursing Homes Increasingly Rely on Staffing Agencies for Direct Care Nursing*, HealthAffairs Vol. 43, No. 3 (Feb. 14, 2024).

[31]    *See* 42 C.F.R. 438, 442, 483 (2024).

[32]    *See, e.g.*, American Hospital Ass'n, *CMS finalizes minimum staffing standards for nursing homes* (Apr. 22, 2024), available at https://www.aha.org/news/headline/2024-04-22-cms-finalizes-minimum-staffing-standards-nursing-

66.     On May 23, 2024, the American Health Care Association (AHCA) filed a lawsuit

in the United States District Court for the Northern District of Texas challenging the CMS Staffing

Rule, alleging that CMS did not adequately consider the ongoing nationwide staffing shortages

and exceeded its statutory authority.[33]  In connection with this lawsuit, AHCA issued the following

statement:[34]

> To be clear, all agree that nursing homes need an adequate supply of well-trained
> staff.  But imposing a nationwide, multi-billion-dollar, unfunded mandate at a time
> when nursing homes are already struggling with staffing shortages and financial
> constraints will only make the situation worse. If CMS's new standards are
> permitted to take effect, hundreds of nursing homes will likely be forced to
> downsize or close their doors entirely. That threatens to displace tens of thousands
> of nursing home residents from their current facilities, while forcing countless other
> seniors and family members to wait longer, search farther, and pay more for the
> care they need.  The Final Rule thus promises to be a nightmare not only for owners
> and operators of nursing homes, but also for the vulnerable residents they serve, in
> direct derogation of CMS's statutory mandate.

67.     The Debtors, like many other skilled nursing operators, continue to be plagued by

staffing challenges, which will likely only be exacerbated by the CMS Staffing Rule.  Indeed, if

this staffing mandate goes into effect later this month, the Company—like many other SNF

operators who frequently combat staffing shortages—may be forced to depend even *more* on

staffing agencies to adequately staff its Facilities or, in the alternative, decrease their already

diminished census levels in order to ensure compliance with CMS' new requirements.

---

homes; Grebbin, S., *'An Extinction Event': Industry Leaders Blast Finalized Nursing Home Staffing Mandate* (Apr. 22, 2024), available at https://skillednursingnews.com/2024/04/an-extinction-event-industry-leaders-blast-finalized-nursing-home-staffing-mandate/; *see also* Am. Hosp. Ass'n and Am. Health Care Ass'n/Nat'l Ctr. for Assisted Living, *Report: Nursing Homes Increasingly Forced to Use Costly Staffing Agencies to Fill Vacancies* (Feb. 16, 2024), available at https://www.ahcancal.org/News-and-Communications/Press-Releases/Pages/ICYMI-Report-Nursing-Homes-Increasingly-Forced-To-Use-Costly-Staffing-Agencies-To-Fill-Vacancies.aspx.

[33]    *See Am. Health Care Ass'n et al. v. Becerra et al.*, Case No. 24-cv-00114 (N.D. Tex. May 23, 2024).

[34]    *AHCA Files Lawsuit Against Federal Staffing Mandate*, Press Release (May 24, 2024), available at https://www.ahcancal.org/News-and-Communications/Press-Releases/Pages/AHCA-Files-Lawsuit-Against-Federal-Staffing-Mandate.aspx.

### D.      Prepetition Strategic Alternatives

68.      In light of the foregoing industry challenges, regulatory developments, and liquidity constraints following COVID-19, the Company and its management team retained McDermott Will & Emery LLP as legal counsel and Ankura Consulting Group LLC as financial advisor in February 2023 to assess various strategic options for the Company.  The Company's primary goal was to (a) right-size its Facility portfolio, given the operational drag and burdensome losses at certain of its Facilities, and (b) manage its payables by negotiating settlement terms with unpaid vendors and litigation claimants out-of-court.  As this process evolved, the Company continued to explore other potential out-of-court options with Omega and others, including a sale of assets and other potential transactions that did not involve a bankruptcy filing.  Above all else, the Company remained focused on maintaining care at its facilities, and continued to negotiate with vendors, litigation claimants, and other interested parties in an attempt to reach a global solution.

### i.      Right-Sizing Facility Portfolio

69.      At the outset of this process, the Company began to evaluate the viability of its go-forward facility portfolio, identifying its least profitable facilities, understanding current and potential future challenges for each location and state and separating its existing facilities into proposed Facilities to divest ("DivestCo") and proposed Facilities to keep ("KeepCo").  The Company analyzed various portfolio configurations in an effort to retain as many viable facilities as possible, but ultimately determined that the current KeepCo Facilities configuration was optimal. The 71 DivestCo Facilities generated approximately $72 million in EBITDA losses for the trailing 12-month period ending June 2023, inclusive of rent deferrals as described below.

70.      Following this analysis, the Company determined that, in conjunction with several of its landlords, including Omega, that exiting operations on the DivestCo Facilities would be

beneficial to the Company given the difficulty operating environment and burdensome operating losses. As noted earlier, prior to the pandemic, the Company was the largest operator of facilities in the state of Florida, and had invested significant resources in the state, so the decision to exit Florida was not taken lightly.

71.     Accordingly, the Company engaged with Omega to transition six (4 FL and 2 PA) of its DivestCo facilities to new operators in Q2 2023, to be followed by another transition of 27 (all FL) DivestCo facilities in Q3 2023. In exchange, Omega agreed to grant the Company a partial rent deferral through April 2023, with contractual rent to be paid in full beginning in May 2023. Such deferrals provided the Company with additional, albeit short-term, liquidity and breathing room.

72.     Unfortunately, the Company's divestiture of these DivestCo entities—though successful—did not create sufficient liquidity to allow for it to continue to pay Omega rent in May 2023. As such, the Company's equity investors issued a capital call for a $25 million equity infusion in May 2023 to buy additional time for the Company to determine whether its preferred out-of-court path was viable. While these funds helped resolve the Company's short-term liquidity needs, the Company realized that such funds were merely a temporary fix to a larger problem and were insufficient to make a significant dent in the Company's overhang of legacy liabilities.

73.     As part of the continued right-sizing, the Company divested 27 additional DivestCo facilities (all FL) in Q3 2023 and another 30 DivestCo facilities (all FL) in Q4 2024, successfully transitioning their operations to new third-party operators. However, the $25 million capital infusion was largely depleted by this time, and the Company still remained unable to pay full contractual rent and service its ongoing liabilities. In Q3 2023, the Company received approximately $20 million (net of fees and deferred payroll tax payments) in employee retention

credits from the IRS, which was used to provide short-term working capital to stem the ongoing losses, including trailing costs associated with exiting operations at the DivestCo Facilities. Like the equity infusion in May 2023, these funds were also quickly consumed to support ongoing operations and DivestCo transitions.

74.     The Company entered 2024 with only 51 facilities. In doing so, the Company was able to finally right-size its portfolio and stem the losses accruing from the unprofitable DivestCo entities. The Company subsequently divested the remaining eight DivestCo Facilities earlier this year—four Louisiana Facilities in Q1 2024 and the remaining four Florida Facilities in Q2 2024—leaving the Company with its current KeepCo portfolio of 43 licensed Facilities. And although the KeepCo portfolio generates positive EBITDA, the weight of the legacy liabilities remained, and the Debtors still were unable during this time to pay full contractual rent to Omega.

### ii.     Claimant Negotiations

75.     While transition efforts were ongoing through 2023, vendor pressure, along with significant litigation, continued. Given that the Company lacked sufficient cash flow to support ongoing payments of existing divested facility liabilities, including litigation and staffing agency settlement agreements, its ability to provide substantial payments in the near-term—without a significant further capital infusion—became impossible. The Company's focus remained on supporting resident care at their KeepCo facilities, which necessarily meant that the ongoing funding of ever-increasing settlement amounts at the DivestCo facilities placed these dual objectives at odds with one another.

76.     As a result of these forces, many of these negotiations ultimately reached an impasse. The Company could no longer pay their existing settlement amounts, which resulted in dozens of motions in state court to enforce judgments in the spring of 2024, mostly with respect

to legacy liabilities of those facilities no longer operated by the Company.  Nevertheless, during this time, the Company's largest trade vendors remained supportive of the Company's KeepCo Facilities and the Company remained hopeful that there was a viable out-of-court solution that would benefit all parties in interest; however, ultimately unfavorable litigation developments quickly demonstrated to the Company that a chapter 11 process was unavoidable.

       **E.**    **Healthcare Negligence Settlement Recovery Corp.**

       77.    On April 22, 2024, a newly-formed entity self-titled the "Healthcare Negligence Settlement Recovery Corp." ("Recovery Corp. Plaintiff") filed a lawsuit (the "Recovery Corp. Complaint") in Florida state court against certain Debtors and non-debtor entities.  According to the Complaint, approximately 97 litigation plaintiffs putatively assigned their claims to the Recovery Corp. Plaintiff, who then brought suit on behalf of those entities against the defendants. The Recovery Corp. Complaint seeks damages from the defendant entities based on, among other theories, intentional and constructive fraudulent transfers, business liability, de facto merger, veil piercing, unfair and deceptive trade practices, civil conspiracy, breach of fiduciary duty, and unjust enrichment.[35]  Without addressing the allegations set forth in the Recovery Corp. Complaint— which the Debtors dispute—its filing made clear that the Company's ability to effectuate an out-of-court transaction was likely not feasible.  Although the Company had already forecasted to the various plaintiffs' attorneys that their clients would likely receive a higher recovery outside of bankruptcy, their approach remained unchanged.  Accordingly, the Company realized that to

---

[35]    The Debtors dispute the allegations set forth in the Recovery Corp. Complaint and reserve all rights, counterclaims, and defenses with respect thereto.  Pursuant to section 362(a) of the Bankruptcy Code, the lawsuit is stayed as to the Debtors.  In addition, several non-Debtor defendants are named in the lawsuit, and because (a) the causes of action alleged are property of the Debtors' estates, and (b) the Debtors have indemnification obligations over these non-Debtors through various agreements, the Debtors intend to file shortly an adversary proceeding seeking that the Bankruptcy Court extend the automatic stay with respect to these non-Debtor co-defendants.

preserve its ability to continue caring for its residents in the KeepCo facilities, an in-court solution was required, necessitating this bankruptcy filing.

### F.      Forging The Company's Restructuring Path Forward

78.      When it became clear that a chapter 11 filing would likely be necessary, the Debtors' focus turned to ensuring that they could obtain necessary DIP financing and use of cash collateral to fund the process.  The role of Omega in any restructuring path cannot be overstated, as without support from Omega, the Debtors would likely be forced to transfer or exit their facilities and liquidate any remaining assets.  As such, the Debtors, Omega, and TIX 33433 LLC[36] (collectively, the "DIP Lenders") began negotiating potential DIP structures to allow a reorganization or sale of assets around the remaining KeepCo Facilities.  Recognizing that failure to achieve these objectives could jeopardize resident care and/or result in the transfer these facilities (which, in itself, would not address any of the existing liabilities), these parties ultimately agreed to provide funds necessary to finance the Chapter 11 Cases and continue to prioritize resident care in the form of a $20 million **junior** debtor-in-possession financing facility.  At the same time, the Debtors retained Stout Capital LLC to explore alternative DIP financing options, and also to begin marketing their assets for sale, either under section 363 of the Bankruptcy Code or through a chapter 11 plan construct.

79.      I have worked closely with the Debtors and their advisors to evaluate the Debtors' cash flow forecasts for the Company.  Based on these forecasts and Ankura's evaluation of the Debtors' cash needs during the Chapter 11 Cases, the Debtors determined that they would require access to use of cash collateral and postpetition DIP funding to provide sufficient liquidity to administer the Debtors' estates, including to fund payroll for the Debtors' employees, pay vendors

---

[36]   The Debtors have been advised that there is some commonality among the beneficial owners of TIX 33433 LLC, and the Debtors' ultimate parent entity, FC XXI.

and make any other payments that are essential or appropriate for the continued operation of the Debtors' businesses. I believe that the Debtors' ability to continue making such payments during the Chapter 11 Cases is essential to the Debtors' continued operation and the preservation of their assets during the pendency of the Chapter 11 Cases.

80.     In the exercise of their sound business judgment, and at the direction of the Debtors' independent manager, Mr. James D. Decker, the Debtors negotiated extensively with the DIP Lenders and the Prepetition ABL Lender for access to critical and necessary financing, including use of cash collateral. I understand that the proposed DIP financing allows the Debtors to avoid the need to engage in a costly and time-consuming priming fight at the outset of the Chapter 11 Cases, and provides the Debtors with a clear source of financing to administer these cases. In sum, I believe entry into the DIP financing will provide comfort to the Debtors' employees, residents, vendors and suppliers that the Debtors will be able to continue to meet their commitments during the Chapter 11 Cases, and will enable the Debtors to pursue their restructuring goals in a manner that maximizes the value of the Debtors' estates, and prioritizes the health and safety of their residents.

81.     The Debtors intend to move through these chapter 11 cases in an efficient manner, recognizing that operating skilled nursing facilities inside of chapter 11 for an extended period comes with its own inherent difficulties. However, with the critical support and funding of the DIP financing (on a junior basis) by the DIP Lenders, as well as the support of other key stakeholders such as the Prepetition ABL Lender and Welltower, the Debtors believe that proceeding in this manner will maximize the value of the Debtors' estates and allow them to continue to prioritize ongoing resident care in their remaining Facilities.

## IV.    FIRST DAY PLEADINGS

82.    To minimize the possible adverse effects on the Company's business, the Debtors have filed various First Day Pleadings to allow the Debtors to meet necessary obligations and fulfill their duties as debtors-in-possession for the purposes of preserving value for all of the Debtors' stakeholders.  I am familiar with the contents of each First Day Pleading and believe that the relief sought therein (a) is necessary to enable the Debtors to operate during the pendency of the Chapter 11 Cases with minimal disruption or loss of productivity and value; and (b) is in the best interests of the Debtors' estates, residents, and creditors.  The facts set forth in each First Day Pleading are incorporated herein by reference.

83.    The First Day Pleadings that are sought to be heard at the first day hearing include:

(a)    *Debtors' Emergency Motion for Entry of Order Directing Joint Administration of the Chapter 11 Cases*;

(b)    *Debtors' Emergency Motion for Entry of Order (I) Authorizing the Debtors to (A) Prepare a List of Creditors in Lieu of Submitting a Formatted Mailing Matrix and (B) File a Consolidated List of the Debtors' 30 Largest Unsecured Creditors, (II) Authorizing the Debtors to Redact Certain Personal Identification Information for Individual Creditors, (III) Approving the Form and Manner of Notifying Creditors of Commencement of These Chapter 11 Cases, and (IV) Authorizing the Debtors to File Their Monthly Operating Reports on a Consolidated Basis;*

(c)    *Debtors' Emergency Application for Entry of Order Authorizing the Retention and Employment of Kurtzman Carson Consultants LLC as Claims, Noticing, Solicitation, and Administrative Agent Effective as of the Petition Date*;

(d)    *Debtors' Emergency Motion for Entry of Order (I) Extending Time to File Schedules of Assets and Liabilities and Statements of Financial Affairs and (II) Granting Related Relief;*

(e)    *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Implementation of Procedures to Maintain and Protect Confidential Health Information as Required by Applicable Privacy Rules and (II) Granting Related Relief;*

41

(f)     *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Maintain and Continue Resident Programs and Honor Prepetition Obligations Related Thereto, and (II) Granting Related Relief*;

(g)     *Debtors' Emergency Motion for Entry of Interim and Final Orders Authorizing Payment of Prepetition Obligations Owed to Resident Care Vendors;*

(h)     *Debtors' Emergency Motion for Entry of Interim and Final Orders Authorizing Debtors to (I) Maintain Existing Insurance Policies and Surety Bonds, and Pay All Obligations Arising Thereunder; (II) Renew, Revise, Extend, Supplement, Change, or Enter into New Insurance Policies; and (III) Granting Related Relief*;

(i)     *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to Pay Certain Prepetition Taxes, Fees, and Related Obligations and (II) Granting Related Relief*;

(j)     *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment; (II) Establishing Procedures for Resolving Objections by Utility Providers; and (III) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Service*;

(k)     *Debtors' Emergency Motion for Entry of Interim and Final Orders Authorizing Debtors to (I) Pay Prepetition Wages, Compensation, and Employee Benefits, (II) Continue Certain Employee Benefit Programs in the Ordinary Course, and (III) Granting Related Relief*;

(l)     *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Existing Cash Management System, (B) Maintain Existing Bank Accounts and Business Forms and Honor Certain Prepetition Obligations Related to the Use Thereof, (C) Maintain Purchasing Card Program and Honor Prepetition Obligations Related Thereto, and (D) Continue to Perform Intercompany Transactions; (II) Extending the Time for the Debtors to Comply with 11 U.S.C. § 345(b) Deposit and Investment Requirements; and (III) Granting Related Relief*; and

(m)     *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief.*

84.     I have reviewed each of the First Day Pleadings (including the exhibits and schedules attached thereto) listed above and, to the best of my knowledge, I believe the facts set forth in the First Day Pleadings are true and correct.  If I were called upon to testify, I could and would, based on the foregoing, testify competently to the facts set forth in each of the First Day Pleadings.

85.     In accordance with the Procedures for Complex Chapter 11 Cases in the United States Bankruptcy Court for the Northern District of Georgia, I believe that joint administration of the Chapter 11 Cases (approximately 282 entities) is warranted and will ease the administrative burden for the Court and parties-in-interest without harming the substantive rights of any such party.  Moreover, such joint administration will reduce fees and costs by avoiding duplicative filings, objections, and hearings, and will allow the U.S. Trustee and all parties-in-interest to monitor these complex Chapter 11 Cases with greater ease and efficiency.  Finally, joint administration in these Chapter 11 Cases will not adversely affect the Debtors' respective constituencies because the motion requests only administrative, rather than substantive, consolidation of the Debtors' estates.

86.     Further, based on my personal knowledge, information supplied to me by other members of the Debtors, their advisors, agents, counsel, and my colleagues that perform services for the Debtors, my review of relevant documents, and my opinion based on my experience, discussions with the Debtors' advisors, and knowledge of the Debtors' operations and financial condition, I believe the relief sought in the First Day Pleadings is necessary for the Debtors to effectuate a smooth transition into chapter 11 and to avoid irreparable harm to their businesses and estates during the pendency of the Chapter 11 Cases, and is in the best interests of the Debtors' residents, creditors, estates, and other stakeholders.

87.    Accordingly, for the reasons stated herein and in each of the First Day Pleadings, I believe that the relief sought in the First Day Pleadings should be granted by the Court in its entirety, together with such other and further relief for the Debtors as this Court deems just and proper, in the most expeditious manner possible.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: Pinehurst, North Carolina        By:
      June 2, 2024        Name: M. Benjamin Jones
                        Title:   Chief Restructuring Officer

**Exhibit A**

**Organizational Chart**



**LaVie Care Centers, LLC
Organizational Structure**

**LaVie Care Centers, LLC**
**Organizational Structure**



Genoa Healthcare Group, LLC

Florida Health Care Properties, LLC

Genoa Healthcare Consulting, LLC

Coastal Management Investment, LLC

Sea Crest Management Investment, LLC

RAC Insurance Investors, LLC

Salus Management Investment, LLC

Alpha Health Care Properties, LLC

Epsilon Health Care Properties, LLC

Augusta Health Care Properties, LLC

Coastal Administrative Services, LLC

**Under Epsilon Health Care Properties, LLC:**
- 9035 Bryan Dairy Road Operations LLC d/b/a Bardmoor Oaks Healthcare and Rehabilitation Center
- 1026 Albee Farm Road Operations LLC d/b/a Bay Breeze Health and Rehabilitation Center
- 6305 Cortez Road West Operations LLC d/b/a Bradenton Health Care
- 1465 Oakfield Drive Operations LLC d/b/a Brandon Health and Rehabilitation Center
- 2333 North Brentwood Circle Operations LLC d/b/a Health Center at Brentwood
- Brentwood Meadow Health Care Associates, LLC d/b/a Brentwood Retirement Community
- Capital Health Care Associates, LLC
- 15204 West Colonial Drive Operations LLC d/b/a Colonial Lakes Health Care
- 216 Santa Barbara Boulevard Operations LLC d/b/a Coral Trace Health Care
- 3825 Countryside Boulevard Operations LLC d/b/a Countryside Rehab and Healthcare Center
- Cypress Manor Health Care Associates, LLC

- Cypress Square Health Care Associates, LLC
- 1851 Elkcam Boulevard Operations LLC d/b/a Deltona Health Care
- 195 Mattie M. Kelly Boulevard Operations LLC d/b/a Destin Healthcare and Rehabilitation Center
- 626 North Tyndall Parkway Operations LLC d/b/a Emerald Shores Health and Rehabilitation
- 1111 Drury Lane Operations LLC d/b/a Englewood Healthcare and Rehabilitation Center
- 3735 Evans Avenue Operations LLC d/b/a Evans Health Care
- 518 West Fletcher Avenue Operations LLC d/b/a Fletcher Health and Rehabilitation Center
- 611 South 13th Street Operations LLC d/b/a Fort Pierce Health Care
- 3001 Palm Coast Parkway Operations LLC d/b/a Grand Oaks Health and Rehabilitation Center
- Green Cove Facility Operations LLC d/b/a Green Cove Springs Rehabilitation and care Center

- 2916 Habana Way Operations LLC d/b/a Habana Health Care Center
- 1615 Miami Road Operations LLC d/b/a Harbor Beach Nursing and Rehabilitation Center
- 11565 Harts Road Operations LLC d/b/a Harts Harbor Health Care Center
- 3101 Ginger Drive Operations LLC d/b/a Heritage Healthcare Center
- 777 Ninth Street North Operations LLC d/b/a Heritage Healthcare and Rehabilitation Center
- 2826 Cleveland Avenue Operations LLC d/b/a Heritage Park Rehabilitation and Healthcare
- 1445 Howell Avenue Operations LLC d/b/a Heron Pointe Health and Rehabilitation Center
- 4200 Washington Street Operations LLC d/b/a Hillcrest Nursing and Rehabilitation Center
- 125 Alma Boulevard Operations LLC d/b/a Island Health and Rehabilitation Center
- 1120 West Donegan Avenue Operations LLC d/b/a Keystone Rehabilitation and Health Center
- Donegan Square Health Care Associates, LLC d/b/a Keystone Villas

- 710 North Sun Drive Operations LLC d/b/a Lake Mary Health and Rehabilitation Center
- 1061 Virginia Street Operations LLC d/b/a Lakeside Oaks Care Center
- 1507 South Tuttle Avenue Operations LLC d/b/a Magnolia Health and Rehabilitation Center
- 6700 NW 10th Place Operations LLC d/b/a North Florida Rehabilitation and Specialty Care
- 650 Reed Canal Road Operations LLC d/b/a Oaktree Healthcare
- Perry Facility Operations LLC d/b/a Perry Oaks Health Care
- 4641 Old Canoe Creek Road Operations LLC d/b/a Plantation Bay Rehabilitation Center
- 5065 Wallis Road Operations LLC d/b/a Renaissance Health and Rehabilitation
- 7950 Lake Underhill Road Operations LLC d/b/a Rio Pinar Health Care
- 3920 Rosewood Way Operations LLC d/b/a Rosewood Health and Rehabilitation Center
- 1010 Carpenters Way Operations LLC d/b/a Wedgewood Healthcare Center

- 9355 San Jose Boulevard Operations LLC d/b/a San Jose Health and Rehabilitation Center
- 1937 Jenks Avenue Operations LLC d/b/a Sea Breeze Health Care
- 2401 NE 2nd Street Operations LLC d/b/a SeaView Nursing and Rehabilitation Center
- 500 South Hospital Drive Operations LLC d/b/a Shoal Creek Rehabilitation Center
- 12170 Cortez Boulevard Operations LLC d/b/a Spring Hill Health and Rehabilitation Center
- Tarpon Health Care Associates, LLC
- 5405 Babcock Street Operations LLC d/b/a The Palms Rehabilitation and Healthcare Center
- Edinborough Square Health Care Associates, LLC d/b/a The Villas at Lakeside Oaks
- 10040 Hillview Road Operations LLC d/b/a University Hills Health and Rehabilitation
- 1550 Jess Parrish Court Operations LLC d/b/a Vista Manor

**Under Augusta Health Care Properties, LLC:**
- 741 South Beneva Road Operations LLC d/b/a Beneva Lakes Healthcare and Rehabilitation Center
- 702 South Kings Avenue Operations LLC d/b/a Central Park Healthcare and Rehabilitation Center
- 2939 South Haverhill Road Operations LLC d/b/a Coral Bay Healthcare and Rehabilitation
- 3110 Oakbridge Boulevard Operations LLC d/b/a Oakbridge Healthcare Center
- Catalina Gardens Health Care Associates, LLC d/b/a The Brookshire
- 9311 South Orange Blossom Trail Operations LLC d/b/a The Parks Healthcare and Rehabilitation Center
- Paloma Blanca Health Care Associates, LLC
- Southpoint Health Care Associates, LLC
- 6414 13th Road South Operations LLC d/b/a Wood Lake Nursing and Rehabilitation Center

**Under Catalina Health Care Associates, LLC:**
- Catalina Health Care Associates, LLC
- 1820 Shore Drive Operations LLC d/b/a The Health and Rehabilitation Centre at Dolphins View

**Legend:**
- - - - Non Operational Entity
——— Operational Legal Entity

The membership interest for each parent entity is 100%.

Non-Debtor



LaVie Care Centers, LLC
Organizational Structure

**LaVie Care Centers, LLC**
**Organizational Structure**



- - - - Non Operational Entity

_____ Operational Legal Entity

The membership interest for each parent entity is 100%.

Non-Debtor



**LaVie Care Centers, LLC
Organizational Structure**

**LaVie Care Centers, LLC**
**Organizational Structure**



Consulate NHCG
Leaseholdings, LLC

Floridian Facility Operations, LLC
d/b/a Floridean Nursing and
Rehabilitation Center

- - - -  Non Operational Entity
———  Operational Legal Entity

The membership interest for each parent
entity is 100%.

Non-Debtor

**LaVie Care Centers, LLC**
**Organizational Structure**

LV CHC Holdings I, LLC

- Ambassador Ancillary Services, LLC
- Ambassador Rehabilitative Services, LLC
- Ashland Facility Operations, LLC d/b/a Ashland Nursing and Rehabilitation Ctr.
- Augusta Facility Operations, LLC d/b/a Augusta Nursing and Rehab Center
- Bayonet Point Facility Operations, LLC
- Brandon Facility Operations, LLC
- Briley Facility Operations, LLC
- Canonsburg Property Investors, LLC
- Carey Facility Operations, LLC
- Cheswick Facility Operations, LLC

- Consulate Facility Leasing, LLC
- Country Meadow Facility Operations, LLC
- Crestline Facility Operations, LLC
- FLLVMT, LLC
- Assisted Living at Frostburg Village Facility Operations, LLC
- Frostburg Facility Operations, LLC
- Grayson Facility Operations, LLC d/b/a Grayson Rehabilitation and Health Care Center
- Greenfield Facility Operations, LLC
- Harbor Pointe Facility Operations, LLC
- HFLLVMT, LLC

- Jacksonville Facility Operations, LLC d/b/a Raydiant Health Care of Jacksonville
- Kenton Facility Operations, LLC
- Kings Daughters Facility Operations, LLC d/b/a Kings Daughters Community Health & Rehab
- Kissimmee Facility Operations, LLC
- Lake Parker Facility Operations, LLC
- Lakeland Facility Operations, LLC
- Legends Facility Operations, LLC
- Locust Grove Facility Operations, LLC d/b/a Locust Grove Retirement Village
- Lucasville I Facility Operations, LLC
- Lucasville II Facility Operations, LLC

- Luther Ridge Facility Operations, LLC d/b/a Luther Ridge at Seiders Hill
- LVFH Master Tenant, LLC
- Melbourne Facility Operations, LLC
- Miami Facility Operations, LLC
- Mount Royal Facility Operations, LLC
- New Port Richey Facility Operations, LLC
- Newport News Facility Operations, LLC d/b/a Newport News Nursing and Rehabilitation Center
- Norfolk Facility Operations, LLC d/b/a Consulate Health Care of Norfolk
- North Fort Myers Facility Operations, LLC d/b/a Raydiant Health Care of North Fort Myers
- North Strabane Facility Operations, LLC

- Retirement Village of North Strabane Facility Operations, LLC
- Orange Park Facility Operations, LLC d/b/a Raydiant Health Care of Orange Park
- Parkside Facility Operations, LLC
- Parkview Facility Operations, LLC
- Penn Village Facility Operations, LLC d/b/a The Manor at Penn Village
- Pennknoll Village Facility Operations, LLC d/b/a Pennknoll Village
- Pensacola Facility Operations, LLC
- Perry Village Facility Operations, LLC
- Pheasant Ridge Facility Operations, LLC d/b/a Pheasant Ridge Nursing and Rehab Ctr

- Piketon Facility Operations, LLC
- Port Charlotte Facility Operations, LLC
- QCPMT, LLC
- Reeders Facility Operations, LLC
- Ridgewood Facility Operations, LLC
- Safety Harbor Facility Operations, LLC d/b/a Independence Living Center of Safety Harbor
- Sarasota Facility Operations, LLC
- Skyline Facility Operations, LLC d/b/a Skyline Nursing and Rehabilitation Ctr.
- Manor at St. Luke Village Facility Operations, LLC d/b/a The Manor at St. Luke Village

- Pavilion at St. Luke Village Facility Operations, LLC d/b/a The Pavilion at St. Luke Village
- St. Petersburg Facility Operations, LLC d/b/a Independence Living Center at St. Petersburg
- Stratford Facility Operations, LLC
- Summit Facility Operations, LLC
- Susquehanna Village Facility Operations, LLC
- Swan Pointe Facility Operations, LLC
- Tallahassee Facility Operations, LLC d/b/a Independence Living Center of Tallahassee
- VAPAMT, LLC
- Vero Beach Facility Operations, LLC

- Wellston Facility Operations, LLC
- West Altamonte Facility Operations, LLC
- West Palm Beach Facility Operations, LLC
- Westerville Facility Operations, LLC
- Whispering Hills Facility Operations, LLC
- Williamsburg Facility Operations, LLC d/b/a Consulate Health Care of Williamsburg
- Windsor Facility Operations, LLC d/b/a Consulate Health Care of Windsor
- Winter Haven Facility Operations, LLC
- Woodstock Facility Operations, LLC d/b/a Consulate Health Care of Woodstock

Non-Debtor

- - - Non Operational Entity
——— Operational Legal Entity

The membership interest for each parent entity is 100%.

**LaVie Care Centers, LLC**
**Organizational Structure**



Non Operational Entity

Operational Legal Entity

The membership interest for each parent entity is 100%.

Non-Debtor