SOLICITATION VERSION

# IN THE UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| LAVIE CARE CENTERS, LLC, *et al.*[1] | ) | Case No. 24-55507 (PMB) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Related to Docket Nos. 273, 316, 438, 461, 480** |

## DEBTORS' SECOND AMENDED COMBINED
## DISCLOSURE STATEMENT AND JOINT CHAPTER 11 PLAN OF REORGANIZATION

**MCDERMOTT WILL & EMERY LLP**
Daniel M. Simon (Georgia Bar No. 690075)
1180 Peachtree St. NE, Suite 3350
Atlanta, Georgia 30309
Telephone:     (404) 260-8535
Facsimile:      (404) 393-5260
Email:            dsimon@mwe.com

**MCDERMOTT WILL & EMERY LLP**
Emily C. Keil (admitted *pro hac vice*)
Jake Jumbeck (admitted *pro hac vice*)
Catherine Lee (admitted *pro hac vice*)
444 West Lake Street, Suite 4000
Chicago, Illinois 60606-0029
Telephone:     (312) 372-2000
Facsimile:      (312) 984-7700
Email:            ekeil@mwe.com
                     jjumbeck@mwe.com
                     clee@mwe.com

*Counsel for Debtors and Debtors-in-Possession*

Dated: October 1, 2024

---

[1]   The last four digits of LaVie Care Centers, LLC's federal tax identification number are 5592.  There are 282 Debtors in these chapter 11 cases, which are being jointly administered for procedural purposes only.  A complete list of the Debtors and the last four digits of their federal tax identification numbers are not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://veritaglobal.net/lavie.  The location of LaVie Care Centers, LLC's corporate headquarters and the Debtors' service address is 1040 Crown Pointe Parkway, Suite 600, Atlanta, GA 30338.

## TABLE OF CONTENTS

**ARTICLE I. INTRODUCTION** ............................................................................................. **4**
    A.    Overview ................................................................................................................ 4
    B.    Summary of Treatment of Claims and Interests ..................................................... 7

**ARTICLE II. DEFINITIONS, RULES OF INTERPRETATION AND CONSTRUCTION, COMPUTATION OF TIME, AND GOVERNING LAW** ........................................ **12**
    A.    Definitions ........................................................................................................... 12
    B.    Rules of Interpretation and Construction ............................................................ 33
    C.    Computation of Time ........................................................................................... 34
    D.    Governing Law .................................................................................................... 34

**ARTICLE III. BACKGROUND AND DISCLOSURES** ..................................................... **34**
    A.    General Background ............................................................................................ 34
    B.    Circumstances Giving Rise to the Chapter 11 Cases ........................................... 39
    C.    Appointment of Independent Manager and Subsequent Investigation ................. 41
    D.    The Chapter 11 Cases .......................................................................................... 45
    E.    Releases, Injunctions, and Exculpation ............................................................... 56
    F.    Substantive Consolidation ................................................................................... 59

**ARTICLE IV. TREATMENT AND ALLOWANCE OF UNCLASSIFIED CLAIMS** ...................... **63**
    A.    Administrative Expense Claims ........................................................................... 63
    B.    Priority Tax Claims .............................................................................................. 64
    C.    Professional Fee Claims ...................................................................................... 64
    D.    DIP Claims .......................................................................................................... 66

**ARTICLE V. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS** ............. **66**
    A.    Substantive Consolidation ................................................................................... 66
    B.    Classification of Claims and Interests ................................................................. 67
    C.    Treatment of Claims and Interests ...................................................................... 68
    D.    Special Provision Governing Unimpaired Claims ............................................... 72
    E.    Nonconsensual Confirmation ............................................................................... 72
    F.    Allowed Claims ................................................................................................... 72

**ARTICLE VI. MEANS FOR IMPLEMENTATION OF THE PLAN** ................................................. **73**
    A.    General Settlement of Claims and Interests ......................................................... 73
    B.    Plan Transaction ................................................................................................. 73
    C.    Sources of Consideration for Plan Distributions ................................................. 78
    D.    Waiver of General Unsecured Claims ................................................................. 78
    E.    Corporate Action ................................................................................................. 78
    F.    Cancellation of Notes, Interests, Certificates, and Instruments ........................... 79
    G.    Preservation of Causes of Action ........................................................................ 79
    H.    Assignment of D&O Claims/Causes of Action .................................................... 80
    I.    Continuing Effectiveness of Final Orders ........................................................... 80
    J.    UCC Dissolution ................................................................................................. 81
    K.    Exemption from Certain Transfer Taxes .............................................................. 81
    L.    GUC Trust ........................................................................................................... 81
    M.    Resident Medical Records ................................................................................... 82
    N.    Dissolution of the Debtors ................................................................................... 83

    O.       Transfer of Provider Agreements .................................................................. 83

**ARTICLE VII. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES .. 83**
    A.       Rejection of Executory Contracts and Unexpired Leases ................................. 83
    B.       Cure of Defaults; Assignment of Executory Contracts and Unexpired Leases ............... 84
    C.       Rejection Bar Date ......................................................................................... 85
    D.       Extension of Time to Assume or Reject .......................................................... 85
    E.       Modifications, Amendments, Supplements, Restatements, or Other Agreements ......... 86
    F.       Indemnification and Reimbursement .............................................................. 86
    G.       Insurance Policies .......................................................................................... 86
    H.       Nonoccurrence of Effective Date ................................................................... 86
    I.       Contracts and Leases Entered Into After the Petition Date ............................. 87

**ARTICLE VIII. PROVISIONS GOVERNING DISTRIBUTIONS ................................................. 87**
    A.       Distributions on Allowed Claims .................................................................... 87
    B.       Distribution Agent .......................................................................................... 87
    C.       Delivery of Distributions and Undeliverable or Unclaimed Distributions ........ 87
    D.       Timing of Distributions .................................................................................. 88
    E.       Means of Cash Payment ................................................................................. 88
    F.       Interest on Claims .......................................................................................... 89
    G.       No Creditor to Receive More than Payment in Full ....................................... 89
    H.       Withholding and Reporting Requirements ..................................................... 89
    I.       Setoffs ............................................................................................................ 89
    J.       Procedure for Treating and Resolving Disputed, Contingent, and/or Unliquidated Claims ............................................................................................................ 90

**ARTICLE IX. CONDITIONS PRECEDENT TO CONFIRMATION AND  CONSUMMATION OF THE PLAN ........................................................................................ 91**
    A.       Conditions Precedent to Confirmation ........................................................... 91
    B.       Conditions Precedent to Effective Date .......................................................... 92
    C.       Establishing the Effective Date ...................................................................... 93
    D.       Waiver of Conditions ..................................................................................... 93
    E.       Consequences of Non-Occurrence of Effective Date ..................................... 94

**ARTICLE X. EFFECTS OF CONFIRMATION ...................................................................... 94**
    A.       Compromise and Settlement of Claims and Controversies ............................ 94
    B.       Binding Effect ................................................................................................. 94
    C.       Discharge of the Debtors ................................................................................ 94
    D.       Releases .......................................................................................................... 95
    E.       Exculpation and Limitation of Liability ......................................................... 97
    F.       Injunction ....................................................................................................... 98

**ARTICLE XI. RETENTION OF JURISDICTION ................................................................... 99**
    A.       Retention of Jurisdiction ................................................................................ 99
    B.       Alternative Jurisdiction ................................................................................ 101
    C.       Failure of Court to Exercise Jurisdiction ..................................................... 101

**ARTICLE XII. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN ........ 101**
    A.       Modifications and Amendments ................................................................... 101
    B.       Effect of Confirmation on Modifications ..................................................... 102

    C.      Revocation or Withdrawal of the Plan.................................................................102

**ARTICLE XIII. CONFIRMATION AND VOTING PROCEDURES** ............................................**102**
    A.      Confirmation Procedure ..............................................................................102
    B.      UCC's Support of Confirmation .................................................................103
    C.      Statutory Requirements for Confirmation ..................................................103
    D.      Acceptance or Rejection of the Plan ...........................................................107
    E.      Voting Procedures.......................................................................................108

**ARTICLE XIV. CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING** ......**109**
    A.      General Bankruptcy Law and Plan Considerations ....................................110
    B.      Risks Related to the Business and Industry ................................................111
    C.      Risks Associated with Forward Looking Statements ..................................113
    D.      Alternatives to Confirmation and Consummation of the Plan .....................113

**ARTICLE XV. CERTAIN FEDERAL INCOME TAX CONSEQUENCES** ...................................**114**
    A.      Overview......................................................................................................114
    B.      Certain U.S. Federal Income Tax Consequences to the Debtors, the Reorganized Debtors, and Holders of Existing Equity Interests ..................................................................115
    C.      Tax Consequences to U.S. Holders of Certain Allowed Claims..................116
    D.      Tax Consequences to Non-U.S. Holders of Certain Allowed Claims ..........117
    E.      Information Reporting and Back-Up Withholding .......................................119
    F.      Tax Treatment of the GUC Trust ................................................................119

**ARTICLE XVI. MISCELLANEOUS PROVISIONS** .................................................................**122**
    A.      Terminations of Injunctions or Stays..........................................................122
    B.      Severability of Provisions...........................................................................122
    C.      Payment of Statutory Fees ..........................................................................122
    D.      Service of Documents..................................................................................122
    E.      2002 Service List .......................................................................................124
    F.      Filing of Additional Documents .................................................................124
    G.      Plan Supplement(s) .....................................................................................124
    H.      Votes Solicited in Good Faith.....................................................................125
    I.      Closing of Chapter 11 Cases.......................................................................125
    J.      No Admissions.............................................................................................125
    K.      Inconsistency...............................................................................................125
    L.      Request for Expedited Determination of Taxes...........................................125
    M.      Reservation of Rights..................................................................................125

**EXHIBITS**

**Exhibit A**    Liquidation Analysis
**Exhibit B**    Financial Projections
**Exhibit C**    Debtors' Corporate Structure
**Exhibit D**    List of DivestCo Debtors
**Exhibit E**    List of OpCo Facility Debtors
**Exhibit F**    List of OpCo Non-Facility Debtors
**Exhibit G**    List of Facilities

**THIRD-PARTY RELEASE DISCLOSURE**

<u>CAUTION</u> - IF YOU DO NOTHING, YOUR RIGHTS MAY BE COMPROMISED.  PLEASE PAY CAREFUL ATTENTION TO THE BELOW DISCLOSURE, AND IF YOU DO NOT UNDERSTAND OR HAVE FURTHER QUESTIONS, PLEASE CONSULT WITH YOUR ATTORNEY.

THIS SECOND AMENDED COMBINED DISCLOSURE STATEMENT AND JOINT PLAN CONTAINS A DEBTOR RELEASE AND A THIRD-PARTY RELEASE.  ADDITIONAL INFORMATION REGARDING THE DIFFERENCE BETWEEN A DEBTOR RELEASE AND A THIRD-PARTY RELEASE IS FOUND IN ARTICLE III.E OF THE PLAN.

A THIRD-PARTY RELEASE LIMITS OR RELEASES THE LIABILITY OF CERTAIN RELEASED PARTIES THAT ARE NON-DEBTOR PARTIES AND MAY PREVENT RELEASING PARTIES FROM SUING THE RELEASED PARTIES FOR THEIR ACTIONS.  A THIRD-PARTY RELEASE MAY ONLY BE GRANTED CONSENSUALLY WITH EACH OF THE AFFECTED CREDITORS, BUT CONSENT MAY BE SHOWN BY A CREDITORS' FAILURE TO ACT.

<u>YOU HAVE THE CHOICE AS TO WHETHER YOU WILL BE BOUND BY THE THIRD-PARTY RELEASE, AND THE CHOICE IS YOURS ALONE.</u>  YOU WILL BE A RELEASING PARTY AND YOUR RIGHTS MAY BE COMPROMISED UNLESS YOU TAKE CERTAIN ACTIONS. IF YOU HOLD A CLAIM AGAINST THE DEBTORS AND WOULD LIKE TO OPT OUT OF THE THIRD-PARTY RELEASE, YOU MUST ELECT TO OPT OUT OF THE THIRD-PARTY RELEASE BY CHECKING THE OPT-OUT BOX ON THE BALLOT OR THE OPT-OUT NOTICE FORM THAT YOU RECEIVE. YOU MUST ALSO VOTE TO REJECT THE PLAN OR ABSTAIN FROM VOTING.  IF YOU VOTE TO ACCEPT THE PLAN YOU WILL BE A RELEASING PARTY. IF YOU DO NOT RECEIVE EITHER A BALLOT OR OPT OUT NOTICE FORM YOU MUST OBJECT TO THE THIRD-PARTY RELEASE OR YOU WILL BE A RELEASING PARTY.  OPTING OUT OF THE THIRD-PARTY RELEASE WILL NOT OTHERWISE MODIFY YOUR TREATMENT OR RECOVERY UNDER THE PLAN.

THE RELEASED PARTIES ARE IDENTIFIED IN THE DEFINITION OF RELEASED PARTIES IN SECTION 1.243 OF THE PLAN.  THE RELEASED PARTIES INCLUDE, AMONG OTHERS, THE DEBTORS, REORGANIZED DEBTORS, AND THEIR DIRECTORS AND OFFICERS. THE RELEASED PARTIES ALSO INCLUDE OMEGA, ABL SECURED PARTIES, AND THE DIP LENDERS.

<u>PLEASE READ</u> THE FULL TEXT OF THE CONSENSUAL THIRD-PARTY RELEASES AND RELATED DISCLOSURES IN ARTICLES III.E AND X.D.2 OF THE PLAN FOR FURTHER DETAIL REGARDING THE THIRD-PARTY RELEASE.  ANY HOLDER OF CLAIMS THAT (i) VOTES IN FAVOR OF THE PLAN, (ii) VOTES TO REJECT THE PLAN OR ABSTAINS FROM VOTING BUT THAT FAILS TO ELECT TO OPT OUT OF THE THIRD-PARTY RELEASE ON HIS OR HER BALLOT OR OPT-OUT NOTICE FORM, OR (iii) THAT DOES NOT OBJECT TO THE THIRD-PARTY RELEASE IF SUCH HOLDER DID NOT RECEIVE A BALLOT OR OPT OUT NOTICE FORM WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY RELEASED AND DISCHARGED THE THIRD-PARTY RELEASED PARTIES PURSUANT TO THE THIRD-PARTY RELEASE SET FORTH IN ARTICLE X.D.2 OF THE PLAN.

**IMPORTANT INFORMATION AND RECOMMENDATION**

THIS SECOND AMENDED COMBINED DISCLOSURE STATEMENT AND JOINT PLAN PROVIDES IMPORTANT INFORMATION REGARDING THE DEBTORS, THEIR CHAPTER 11 CASES, AND THE PLAN FOR WHICH THE DEBTORS WILL SEEK CONFIRMATION BY THE BANKRUPTCY COURT. THE DEBTORS ARE PROVIDING THE INFORMATION CONTAINED HEREIN TO ALL HOLDERS OF CLAIMS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE PLAN.

THE DEBTORS' INDEPENDENT MANAGER, MR. JAMES D. DECKER, HAS THE SOLE AUTHORITY ON BEHALF OF EACH OF THE DEBTORS RELATING TO APPROVAL OF THE TERMS OF A PLAN OF REORGANIZATION OR LIQUIDATION, AND HAS APPROVED THE TERMS OF THE PLAN AS FURTHER CONTAINED HEREIN, SUBJECT TO BANKRUPTCY COURT APPROVAL. THE DEBTORS, THROUGH MR. DECKER AS INDEPENDENT MANAGER, BELIEVES THAT THE COMPROMISES CONTAINED IN THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF EACH OF THE DEBTORS' ESTATES, AND PROVIDE THE BEST OVERALL RECOVERY TO THE DEBTORS' CLAIMANTS. AT THIS TIME, EACH OF THE DEBTORS BELIEVE THAT THE PLAN AND RELATED TRANSACTIONS CONTAINED HEREIN REPRESENT THE BEST AVAILABLE ALTERNATIVE FOR ACCOMPLISHING THE DEBTORS' OVERALL RESTRUCTURING OBJECTIVES, AND MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES FOR THE BENEFIT OF THEIR CREDITORS. THE DEBTORS BELIEVE THAT ANY ALTERNATIVE RESTRUCTURING SCENARIO WILL RESULT IN NO RECOVERY TO HOLDERS OF GENERAL UNSECURED CLAIMS.

THE DEBTORS THEREFORE STRONGLY RECOMMEND THAT ALL HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED VOTE TO <u>ACCEPT</u> THE PLAN BY RETURNING THEIR BALLOTS SO AS TO BE ACTUALLY RECEIVED BY THE CLAIMS AND NOTICING AGENT NO LATER THAN <u>NOVEMBER 4, 2024 AT 4:00 P.M. (PREVAILING EASTERN TIME)</u> PURSUANT TO THE INSTRUCTIONS CONTAINED HEREIN AND ON THE BALLOTS.

THE DEBTORS URGE EACH HOLDER OF A CLAIM TO CONSULT WITH ITS OWN ATTORNEYS OR ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS SECOND AMENDED COMBINED DISCLOSURE STATEMENT AND JOINT PLAN.

THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS ALSO BELIEVES THAT THE PLAN AND RELATED TRANSACTIONS CONTAINED HEREIN REPRESENT THE BEST OPPORTUNITY FOR HOLDERS OF GENERAL UNSECURED CLAIMS TO MAXIMIZE THEIR RECOVERIES. THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS THEREFORE RECOMMENDS THAT ALL HOLDERS OF GENERAL UNSECURED CLAIMS VOTE TO <u>ACCEPT</u> THE PLAN BY RETURNING THEIR BALLOTS SO AS TO BE ACTUALLY RECEIVED BY THE CLAIMS AND NOTICING AGENT NO LATER THAN <u>NOVEMBER 4, 2024 AT 4:00 P.M. (PREVAILING EASTERN TIME).</u>

## DISCLAIMERS

THIS SECOND AMENDED COMBINED DISCLOSURE STATEMENT AND PLAN CONTAINS CERTAIN SUMMARIES OF CERTAIN STATUTORY PROVISIONS AND CERTAIN DOCUMENTS RELATED TO THE SECOND AMENDED COMBINED DISCLOSURE STATEMENT AND PLAN THAT MAY BE ATTACHED AND ARE INCORPORATED BY REFERENCE AND DESCRIBES CERTAIN EVENTS IN THE CHAPTER 11 CASES.  ALTHOUGH THE DEBTORS BELIEVE THAT THIS INFORMATION IS FAIR AND ACCURATE, THIS INFORMATION IS QUALIFIED IN ITS ENTIRETY TO THE EXTENT THAT IT DOES NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS.    THE TERMS OF THE DOCUMENTS RELATED TO THE SECOND AMENDED COMBINED DISCLOSURE STATEMENT AND PLAN AND APPLICABLE STATUTES GOVERN IN THE EVENT OF ANY DISCREPANCY WITH THE SECOND AMENDED COMBINED DISCLOSURE STATEMENT AND PLAN.  CREDITORS AND OTHER INTERESTED PARTIES SHOULD READ THE SECOND AMENDED COMBINED DISCLOSURE STATEMENT AND PLAN, THE DOCUMENTS RELATED THERETO, AND THE APPLICABLE STATUTES THEMSELVES FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.

THE FACTUAL STATEMENTS AND REPRESENTATIONS CONTAINED HEREIN OR ATTACHED HERETO ARE MADE BY THE DEBTORS ONLY AS OF THE DATE OF THIS SECOND AMENDED COMBINED DISCLOSURE STATEMENT AND PLAN, UNLESS ANOTHER TIME IS SPECIFIED.  THIS SECOND AMENDED COMBINED DISCLOSURE STATEMENT AND PLAN WAS COMPILED FROM INFORMATION OBTAINED FROM NUMEROUS SOURCES BELIEVED TO BE ACCURATE TO THE BEST OF THE DEBTORS' KNOWLEDGE, INFORMATION, AND BELIEF.  THERE CAN BE NO ASSURANCES THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THIS DATE.  THE DEBTORS DISCLAIM ANY OBLIGATION TO UPDATE ANY SUCH STATEMENTS AFTER THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN.  THE DELIVERY OF THE SECOND AMENDED COMBINED DISCLOSURE STATEMENT AND PLAN SHALL NOT BE DEEMED OR CONSTRUED TO CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME AFTER THE DATE HEREOF.  FOR THE AVOIDANCE OF DOUBT, EXCEPT AS OTHERWISE EXPRESSLY STATED, THE FACTUAL STATEMENTS AND REPRESENTATIONS CONTAINED HEREIN OR ATTACHED HERETO ARE MADE SOLELY BY THE DEBTORS AND NOT BY THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS.

NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS.    EXCEPT WHERE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED IN THIS SECOND AMENDED COMBINED DISCLOSURE STATEMENT AND PLAN AND IN THE RELATED EXHIBITS HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND HAS NOT BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES IN THE UNITED STATES OR ANY OTHER JURISDICTION.

THIS SECOND AMENDED COMBINED DISCLOSURE STATEMENT AND PLAN HAS BEEN PREPARED IN ACCORDANCE WITH BANKRUPTCY CODE SECTIONS 1123 AND 1125 AND BANKRUPTCY RULE 3016 AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAWS.  THIS SECOND AMENDED COMBINED DISCLOSURE STATEMENT AND PLAN HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), ANY STATE SECURITIES COMMISSION OR ANY SECURITIES EXCHANGE OR

3

ASSOCIATION, NOR HAS THE SEC, ANY STATE SECURITIES COMMISSION, OR ANY SECURITIES EXCHANGE OR ASSOCIATION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.  NO OTHER GOVERNMENTAL OR OTHER REGULATORY AUTHORITY HAS PASSED ON, CONFIRMED, OR DETERMINED THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN.

NOTHING STATED HEREIN SHALL BE DEEMED OR CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE SECOND AMENDED COMBINED DISCLOSURE STATEMENT AND PLAN ON THE DEBTORS OR HOLDERS OF CLAIMS OR INTERESTS.  CERTAIN STATEMENTS CONTAINED HEREIN, BY NATURE, ARE FORWARD-LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS AND INVOLVE MATERIAL RISKS AND UNCERTAINTIES THAT ARE SUBJECT TO CHANGE BASED ON A NUMBER OF FACTORS. ACCORDINGLY, THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL REFLECT ACTUAL OUTCOMES AND THE DEBTORS' FUTURE PERFORMANCE AND FINANCIAL RESULTS MAY DIFFER MATERIALLY FROM THOSE EXPRESSED OR IMPLIED IN ANY SUCH FORWARD-LOOKING STATEMENTS.

CLASSIFICATION AND TREATMENT OF CREDITOR CLAIMS AGAINST THE DEBTORS AND ANY PROJECTED RECOVERIES TO CREDITORS SET FORTH IN THE SECOND AMENDED COMBINED DISCLOSURE STATEMENT AND PLAN ARE SUBJECT TO MATERIAL CHANGE AND ARE BASED UPON THE ANALYSES PERFORMED BY THE DEBTORS AND THEIR ADVISORS.  ALTHOUGH THE DEBTORS AND THEIR ADVISORS HAVE MADE EVERY EFFORT TO VERIFY THE ACCURACY OF THE INFORMATION PRESENTED HEREIN, THE DEBTORS AND THEIR ADVISORS CANNOT MAKE ANY REPRESENTATIONS OR WARRANTIES REGARDING THE ACCURACY OF THIS INFORMATION.

HOLDERS OF CLAIMS AND INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS SECOND AMENDED COMBINED DISCLOSURE STATEMENT AND PLAN AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE.  THEREFORE, EACH SUCH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL, AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THE SECOND AMENDED COMBINED DISCLOSURE STATEMENT AND PLAN AND THE TRANSACTIONS CONTEMPLATED HEREBY.

**ARTICLE I.**
**INTRODUCTION**

**A.     Overview**[2]

The Debtors hereby propose the Second Amended Combined Disclosure Statement and Joint Chapter 11 Plan of Reorganization (the disclosure statement portion hereof, the "<u>Disclosure Statement</u>" and the chapter 11 plan portion hereof, the "<u>Plan</u>", as may be subsequently modified, amended, or supplemented

---

[2]   Capitalized terms used but not defined in this introduction shall have the same meanings set forth in Article II.A hereof.

from time to time),[3] pursuant to Bankruptcy Code sections 1125 and 1129.  The Debtors are the proponents of the Plan within the meaning of Bankruptcy Code section 1129.

The Debtors submit the Disclosure Statement pursuant to Bankruptcy Code section 1125 to Holders of Claims against and Interests in the Debtors in connection with (1) solicitation of acceptances of the Plan; and (2) the hearing to consider approval of the Disclosure Statement.  The Disclosure Statement contains, among other things, a discussion of the Debtors' history, business operations, events leading to the filing of the Chapter 11 Cases, significant events that has occurred during the Chapter 11 Cases, certain risk factors, and a discussion of certain other related matters.  The Disclosure Statement also discusses the Confirmation process and the procedures for voting, which procedures must be followed by the Holders of Claims entitled to vote under the Plan for their votes to be counted.

The Debtors are the proponents of the Plan within the meaning of Bankruptcy Code section 1129.  As discussed more fully in Article III.F and V.A of the Plan, the Debtors seek substantive consolidation of the OpCo Debtors, on the one hand, and the DivestCo Debtors, on the other hand, for all purposes, including voting, distribution, and confirmation; however, in the event the Court determines substantive consolidation is not appropriate, the Debtors' Estates will be administratively consolidated for purposes of Distributions under the Plan, but the Plan will be deemed to be a chapter 11 Plan for each Debtor.  Except as otherwise provided by Order of the Bankruptcy Court, Distributions will occur on the Effective Date or as soon thereafter as is practicable.

In exchange for the transactions contemplated hereunder, including the releases, exculpations, injunctions and other consideration set forth in Article X of the Plan and subject to the occurrence of the Effective Date, the Plan contemplates, among other things, (a) the assumption by the Debtors and assignment to the Reorganized Debtors of the Elderberry Leases, the Harts Harbor Lease, the Omega Lease, and the Welltower Lease, each pursuant to the underlying leases and agreements, including the Omega Master Lease Documents and Omega Term Loan Documents, each as modified and agreed upon by the Omega Secured Parties; (b) release and satisfaction of the DIP Facility and assumption (as modified) of the Omega Term Loan; (c) payment, or assumption of, all Allowed Administrative Expense Claims and Priority Claims; (d) establishment of a GUC Trust; (e) waiver of proceeds on account of any recoveries Omega Note Agreement Lenders receive (or are entitled to receive) on account of any Omega General Unsecured Claim, or OHI Mezz Lender, LLC receives (or is entitled to receive under the Subordination Agreement; (f) waiver of proceeds on account of any recoveries Powerback Rehabilitation is entitled to receive in exchange for treatment of its Claim as a Go-Forward Trade Claim in Class 5; (g) assumption of all of the Debtors' collective bargaining agreements; (h) assignment of D&O Claims to the GUC Trust; and (h) funding of the Plan Sponsor Contribution and entry into the Backstop Note and Backstop Note Guaranty for the benefit of Holders of Class 6A OpCo General Unsecured Claims, Class 6B DivestCo General Unsecured Claims, and Class 6C Joint & Several OpCo General Unsecured Claims.

The Debtors believe that the Plan and the transactions contemplated hereunder provide Holders of Claims and Holders of Interests with the best available recovery and are essential to ensure continuity of quality patient care at the Facilities.  Specifically, the Plan is the result of extensive arm's-length negotiation efforts among various key stakeholders in the Chapter 11 Cases.  The Plan is the culmination of these negotiations, and follows a comprehensive marketing and sale process of the Debtors' assets, and an independent investigation by the Debtors, through their independent manager, Mr. James D. Decker, with the advice of independent counsel, Chapman and Cutler LLP.  The Plan seeks to implement a reorganization transaction and resolves various potential Claims and Causes of Action held by the Debtors against certain

---

[3]    Copies of all filings in the Chapter 11 Cases (as defined herein) can be obtained and viewed free of charge at the following web address:  https://veritaglobal.net/lavie.

non-Debtor affiliates, equity investors, Omega, and other parties. These potential Causes of Action are highly-fact intensive, the results of which are uncertain and which—if left unresolved—would cause extensive delay, cost and uncertainty in these Chapter 11 Cases.

The Debtors believe that the compromises provided under the Plan are fair, reasonable, and in the best interests of the Debtors' estates. Equally important is that the negotiations regarding the amount of Plan consideration funded by the Released Parties was heavily fought, arm's-length, and resulted in Plan consideration in excess of $70 million, which includes among other things, forgiveness of the DIP Facility, assumption of the Omega Term Loan Claims (as modified), payment (or assumption) by the Reorganized Debtors of all Allowed Administrative Expense Claims and Priority Claims, and additional funds and non-cash consideration flowing to Holders of General Unsecured Claims, including (a) $10.75 million in cash from the Plan Sponsor, *plus* (b) the Debtors' interests in any proceeds generated on account of Divested Accounts Receivable,[4] which shall be backstopped by the Reorganized Debtors (and guaranteed by the Plan Sponsor) up to $2 million pursuant to the Backstop Note, *plus* (c) the Debtors' interests in any D&O claims and causes of action (up to the applicable policy limits and subject to certain limitations), *plus* (d) certain waivers of claims and causes of action, including recovery on General Unsecured Claims held by Omega and Powerback Rehabilitation.

In the event the Plan is not confirmed and the Debtors' remaining assets are transferred or the cases are converted to cases under chapter 7 of the Bankruptcy Code, the Debtors believe that no recovery will be available. While the Debtors or a chapter 7 trustee could prosecute certain causes of action, the outcome of such litigation is speculative, uncertain, and unknown and, even if successful, would likely return nothing to Holders of General Unsecured Claims, as compared to the guaranteed recoveries under the Plan. Therefore, in the Debtors' view, the Plan offers Holders of Allowed General Unsecured Claims the best (and only) opportunity for a financial recovery and, therefore, is in the best interests of all creditors. Accordingly, the Debtors urge all holders of Claims entitled to vote to **accept** the Plan. The UCC also believes that the Plan offers Holders of Allowed General Unsecured Claims the best opportunity to maximize their recoveries and urges Holders of Allowed Go-Forward Trade Claims and General Unsecured Claims in Class 5, Class 6A, Class 6B, and Class 6C to vote to **accept** the Plan.

Subject to the restrictions on modifications set forth in Bankruptcy Code section 1127 of and Bankruptcy Rule 3019 and those restrictions on modifications set forth in Article XII hereof, the Debtors expressly reserve the right to alter, amend, or modify the Plan, one or more times, before its substantial consummation.

---

[4]    Although the gross amount of the Divested Accounts Receivable is much higher, the Debtors estimate that, as of the date hereof, the gross amount of collectable Divested Accounts Receivable is approximately $2 million to $3 million. The actual amount of Divested Accounts Receivable collected by the GUC Trust may be materially higher than those amounts, but will provide at least $2 million funded to the GUC Trust pursuant to the Backstop Note.

B.    **Summary of Treatment of Claims and Interests**[5]

THE DEBTORS RESERVE ALL RIGHTS TO AMEND THE CLASSIFICATION, TREATMENT AND PROJECTED RECOVERIES SET FORTH IN THIS COMBINED PLAN AND DISCLOSURE STATEMENT. ALL RIGHTS OF THE DEBTORS' CREDITORS AND INTEREST HOLDERS WITH RESPECT TO THE CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS AS SET FORTH IN THIS COMBINED PLAN AND DISCLOSURE STATEMENT OR AS MAY BE AMENDED IN THE FUTURE ARE RESERVED IN ALL RESPECTS.

ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THE SECOND AMENDED COMBINED DISCLOSURE STATEMENT AND PLAN IN ITS ENTIRETY, AND TO CONSULT WITH AN ATTORNEY, BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

The classification and treatment of Claims against the Debtors pursuant to the Plan is as set forth below and as further detailed in Article V hereof:

| Class | Claim / Interest | Treatment | Status | Voting Rights | Est. Dollar Amount of Allowed Claims / Approx. Recovery |
|---|---|---|---|---|---|
| 1 | Other Secured Claims | On the Effective Date, in full and final satisfaction of such Allowed Other Secured Claim, except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment of its Allowed Claim, each Holder of an Allowed Other Secured Claim shall receive at the option of the Debtors or Reorganized Debtors, as applicable (i) payment in full in cash, (ii) the return of the applicable collateral in satisfaction of the Allowed amount of such Other Secured Claim, or (iii) such other treatment sufficient to | Unimpaired | Deemed to Accept | Estimated Amount: $0  Projected Recovery: 100% |

---

[5]    The information set forth herein is provided in summary form for illustrative purposes only and is subject to material change based on certain contingencies, including those related to the Claims reconciliation process. Actual recoveries may widely vary within these ranges and any changes to any of the assumptions underlying these amounts could result in material adjustments to recovery estimates provided herein and/or the actual distributions received by Holders of Allowed Claims. The projected recoveries are based on information available to the Debtors as of the date hereof and reflect the Debtors' estimates as of the date hereof only. **Additionally, the reconciliation of Claims remains ongoing and certain costs associated with such reconciliation (as well as other costs) will be borne by the GUC Trust, which will necessarily reduce the estimated amounts and projected recoveries reflected above.** In addition to the cautionary notes contained elsewhere in the Second Amended Combined Disclosure Statement and Plan, it is underscored that the Debtors make no representation as to the accuracy of these recovery estimates. The Debtors expressly disclaim any obligation to update any estimates or assumptions after the date hereof on any basis (including new or different information received and/or errors discovered).

| Class | Claim / Interest | Treatment | Status | Voting Rights | Est. Dollar Amount of Allowed Claims / Approx. Recovery |
|---|---|---|---|---|---|
|  |  | render such Allowed Other Secured Claim as Unimpaired. |  |  |  |
| 2 | Other Priority Claims | On the Effective Date, or as soon as reasonably practicable thereafter, in full and final satisfaction of such Allowed Other Priority Claim, except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment of its Allowed Claim, each holder of an Allowed Other Priority Claim shall receive at the option of the Debtors or Reorganized Debtors, as applicable (i) payment in full in cash or (ii) such other treatment in accordance with the Bankruptcy Code in full satisfaction of such Claim. | Unimpaired | Deemed to Accept | Estimated Amount: $0.3 million  Projected Recovery: 100% |
| 3 | ABL Claims | On the Effective Date, in full and final satisfaction of such Allowed ABL Claim, except to the extent that a Holder of an Allowed ABL Claim agrees to a less favorable treatment of its Allowed Claim, each Holder of an Allowed ABL Claim shall receive its Pro Rata share of the ABL Exit Facility, to be assumed by the Reorganized Debtors. | Impaired | Entitled to Vote | Estimated Amount: $34,381,211  Projected Recovery: TBD |
| 4 | Omega Term Loan Claims | On the Effective Date, in full and final satisfaction of such Allowed Omega Term Loan Claim, except to the extent that a Holder of an Allowed Omega Term Loan Claim agrees to a less favorable treatment of its Allowed Claim, each Holder of an Allowed Omega Term Loan Claim shall have the Omega Term Loan Claim assumed, as modified, by the Reorganized Debtors, which such modifications shall be set forth in the Definitive Documents and the Plan Supplement. | Impaired | Entitled to Vote | Estimated Amount: $26,952,146  Projected Recovery: TBD |
| 5 | Go-Forward | On the Effective Date, in full and final satisfaction of such Allowed Go-Forward Trade Claim, except to the | Impaired | Entitled to Vote | Estimated Amount: TBD |

| Class | Claim / Interest | Treatment | Status | Voting Rights | Est. Dollar Amount of Allowed Claims / Approx. Recovery |
|---|---|---|---|---|---|
| | Trade Claims | extent that a holder of an Allowed Go-Forward Trade Claim agrees to less favorable treatment of its Allowed Claim, each Holder of an Allowed Go-Forward Trade Claim shall receive an applicable Go-Forward Trade Contract with the Reorganized Debtors, but shall not be entitled to any additional recovery from the GUC Trust or otherwise.<br><br>The Debtors will identify potential Holders of Go-Forward Trade Claims in connection with solicitation of the Plan, and may supplement such list at any time prior to the Voting Deadline; *provided, however*, that in the event such identified Holders of Go-Forward Trade Claims do not reach agreement with the Debtors regarding the applicable Go-Forward Trade Contract or do not agree in writing to the treatment in Class 5 on or before the Voting Deadline, such identified claims shall not be Class 5 Go-Forward Trade Claims. For the avoidance of doubt, (a) Powerback Rehabilitation shall be a Holder of a Go-Forward Trade Claim in Class 5 and shall receive no distribution as a Class 6A, Class 6B, or Class 6C creditor, and (b) no other Claim shall be a Go-Forward Trade Claim absent the affirmative written consent of the Holder of such Claim. | | | Projected Recovery: 0% |
| 6A | OpCo General Unsecured Claims | As soon as reasonably practicable after the Effective Date, in full and final satisfaction of such Allowed OpCo General Unsecured Claim (and, to the extent applicable, subject to the Unliquidated Claim Procedures), except to the extent such Allowed OpCo General Unsecured Claim is also an Allowed Joint & Several OpCo General Unsecured Claim or an | Impaired | Entitled to Vote | Estimated Amount: $83.5 million<br><br>Projected Recovery: 10.8% |

| Class | Claim / Interest | Treatment | Status | Voting Rights | Est. Dollar Amount of Allowed Claims / Approx. Recovery |
|---|---|---|---|---|---|
| | | Allowed DivestCo General Unsecured Claim and except to the extent that a Holder of an Allowed OpCo General Unsecured Claim agrees to less favorable treatment of its Allowed Claim, each Holder of an Allowed OpCo General Unsecured Claim shall receive such Holder's Pro Rata share of the OpCo GUC Allocation. To the extent a Holder of an Allowed OpCo General Unsecured Claim has an Allowed DivestCo General Unsecured Claim and/or an Allowed Joint & Several OpCo General Unsecured Claim (each discussed below), such creditor shall also be entitled to recoveries as a Holder of Allowed General Unsecured Claims in Class 6A and Class 6B and/or Class 6C, as applicable. | | | |
| 6B | DivestCo General Unsecured Claims | As soon as reasonably practicable after the Effective Date, in full and final satisfaction of such Allowed DivestCo General Unsecured Claim (and, to the extent applicable, subject to the Unliquidated Claim Procedures), except to the extent that such Allowed DivestCo General Unsecured Claim is also an Allowed Joint & Several OpCo General Unsecured Claim or an Allowed OpCo General Unsecured Claim and except to the extent that a Holder of an Allowed DivestCo General Unsecured Claim agrees to less favorable treatment of its Allowed Claim, each Holder of an Allowed DivestCo General Unsecured Claim shall receive such Holder's Pro Rata share of the DivestCo GUC Allocation. To the extent a Holder of an Allowed DivestCo General Unsecured Claim also has an Allowed OpCo General Unsecured Claim and/or an Allowed Joint & Several OpCo General | Impaired | Entitled to Vote | Estimated Amount: $284.6 million  Projected Recovery: 1.2% - 10.0% |

| Class | Claim / Interest | Treatment | Status | Voting Rights | Est. Dollar Amount of Allowed Claims / Approx. Recovery |
|---|---|---|---|---|---|
| | | Unsecured Claim (each discussed above and below), such creditor shall be entitled to recoveries as a Holder of Allowed General Unsecured Claims in Class 6B and Class 6A and/or Class 6C, as applicable. | | | |
| 6C | Joint & Several OpCo General Unsecured Claims | As soon as reasonably practicable after the Effective Date, in full and final satisfaction of such Allowed Joint & Several OpCo General Unsecured Claim (and, to the extent applicable, subject to the Unliquidated Claim Procedures), except to the extent that such Allowed Joint & Several OpCo General Unsecured Claim is also an Allowed OpCo General Unsecured Claim or an Allowed DivestCo General Unsecured Claim and except to the extent that a Holder of an Allowed Joint & Several OpCo General Unsecured Claim agrees to less favorable treatment of its Allowed Claim, each Holder of an Allowed Joint & Several OpCo General Unsecured Claim shall receive such Holder's Pro Rata Share of the Joint & Several OpCo GUC Allocation. To the extent a Holder of an Allowed Joint & Several OpCo General Unsecured Claim has an Allowed OpCo General Unsecured Claim and/or an Allowed DivestCo General Unsecured Claim (each discussed above), such creditor shall be entitled to recoveries as a Holder of Allowed General Unsecured Claims in both Class 6C and Class 6A and/or Class 6B, as applicable. | Impaired | Entitled to Vote | Estimated Amount: $26.6 million<br><br>Projected Recovery: 1% |
| 7 | Intercompany Claims | On the Plan Effective Date, each Intercompany Claim shall be cancelled, released, and extinguished, and each Holder of an Intercompany Claim will not be entitled to, and will not receive or retain, any property or interest in | Impaired | Deemed to Reject | Estimated Amount: $0<br><br>Projected Recovery: 0% |

| Class | Claim / Interest | Treatment | Status | Voting Rights | Est. Dollar Amount of Allowed Claims / Approx. Recovery |
|---|---|---|---|---|---|
| | | property on account of such Intercompany Claim. | | | |
| 8 | Existing Equity Interests | On the Plan Effective Date, Holders of Existing Equity Interests shall be cancelled, released and extinguished, and shall not be entitled to receive any distribution on account of their Existing Equity Interests. | Impaired | Deemed to Reject | Estimated Amount: $0  Projected Recovery: 0% |
| 9 | Intercompany Interests | Intercompany Interests shall be Reinstated so as to maintain the organization structure of the Debtors as such structure exists on the Plan Effective Date unless implementation of the Restructuring Transactions requires otherwise. | Unimpaired | Deemed to Accept | Estimated Amount: $0  Projected Recovery: 0% |

## ARTICLE II.
## DEFINITIONS, RULES OF INTERPRETATION AND CONSTRUCTION, COMPUTATION OF TIME, AND GOVERNING LAW

**A.    Definitions**

For purposes of the Second Amended Combined Disclosure Statement and Plan, except as expressly provided herein or unless the context otherwise requires, all capitalized terms not otherwise defined herein shall have the meanings ascribed to them in this Article II.

1.1    **"ABL Agent"** has the meaning set forth in Article III.A.4.i.a hereof.

1.2    **"ABL Borrowers"** has the meaning set forth in Article III.A.4.i.a hereof.

1.3    "**ABL Claims**" means any and all Claims arising under, derived from, or based upon the ABL Credit Agreement.

1.4    **"ABL Credit Agreement"** means that certain Second Amended and Restated Credit and Security Agreement, dated as of March 25, 2022, by and among LV CHC Holdings I, LLC, and certain of its affiliates designated therein as borrowers, and the ABL Secured Parties.

1.5    **"ABL Credit Facility"** has the meaning set forth in Article III.A.4.i.a hereof.

1.6    **"ABL Documents"** has the meaning set forth in Article III.A.4.i.a hereof.

1.7    "**ABL Exit Facility**" means the credit facility provided for under the ABL Exit Facility Credit Agreement.

1.8    "**ABL Exit Facility Credit Agreement**" means the definitive credit agreement governing the ABL Exit Facility, the material terms of which shall be included in the Plan Supplement in the form of either (i) a term sheet, or (ii) the form ABL Exit Facility Credit Agreement, which shall be in form and substance acceptable to the ABL Lenders, the Debtors, the DIP Lenders, and the Omega Secured Parties.

1.9    "**ABL Exit Facility Documents**" means, collectively, the ABL Exit Facility Credit Agreement and any and all security documents or other documents related thereto, each of which shall be in form and substance acceptable to the ABL Lenders, the Debtors, the DIP Lenders, and the Omega Secured Parties.

1.10    "**ABL Lenders**" has the meaning set forth in Article III.A.4.i.a hereof.

1.11    "**ABL Liens**" has the meaning set forth in Article III.A.4.i.a hereof.

1.12    "**ABL Loans**" has the meaning set forth in Article III.A.4.i.a hereof.

1.13    "**ABL Obligations**" has the meaning set forth in Article III.A.4.i.a hereof.

1.14    "**ABL Obligors**" has the meaning set forth in Article III.A.4.i.a hereof.

1.15    "**ABL Secured Parties**" has the meaning set forth in Article III.A.4.i.a hereof.

1.16    "**ABL Senior Collateral**" has the meaning set forth in Article III.A.4.i.a hereof.

1.17    "**ABL/Omega Landlord Intercreditor Agreement**" has the meaning set forth in Article III.A.4.i.1 hereof.

1.18    "**ABL/Omega Term Loan Intercreditor Agreement**" has the meaning set forth in Article III.A.4.i.c hereof.

1.19    "**Administrative Expense Claim**" means a Claim against the Debtors or their Estates for costs or expenses of administration of the Estate pursuant to Bankruptcy Code sections 503(b), 503(c), 507(b), or 1114(e)(2), including: (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the business of the Debtors; (b) compensation for legal, financial advisory, accounting, and other services and reimbursement of expenses awarded or allowed under Bankruptcy Code sections 330(a) or 331, including Professional Fee Claims; (c) all Allowed requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to Bankruptcy Code sections 503(b)(3), (4), and (5); and (d) all fees and charges assessed against the Estates under chapter 123 of title 28 of the United States Code, 28 U.S.C. sections 1911–1930.

1.20    "**Administrative Expense Claim Bar Date**" means the deadline for Filing Proofs of Claim for payment of Administrative Expense Claims (other than a Professional Fee Claim or any Statutory Fees), which shall be (a) any date previously set by the Bankruptcy Court; or (b) thirty (30) days after the Effective Date, unless otherwise ordered by the Bankruptcy Court; *provided*, *that* Professional Fee Claims shall be subject to the Professional Fee Claim Bar Date.

13

1.21    "**Administrative Expense Claim Objection Deadline**" means the date that is no later than seventy-five (75) days after the Administrative Expense Claim Bar Date, unless such objection deadline is extended by Order of the Bankruptcy Court; *provided, however*, notwithstanding the foregoing, the Professional Fee Claim Objection Deadline shall govern the deadline to object to Final Fee Applications.

1.22    "**Administrative and Priority Claim Estimate**" means a good-faith estimate of anticipated accrued, unpaid Administrative Expense Claims and Priority Claims as of the Effective Date to be provided by the Debtors and reasonably acceptable to the Plan Sponsor; *provided*, *however*, that the Administrative and Priority Claim Estimate shall not include Professional Fee Claims.

1.23    "**Adversary Proceeding**" has the meaning set forth in Article III.D.10 hereof.

1.24    "**Affiliate**" has the meaning set forth in Bankruptcy Code section 101(2). With respect to any Person that is not a Debtor, the term "Affiliate" shall apply to such Person as if the Person was a Debtor in the Chapter 11 Cases.

1.25    "**Allowed**" means, with respect to any Claim, except as otherwise provided herein: (a) a Claim that is evidenced by a Proof of Claim (including a Proof of Claim asserting a Claim under Bankruptcy Code section 503(b)(9)) Filed by the applicable claims bar date or a request for payment of an Administrative Expense Claim Filed by the Administrative Expense Claim Bar Date, as applicable (or for which Claim a Proof of Claim is not required under the Plan, the Bankruptcy Code, or a Final Order, including the DIP Order); (b) a Claim that is scheduled by the Debtors as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim, as applicable, has been timely Filed; or (c) a Claim allowed pursuant to the Plan or a Final Order, including the DIP Order; provided, that with respect to a Claim described in clauses (a) and (b) above, such Claim shall be Allowed only if and to the extent that with respect to such Claim no objection to the allowance thereof is interposed within the applicable period of time fixed by the Plan or the Bankruptcy Court, or such an objection is so interposed and the Claim has been Allowed by a Final Order. Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no contrary or superseding Proof of Claim is or has been timely Filed, or that is not or has not been Allowed by a Final Order, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court. Unless expressly waived by the Plan, the Allowed amount of Claims or Interests shall be subject to and shall not exceed the limitations or maximum amounts permitted by the Bankruptcy Code, including Bankruptcy Code sections 502 or 503, to the extent applicable. For the avoidance of doubt, a Proof of Claim Filed after the applicable claims bar date or a request for payment of an Administrative Expense Claim Filed after the Administrative Expense Claim Bar Date, as applicable, shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-Filed Claim. "**Allow**" and "**Allowing**" shall have correlative meanings.

1.26    "**Alpha**" has the meaning set forth in Article III.A.4.i.1 hereof.

1.27    "**Assets**" means all the assets of the Debtors of any nature whatsoever, including, without limitation, all property of the Estates pursuant to Bankruptcy Code section 541, Cash, Causes of Action, accounts receivable, tax refunds, claims of right, interests and property, real and personal, tangible and intangible, and the proceeds of all of the foregoing.

1.28    "**Assumed Administrative and Priority Claims**" means General Administrative Claims *plus* those Administrative Expense Claims and Priority Claims that the Plan Sponsor agrees, in its sole discretion, that the Reorganized Debtors shall assume and that shall be set forth on a schedule to be filed in connection with the Plan Supplement.

1.29    "**Assumed Executory Contracts and Unexpired Leases**" means those Executory Contracts and Unexpired Leases to be assumed by the Reorganized Debtors pursuant to and as set forth in the Confirmation Order and the Definitive Documents.

1.30    "**Assumed Executory Contracts and Unexpired Leases List**" means the list or lists of Assumed Contracts, which will be included in preliminary form in the Plan Supplement.

1.31    "**Assumption Notice**" has the meaning set forth in Article VII.B hereof.

1.32    "**Available Cash**" means Cash held in the name of a Debtor, excluding Cash held in the Professional Fee Reserve and any Cash held by a Debtor in trust for a third-party.

1.33    "**Avoidance Actions**" means any and all Claims and Causes of Action of the Debtors arising under chapter 5 of the Bankruptcy Code, including, without limitation, sections 544, 545, 547, 548, 549, 550, 553(b) and 724(a) thereof, or their state law analogs.

1.34    "**Backstop Note Guaranty**" means the guaranty agreement to be executed by the Plan Sponsor on the Effective Date, unconditionally guaranteeing payment of the Backstop Note.

1.35    "**Backstop Note**" means that certain promissory note to be executed by the Reorganized Debtors and the GUC Trustee (and guaranteed by the Plan Sponsor) on the Effective Date in connection with the assignment of the Debtors' interest in the Divested Accounts Receivable, which such obligations under the note and guaranty agreement to reduce on a dollar-for-dollar basis as Divested Accounts Receivable are converted to cash and transferred to the GUC Trust, until $2 million net proceeds under the Divested Accounts Receivable are received by the GUC Trust.

1.36    "**Ballot**" means the appliable form or forms of ballot(s) distributed to each Holder of an Impaired Claim entitled to vote on the Plan on which the Holder indicates either acceptance or rejection of the Plan.

1.37    "**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, as such title has been, or may be, amended from time to time, to the extent that any such amendment is applicable to the Chapter 11 Cases.

1.38    "**Bankruptcy Court**" means the United States Bankruptcy Court for the Northern District of Georgia, having jurisdiction over the Chapter 11 Cases, or such other court as may have jurisdiction over the Chapter 11 Cases.

1.39    "**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure, the Official Bankruptcy Forms, and the Local Rules, as each has been, or may be, amended from time to time, to the extent that any such amendment is applicable to the Chapter 11 Cases.

1.40    "**Bar Date**" means August 30, 2024 at 5:00 p.m. (prevailing Eastern Time).

1.41    "**Bidding Procedures Motion**" means the *Debtors' Motion for Entry of Order (I) Approving Bidding Procedures and Bid Protections, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof,  (IV) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (V) Authorizing the Assumption and Assignment of Assumed Contracts, and (VI) Authorizing the Sale of Assets* [Docket No. 104].

1.42    **"Bidding Procedures Order"** means the *Order (I) Approving Bidding Procedures and Bid Protections, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (V) Authorizing the Assumption and Assignment of Assumed Contracts, and (VI) Authorizing the Sale of Assets* [Docket No. 177].

1.43    **"Books and Records"** means any and all books and records of the Debtors, including any and all documents and any and all computer generated or computer-maintained books and records and computer data, as well as electronically generated or maintained books and records or data, along with books and records of the Debtors maintained by or in the possession of third parties, wherever located.

1.44    **"Business Day"** means any day other than a Saturday, Sunday, or any legal holiday (as that term is defined in Bankruptcy Rule 9006(a)).

1.45    **"Carve-Out"** has the meaning set forth in the Final DIP Order.

1.46    **"Cash"** means legal tender of the United States of America and equivalents thereof.

1.47    **"Causes of Action"** means any and all claims, cross-claims, third-party claims, actions, proceedings, causes of action, Avoidance Actions, suits, accounts, controversies, disputes, rights, liens, indemnities, guaranties, suites, obligations, liabilities, losses, debts, fees or expense, damages, interests, judgements, costs, accounts, defenses, powers, privileges, licenses, franchises, agreements, promises, offsets, remedies, rights to legal remedies, rights to equitable remedies, rights to payment and Claims, of any kind or character whatsoever,  known or unknown, reduced to judgment or not reduced to judgment, liquidated or unliquidated, contingent or non-contingent, matured or unmatured, disputed or undisputed, secured or unsecured, assertable directly or derivatively (including any alter ego or successor liability theories) in law, equity or otherwise, based in whole or in part upon any act or omission or other event occurring or arising prior to the Petition Date or during the course of the Chapter 11 Cases, through and including the Effective Date, that the Debtors and/or the Estates may hold against any Person or Entity.  For the avoidance of doubt, Cause of Action also includes (a) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity, (b) the right to object to Claims or Interests, (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code, (d) any claim or defense including fraud, mistake, duress, and usury and any other defenses set forth in Bankruptcy Code section 558, and (e) any Avoidance Action or state law fraudulent transfer claim.

1.48    **"Chapman"** means Chapman and Cutler LLP.

1.49    **"Chapter 11 Cases"** means the chapter 11 cases commenced by the Debtors and jointly administered under case number 24-55507 (PMB) in the Bankruptcy Court.

1.50    **"CIM"** has the meaning set forth in Article III.D.4 hereof.

1.51    **"Claim"** means a claim against the Debtors, whether or not asserted, as such term is defined in Bankruptcy Code section 101(5).

1.52    **"Claims and Noticing Agent"** means Verita Global, formerly known as Kurtzman Carson Consultants, LLC, or any successor thereto.

1.53    **"Claims Objection Deadline"** means the last day for filing objections to Claims (other than Disallowed Claims for which no objection or request for estimation is required or Administrative Expense Claims for which the deadline is the Administrative Expense Claim Objection Deadline), which

day shall be 270 days after the Effective Date, or such other date as may be ordered by the Bankruptcy Court.  For the avoidance of doubt, the Claims Objection Deadline may be extended one or more times by the Bankruptcy Court upon a motion Filed by the GUC Trustee.

1.54    **"Class"** means each category or group of Holders of Claims or Interests that has been designated as a class in Article V hereof.

1.55    **"Clerk"** means the clerk of the Bankruptcy Court.

1.56    "**CMC III**" has the meaning set forth in Article III.C.2 hereof.

1.57    **"Collateral"** means any property or interest in property of the Debtors' Estates subject to a Lien to secure the payment or performance of a Claim, which Lien is not subject to avoidance under the Bankruptcy Code or otherwise invalid under the Bankruptcy Code or applicable state law.

1.58    **"Combined Hearing"** means the hearing(s) held by the Bankruptcy Court to consider final approval of the Disclosure Statement pursuant to Bankruptcy Code section 1125 and confirmation of the Plan pursuant to Bankruptcy Code section 1129, as such hearing may be adjourned or continued from time to time.

1.59    **"Combined Hearing Notice"** has the meaning set forth in Article XIII.E hereof.

1.60    **"Confirmation"** means the entry of the Confirmation Order, subject to all conditions specified in Article IX.A having been satisfied or waived pursuant to Article IX.D.

1.61    **"Confirmation Date"** means the date of entry of the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

1.62    **"Confirmation Order"** means the order of the Bankruptcy Court confirming the Plan pursuant to Bankruptcy Code section 1129, in a form reasonably acceptable to the Plan Sponsor, the DIP Lenders, the ABL Lenders, and the Omega Secured Parties.

1.63    **"Consent Judgments"** means consents executed by the Debtors or Reorganized Debtors and Plan Sponsor to entry of judgment against each of them in the amount of the then outstanding balance of the Backstop Note at the time of entry of such judgments, *plus* a 100% penalty of the then outstanding balance of the Backstop Note, which shall be held by the GUC Trustee and may be entered in the event of a default under the Backstop Note.

1.64    **"Consummation"** means the occurrence of the Effective Date.

1.65    **"Contingent"** means, with reference to a Claim, a Claim that has not accrued or is not otherwise payable and the accrual of which, or the obligation to make payment on which, is dependent upon a future event that may or may not occur.

1.66    **"Creditor"** means any Person or Entity that is the Holder of a Claim against the Debtors.

1.67    **"CRO"** means M. Benjamin Jones, in his capacity as Chief Restructuring Officer of the Debtors.

1.68    **"Cure Claim Amount"** has the meaning set forth in Article VII.B hereof.

1.69    **"Cure Notice"** means the *Notice to Contract Parties to Potentially Assumed Executory Contracts and Unexpired Leases* [Docket No. 274] (as may be amended, supplemented, or modified from time to time).

1.70    **"D&O Claim Limitations"** has the meaning set forth in Article VI.H hereof.

1.71    **"D&O Claims"** has the meaning set forth in Article VI.H hereof.

1.72    **"D&Os"** has the meaning set forth in Article VI.H hereof. For the avoidance of doubt, the "D&Os" shall not include the CRO or the Independent Manager.

1.73    **"Date of Satisfaction"** has the meaning set forth in Article VI.B.4 hereof.

1.74    **"Debtor Release"** means the release set forth in Article X.D.1 hereof.

1.75    **"Debtors"** means LaVie Care Centers, LLC and each of its affiliate Debtors in the these jointly administered Chapter 11 Cases in their capacity as debtors and debtors-in-possession in the Chapter 11 Cases.

1.76    **"Definitive Documents"** means those documents governing the Plan Transaction in form and substance reasonably acceptable to the DIP Lenders, the ABL Lenders, the Omega Secured Parties, and the UCC including the following: (a) the Second Amended Combined Disclosure Statement and Plan; (b) the Confirmation Order; (c) the Solicitation Package; (d) the Solicitation Procedures Order; (e) the DIP Orders and the DIP Documents; (f) the New Governance Documents; (g) the Plan Supplement; (h) the ABL Exit Facility Documents, (i) the Go-Forward Trade Contracts, (j) such other definitive documentation relating to a recapitalization or restructuring of the Debtors as is necessary or desirable to consummate the Plan Transaction, including without limitation, the assumption and assignment of the Omega Master Lease Documents and Omega Term Loan Documents; and (k) any other material exhibits, schedules, amendments, modifications, supplements, appendices or other documents and/or agreements relating to any of the foregoing.

1.77    **"DIP Administrative Agent"** means OHI DIP Lender, LLC, in its capacity as administrative agent for the DIP Lenders under the DIP Credit Agreement.

1.78    **"DIP Agents"** means, collectively, the DIP Administrative Agent and the DIP Collateral Agent.

1.79    **"DIP Budget"** means the budget (as may be amended from time to time pursuant to the Final DIP Order) depicting cash revenue, receipts, expenses, and disbursements in connection with the Debtors' use of debtor-in-possession financing and cash collateral, which was approved in accordance with the terms of the Final DIP Order.

1.80    **"DIP Claims"** means any and all Claims arising under, derived from, or based upon the DIP Loans, which DIP Claims shall have the priorities set forth in the DIP Credit Agreement and the DIP Orders.

1.81    **"DIP Collateral Agent"** means TIX 33433 LLC, in its capacity as collateral agent for the DIP Lenders under the DIP Credit Agreement.

1.82    "**DIP Credit Agreement**" means the Junior Secured Debtor-in-Possession Credit and Guaranty Agreement, dated as of June 21, 2024, by and among the Debtors, the DIP Lenders, and the DIP Agents, together with any amendments, modifications or supplements thereto.

1.83    "**DIP Documents**" means the DIP Credit Agreement, the DIP Orders, and any other documents governing the DIP Facility that are entered into in accordance with the DIP Credit Agreement and the DIP Orders, and any amendments, modifications, and supplements thereto, and together with any related notes, certificates, agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection therewith.

1.84    "**DIP Facility**" means that certain debtor-in-possession credit facility provided to the Debtors on the terms and conditions of the DIP Credit Agreement and the DIP Orders.

1.85    "**DIP Lenders**" means, collectively, TIX 33433 LLC and OHI DIP Lender, LLC.

1.86    "**DIP Loans**" means the new money term loans extended to the Debtors pursuant to the DIP Credit Agreement and DIP Orders.

1.87    "**DIP Motion**" means the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 15].

1.88    "**DIP Orders**" means the Interim DIP Order and the Final DIP Order.

1.89    "**Disallowed**" means, when used in reference to a Claim or Interest within a particular Class, a Disallowed Claim or Interest in the specified Class or of a specified type.

1.90    "**Disallowed Claim**" means a Claim or any portion thereof that (a) has been disallowed by a Final Order, (b) is Scheduled at zero or as contingent, disputed, or unliquidated and as to which no Proof of Claim has been Filed by the Bar Date or deemed timely Filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order or under applicable law, (c) is not Scheduled, and as to which (i) no Proof of Claim has been Filed by the Bar Date or deemed timely Filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order or under applicable law, and (ii) no request for payment of an Administrative Expense Claim has been Filed by the Administrative Expense Claim Bar Date or deemed timely Filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order or under applicable law, or (d) after the Effective Date, has been disallowed in a written agreement by and between the GUC Trustee and the Holder of such Claim.

1.91    "**Disclosure Statement**" has the meaning set forth in Article I.A hereof.

1.92    "**Disclosure Statement Hearing**" means the hearing held by the Bankruptcy Court to consider conditional approval of the Disclosure Statement pursuant to Bankruptcy Code section 1125, as such hearing may be adjourned or continued from time to time.

1.93    "**Disputed**" means, as to a Claim or an Interest, any Claim or Interest:  (a) that is not Allowed; (b) that is not disallowed by the Plan, the Bankruptcy Code, or a Final Order, as applicable; (c) as to which a dispute is being adjudicated by a court of competent jurisdiction in accordance with non-bankruptcy law; (d) that is Filed in the Bankruptcy Court and not withdrawn, as to which an objection or request for estimation has been Filed; and (e) with respect to which a party in interest has Filed a Proof of

Claim or otherwise made a written request to a Debtor for payment, without any further notice to or action, order, or approval of the Bankruptcy Court.

1.94    **"Distribution"** means any distribution to be made by the Distribution Agent in accordance with the Plan of, as the case may be: (a) Cash or (b) any other consideration or residual value distributed to Holders of Allowed Claims under the terms and provisions of the Plan.

1.95    **"Distribution Agent"** means, as to all Claims other than Class 6A, Class 6B, and Class 6C Claims, the Reorganized Debtors, and as to Class 6A, Class 6B, and Class 6C Claims, the GUC Trustee, or the Entity or Entities selected by the Debtors, the Reorganized Debtors or the GUC Trustee, as applicable, to make or facilitate distributions pursuant to the Plan.

1.96    **"Distribution Date"** means any date on which a Distribution is made to Holders of Allowed Claims under the Plan, or as otherwise agreed. The first Distributions shall occur on or as soon as practicable after the Effective Date or as otherwise determined by the GUC Trustee. To the extent subsequent Distributions are necessary, such subsequent Distributions shall occur as soon after the first Distribution Date as the GUC Trustee shall determine in accordance with the GUC Trust Agreement.

1.97    **"Distribution Record Date"** means the record date for the purpose of determining Holders of Allowed Claims entitled to receive Distributions under the Plan on account of Allowed Claims, which date shall be the Confirmation Date, or such other date designated in the Confirmation Order or any subsequent Court order.

1.98    **"District Court"** means the United States District for the Northern District of Georgia.

1.99    **"DivestCo Debtors"** means the Debtors which no longer operate Facilities as a result of divestitures to New Operators prior to the Petition Date, or are otherwise non-operational. A list of the DivestCo Debtors is attached hereto as **Exhibit D**.

1.100    **"DivestCo General Unsecured Claims"** means the General Unsecured Claims against the DivestCo Debtors.

1.101    **"DivestCo GUC Allocation"** means the allocation of the GUC Contribution attributed to Holders of DivestCo General Unsecured Claims, which shall include (a) a minimum of $3.5 million in Cash consideration, which shall include (i) $1.5 million in Cash from the Plan Sponsor Contribution and (ii) all proceeds of the Backstop Note (including any attendant costs and/or penalties associated therewith, if applicable), _plus_ (b) all proceeds of the D&O Claims, _plus_ (c) all proceeds of the Divested Accounts Receivable.

1.102    **"Divested Accounts Receivable"** means all accounts receivable relating to any of the Debtors' facilities whose operations were transferred prior to the Petition Date and not otherwise collected by the Debtors as of the Effective Date.

1.103    **"Docket"** means the docket in the Chapter 11 Cases maintained by the Clerk.

1.104    **"Effective Date"** means the first Business Day on which all conditions to the Consummation of the Plan set forth in Article IX.B have been satisfied or waived in accordance with Article IX.D.

1.105    **"Elderberry"** or **"Elderberry Landlords"** means Elderberry of Hayesville, LLC, Elderberry of Charolette, LLC, and Elderberry of Lincolnton, LLC.

1.106    **"Elderberry Facilities"** has the meaning set forth in Article III.A.4.i.d hereof.

1.107    **"Entity"** means an entity as defined in Bankruptcy Code section 101(15).

1.108    **"Estates"** means the estates of the Debtors created upon the commencement of the Chapter 11 Cases pursuant to Bankruptcy Code section 541.

1.109    **"Exculpated Parties"** means, collectively, and in each case in its capacity as such: (a) the Debtors; (b) the UCC and each member thereof (solely in its capacity as such); (c) each of the Patient Care Ombudspersons; (d) any retained Professional of the Debtors, and the UCC; and (d) the Debtors' directors and officers who served in such capacity during the pendency of the Chapter 11 Cases, including the CRO and the Independent Manager.

1.110    **"Executory Contract"** means a contract to which any of the Debtors is a party that is subject to assumption or rejection under Bankruptcy Code section 365.

1.111    "**Existing Equity Interests**" means all existing membership interests or equity interests in LV Operations I, LLC.

1.112    **"Face Amount"** means (a) when used in referenced to a Disputed Claim or Disallowed Claim, the Disputed Claim amount; and (b) when used in reference to an Allowed Claim, the Allowed amount of such Claim.

1.113    **"Facilities"** means the 43 licensed skilled nursing and independent living facilities that the Debtors continue to operate and that are set forth on **Exhibit G** hereto.

1.114    **"FATCA"** has the meaning set forth in Article XV.D.3 hereof.

1.115    "**FC XXI**" has the meaning set forth in Article III.C.2 hereof.

1.116    **"File"**, **"Filed"**, or **"Filing"** means, file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

1.117    **"Final DIP Order"** means the *Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing for June 27, 2024, and (V) Granting Related Relief* [Docket No. 189] entered on the Docket by the Bankruptcy Court on June 28, 2024.

1.118    **"Final Fee Applications"** has the meaning set forth in Article IV.C.1 hereof.

1.119    **"Final Order"** means an Order of the Bankruptcy Court (a) as to which the time to appeal or petition for certiorari has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument, rehearing, or new trial shall then be pending; (b) as to which any right to appeal, petition for certiorari, reargue, rehear, or retry shall have been waived in writing; or (c) in the event that an appeal or writ of certiorari has been sought, as to which (i) such order of the Bankruptcy Court shall have been affirmed by the highest court to which such order is appealed; (ii) certiorari has been denied as to such order; or (iii) reargument or rehearing or new trial from such order shall have been denied, and the time to take any further appeal or petition for certiorari shall have expired without such actions having been taken.

1.120   **"Financial Projections"** means those projections attached as **Exhibit B** to the Second Amended Combined Disclosure Statement and Plan.

1.121   **"Florida Claimants"** has the meaning set forth in Article III.D.12 hereof.

1.122   **"General Administrative Claim"** means an Administrative Expense Claim that was incurred by the Debtors for goods or services provided by trade vendors in the ordinary course of business during the Chapter 11 Cases; *provided, however,* that if the Reorganized Debtors dispute a General Administrative Claim, the Reorganized Debtors shall provide notice to the Holder of such Claim and may seek resolution of any such dispute in the Bankruptcy Court.  For the avoidance of doubt, a General Administrative Claim shall not include a Professional Fee Claim, a PL/GL Administrative Claim, or any other Administrative Expense Claim that is unliquidated and/or disputed by the Debtors.

1.123   **"General Unsecured Claim"** means any Claim against any of the Debtors that is not (a) paid in full before the Effective Date pursuant to an order of the Bankruptcy Court, (b) an Administrative Expense Claim, (c) a Priority Tax Claim, (d) an Other Priority Claim, (e) an Other Secured Claim, (f) a DIP Claim, (g) an Intercompany Claim, (h) a Subordinated Claim, (i) an ABL Claim, (j) an Omega Term Loan Claim, (k) an Omega Master Lease Claim, or (i) a Go-Forward Trade Claim.

1.124   **"Go-Forward Trade Claim"** means a Claim of a trade vendor who agrees to a Go-Forward Trade Contract to provide services to the Facilities on and after the Effective Date.

1.125   **"Go-Forward Trade Contract"** means those contracts agreed upon between the Plan Sponsor (or Reorganized Debtors, as applicable) and a go-forward trade vendor regarding a contract to be entered on the Effective Date, which such vendors shall be identified in connection with solicitation and as disclosed in the Plan Supplement.

1.126   **"Governmental Bar Date"** means November 29, 2024.

1.127   **"Governmental Unit"** has the meaning set forth in Bankruptcy Code section 101(27).

1.128   **"GUC Contribution"** means (a) the Plan Sponsor Contribution *plus* (b) the Debtors' interest in the Divested Accounts Receivable *plus* (c) the Backstop Note *plus* (d) the Backstop Note Guaranty, *plus* (e) the D&O Claims, which shall solely be used to fund distributions to Holders of Claims in Class 6A, Class 6B, and Class 6C as set forth herein.

1.129   **"GUC Trust"** means the trust established on the Effective Date that, among other things, reconciles General Unsecured Claims and makes Distributions in accordance with the terms hereof and the GUC Trust Agreement.

1.130   **"GUC Trustee"** means the person appointed to administer the GUC Trust with such rights, duties, and obligations as set forth herein and the GUC Trust Agreement.  The identity of the GUC Trust shall be determined by the UCC with the reasonable consent of the Debtors, the Omega Secured Parties, the ABL Lenders, and the Plan Sponsor (which such consent shall not be unreasonably withheld), and the identity of such individual shall be disclosed in the Plan Supplement.

1.131   **"GUC Trust Agreement"** means the agreement establishing the GUC Trust in conformity with the provisions of the Plan approved in the Confirmation Order, and entered into by the Debtors, on behalf of the holders of GUC Trust Interests, and the GUC Trustee on the Effective Date pursuant to the Plan. The GUC Trust Agreement shall be in form acceptable to the UCC and shall be subject to the reasonable consent of the Debtors, the Omega Secured Parties, the ABL Lenders, and the Plan Sponsor

(which such consent shall not be unreasonably withheld), and a copy of the GUC Trust Agreement shall be Filed with the Plan Supplement.

1.132 **"GUC Trust Assets"** means the GUC Contribution and any other assets transferred to the GUC Trust.

1.133 **"GUC Trust Interest"** means a non-certificated beneficial interest in the GUC Trust granted to each beneficiary of the GUC Trust, which shall entitle such Holder to a Pro Rata share of the GUC Trust, subject to the terms of the Plan and the GUC Trust Agreement.

1.134 **"Harts Harbor Landlord"** means Jacksonville Nursing Home, Ltd.

1.135 **"Harts Harbor"** has the meaning set forth in Article III.A.4.i.d hereof.

1.136 **"Holder"** means a Person or Entity who is the beneficial holder of any Claim or Interest.

1.137 **"Impaired Class"** means a Class of Claims or Interests that is Impaired.

1.138 **"Impaired"** means, with respect to a Class of Claims or Interests, a Claim or an Interest that is impaired within the meaning of Bankruptcy Code section 1124."

1.139 **"Independent Manager"** means James D. Decker, in his capacity as Independent Manager of LV Operations I, LLC.

1.140 **"Initial Distribution Date"** means the date that is as soon as practicable after the Effective Date, when, subject to the "Treatment" sections in Article V hereof, distributions under this Plan shall commence to Holders of Allowed Claims.

1.141 **"Insurance Policies"** means any and all insurance policies, insurance settlement agreements, coverage-in-place agreements, and other agreements, documents, or instruments relating to the provisions of insurance entered into by or issued to or for the benefit of, at any time, the Debtors or their predecessors (including, for the avoidance of doubt, any such policies, agreements, or other documents that have been paid in full).

1.142 **"Intercompany Claim"** means any Claim held by a Debtor against another Debtor, including, without limitation, (a) any account reflecting intercompany book entries with respect to another Debtor; (b) any Claim not reflected in such book entries that is held by a Debtor against another Debtor; and (c) any derivative Claim asserted by or on behalf of one Debtor against another Debtor.

1.143 **"Intercompany Interest"** means an Interest held by a Debtor or an Affiliate of a Debtor.

1.144 **"Intercreditor Agreements"** has the meaning set forth in Article III.A.4.i.1 hereof.

1.145 **"Interest"** means the legal interests, equitable interests, contractual interests, Interests, or ownership interests, or other rights of any Person or Entity in the Debtors, including all partnership interests, limited liability company or membership interests, rights, investment securities, subscriptions or other agreements and contractual rights to acquire or obtain such an interest in the Debtors, subscription rights and Distribution preferences, and commitments of any character whatsoever relating to any such equity or ownership interests or obligating the Debtors to issue, transfer, or sell any interests whether or not certificated, transferable, voting, or denominated security.

1.146    **"Interim DIP Order"** means the *Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing for June 27, 2024, and (V) Granting Related Relief* [Docket No. 49] entered on the Docket by the Bankruptcy Court on June 5, 2024.

1.147    **"Internal Revenue Code"** has the meaning set forth in Article XV.A hereof.

1.148    **"IOIs"** has the meaning set forth in Article III.D.4 hereof.

1.149    **"Joint & Several OpCo General Unsecured Claim"** means a General Unsecured Claim as to which a majority of OpCo Debtors are jointly and severally liable pursuant to a written guaranty, contract, note, or similar written instrument.  For the avoidance of doubt, Joint & Several OpCo General Unsecured Claims are also OpCo General Unsecured Claims, and, to the extent Allowed, shall recover from both the OpCo GUC Allocation and the Joint & Several OpCo GUC Allocation.

1.150    **"Joint & Several OpCo GUC Allocation"** means Cash equal to 1% of the aggregate amount of all Allowed Joint & Several OpCo General Unsecured Claims, funded from the OpCo GUC Allocation.

1.151    **"Liabilities"** means any and all Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, arising in law, equity or otherwise, that are based in whole or in part on any act, event, injury, omission, transaction or agreement.

1.152    **"Lien"** has the meaning set forth in Bankruptcy Code section 101(37).

1.153    **"Liquidation Analysis"** means the hypothetical chapter 7 liquidation analysis attached hereto as **Exhibit A**.

1.154    **"Local Rules"** means the Local Rules of the United States Bankruptcy Court for the Northern District of Georgia.

1.155    "**Mediation Procedures**" means the Mediation Procedures of the United States Bankruptcy Court for the Northern District of Georgia.

1.156    **"Miami Action"** has the meaning set forth in Article III.D.12 hereof.

1.157    "**Minimum Working Capital**" has the meaning set forth in Article IX.B hereof.

1.158    "**Motion to Dismiss**" has the meaning set forth in Article III.D.12 hereof.

1.159    **"NDA"** has the meaning set forth in Article III.D.4 hereof.

1.160    **"New Board"** means the initial board of managers or directors or other governing or managing Person or Entity of the Reorganized Debtors or such other entity contemplated by the Restructuring Transactions Memorandum, which shall be acceptable to Plan Sponsor in its sole discretion. The identity of the New Board shall be Filed with the Plan Supplement.

1.161  **"New Equity Interests"** means the ownership interests in Reorganized Parent and/or another applicable Person or Entity as set forth in the Restructuring Steps Memorandum authorized to be issued pursuant to this Plan and the New Governance Documents.

1.162  **"New Governance Documents"** means the new and/or amended or restated organizational documents for each of the Reorganized Debtors and/or any applicable Entity as contemplated by the Restructuring Transactions Memorandum, which, with respect to each of the foregoing, relate to, among other things, (a) significant corporate actions, and (b) voting rights, in each case subject to regulatory constraints.  The New Governance Documents shall be included in the Plan Supplement and will be in form and substance acceptable to the Plan Sponsor in all respects.

1.163  "**New Operators**" means each of the New Operators that operate a facility that was previously operated by any of the Debtors and subsequently transferred operations by any such Debtor to such New Operator prior to the Petition Date.

1.164  **"Non-U.S. Holder"** has the meaning set forth in Article XV.A hereof.

1.165  **"Notice"** has the meaning set forth in Article XVI.D of this Plan.

1.166  **"Notice Parties"** has the meaning set forth in Article XIII.A hereof.

1.167  **"Objection(s)"** means any objection, application, motion, complaint, or other legal proceeding seeking, in whole or in part, to disallow, determine, liquidate, classify, reclassify, or establish the priority, expunge, subordinate, or estimate any Claim (including the resolution of any request for payment of any Administrative Expense Claim).

1.168  **"Official Bankruptcy Forms"** means the Official Bankruptcy Forms, prescribed by the Judicial Conference of the United States, the observance and use of which is required pursuant to Bankruptcy Rule 9009, as such forms may be amended, revised, or supplemented from time to time.

1.169  **"OID"** has the meaning set forth in Article XV.D.1 hereof.

1.170  **"Omega"** means Omega Healthcare Investors, Inc., the Omega Landlords, the Omega Secured Parties, the Omega Note Agreement Lenders, and the OHI DIP Lender.

1.171  **"Omega Collateral"** has the meaning set forth in Article III.A.4.i.1 hereof.

1.172  **"Omega Facilities"** has the meaning set forth in Article III.A.4.i.d hereof.

1.173  **"Omega Facility Debtors"** has the meaning set forth in Article III.A.4.i.1 hereof.

1.174  **"Omega Landlord Collateral"** has the meaning set forth in Article III.A.4.i.1 hereof.

1.175  **"Omega Landlord Liens"** has the meaning set forth in Article III.A.4.i.1 hereof.

1.176  **"Omega Landlords"** means the indirect affiliates or subsidiaries of Omega Healthcare Investors, Inc. identified as the landlords of the Omega Facilities in the Omega Master Lease.

1.177  **"Omega Liens"** has the meaning set forth in Article III.A.4.i.1 hereof.

1.178  **"Omega Master Lease Claim"** means any and all Claims arising under, derived from, or based upon the Omega Master Lease.

1.179   **"Omega Master Lease Documents"** has the meaning set forth in Article III.A.4.i.1 hereof.

1.180   **"Omega Master Lease Guarantor"** has the meaning set forth in Article III.A.4.i.1 hereof.

1.181   **"Omega Master Lease Obligations"** has the meaning set forth in Article III.A.4.i.1 hereof.

1.182   **"Omega Master Lease Obligors"** has the meaning set forth in Article III.A.4.i.1 hereof.

1.183   **"Omega Master Lease"** has the meaning set forth in Article III.A.4.i.1 hereof.

1.184   **"Omega Note Agreement"** means  that certain Term Note dated as of September 1, 2021 by and among the Omega Note Agreement Lenders and LVE Master Tenant 4, LLC , and any amendments thereto.

1.185   **"Omega Note Agreement Claim"** means any and all Claims arising under, derived from, or based upon the Omega Note Agreement.

1.186   **"Omega Note Agreement Lenders"** means the list of lenders identified on Schedule 1 of the Omega Note Agreement.

1.187   **"Omega Obligors"** has the meaning set forth in Article III.A.4.i.1 hereof.

1.188   **"Omega Secured Obligations"** has the meaning set forth in Article III.A.4.i.1 hereof.

1.189   **"Omega Secured Parties"** has the meaning set forth in Article III.A.4.i.1 hereof.

1.190   **"Omega Term Loan Agent"** has the meaning set forth in Article III.A.4.i.b hereof.

1.191   **"Omega Term Loan Claims"** means any and all Claims arising under, derived from, or based upon the Omega Term Loan Credit Agreement.

1.192   **"Omega Term Loan Collateral"** has the meaning set forth in Article III.A.4.i.b hereof.

1.193   **"Omega Term Loan Credit Agreement"** has the meaning set forth in Article III.A.4.i.b hereof.

1.194   "**Omega Term Loan Deficiency Claims**" means any portion of the Omega Term Loan Claims that is not a Secured Claim.

1.195   **"Omega Term Loan Documents"** has the meaning set forth in Article III.A.4.i.b hereof.

1.196   **"Omega Term Loan Facility"** has the meaning set forth in Article III.A.4.i.b hereof.

1.197   **"Omega Term Loan Guarantors"** has the meaning set forth in Article III.A.4.i.b hereof.

1.198   **"Omega Term Loan Lenders"** has the meaning set forth in Article III.A.4.i.b hereof.

1.199   **"Omega Term Loan Liens"** has the meaning set forth in Article III.A.4.i.b hereof.

1.200   **"Omega Term Loan Obligations"** has the meaning set forth in Article III.A.4.i.b hereof.

1.201    **<u>Omega Term Loan Obligors</u>** has the meaning set forth in Article III.A.4.i.b hereof.

1.202    **<u>Omega Term Loan Secured Parties</u>** has the meaning set forth in Article III.A.4.i.b hereof.

1.203    **<u>Omega Term Loans</u>** has the meaning set forth in Article III.A.4.i.b hereof.

1.204    **<u>OpCo Debtors</u>** means the OpCo Facility Debtors and the OpCo Non-Facility Debtors.

1.205    **<u>OpCo Facility Debtors</u>** means the Debtors that are currently operating a Facility.  A list of the OpCo Facility Debtors is attached hereto as **<u>Exhibit E</u>**.

1.206    **<u>OpCo General Unsecured Claims</u>** means the General Unsecured Claims against the OpCo Debtors; *provided, however*, that a General Unsecured Claim against any OpCo Non-Facility Debtor which the GUC Trustee determines, in his or her sole discretion, related to, arose out of, or was based upon transactions with, or acts or omissions of, a DivestCo Debtor shall be deemed, upon written notice from the GUC Trustee to the affected Holder but without further Order of the Court, solely to be a DivestCo General Unsecured Claim in Class 6B.  For the avoidance of doubt, (a) notwithstanding any direct liability such OpCo Non-Facility Debtor may have with respect to a General Unsecured Claim against an OpCo Non-Facility Debtor that the GUC Trustee determines should be treated as a DivestCo General Unsecured Claim, such Claim shall be treated and receive a recovery solely as a DivestCo General Unsecured Claim, and (b) to the extent such Claim was also asserted or scheduled against a DivestCo Debtor, the Holder of such Claim shall only be entitled to a single recovery from the DivestCo GUC Allocation.

1.207    **<u>OpCo GUC Allocation</u>** means the allocation of the GUC Contribution attributed to Holders of OpCo General Unsecured Claims in the amount of $9.25 million in Cash, *less* the Joint & Several OpCo GUC Allocation.

1.208    **<u>OpCo Non-Facility Debtors</u>** means the Debtors that are otherwise engaged in the management, funding, or operational oversight of the Debtors' Facilities.  A list of the OpCo Non-Facility Debtors is attached hereto as **<u>Exhibit F</u>**.

1.209    **<u>Order</u>** means an order or judgment of the Bankruptcy Court as entered on the Docket.

1.210    **<u>Other Priority Claim</u>** means a Claim that is accorded priority in right of payment under Bankruptcy Code section 507, other than a Priority Tax Claim or an Administrative Expense Claim.

1.211    **<u>Other Secured Claim</u>** means any Secured Claim against the Debtors, including any Secured Tax Claim (to the extent applicable), other than an ABL Claim, an Omega Term Loan Claim, or an Omega Master Lease Claim.

1.212    "**<u>Patient Care Ombudspersons</u>**" means those persons identified in Article III.D.5.ii hereof.

1.213    **<u>Person</u>** has the meaning set forth in Bankruptcy Code section 101(41).

1.214    **<u>Petition Date</u>** means June 2, 2024.

1.215    **<u>Plan</u>** has the meaning set forth in Article I.A hereof.

1.216    **<u>Plan Sponsor</u>** means TIX 33433 LLC or its designee.

1.217    **Plan Sponsor Contribution**" means $10.75 million in Cash.

1.218    **Plan Supplement**" means the compilation of documents and forms of documents, term sheets, agreements, schedules, and exhibits to the Plan (in each case, as may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code and Bankruptcy Rules) to be Filed prior to the Combined Hearing to the extent available, and any additional documents Filed prior to the Effective Date as amendments to the Plan Supplement, and in each case in form and substance acceptable to the DIP Lenders, the ABL Lenders, and the Omega Secured Parties, including the following, as applicable: (a) the New Governance Documents; (b) to the extent known, the identities of the members of the New Board; (c) the identity of the GUC Trustee; (d) the Assumed Executory Contracts and Unexpired Leases List; (e) the schedule of Assumed Administrative and Priority Claims; (f) the Restructuring Transactions Memorandum; (g) the schedule of Go-Forward Trade Contracts; (h) the ABL Exit Facility Credit Agreement; (i) the Unliquidated Claim Procedures; (j) the schedule of preserved Causes of Action; (k) the GUC Trust Agreement; (l) the Backstop Note; and (m) the Backstop Note Guaranty; *provided, however*, that the GUC Trust Agreement, the Unliquidated Claim Procedures, the schedule of preserved Causes of Action, the Backstop Note, the Backstop Note Guaranty, and any other document in the Plan Supplement (solely to the extent that such document materially impacts the GUC Trust or the treatment of General Unsecured Claims or recoveries thereon under the Plan) shall be in a form reasonably acceptable to the UCC; *provided, further, however*, that the UCC shall not have rights to approve the terms of the assumption and assignment of the Omega Master Lease or the Omega Term Loans.  The Debtors shall have the right to alter, amend, modify, or supplement the documents contained in the Plan Supplement up to the Effective Date as set forth in this Plan, subject to the approval rights of the DIP Lenders, the ABL Lenders, the Omega Secured Parties, and the UCC over such documents, as set forth above.

1.219    **Plan Supplement Filing Date**" means the date on which the Plan Supplement was filed with the Bankruptcy Court, which date is at least seven (7) days prior to the Voting Deadline.

1.220    **Plan Transaction**" means the transaction, which shall be acceptable to the DIP Lenders, the ABL Lenders, the Omega Secured Parties, and (solely to the extent that such document materially impacts the GUC Trust or the treatment of General Unsecured Claims or recoveries thereon under the Plan) the UCC, resulting in, among other things, the assumption by the Reorganized Debtors of the Elderberry Facilities, the Harts Harbor Facility, the Omega Facilities, and the Welltower Facilities, each pursuant to the assumption by the Debtors and, if necessary, assignment to the Reorganized Debtors of underlying leases and agreements, including the Omega Master Lease Documents and Omega Term Loan Documents (each as may be modified and agreed upon by the Omega Secured Parties) and the transfer free and clear of all liens, claims and encumbrances (including any overpayments) of the Debtors' Medicare Provider Agreements and Medicare provider number, and the issuance and distribution of New Equity Interests to the Plan Sponsor contemplated by and pursuant to this Plan, as described in Article VI.B of this Plan; *provided, however*, that the UCC shall not have rights to approve the terms of the assumption and assignment of the Omega Master Lease or the Omega Term Loans.

1.221    **PL/GL Administrative Claim**" means an Administrative Expense Claim for death or personal injuries, including emotional distress, arising from or relating to the Debtors' ownership, operation, provision of services, or care to residents, or management of any of the Facilities.

1.222    **Powerback Rehabilitation**" means Genesis Eldercare Rehabilitation Services d/b/a Powerback Rehabilitation.

1.223    **Prepetition Collateral**" has the meaning set forth in Article III.A.4.i.1 hereof.

1.224  **"Prepetition Liens"** has the meaning set forth in Article III.A.4.i.1 hereof.

1.225  **"Prepetition Obligors"** has the meaning set forth in Article III.A.4.i.1 hereof.

1.226  **"Prepetition Secured Documents"** has the meaning set forth in Article III.A.4.i.1 hereof.

1.227  **"Prepetition Secured Obligations"** has the meaning set forth in Article III.A.4.i.1 hereof.

1.228  **"Prepetition Secured Parties"** has the meaning set forth in Article III.A.4.i.1 hereof.

1.229  **"Priority Claims"** means, collectively, Other Priority Claims and Priority Tax Claims.

1.230  **"Priority Tax Claim"** means a Claim that is entitled to priority under Bankruptcy Code section 507(a)(8).

1.231  **"Pro Rata"** means, at any time, the proportion that the Face Amount of a Claim in a particular Class bears to the aggregate Face Amount of all Claims (including Disputed Claims, but excluding Disallowed Claims) in such Class, unless the Plan provides otherwise.

1.232  **"Professional"** means any professional Person employed in the Chapter 11 Cases pursuant to Bankruptcy Code sections 327, 328, 363, or 1103 pursuant to an Order of the Bankruptcy Court and to be compensated for services rendered pursuant to Bankruptcy Code sections 327, 328, 329, 330, or 331.

1.233  **"Professional Fee Claim"** means a Claim of a Professional pursuant to Bankruptcy Code sections 327, 328, 330, 331, or 503(b) for compensation or reimbursement of costs and expenses relating to services performed after the Petition Date and prior to and including the Effective Date.

1.234  **"Professional Fee Claim Bar Date"** means the deadline for Filing all applications for Professional Fee Claims, which shall be forty-five (45) days after the Effective Date.

1.235  **"Professional Fee Claim Objection Deadline"** has the meaning set forth in Article IV.C.1 hereof.

1.236  **"Professional Fee Estimate"** means (a) with respect to any Professional, a good-faith estimate of such Professional's anticipated accrued, unpaid Professional Fee Claims as of the Effective Date to be provided by each Professional (inclusive of any anticipated costs to be incurred in preparing any final fee application or for work to be performed in connection with the implementation and Consummation of the Plan) in writing to the Debtors in accordance with Article IV.C.3, or in the absence of such a writing, to be prepared by the Debtors, and (b) collectively, the sum of all individual Professional Fee Estimates.

1.237  **"Professional Fee Reserve"** means the reserve of Cash funded by the Debtors for the benefit of Holders of Allowed Professional Fee Claims in an amount equal to the Professional Fee Estimate.

1.238  **"Proof of Claim"** means the proof of claim that must be Filed before the Bar Date, the Governmental Bar Date, or the Administrative Expense Claim Bar Date, as applicable, which term shall include a request for payment of an Administrative Expense Claim.

1.239  **"QCPMT"** means Debtor QCPMT, LLC.

1.240  **"Recovery Corp."** has the meaning set forth in Article III.D.10 hereof.

1.241 **"Reinstate," "Reinstated,"** or **"Reinstatement,"** means the treatment provided for in Bankruptcy Code section 1124.

1.242 **"Rejection Bar Date"** means the deadline to File a Proof of Claim for damages relating to the rejection of an Executory Contract or Unexpired Lease, which is the later of (a) thirty (30) days after the effective date of rejection of any unexpired lease or executory contract of the Debtors as provided by an order of the Bankruptcy Court or pursuant to a notice under procedures approved by the Bankruptcy Court, (b) any date set by another order of the Bankruptcy Court, or (c) the Bar Date or the Governmental Bar Date, whichever is applicable.

1.243 **"Released Parties"** means, collectively, the following Entities, each in their capacity as such: (a) the Debtors and the Reorganized Debtors; (b) the UCC and each of its members (solely in their respective capacities as such); (c) Omega; (d) the ABL Secured Parties; (e) OHI DIP Lender, LLC; (f) TIX 33433 LLC; (g) the CRO; (h) the Independent Manager; and (i) with respect to each of the foregoing Entities, each such Entity's current and former affiliates, subsidiaries, officers, directors, managers, principals, members, equity investors, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; *provided, however*, that subject in all respects to Article IV.H hereof, the D&Os shall not be Released Parties for purposes of the D&O Claims, but shall be Released Parties for purposes of the Third-Party Releases contained in Article X.D.2 hereof.

1.244 **"Releasing Parties"** means the following Entities, each in their respective capacities as such: (a) each Holder of a Claim that (i) votes to accept the Plan or (ii) either (1) abstains from voting or (2) votes to reject the Plan and, in the case of either (1) or (2), does not opt out of the voluntary release by checking the opt-out box on the applicable Ballot, and returning it in accordance with the instructions set forth thereon, indicating that they are electing to opt out of granting the releases provided in the Plan; (b) each Holder of a Claim that is deemed to accept the Plan or is otherwise Unimpaired under the Plan and who does not opt out of the voluntary release by checking the opt out box on the applicable non-voting status notice form, and returning it in accordance with the instructions set forth thereon, indicating that they are not willing to grant the releases provided in the Plan; and (c) each Holder of a Claim that is deemed to reject the Plan or is otherwise Impaired under the Plan and who does not opt out of the voluntary release by checking the opt-out box on the applicable non-voting status notice form, and returning it in accordance with the instructions set forth thereon, indicating that they are not willing to grant the releases provided in the Plan; and (d) each Holder of an unclassified Claim who does not object to the Third-Party Release.

1.245 **"Reorganized Debtor"** means a Debtor, or any successor or assign thereto, by merger, consolidation, reorganization, or otherwise, in the form of a corporation, limited liability company, partnership, or other form, as the case may be, on and after the Effective Date.

1.246 **"Reorganized Parent"** means LV Operations I, LLC or any successor or assign thereto, by merger, consolidation, reorganization, or otherwise, in the form of a corporation, limited liability company, partnership, or other form, as the case may be, on and after the Effective Date.

1.247 **"Required DIP Lenders"** has the meaning set forth in the DIP Credit Agreement.

1.248 **"Resident Medical Records"** has the meaning set forth in Article VI.M.

1.249 **"Restructuring Transactions Memorandum"** means the summary of transaction steps to complete the restructuring contemplated by the Plan, which shall be included in the Plan Supplement and acceptable to the Plan Sponsor, the DIP Lenders, the ABL Lenders, the Omega Secured Parties, and (solely to the extent that such document materially impacts the GUC Trust or the treatment of General Unsecured

Claims or recoveries thereon under the Plan) the UCC; *provided, however*, that the UCC shall not have rights to approve the terms of the assumption and assignment of the Omega Master Lease or the Omega Term Loans.

1.250    **Scheduled**" means, with respect to any Claim, the status and amount, if any, of that Claim as set forth in the Schedules.

1.251    **Schedules**" means the schedules of assets and liabilities and the statement of financial affairs Filed by the Debtors, as such schedules and statements have been or may be supplemented or amended from time to time in accordance with Bankruptcy Rule 1009 or any orders of the Bankruptcy Court.

1.252    **Second Amended Combined Disclosure Statement and Plan**" means this second amended combined disclosure statement and chapter 11 plan of reorganization, including, without limitation, the Disclosure Statement, the Plan, the Plan Supplement(s), all exhibits, supplements, appendices, and schedules hereto, either in their present form or as the same may be altered, amended, or modified from time to time in accordance with the terms hereof.

1.253    **Secured Claim**" means a Claim that is secured by a Lien on property in which the Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Final Order of the Bankruptcy Court, or that is subject to a valid right of setoff pursuant to Bankruptcy Code section 553, to the extent of the value of the Holder of such Claim's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to Bankruptcy Code section 506(a) or as Allowed pursuant to the Plan as an Other Secured Claim.

1.254    **Secured Tax Claim**" means any Secured Claim which, absent its secured status, would be entitled to priority in right of payment under Bankruptcy Code section 507(a)(8).

1.255    **Securities Act**" means the Securities Act of 1933, 15 U.S.C. §§ 77c-77aa, as now in effect or hereafter amended, and any similar federal, state or local law.

1.256    **Solicitation Package**" means the forms of documents to be sent to Holders of Claims in compliance with Bankruptcy Rules 3017(d) and 2002(b).

1.257    **Solicitation Procedures Motion**" means the *Debtors' Motion for Entry of Order (I) Approving Disclosure Statement, (II) Scheduling Combined Hearing, (III) Establishing Procedures for Solicitation and Tabulation of Votes on Plan, (IV) Approving Certain Forms and Notices; and (V) Granting Related Relief* [Docket No. 316].

1.258    **Solicitation Procedures Order**" means the *Order (I) Conditionally Approving Disclosure Statement, (II) Scheduling Combined Hearing for November 14, 2024 at 9:30 a.m. (Prevailing Eastern Time), (III) Establishing Procedures for Solicitation and Tabulation of Votes on Plan, (IV) Approving Certain Forms and Notices; and (V) Granting Related Relief* [Docket No. 480].

1.259    **Statutory Fees**" means any fees due and payable pursuant to section 1930 of Title 28 of the United States Code, together with the statutory rate of interest set forth in section 3717 of Title 31 of the United States Code to the extent applicable.

1.260    **Subordination Agreement**" means that certain Subordination Agreement, dated as of March 22, 2022, between OHI Mezz Lender, LLC and Powerback Rehabilitation.

1.261 **"Subordinated Claim"** means any Claim that is subject to (a) subordination under Bankruptcy Code section 510(b) or (b) equitable subordination as determined by the Bankruptcy Court in a Final Order, including, without limitation, any Claim for or arising from the rescission of a purchase, sale, issuance, or offer of a security of any Debtor; for damages arising from the purchase or sale of such a security; or for reimbursement, indemnification, or contribution allowed under Bankruptcy Code section 502 on account of such Claim.

1.262 **"Subsequent Distribution Date"** means the last Business Day of the month following the end of each calendar quarter after the Effective Date; *provided*, *however*, that if the Effective Date is within thirty (30) days of the end of a calendar quarter, then the first Subsequent Distribution Date will be the last Business Day of the month following the end of the first (1st) calendar quarter after the calendar quarter in which the Effective Date falls.

1.263 "**Synergy**" has the meaning set forth in Article III.C.2 hereof.

1.264 "**Tax Code**" means the Internal Revenue Code of 1986, as amended.

1.265 **"Third-Party Release"** means the release set forth in Article X.D.2 hereof.

1.266 **"Treasury Regulations"** has the meaning set forth in Article XV.A hereof.

1.267 **"U.S. Holder"** has the meaning set forth in Article XV.A hereof.

1.268 **"U.S. Trustee"** means the Office of the United States Trustee for Region 21.

1.269 **"U.S."** means the United States.

1.270 **"UCC"** means the Official Committee of Unsecured Creditors appointed by the U.S. Trustee as of June 13, 2024 [Docket No. 112] and reconstituted on August 30, 2024 [Docket No. 369].

1.271 **"Unclaimed Distribution"** means a Distribution that is not claimed by a Holder of an Allowed Claim on or prior to the Unclaimed Distribution Deadline.

1.272 **"Unclaimed Distribution Deadline"** means ninety (90) days from the date the GUC Trustee makes a Distribution of Cash or other property under the Plan to a Holder of an Allowed Claim.

1.273 **"Unexpired Lease(s)"** means an unexpired lease to which a Debtor is party that is subject to assumption or rejection under Bankruptcy Code section 365.

1.274 **"Unimpaired"** means, when used in reference to a Claim or a Class, a Claim or a Class that is not impaired within the meaning of Bankruptcy Code section 1124.

1.275 **"Unliquidated Claim"** means a Claim for which a specific value has not been determined by settlement, agreement, or final order or judgment of a court of competent jurisdiction.

1.276 "**Unliquidated Claim Procedures**" means the submission, resolution, and distribution procedures in respect of all Unliquidated Claims, which shall be filed as part of the Plan Supplement.

1.277 **"VDR"** has the meaning set forth in Article III.D.4 hereof.

1.278 "**Verita**" has the meaning set forth in Article III.D.6.i hereof.

1.279  **"Voting Classes"** means Class 3 (ABL Claims), Class 4 (Omega Term Loan Claims), Class 5 (Go-Forward Trade Claims), Class 6A (OpCo General Unsecured Claims), Class 6B (DivestCo General Unsecured Claims), and Class 6C (Joint & Several OpCo General Unsecured Claims).

1.280  **"Voting Deadline"** means November 4, 2024, at 4:00 p.m. (prevailing Eastern Time), the date and time by which all Ballots to accept or reject the Plan must be received to be counted, as set forth by the Solicitation Procedures Order.

1.281  **"Welltower"** or **"Welltower Landlord"** means Welltower NNN Group, LLC.

1.282  **"Welltower Facilities"** has the meaning set forth in Article III.A.4.i.d hereof.

1.283  **"Welltower Facility Debtors"** has the meaning set forth in Article III.A.4.i.2 hereof.

1.284  **"Welltower Landlord Liens"** has the meaning set forth in Article III.A.4.i.2 hereof.

1.285  **"Welltower Master Lease"** has the meaning set forth in Article III.A.4.i.2 hereof.

1.286  "**Working Capital**" means the sum of (a) Available Cash *plus* (b) the product of (i) ten percent (10%) *multiplied by* (ii) the aggregate net amount at such time of the Eligible Accounts (as defined in the ABL Credit Agreement).

## B.    Rules of Interpretation and Construction

For purposes of this Second Amended Combined Disclosure Statement and Plan: (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and neuter gender; (2) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, restated, supplemented, or otherwise modified; (4) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references herein to "Articles" are references to Articles of the Second Amended Combined Disclosure Statement and Plan or hereto; (6) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (7) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Second Amended Combined Disclosure Statement and Plan in its entirety rather than to a particular portion of the Second Amended Combined Disclosure Statement and Plan; (8) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Second Amended Combined Disclosure Statement and Plan; (9) unless otherwise specified herein, the rules of construction set forth in Bankruptcy Code section 102 shall apply; (10) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (11) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (12) any effectuating provisions may be interpreted by the Debtors in such a manner that is consistent with the overall purpose and intent of the Second Amended Combined Disclosure Statement and Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; (13) any references herein to the Effective Date shall mean the Effective Date or as soon as reasonably practicable thereafter; (14) all references herein to consent, acceptance, or approval shall be deemed to include the requirement that such consent, acceptance, or approval be evidenced by a writing,

which may be conveyed by counsel for the respective parties that have such consent, acceptance, or approval rights, including by electronic mail; and (15) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

## C.    Computation of Time

In computing any period of time prescribed or allowed by the Second Amended Combined Disclosure Statement and Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

## D.    Governing Law

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) and except as otherwise provided herein or therein, the laws of (1) the State of Georgia shall govern the construction and implementation of the Second Amended Combined Disclosure Statement and Plan and any agreements, documents and instruments executed in connection with the Second Amended Combined Disclosure Statement and Plan and (2) the state of incorporation of the Debtors shall govern corporate governance matters with respect to the Debtors, in either case without giving effect to the principles of conflicts of law thereof.

## ARTICLE III.
## BACKGROUND AND DISCLOSURES

## A.    General Background

### 1.    Corporate History

LaVie is an operator of 43 licensed skilled nursing facilities and independent living facilities across five states that care for more than 3,700 residents on a daily basis, with approximately 3,600 employees. LaVie was formed in 2011 and 2012 through a series of mergers and acquisitions involving a group of Florida-based skilled nursing facility operators under the original LaVie brand, Consulate Health Care, a separate and independent company operating approximately 78 skilled nursing facilities under the Consulate name.

In the years following its formation, the Debtors continued to expand and, at the height of its operations, was one of the largest operators of skilled nursing and independent living facilities in the United States.  Since then, the Debtors have divested or closed many of their former facilities, including, most recently, the divestiture of 63 facilities in 2023, predominantly in Florida and eight facilities in the first two quarters of 2024.

As a result of these divestitures, the Debtors' portfolio currently consists of 43 licensed facilities comprising nearly 4,300 licensed beds across Pennsylvania, Virginia, North Carolina, Mississippi, and Florida.

### 2.    Corporate Structure

#### i.    Debtors

The Debtors' corporate structure is attached hereto as **Exhibit C**.

### 3.    Business Operations

The Debtors provide a broad range of services in their Facilities, including short-term rehabilitation, comprehensive post-acute skilled care, long-term care, assisted living, and therapy services.  The Debtors operate the Facilities in Pennsylvania, Virginia, North Carolina, Mississippi, and Florida.  These Facilities provide much-needed services to the communities that they serve and also provide meaningful employment in such communities.  Across the Facilities, the Debtors employ approximately 3,600 employees, including nurses, certified nursing assistants, other caregivers, maintenance workers, and corporate and administrative personnel.

### 4.    Prepetition Capital Structure

#### i.    Secured Debt Obligations

The Debtors do not own the underlying real property of the Facilities and hold only leasehold interests in their Facilities.  As a result, the primary collateralized assets owned by the Debtors are cash and accounts receivables.  As described and defined below, (a) the ABL Secured Parties hold a first priority security interest in the Debtors' cash and accounts receivable; (b) the Omega Term Loan Secured Parties hold a second priority security interest in the Debtors' cash and accounts receivable, subject to the priorities in the Intercreditor Agreement (as defined below); and (c) certain of the Debtors' landlords have security interests in certain limited assets of the Debtors that are either subordinated to the interests of the ABL Secured Parties and the Omega Term Loan Secured Parties, or are collateralized by the Debtors' otherwise unencumbered personal property.

The following chart sets forth the Debtors' funded secured debt obligations as of June 2, 2024.

| Debt Obligation | Secured Status | Prepetition Principal Amount Owed (Approx.) |
|---|---|---|
| ABL Credit Facility | Secured | $34.4 million |
| Omega Term Loan Credit Facility | Secured | $26.9 million |
| Capital Lease Obligations | Secured | $622.2 million |
| **Total** | **N/A** | **$683.5 million** |

#### a.    ABL Credit Facility

The Debtors have outstanding obligations under that certain Second Amended and Restated Credit and Security Agreement, dates as of March 25, 2022 (as otherwise amended, supplemented, or otherwise modified from time to time, the "ABL Credit Agreement," and together with any other documents executed and delivered in connection therewith, collectively, the "ABL Documents"), by and among, LV CHC Holdings I, LLC, and certain of its affiliates designated therein as borrowers (such borrowers, collectively, the "ABL Borrowers" or the "ABL Obligors"), the financial institutions party thereto from time to time as lenders (the "ABL Lenders"), MidCap Funding IV Trust, as agent for the ABL Lenders (in such capacity, the "ABL Agent," and together with the ABL Lenders, the "ABL Secured Parties"), pursuant to which the ABL Lenders provided a first lien asset-based lending credit facility to the ABL Borrowers (the "ABL Credit Facility," and the loans provided thereunder, the "ABL Loans").

Under the ABL Loan Documents, the ABL Borrowers granted to the ABL Agent, for the benefit of itself and the ABL Lenders, valid and properly perfected continuing liens on and security interests in (the "ABL Liens") all "Collateral" (as defined in the ABL Documents) (such collateral, the "ABL Senior Collateral").

As of the Petition Date, the Debtors were justly and lawfully indebted and liable to the ABL Agent and ABL Lenders, without defense, counterclaim, or offset of any kind, in the aggregate amount of $34,381,211.58 on account of the ABL Loans outstanding under the ABL Documents, plus any and all unpaid interest (including default interest), reimbursement obligations, fees, costs, expenses (including, without limitation, attorneys' fees, financial advisors' fees, related expenses and disbursements), charges, disbursements, indemnification obligations, and any other amounts, contingent or otherwise, whenever arising or accruing, that may be due, owing, or chargeable in respect thereof, in each case, to the extent provided in the ABL Documents (collectively, the "<u>ABL Obligations</u>").

### b.    Omega Term Loan Credit Facility

The Debtors have obligations under that certain Credit and Security Agreement, dated as of March 25, 2022 (as otherwise amended, supplemented, or otherwise modified from time to time, the "<u>Omega Term Loan Credit Agreement</u>," and together with any other documents executed and delivered in connection therewith, collectively, the "<u>Omega Term Loan Documents</u>"), by and among the Borrowers (as defined in the Omega Term Loan Credit Agreement), the other parties thereto as guarantors (the "<u>Omega Term Loan Guarantors</u>," and together with the Borrowers, collectively, the "<u>Omega Term Loan Obligors</u>"), OHI Mezz Lender, LLC and the other financial institutions party thereto from time to time as lenders (the "<u>Omega Term Loan Lenders</u>"), and OHI Mezz Lender, LLC, as agent for the Omega Term Loan Lenders (in such capacity, the "<u>Omega Term Loan Agent</u>," and together with the Omega Term Loan Lenders, collectively, the "<u>Omega Term Loan Secured Parties</u>").  Under the Omega Term Loan Credit Agreement, the Omega Term Loan Lenders provided term loans and other financial accommodations to the Borrowers (the "<u>Omega Term Loan Facility</u>," and the loans provided thereunder, the "<u>Omega Term Loans</u>").

As of the Petition Date, the Debtors were justly and lawfully indebted and liable to the Omega Term Loan Agent and the Omega Term Loan Lenders, without defense, counterclaim, or offset of any kind, in the aggregate amount of not less than $26,952,146.54 on account of Omega Term Loans outstanding under the Omega Term Loan Documents, plus any and all unpaid interest (including default interest), reimbursement obligations, fees, costs, expenses (including, without limitation, attorneys' fees, financial advisors' fees, related expenses and disbursements), charges, disbursements, indemnification obligations, and any other amounts, contingent or otherwise, whenever arising or accruing, that may be due, owing, or chargeable in respect thereof, in each case, to the extent provided in the Omega Term Loan Documents, (collectively, the "<u>Omega Term Loan Obligations</u>").

The Omega Term Loan Obligations are secured by second priority security interests in and liens on property of the Omega Term Loan Obligors constituting ABL Senior Collateral and first priority security interests in and liens on any other property of the Omega Term Loan Obligors as set forth in the Omega Term Loan Documents (such collateral, the "<u>Omega Term Loan Collateral</u>" and such security interests in and liens on the Omega Term Loan Collateral, the "<u>Omega Term Loan Liens</u>").

### c.    ABL/Omega Term Loan Intercreditor Agreement

The relative contractual rights of the ABL Secured Parties and the Omega Term Loan Secured Parties are governed by that certain Intercreditor Agreement, dated as of March 25, 2022 (as otherwise amended, supplemented, or otherwise modified from time to time, the "<u>ABL/Omega Term Loan Intercreditor Agreement</u>"), among the ABL Agent and the Omega Term Loan Agent, and acknowledged by the ABL Obligors and the Omega Term Loan Obligors.

### d.    Capital Lease Obligations

The Debtors do not own the underlying real property at the Facilities, but rather lease or sublease their respective facilities from four landlords. Collectively, the Debtors lease (a) 30 Facilities in North Carolina, Virginia, Mississippi, and Pennsylvania (collectively, the "Omega Facilities") from the Omega Landlords; (b) nine Facilities in Virginia (collectively, the "Welltower Facilities") from the Welltower Landlord; (c) three Facilities in North Carolina (collectively, the "Elderberry Facilities") from Elderberry Landlords; and (d) one Facility in Florida ("Harts Harbor") from the Harts Harbor Landlord. The obligations owed to the Omega Landlords and the Welltower Landlord are secured, while the obligations owed to the Elderberry Landlords and the Harts Harbor Landlord are unsecured.

## 1.    Omega Master Lease Obligations

The Omega Facilities are currently subject to (a) that certain Amended and Restated Consolidated Master Lease, dated as of March 25, 2022 (as subsequently amended, modified, renewed, or restated from time to time, the "Omega Master Lease," and together with all other agreements, documents, and instruments executed and/or delivered with, to or in favor of the Omega Landlords, including, without limitation, all security agreements, notes, guarantees, mortgages, Uniform Commercial Code financing statements, documents, and instruments, including any fee letters, executed and/or delivered in connection therewith or related thereto, the "Omega Master Lease Documents"; the Omega Master Lease Documents, together with the ABL Documents and the Omega Term Loan Documents, collectively, the "Prepetition Secured Documents"),[6] by and among Debtor Alpha Health Care Properties, LLC ("Alpha") and certain Omega Landlords (the Omega Landlords, together with the Omega Term Loan Secured Parties, collectively, the "Omega Secured Parties"; the Omega Secured Parties, together with the ABL Secured Parties, collectively, the "Prepetition Secured Parties"); and (b) certain subleases between Alpha and each Debtor that operates an Omega Facility (collectively, the "Omega Facility Debtors"). Certain of the Debtors, the Omega Facility Debtors and other parties guaranteed the obligations due and owing under the Omega Master Lease Documents (each an "Omega Master Lease Guarantor", and collectively with Alpha and the Omega Facility Debtors, the "Omega Master Lease Obligors," and, together with the Omega Term Loan Obligors, the "Omega Obligors" and, the Omega Obligors together with the ABL Obligors, the "Prepetition Obligors"). The Omega Master Lease constitutes one indivisible and non-severable executory contract under Bankruptcy Code section 365. The Omega Term Loan Credit Agreement was entered into in connection with the Omega Master Lease, is an integral component of the transactions contemplated thereunder, and the Omega Master Lease Agreement and the Omega Term Loan Credit Agreement represent a single integrated transaction.

The Omega Master Lease's term expires on December 31, 2037, with two ten-year renewal options. Current monthly rent under the Omega Master Lease is approximately $3.0 million. As of the Petition Date, the Omega Master Lease Obligors were justly and lawfully indebted and liable to the Omega Landlords, without defense, counterclaim or offset of any kind, with respect to $31,954,950.71 in principal amount of unpaid Rent (as defined in the Omega Master Lease), plus accrued and unpaid interest thereon and fees, expenses (including any attorneys', accountants', appraisers' and financial advisors' fees, in each case, solely to the extent that they are chargeable or reimbursable under the Omega Master Lease Documents), charges, indemnities and all other obligations arising under the Omega Master Lease Documents incurred in connection therewith (whether arising before, on, or after the Petition Date) as provided in the Omega Master Lease Documents (collectively, the "Omega Master Lease Obligations" and, together with the Omega Term Loan Obligations, the "Omega Secured Obligations" and, the Omega Secured Obligations together with the ABL Obligations, the "Prepetition Secured Obligations"), which

---

[6]    The Omega Master Lease was subsequently amended on August 31, 2022, December 29, 2022, January 31, 2023, April 1, 2023, April 17, 2023, July 31, 2023, September 29, 2023, November 1, 2023, November 30, 2023, December 15, 2023, February 29, 2024, April 1, 2024, and April 30, 2024.

Omega Master Lease Obligations have been guaranteed on a joint and several basis by the Omega Master Lease Guarantors.

The Omega Master Lease Obligations are secured by second priority security interests in and liens on property of the Omega Master Lease Obligors constituting ABL Senior Collateral and first priority security interests in and liens on any other property of the Omega Master Lease Obligors as set forth in the Omega Master Lease Documents (the "Omega Landlord Collateral," and together with the Omega Term Loan Collateral, the "Omega Collateral" and, the Omega Collateral together with the ABL Senior Collateral, the "Prepetition Collateral"; and such liens on and security interests in the Omega Landlord Collateral, the "Omega Landlord Liens," and together with the Omega Term Loan Liens, the "Omega Liens" and, the Omega Liens with the ABL Liens, the "Prepetition Liens").

The ABL Agent, the Omega Landlords, and certain of the Debtors party to the Omega Master Lease Documents entered into that certain Seventh Amended and Restated Subordination and Intercreditor Agreement, dated as of April 1, 2024 (the "ABL/Omega Landlord Intercreditor Agreement," and together with the ABL/Omega Term Loan Intercreditor Agreement, the "Intercreditor Agreements"), to govern the respective rights, interests, obligations, priority and positions of the ABL Obligations and the Omega Master Lease Obligations with respect to certain of the ABL Collateral and the Omega Landlord Collateral (it being understood that certain ABL Collateral is not also Omega Landlord Collateral subject to the ABL/Omega Landlord Intercreditor Agreement because certain ABL Borrowers are not also Omega Master Lease Obligors).

### 2. Welltower Master Lease Obligations

The Welltower Facilities are currently subject to (a) that certain Master Lease Agreement, dated as of August 23, 2018 (as subsequently amended, modified, renewed, or restated from time to time, the "Welltower Master Lease"),[7] by and among QCPMT and the Welltower Landlord; and (b) certain subleases between QCPMT and each Active Facility Debtor that operates a Welltower Facility (collectively, the "Welltower Facility Debtors").

The Welltower Master Lease expires on June 30, 2037, with two five-year renewal options. Current monthly rent under the Welltower Master Lease is approximately $1.125 million. As of the Petition Date, the Debtors are current on rent obligations owed under the Welltower Master Lease.

The Debtors' obligations under the Welltower Master Lease are secured by liens in favor of the Welltower Landlord (the "Welltower Landlord Liens") encumbering the "Collateral" as defined in the Welltower Master Lease, including, among other things, the Debtors' personal property, general intangibles, and other assets related to the Welltower Facilities. Pursuant to that certain Landlord Agreement, dated as of September 30, 2022, by and between the Welltower Landlord and the ABL Agent (the "MidCap/Welltower Landlord Agreement"), the Welltower Landlord Liens do not consist of any liens on the Welltower Facility Debtors "Accounts Receivable" (as defined in the MidCap/Welltower Landlord Agreement). Moreover, pursuant to that certain Intercreditor Agreement, dated as of September 30, 2022, by and between the Welltower Landlord, the Omega Term Loan Agent, QCPMT, Debtor LaVie Care Centers, LLC, and Debtor LV Operations I, LLC, the Welltower Landlord agreed to subordinate the Welltower Landlord Liens to the Omega Term Loan Liens.

---

[7]    The Welltower Master Lease was subsequently amended on November 16, 2018, and July 1, 2022.

ii.    **Unsecured Debt Obligations**

In addition to the secured debt obligations described above, the Debtors are liable for other unsecured debt obligations, which include, among other things, (a) trade, vendor, and other accrued expenses; (b) litigation claims (including those subject to settlements, those currently in pending litigation, and other incurred but not yet reported claims); and (c) other liabilities, including unsecured term loan obligations.  As discussed more fully herein, the Bar Date passed on August 30, 2024, and the Debtors are in the process of reconciling filed claims.

**B.    Circumstances Giving Rise to the Chapter 11 Cases**

**1.    COVID-19 Pandemic**

At the time of the initial onset of the COVID-19 pandemic, the Company was one of the largest operators of skilled nursing facilities in the nation, operating approximately 140 skilled nursing facilities, assisted living facilities and independent living facilities.  As a result of the impacts of the pandemic, and to try to stabilize the Debtors' financial condition, the Company exited operations at more than 90 facilities.  Today, the Debtors operate 43 licensed facilities across five states that care for more than 3,700 residents on a daily basis, with approximately 3,600 employees.  The Debtors' current portfolio of facilities produce positive cash flow; however, the substantial continuing impacts of the pandemic and resulting facility divestitures continue to plague the business.

The COVID-19 pandemic impacted sectors of the U.S. economy in dramatically different ways, with certain industries, like movie theaters, retail, and cruise lines, rebounding despite being impacted severely at the outset.  In contrast, skilled nursing, which was among the first sectors impacted at the beginning of the pandemic, has yet to fully recover from the lasting economic impacts of COVID-19.  Like many of their peers, the Debtors have been unable to shake the lasting economic effects that have reverberated throughout the sector since that time.

**2.    Post-COVID 19 Regulatory Changes**

The industry-wide economic impacts of COVID have varied significantly from state to state depending on, among other things, differing state reimbursement rates, varying access to high-quality nursing staff, incremental state funding and investment in the skilled nursing sector, insurance costs, and the overall landscape of litigation claims (which occur regularly in this industry).  Reflective of these factors, post-pandemic many of the Debtors' skilled nursing facilities could be easily classified as either "haves" and "have nots" depending on the state in which they operated.

By way of example, the Debtors were previously the largest skilled nursing facility operator in the state of Florida.  The post-pandemic operating environment in Florida was extremely challenging, as a result of a tight labor market and Florida state COVID relief funds that significantly trailed many other states.  Moreover, the impact of Florida's statutory minimum staffing requirements, which were put in place prior to COVID, added additional significant costs for Florida operators.  Compounding these issues, in the years that followed the onset of COVID, the need for skilled labor spiked at the same time that wages substantially increased and significant numbers left the workforce.  This intersection of factors caused the Debtors to suffer a nearly 25% reduction in their total workforce in 2021 and they were forced to substantially increase their reliance on staffing agencies to staff their facilities.  The necessary use of these agencies resulted in a more than 50% premium over prior wage levels.  While some of these staffing issues were felt in other states, due to the minimum staffing requirements and lack of corresponding state relief funds made the situation particularly acute in Florida.  As a result, across 2022 and 2023, the Debtors'

Florida facilities generated approximately $133 million in EBITDA losses. The Debtors have since exited operations in all but one facility in the state of Florida.

### 3.    Difficulties With Lease Obligations

Despite the Company's management implementing various initiatives to improve operating and financial performance between 2020 and 2023, the Company found itself unable to fund contractual rent payments to some of their largest landlords. Given the clear state-by-state disparities that became emblematic of the post-COVID skilled nursing landscape, the Debtors found it necessary to evaluate the viability of their lease portfolio by identifying facilities and/or states that had favorable future prospects and generated positive cash flow, and those—like Florida—that were unsustainable. Recognizing that the Debtors were at risk of lease terminations as a result of missed lease payments and increasing lease arrearages, the Company engaged with its current landlords to find solutions for the benefit of the residents in the facilities, its employees and the Company as a whole.

Accordingly, the Company began negotiations with many of its existing landlords—including their largest landlord, the Omega Landlords—regarding potential solutions to the fiscal challenges facing the Company, including potentially exiting operations at many of their unsustainable facilities and helping transition them to new third-party operators. These efforts were not only necessary for the Company to stem further losses, but were also driven in part by the respective landlords' needs to find viable go-forward resolutions. As of June 2023 (a year prior to the Petition Date), the Company operated approximately 114 facilities (down from approximately 140 in 2020). Today, the Debtors' current portfolio includes 43 licensed facilities. Other than one remaining facility in Florida, the Debtors' facilities are all located in the favorable operating states of Mississippi, North Carolina, Pennsylvania and Virginia. The Debtor's current portfolio of facilities is leaner and more productive, and for the first time in years, the Company's remaining facilities now generate positive EBITDA.

### 4.    Divestitures and Operational Shortcomings

Although these divestitures have been both necessary and successful from an operational and future performance standpoint by stemming operating losses, they did not address the substantial legacy liabilities at the remaining corporate entities that previously operated the Debtors' now-divested facilities. As facility operators, the Debtors do not own the underlying real property assets at their facilities, but merely operate the facilities as tenants on the applicable facility lease.[8] When the operations of the underperforming facilities were transitioned to New Operators with the consent of the landlord, the New Operators generally did not assume the liabilities of Company, nor did any material consideration flow to the prior operator. Following transition, the only material asset that remained behind for each of the divested facilities was accounts receivable generated prior to the transition; however, the proceeds from the collection of the receivables had to be used to pay down the Debtors' Pre-Petition ABL Facility. As such, the Debtors do not have any material assets remaining behind at their now-divested facilities. Yet, there remain significant legacy liabilities which were incurred in connection with the prior operations, including, among others, lease liabilities, trade claims, and litigation claims, that were not transferred to their new operators as part of the underlying facility divestitures.

The Company had historically been able to negotiate agreements with certain of these parties through graduated payment plans which provided for discounted amounts and payments over time. But as a result of operating losses incurred, the Company's liquidity decreased along with borrowing availability,

---

[8]    If a skilled nursing facility tenant is unable to pay contractual rent, a landlord can terminate the lease and effectively cut off the ability of the operator to continue operating that facility.

meaning substantial outside funding would be required for the Company to achieve broad consensus with its creditors on out-of-court payment plans. Nevertheless, the Company remained focused on pursuing an out-of-court solution because it believed that creditors would be better served by agreeing to substantial discounts with payments over time, compared to the amounts that would be available to them in any chapter 11 process. While certain vendors and key stakeholders remained patient and engaged, other creditors (principally litigation plaintiffs and staffing agencies) opted for litigation that ultimately rendered the Company's restructuring goals untenable absent an in-court process. Over time, the Company became unable to service its existing settlements, and its limited liquidity and inability to pay outstanding amounts forced a negotiation stalemate with these and other creditors. As a result, the Company, with the assistance of its advisors, began to evaluate potential in-court scenarios to ensure that its existing facility portfolio could continue operating without interruption. Accordingly, though chapter 11 was never the Company's preferred restructuring option, it became the only viable alternative that presented the Company with the ability to obtain necessary funding to deal with all outstanding claims and related issues.

Over the weeks and months prior to the commencement of these Chapter 11 Cases, the Debtors worked collaboratively with the Omega Secured Parties, the Debtors' largest landlord and secured lender. Because the Omega Landlords are landlords on 30 of the Debtors' remaining 43 licensed facilities and holds a secured position on substantially all of the Debtors' assets, coupled with the substantial payment arrearage on Omega's lease, any viable restructuring path requires the consent and cooperation of the Omega Secured Parties.

## C.    Appointment of Independent Manager and Subsequent Investigation

### 1.    Appointment of Independent Manager

On May 19, 2024, the board of directors of the Debtors' indirect equity holder adopted by unanimous written consent certain resolutions that provided for, among other things, the appointment of James D. Decker as sole independent manager at Debtor LV Operations I, LLC (the top-level Debtor entity) and all its direct and indirect subsidiaries (the "Independent Manager"). The Independent Manager has two primary duties. First, the Independent Manager has sole authority to take any "Restructuring Actions" on behalf of the Debtors.[9]

Second, the Independent Manager has the authority to investigate, prosecute, and settle potential claims and potential Causes of Action the Debtors may have against certain insider and non-insider parties. This investigation began prior to the Petition Date, commencing on May 24, 2024.

### 2.    Independent Manager's Investigation

As noted above, the Independent Manager has sole authority to act on behalf of each of the Debtors, and was appointed for the purpose of considering, investigating, analyzing, negotiating, and otherwise approving or rejecting any "Restructuring Actions" of the Debtors. The Independent Manager retained Chapman (with assistance provided by McDermott Will & Emery LLP ("McDermott")) to provide legal advice and representation regarding any estate claims and causes of action that may be available to the

---

[9]    "Restructuring Actions" is defined in the appointing resolutions as the Independent Manager's authority to "negotiate implement or otherwise handle and address all aspects of strategic and/or financial alternatives available to [Debtor LV Operations I, LLC] and its direct and indirect subsidiaries and their respective businesses, assets, properties, and debt obligations, including, without limitation, any financing, refinancing, restructuring, recapitalization, merger, consolidation, sale, reorganization, liquidation or an amendment or modification to the credit facilities of [Debtor LV Operations I, LLC] or its direct and indirect subsidiaries, . . . ."

Debtors, including whether any such claims or causes of action are proposed to be settled or released in connection with any potential sale or chapter 11 plan and, if so, the appropriateness and reasonableness of such releases in connection therewith.

A brief summary of certain Debtor and non-Debtor entities and individuals is instructive to understand the Independent Manager's investigation.

- The Debtors are indirectly owned by a large number of individuals, LLCs, and family trusts at FC Investors XXI, LLC ("FC XXI"), its indirect parent company. The Debtors do not have full clarity as to the entire makeup of their ownership structure, as many of the LLCs holding membership interests in FC XXI are syndicates and may have many individuals or entities behind each of them.

- FC XXI also owns two non-Debtor affiliates:

  o **NSPRMC, LLC ("Nspire")**, which operates approximately 11 skilled nursing facilities, but has a completely stand-alone financing and no cross-collateralization with the Debtors; and

  o **Pourlessoins, LLC d/b/a Synergy Healthcare Services ("Synergy")**, which provides critical back-office services to the Debtors and Nspire, including accounting, asset management, financial services, legal, tax, and other necessary services.

- Certain of the indirect beneficial owners of FC XXI are investors in TIX 33433, which serves as one of the DIP Lenders (alongside Omega) and Plan Sponsor.

- The Debtors understand that certain of the investing parties (individuals and companies) of FC XXI are also significant investors in other companies doing business within the skilled nursing industry, including entities that own real property. The Debtors understand that certain of the real property previously owned by certain of the Omega Landlords were sold to entities that may have some shared indirect ownership with FC XXI.

The investigative process involved, among other things:

- Conducting multiple interviews with key individuals at the Debtors, Synergy and Dias & Associates;
- Reviewing Debtor and non-Debtor emails and documents;
- Reviewing key transaction and other documents in a comprehensive data room;
- Consulting with Ankura regarding financial analysis;
- Obtaining ownership information and financial information from certain of the Debtors' New Operators;
- Participating in meetings with the UCC;
- Attending "informal interviews" of Debtor and non-Debtor individuals conducted by the UCC;
- Obtaining key information and documents based on follow-up with the Plan Sponsor's counsel regarding critical issues;
- Coordinating with the Debtors' counsel's bankruptcy and litigation teams;
- Holding regular meetings with the Independent Manager; and
- The Debtors' review of the applicable governing law.

The primary areas the investigative team has focused on include, without limitation: (a) the Debtors' divestitures of facilities prior to the Petition Date, including facilities in Florida and consideration obtained in connection therewith; (b) the settlement of litigation claims by the Debtors entered into prior to the Petition Date; (c) the circumstances around additional infusions of capital into the Debtors in fall 2022, May 2023, and in connection with the receipt of Employee Retention Tax Credits received in the fall of 2023; (d) transfers made to non-Debtors, including Synergy; and (e) the conduct of FC XXI' board of directors and officers.[10]

Based on those transactions, the investigation analyzed and evaluated, among other things, (a) potential fraudulent transfer claims arising in connection with transfers relating to the Florida divestitures, including against the New Operators, purchasers of real property, Omega, or otherwise; (b) potential successor liability claims against the New Operators; (c) potential fraudulent transfer or other claims against Synergy or other non-Debtor affiliates in connection with the back-office services provided by Synergy; (d) potential breach of fiduciary duty claims against the members of the board of FC XXI; and (e) legal malpractice claims or fiduciary duty claims against Dias & Associates.

In addition to the factual issues underlying the potential causes of action, the Independent Manager was guided by relevant legal considerations, including among other things, (a) the viability of claims relating to the sale of real property, as the Debtors did not own any such real property and were in default under their leases related to such real property; (b) the appropriateness of evaluating fraudulent transfer claims against the New Operators based upon value ascribed by the New Operators in stepping in to a fully-functioning skilled nursing facility; (c) the ability to seek recovery on the relevant directors' and officers' insurance policy that sits with a non-Debtor affiliate; (d) the ability to pursue successor liability claims against New Operators based upon the information provided regarding their affiliation with the Debtors; (e) the ability for the UCC to seek standing to pursue or otherwise settle the causes of action, or the ability to transfer such claims to a litigation trustee to pursue or settle such claims, given recent case law regarding the pursuit of derivative claims on behalf of limited liability corporations.

Highly relevant to the analysis was that—despite certain affiliations between the Debtors and various third parties—all relevant transfers of cash related to the divestitures were one way into the Debtors. No dividends were paid out to equity investors, and no cash transfers were made to equity investors. Significant sums were invested **into** the Company to try to stave off bankruptcy, which were used to pay trade claims, tort claimants, and staffing agencies, until those funds ran out. All told, the Debtors received more than $100 million in consideration on account of their divestitures of leasehold interests that lost over $140 million in 2022 and 2023. The Debtors believe that they likely received more than reasonably equivalent value on many of these transactions *simply because affiliated entities and individuals were involved*, because those affiliated persons and entities had a vested interest and desire (for various reasons) in providing support to the Company so the Company could avoid bankruptcy and continue to operate as a going concern.

In addition, the Independent Manager considered the significant cost, time, uncertainty, and other inherent risks in connection with litigating these claims and causes of action, which are factually intensive and would likely require years of litigation and appeals, in addition to substantial litigation costs. Furthermore, even if such causes of action were ultimately pursued successfully, and judgments were obtained, it is unlikely that those judgments would be collectible and thus unlikely to actually provide any recovery to flow down to general unsecured creditors. Based upon the below waterfall, in order for Class

---

[10]    These categories are illustrative only and should not be interpreted as reflecting the entire scope of the Independent Manager's investigation.

6A (OpCo General Unsecured Claims), Class 6B (DivestCo General Unsecured Claims), and Class 6C (Joint & Several OpCo General Unsecured Claims) to receive *any* recovery, it is estimated that approximately $84.2 million in gross proceeds would need to be collected.

| ($ in millions) | Est. Claim Amount | Illustrative Proceeds From Causes of Action | | | |
| --- | --- | --- | --- | --- | --- |
| | | $25.0M | $50.0M | B/E $84.2M | $100.0M |
| **Illustrative GUC Recovery Scenarios (Chapter 7)** | | | | | |
| 1. Illustrative Gross Causes of Action | | $25.0 | $50.0 | $84.2 | $100.0 |
| 2. (+/-): Litigation Costs (30.0% contingency counsel) | | (7.5) | (15.0) | (25.3) | (30.0) |
| **3. Net Proceeds From Causes of Action** | **$ -** | **$17.5** | **$35.0** | **$59.0** | **$70.0** |
| 4. (+/-): Gross Liquidation Proceeds | | 48.0 | 48.0 | 48.0 | 48.0 |
| 5. (+/-): Ch. 7 Liquidation Costs | (16.6) | (16.6) | (16.6) | (16.6) | (16.6) |
| 6. (+/-): Carve Out Claims | (0.8) | (0.8) | (0.8) | (0.8) | (0.8) |
| **7. Net Proceeds After Ch. 7 Costs and Carve Out Claims** | **$(17.4)** | **$48.1** | **$65.6** | **$89.6** | **$100.6** |
| 8. (+/-): ABL Balance | (32.3) | (32.3) | (32.3) | (32.3) | (32.3) |
| 9. (+/-): DIP Loan | (21.7) | (15.8) | (21.7) | (21.7) | (21.7) |
| 10. (+/-): Omega Secured Term Loan | (27.0) | - | (11.7) | (27.0) | (27.0) |
| **11. Net Proceeds After Secured Claims** | **$(98.3)** | **$ -** | **$ -** | **$8.7** | **$19.7** |
| 12. (+/-): Administrative / 503(b)(9) Claims | (8.4) | - | - | (8.4) | (8.4) |
| 13. (+/-): Class 2 - Estimated Priority Claims | (0.3) | - | - | (0.3) | (0.3) |
| **14. Proceeds Available For Unsecured Creditors** | **$(107.0)** | **$ -** | **$ -** | **$ -** | **$11.0** |
| 15. Total General Unsecured Claims Pool | $594.7 | $636.1 | $618.6 | $594.7 | $594.7 |
| *16. GUC Pool Recovery* | | *-%* | *-%* | *-%* | *1.9%* |
| **Present Value (Assuming 4 Years at 20.0% Discount Rate)** | | | | | |
| 17. Present Value of Proceeds for GUC Recovery | | $ - | $ - | $ - | $5.3 |
| *18. Present Value of GUC Pool Recovery* | | *-%* | *-%* | *-%* | *0.9%* |

Notes:
1.  Gross proceeds from other assets includes recoveries from cash of $8.3M, and AR of ~$39.7M (mid-point).
2.  Ch. 7 liquidation costs include outstanding unpaid payroll, AR collection costs (20%), wind-down expenses, and Ch. 7 Trustee and other professional fees.
3.  Estimated DIP loan balance as of 11/1, assumed to be fully drawn with accrued PIK interest and fees.
4.  Administrative expenses include unpaid postpetition employee healthcare claims, utilities, trade, and bed taxes.

The Independent Manager was routinely updated by the investigative team, culminating in numerous hours-long sessions to discuss and finalize the conclusions and recommendations prior to, and during the mediation process. On September 10, Chapman and McDermott met with the Independent Manager to explain the findings and to afford the Independent Manager the opportunity to ask questions and raise concerns. At this meeting, counsel explained to the Independent Manager the viability of the claims and causes of actions analyzed, including whether there were any viable or colorable claims against any of the Released Parties under the Plan, and if pursued, whether any such claims would likely result in proceeds flowing to the Debtors. On September 13, Chapman met again with the Independent Manager to explain its recommendations concerning the investigation and the transactions contemplated under the Plan. Although McDermott provided support to Chapman throughout the investigation period, McDermott did not attend the September 13 meeting, and Mr. Decker relied solely on the advice and counsel of Chapman in approving the compromises contained in the Plan.

Based upon these and other factors, the Independent Manager determined, based upon advice of counsel and in his reasonable business judgment, that the Debtors' likelihood of achieving a greater return for their creditors than the compromises embodied in the Plan is low, and that pursuit of such causes of

action (even in a best-case scenario) would likely result in no recovery to Holders of General Unsecured Claims.

### 3.    UCC's Investigation

The Debtors understand that the UCC ran a parallel investigation and analyzed claims and causes of action available to provide recovery to unsecured creditors.  The Debtors understand from the UCC that its investigation revealed that potential Causes of Action exist against the Debtors' directors and officers, equity investors, the Omega Secured Parties, and the New Operators.  These Causes of Action include, among others, preference and fraudulent transfer claims in connection with certain secured claims, fraudulent transfer claims in connection with the landlords' sale of real property, fraudulent transfer claims against the New Operators in connection with the transfer of operations in exchange for less than reasonably equivalent value, successor liability claims against certain of the New Operators, and breach of fiduciary duty and other claims against the D&Os.  Recognizing the potential cost, delay, risk and other factors in connection with asserting these potential Causes of Action, notwithstanding the UCC's belief as to their arguably potential significant value, the UCC ultimately agreed to support confirmation of the Plan based upon the settlements embodied herein.  As part of the global settlement, the Debtors have agreed to assign D&O Claims to the GUC Trust (up to the applicable policy limits) and subject to the limitation discussed herein. All other Causes of Action will either be released, waived, or settled under the Plan or otherwise revert to the Reorganized Debtors.

### D.    The Chapter 11 Cases

The following is a brief description of certain material events that have occurred during the Chapter 11 Cases to date.  The pleadings and Orders referenced herein can be viewed free of charge at https://veritaglobal.net/lavie.

### 1.    First-Day Relief

On the Petition Date, the Debtors Filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their business and manage their assets and affairs as debtors-in-possession pursuant to Bankruptcy Code sections 1107 and 1108.  On the Petition Date, the Debtors also Filed pleadings seeking certain "first day" relief, including the following:

(a)    *Debtors' Emergency Motion for Entry of Order Directing Joint Administration of the Chapter 11 Cases* [Docket No. 3];

(b)    *Debtors' Emergency Motion for Entry of Order (I) Authorizing the Debtors to (A) Prepare a List of Creditors in Lieu of Submitting a Formatted Mailing Matrix and (B) File a Consolidated List of the Debtors' 30 Largest Unsecured Creditors, (II) Authorizing the Debtors to Redact Certain Personal Identification Information for Individual Creditors, (III) Approving the Form and Manner of Notifying Creditors of Commencement of These Chapter 11 Cases, and (IV) Authorizing the Debtors to File Their Monthly Operating Reports on a Consolidated Basis* [Docket No. 4];

(c)    *Debtors' Emergency Application for Entry of Order Authorizing the Retention and Employment of Kurtzman Carson Consultants LLC as Claims, Noticing, Solicitation, and Administrative Agent Effective as of the Petition Date* [Docket No. 5];

45

(d)     *Debtors' Emergency Motion for Entry of Order (I) Extending Time to File Schedules of Assets and Liabilities and Statements of Financial Affairs and (II) Granting Related Relief* [Docket No. 6];

(e)     *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Implementation of Procedures to Maintain and Protect Confidential Health Information as Required by Applicable Privacy Rules and (II) Granting Related Relief* [Docket No. 7];

(f)     *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Maintain and Continue Resident Programs and Honor Prepetition Obligations Related Thereto, and (II) Granting Related Relief* [Docket No. 8];

(g)     *Debtors' Emergency Motion for Entry of Interim and Final Orders Authorizing Payment of Prepetition Obligations Owed to Resident Care Vendors* [Docket No. 9];

(h)     *Debtors' Emergency Motion for Entry of Interim and Final Orders Authorizing Debtors to (I) Maintain Existing Insurance Policies and Surety Bonds, and Pay All Obligations Arising Thereunder; (II) Renew, Revise, Extend, Supplement, Change, or Enter into New Insurance Policies; and (III) Granting Related Relief* [Docket No. 10];

(i)     *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to Pay Certain Prepetition Taxes, Fees, and Related Obligations and (II) Granting Related Relief* [Docket No. 11];

(j)     *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment; (II) Establishing Procedures for Resolving Objections by Utility Providers; and (III) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Service* [Docket No. 12];

(k)     *Debtors' Emergency Motion for Entry of Interim and Final Orders Authorizing Debtors to (I) Pay Prepetition Wages, Compensation, and Employee Benefits, (II) Continue Certain Employee Benefit Programs in the Ordinary Course, and (III) Granting Related Relief* [Docket No. 13];

(l)     *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Existing Cash Management System, (B) Maintain Existing Bank Accounts and Business Forms and Honor Certain Prepetition Obligations Related to the Use Thereof, (C) Maintain Purchasing Card Program and Honor Prepetition Obligations Related Thereto, and (D) Continue to Perform Intercompany Transactions; (II) Extending the Time for the Debtors to Comply with 11 U.S.C. § 345(b) Deposit and Investment Requirements; and (III) Granting Related Relief* [Docket No. 14]; and

(m)     *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 15].

In support of the foregoing, the Debtors Filed the *Declaration of M. Benjamin Jones in Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. 17] and the *Declaration of Michael Krakovsky*

*in Support of Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 16].

### 2.    DIP Facility

On the Petition Date, the Debtors Filed the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 15], seeking Court authorizing to incur $20 million of junior secured debtor-in-possession financing during the Chapter 11 Cases and use of cash collateral.

On June 5, 2024, the Bankruptcy Court entered the Interim DIP Order, authorizing the Debtors' access the DIP Facility on an interim basis and interim use of cash collateral accordance with the Initial DIP Budget attached thereto. *See* Docket No. 49.  On June 28, 2024, the Bankruptcy Court entered the Final DIP Order, granting the Debtors full amount available under the DIP Facility and use of cash collateral on a final basis in accordance with the Approved DIP Budget attached thereto. *See* Docket No. 189.

### 3.    Bid Procedures Motion

On June 10, 2024, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Approving Bidding Procedures and Bid Protections, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (V) Authorizing the Assumption and Assignment of Assumed Contracts, and (VI) Authorizing the Sale of Assets* [Docket No. 104] (the "Bidding Procedures Motion").  In the Bid Procedures Motion, the Debtors sought approval of bid procedures for a sale of substantially all of their assets or the rights to sponsor a plan of reorganization.  The Debtors also requested authority to designate a stalking horse bidder, if any, and grant bid protections in the form of an expense reimbursement and breakup fee, collectively capped at 3.0% of the purchase price.

On June 27, 2024, the Bankruptcy Court entered the *Order Approving Bidding Procedures and Bid Protections, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (V) Authorizing the Assumption and Assignment of Assumed Contracts, and (VI) Authorizing the Sale of Assets* [Docket No. 177] (the "Bidding Procedures Order").  The Bidding Procedures Order set the following dates and deadlines for the Debtors' sale process:

| Event | Date |
|---|---|
| Filing of Contract Assumption Notice | July 23, 2024 |
| Deadline to Select Stalking Horse Bid | August 29, 2024, at 4:00 p.m. (prevailing Eastern Time) |
| Cure and Adequate Assurance Objection Deadline | September 5, 2024, at 4:00 p.m. (prevailing Eastern Time) |
| Deadline to Submit Qualified Bids | September 5, 2024, at 4:00 p.m. (prevailing Eastern Time) |
| Auction (if necessary) | September 9, 2024, at 10:00 a.m. (prevailing Eastern Time) |
| Sale Objection Deadline | September 10, 2024, at 4:00 p.m. (prevailing Eastern Time) |

| Event | Date |
|-------|------|
| Sale Hearing | September 11, 2024, at 9:30 a.m. (prevailing Eastern Time) |

Notice of the dates and the sale process generally was published on July 1, 2024, in the national edition of *The New York Times* [Docket No. 228].

### 4. Sale Process

Stout Capital, LLC ("Stout") launched a broad marketing process to prospective buyers on June 24, 2024 by distributing a two-page "teaser" and non-disclosure agreement (each, an "NDA") to 140+ prospective buyers. Additional prospective buyers received the teaser and NDA materials throughout the marketing process and, in total, 147 prospective buyers received the materials. After reviewing the teaser materials, 34 parties executed NDA and received the Confidential Information Memorandum (the "CIM"), which provided additional detailed information regarding the Debtors' operations and historical and projected financial performance, among other things. In addition, 19 parties that received and reviewed the CIM were granted access to the virtual data room (the "VDR") which contained detailed information such financial statements, asset listings, lease agreements and other contracts, and regulatory and other information relating to the Debtors' operations.

On July 9, 2024, Stout distributed a process letter to all active parties (i.e., parties that had not confirmed they were a "pass") which requested submission of written, non-binding indications of interest (the "IOIs") by August 5, 2024, although in its communication with prospective buyers, Stout indicated that IOIs submitted after August 5 would continue to be considered so long as the prospective buyer could complete diligence and submit a definitive and binding final bid by the September 5, 2024, deadline as required by the Bidding Procedures. Ultimately, only two parties submitted written IOIs, each of which expressed interest in acquiring only a subset of the Debtors' facilities. The three facilities leased from Elderberry were included in both IOIs, and one IOI included two additional facilities under the Omega Master Lease. Both parties were invited to conduct onsite diligence of the Elderberry facilities, and site visits were conducted the week of August 19, 2024. Following the site visit, one of the parties submitted a revised IOI that proposed a reduced purchase price and excluded one of the Elderberry facilities. Stout continued to facilitate diligence requests from the interested parties (including parties that did not submit written IOIs). Stout distributed a final process letter on September 3, 2024, reminding the prospective bidders of the September 5 final bid deadline and the requirements for submitting a qualified bid, including a markup of the form operations transfer agreement (a copy of which was provided in the VDR).

Ultimately, the Debtors did not receive any qualified bids on or after the September 5 deadline, other than a letter from the DIP Lenders (already deemed to be "Qualified Bidders" under the Bidding Procedures Order) that they intend to attend and participate at the auction. Accordingly, the Debtors, in their business judgment and after consultation with the consultation parties, canceled the auction and sale hearing.

### 5. Mediation

On August 26, 2024, the Debtors jointly with the UCC, and the DIP Lenders filed the *Joint Motion for Order Authorizing and Directing Mediation* [Docket No. 346] by which the Debtors and joining parties sought authority and direction of a mediation by the Honorable Jeffery W. Cavender pursuant to the Mediation Procedures to facilitate settlement discussions between the Debtors, the UCC, the Plan Sponsor, and Omega. On August 26, 2024, the Bankruptcy Court entered an Order authorizing and directing mediation. *See* Docket No. 347. To allow time for the mediation, the hearing to consider approval of solicitation procedures and conditional approval of the Disclosure Statement portion of the Second

Amended Combined Disclosure Statement and Plan was adjourned from September 11 to September 17, and further continued to September 23, 2024, and then to September 30, 2024.

The mediation commenced in-person at the offices of McDermott on the afternoon of September 9, with representatives from the Debtors, the UCC, Omega, and the Plan Sponsor attending. The mediation was adjourned later that evening, and continued in a full-day session on September 11, with discussions amongst the parties and the mediator continuing through the following week. On September 18, 2024, Judge Cavender circulated a mediator's proposal to the parties, which prompted additional discussions regarding the terms of a potential settlement.

On September 20, 2024, following continued discussions in furtherance of the mediation, the parties agreed to the terms of a revised mediator's proposal, which are set forth in full below:

- $10,750,000 cash contribution to the GUC Trust to be funded by the Plan Sponsor on the Effective Date of the Plan;

- Divested Accounts Receivable are assigned to the GUC Trust with a $2 million Backstop Note executed by the Reorganized Debtors and guaranteed by the Plan Sponsor with a 12-month maturity. If the outstanding balance of the Backstop Note (after reduction by accounts receivable collections) is not paid at maturity, the GUC Trust will be entitled to pocket judgments against the Reorganized Debtors and the Plan Sponsor in the amount of the then outstanding balance of the Backstop Note plus a 100% penalty of the then outstanding amount on the Backstop Note.

- D&O Claims are assigned to the GUC Trust (up to the policy limits) and subject to certain limitations.

- Powerback Rehabilitation's waiver of its General Unsecured Claim will be a condition to Confirmation that cannot be waived.

- Omega will receive no distribution from funds for General Unsecured Claims.

- Chapter 5 causes of action (preferences, etc.) will be waived except to the extent a creditor opts out of the releases set forth in the Plan and pursues a non-Debtor for Debtor derived claims. In such instance, the chapter 5 claim will only be used defensively to offset any amount determined to be due plus costs and there would be no positive recovery to the GUC Trust.

- All parties will support substantive consolidation of the Debtors' estates on an OpCo Debtors/DivestCo Debtors siloed basis.

- Causes of Action remain with the Reorganized Debtors except for D&O Claims up to the policy limits and subject to certain limitations.

- The GUC Trust / GUC Contribution will not fund/pay Administrative Expense Claims (including 503(b)(9) and Priority Claims). The Plan provides that the Reorganized Debtors either assume or pay Administrative Expense Claims, not the Plan Sponsor directly. The Plan Sponsor is only obligated to fund the Plan Sponsor Contribution on the Effective Date, subject to satisfaction of the conditions of the Effective Date.

49

- The UCC supports confirmation and will support opposition to any objecting parties.

After the parties accepted the foregoing terms set forth in the mediator's proposal, the UCC sent the Debtors a proposed allocation of recoveries between Holders of OpCo General Unsecured Claims, Holders of DivestCo General Unsecured Claims, and Holders of Joint & Several OpCo General Unsecured Claims. Such allocation is reflected in this Plan as the OpCo GUC Allocation, the DivestCo GUC Allocation, and the Joint & Several OpCo GUC Allocation.

The DivestCo GUC Allocation consists primarily of the assets of the DivestCo Debtors—the Divested Accounts Receivable and proceeds of the D&O Claims—as well as a portion of the Cash from the Plan Sponsor Contribution. The OpCo GUC Allocation and Joint & Several OpCo GUC Allocation consist of the remainder of the Cash from the Plan Sponsor Contribution, which the UCC believes is a reasonable estimate for the value of the Opco Debtors' assets. The Joint & Several OpCo GUC Allocation provides for a slightly higher recovery to Holders of Joint & Several OpCo General Unsecured Claims because substantive consolidation of the OpCo Debtors would significantly prejudice Holders of Claims on which many of the OpCo Debtors are jointly and severally liable.

Notably, the proposed allocation provides a significantly better recovery to *all* Holders of General Unsecured Claims than they would have received under either of the prior Plans filed by the Debtors. For the foregoing reasons, the Debtors and the UCC believe that the proposed allocation is reasonable and represents an integral part of the settlements arising from the mediation and embodied herein.

## 6. Retention of Debtors' Professionals

### i. Kurtzman Carson Consultants LLC d/b/a Verita ("Verita")

On the Petition Date, the Debtors Filed the *Debtors' Emergency Application for Entry of Order Authorizing the Retention and Employment of Kurtzman Carson Consultants LLC as Claims, Noticing, Solicitation, and Administrative Agent Effective as of the Petition Date* [Docket No. 5], by which the Debtors sought authorization to retain and employ Verita as its claims, noticing, solicitation, and administrative agent in the Chapter 11 Cases. On June 5, 2024, the Bankruptcy Court entered an Order approving the Debtors' retention of Verita. *See* Docket No. 43.

### ii. McDermott Will & Emery LLP

On June 25, 2024, the Debtors Filed the *Debtors' Application for Entry of Order Authorizing the Retention and Employment of McDermott Will & Emery LLP as Counsel for the Debtors and Debtors-in-Possession Effective as of the Petition Date* [Docket No. 135]. On June 28, 2024, the Bankruptcy Court entered an Order approving the Debtors' employment of McDermott as its counsel, subject to timely objection. *See* Docket No. 185. The foregoing order became a final order on July 19, 2024.

### iii. Ankura Consulting Group, LLC

On June 25, 2024, the Debtors Filed the *Debtors' Application for Entry of Order Authorizing Debtors to (I) Retain Ankura Consulting Group, LLC to Provide Debtors a Chief Restructuring Officer and Certain Additional Personnel and (II) Designate M. Benjamin Jones as Chief Restructuring Officer for the Debtors, Effective as of the Petition Date* [Docket No. 136]. On June 28, 2024, the Bankruptcy Court entered an Order approving the Debtors' retention of Ankura Consulting Group, LLC and certain additional personnel and designation of Mr. Jones as the Debtors' CRO, subject to timely objection. *See* Docket No. 186. The foregoing order became a final order on July 19, 2024.

### iv.    Stout Capital, LLC

On June 25, 2024, the Debtors Filed the *Debtors' Application for Entry of Order (I) Authorizing the Employment and Retention of Stout Capital, LLC as Investment Banker to the Debtors and (II) Granting Related Relief* [Docket No. 137]. On June 28, 2024, the Bankruptcy Court entered an Order approving the Debtors' retention of Stout as their investment banker, subject to timely objection. *See* Docket No. 187. The foregoing order became a final order on July 19, 2024.

### v.    Chapman

On June 25, 2024, the Debtors Filed the *Debtors' Application for Entry of Order Authorizing Debtors, By and Through the Independent Manager, to (I) Retain and Employ Chapman and Cutler LLP as Special Counsel Effective as of the Petition Date and (II) Granting Related Relief* [Docket No. 138]. On June 28, 2024, the Bankruptcy Court entered an Order approving the Debtors' retention of Chapman as their special counsel, subject to timely objection. *See* Docket No. 188. The foregoing order became a final order on July 19, 2024.

### 7.    Appointment of the UCC and the Patient Care Ombudpersons

### i.    UCC

On June 13, 2024, the U.S. Trustee appointed the UCC pursuant to Bankruptcy Code section 1102(a). *See* Docket No. 112. On July 3, 2024, the UCC filed the *Application to Retain and Employ Troutman Pepper Hamilton Sanders LLP as Counsel for the Official Committee of Unsecured Creditors, Effective as of June 14, 2024* [Docket No. 220], and, on July 17, 2024, the UCC filed the *Application for an Order Authorizing the Retention and Employment of FTI Consulting, Inc. as Financial Advisor to the Official Committee of Unsecured Creditors Effective as of June 17, 2024* [Docket No. 256]. On July 8, 2024, the Bankruptcy Court entered an Order approving the UCC's retention of Troutman Pepper as counsel to the UCC, subject to timely objection [Docket No. 226]. The foregoing order became a final order on July 29, 2024. On July 18, 2024, the Bankruptcy Court entered an Order approving the UCC's retention of FTI Consulting, Inc. as financial advisor to the UCC, subject to timely objection [Docket No. 259]. The foregoing order became a final order on August 8, 2024. On August 30, 2024, counsel to the UCC filed a notice of change in composition of the UCC.

### ii.    Patient Care Ombudspersons

On June 28, 2024, the Bankruptcy Court entered the *Order Authorizing Appointment of Patient Care Ombudspersons* [Docket No. 184]. On July 5, 2024, the U.S. Trustee appointed Terri Cantrell as the patient care ombudsman for Debtor 11565 Harts Road Operations, LLC. That same day, the U.S. Trustee appointed Margaret Barajas as the patient care ombudsman for each of the following Debtors: (a) Locust Grove Facility Operations, LLC; (b) Luther Ridge Facility Operations, LLC; (c) Manor at St. Luke Village Facility Operations, LLC; (d) Pavilion at St. Luke Village Facility Operations, LLC; (e) Penn Village Facility Operations, LLC; and (f) Pennknoll Village Facility Operations, LLC. *See* Docket Nos. 224, 225.

On July 15, 2024, the U.S. Trustee appointed Lisa M. Smith as the patient care ombudsman for each of the following Debtors: (a) Glenburney HealthCare, LLC; (b) Hilltop Mississippi HealthCare, LLC; (c) McComb HealthCare, LLC; (d) Riley HealthCare, LLC; (e) Starkville Manor HealthCare, LLC; and (f) Winona Manor HealthCare, LLC. *See* Docket No. 250. That same day, the U.S. Trustee appointed Victor Orija as patient care ombudsman for each of the following Debtors: (a) Cardinal North Carolina HealthCare, LLC; (b) Clay County HealthCare, LLC; (c) Hunter Woods HealthCare, LLC; (d) Cary HealthCare, LLC; (d) Emerald Ridge HealthCare, LLC; (e) Forrest Oaks HealthCare, LLC; (f) Gateway

HealthCare, LLC; (g) Kannapolis HealthCare, LLC; (h) Oak Grove HealthCare, LLC; (i) Oaks at Sweeten Creek HealthCare, LLC; (j) Valley View HealthCare, LLC; (k) Walnut Cove HealthCare, LLC; (*l*) Wellington HealthCare, LLC; (m) Westwood HealthCare, LLC; (n) Willowbrook HealthCare, LLC; and (o) Wilora Lake HealthCare, LLC.  *See* Docket No. 251.

On July 18, 2024, the U.S. Trustee appointed Lisa M. Smith as the patient care ombudsman for each of the following Debtors:  (a) Ashland Facility Operations, LLC; (b) Norfolk Facility Operations, LLC; (c) Augusta Facility Operations, LLC; (d) Grayson Facility Operations, LLC; (e) Kings Daughters Facility Operations, LLC; (f) Newport News Facility Operations, LLC; (g) Pheasant Ridge Facility Operations, LLC; (h) Skyline Facility Operations, LLC; (i) Williamsburg Facility Operations, LLC; (j) Windsor Facility Operations, LLC; and (k) Woodstock Facility Operations, LLC.

On September 5, 2024, Ms. Barajas filed the ombudsman report for the period of July 5, 2024 through September 5, 2024 [Docket No. 402].

### 8.      Claims Process and Bar Dates

#### i.      Section 341(a) Meeting of Creditors

On June 28, 2024, the U.S. Trustee presided over a meeting of creditors in the Chapter 11 Cases pursuant to Bankruptcy Code section 341(a), which such meeting was continued to August 12, 2024 and concluded on such date.

#### ii.      Bar Dates

On July 2, 2024, the Bankruptcy Court established the following deadlines for filing the following categories of Proofs of Claim [Docket No. 218]:

| Category | Deadline |
| --- | --- |
| Bar Date (General) | August 30, 2024, at 5:00 p.m. (prevailing Eastern Time) |
| Governmental Bar Date | November 29, 2024, at 5:00 p.m. (prevailing Eastern Time) |

### 9.      Ordinary Course Professionals Motion

On June 25, 2024, the Debtors filed the *Debtors' Motion for Entry of Order (I) Authorizing Employment and Payment of Professionals Used in the Ordinary Course of Business and (II) Granting Related Relief* [Docket No. 140], seeking approval to continue to use services of certain professionals employed in the ordinary course of business to provide the Debtors with services in matters unrelated to the administration Chapter 11 Cases without filing formal applications for employment and compensation for each ordinary course professionals without filing applications for payment.  On July 22, 2024, the Bankruptcy Court entered an order approving the requested relief.  *See* Docket No. 265.

### 10.      Adversary Complaint

On June 30, 2024, the Debtors filed an adversary complaint against Healthcare Negligence Settlement Recovery Corp. ("Recovery Corp."), styled *LaVie Care Centers, LLC, et al. v. Healthcare Negligence Settlement Recovery Corp. (In re LaVie Care Centers, LLC)*, Adv. Pro. No. 24-05127 (PMB) (Bankr. N.D. Ga.) (the "Adversary Proceeding").  In the Adversary Proceeding, the Debtors seek an injunction to prevent Recovery Corp. from continuing to prosecute claims (a) against certain non-debtors

that share an identity of interest with the Debtors due to, among other things, the Debtors' indemnification obligations to the non-debtors and/or (b) that belong to the Debtors' estates, including, among others, claims for fraudulent conveyances and corporate veil piercing. The Debtors commenced the Adversary Proceeding to preserve the value of the Debtors' estates and to prevent Recovery Corp. from receiving preferential treatment and disadvantaging other creditors.

A hearing on the Debtors' request for a preliminary injunction was held on July 24, 2024, and on July 25, 2024, the Bankruptcy Court entered the *Order (I) Extending the Automatic Stay and/or Preliminary Enjoining Claims and Causes of Action Against Non-Debtor Defendants and (II) Scheduling Continued Contingent Hearing* [Adv. Proc. Docket No. 16]. The order extended the automatic stay as to certain non-debtors with such stay to expire upon dismissal of the Chapter 11 Cases or confirmation of a plan. The Bankruptcy Court also set a hearing on September 30, 2024, to determine whether additional relief was necessary or appropriate.

On September 30, 2024, after a continued hearing in the Adversary Proceeding, the Bankruptcy Court entered the *Order (I) Further Extending the Automatic Stay and/or Preliminarily Enjoining Claims and Causes of Action Against Non-Debtor Defendants and (II) Scheduling Continued Contingent Hearing on November 14, 2024 at 9:30 a.m. (prevailing Eastern Time)* [Adv. Proc. Docket No. 25]. The order further extended the automatic stay as to certain non-debtors with such stay to expire upon dismissal of the Chapter 11 Cases, confirmation of a plan, or November 15, 2024 at 11:59 p.m. (prevailing Eastern Time). The Bankruptcy Court also set a hearing on November 14, 2024 at 9:30 a.m. (prevailing Eastern Time) to determine whether additional relief was necessary or appropriate.

**11.     UCC's Request for Discovery under Bankruptcy Rule 2004**

On July 26, 2024, the UCC filed the *Motion of the Official Committee of Unsecured Creditors for Rule 2004 Examinations* [Docket No. 279], seeking approval to serve discovery requests under Bankruptcy Rule 2004 on ninety-five (95) non-debtor third parties. Those non-debtor third parties are the new operators of certain skilled nursing facilities the Debtors at one time operated before the Petition Date but have since divested. The Debtors and the Omega Secured Parties opposed the UCC's request. *See* Docket Nos. 287, 291.

On July 31, 2024, the Bankruptcy Court held a hearing on the UCC's request to serve discovery under Bankruptcy Rule 2004. At the hearing, the Bankruptcy Court authorized the UCC to serve discovery under Bankruptcy Rule 2004 on a modified basis, subject to discovery subjects' right to oppose the UCC's request for information.

**12.     Recovery Corp.**

**i.     Recovery Corp.'s Motion to Convert of Dismiss Certain of the Chapter 11 Cases**

On August 6, 2024, Recovery Corp. filed a motion with the Bankruptcy Court seeking to convert or dismiss the Chapter 11 Cases of fifty (50) of the Debtors. *See* Docket No. 310 (the "Motion to Dismiss"). The targets of the Motion to Dismiss were non-operating Debtors who before the Petition Date, operated, or assisted with the operations of, skilled nursing facilities in Florida. On September 5, 2024, the Debtors filed the *Debtors' Preliminary Objection to Recovery Corp.'s Motion to Dismiss or Convert Florida DivestCo Reorganizations* [Docket No. 401]. By agreement of the parties, the hearing on this matter is scheduled to be heard contemporaneously with Confirmation on the Combined Hearing Date. The Debtors reserve all rights with respect to each of Recovery Corp.'s arguments and objections and shall address each of them in turn in connection with Confirmation.

ii.      **Recovery Corp.'s Motion to Establish Standing to Challenge Final DIP Order**

On September 16, 2024, Recovery Corp. filed its *Motion to Establish Standing to Challenge Final DIP Financing Order* [Docket No. 433] (the "Standing Motion"), seeking an order granting standing to Recovery Corp. to object to the Final DIP Order to challenge the binding stipulations contained therein. The Debtors intend to file a response to the Standing Motion and reserve all rights with respect thereto.

iii.     **Recovery Corp.'s Lack of Standing and Debtors' Related Concerns**

On September 15, 2024, the Debtors sent a letter to counsel to Recovery Corp., apprising counsel of certain issues with respect to Recovery Corp.'s standing in the Chapter 11 Cases and in the action pending in Florida commenced by Recovery Corp. in April 2024 (the "Miami Action"). Among other issues, the Debtors believe that the assignment of rights and claims purportedly made to Recovery Corp. by approximately 100 tort claimants (collectively, the "Florida Claimants") were not made in compliance with Florida law, specifically Florida's Structured Settlement Protection Act (Fla. Stat. § 626.99296 *et seq.*) (the "SSPA"). The SSPA governs assignments or transfers of tort settlements under Florida law and imposes certain requirements for any assignment or transfer to be valid, including required disclosures and court approval. Specifically, Section 3(a) of the SSPA provides that "[a] direct or indirect transfer of structured settlement payment rights is not effective and a structured settlement obligor or annuity issuer is not required to make a payment directly or indirectly to a transferee or assignee of structured settlement payment rights unless the transfer is authorized in advance in a final order by a court of competent jurisdiction[.]" Any transfer not made in compliance with the SSPA renders the transfer ineffective and subjects the transferee to injunctive relief, penalties, and any other remedies determined by the court.

The Debtors believe that court approval was not obtained for the assignments, and thus they are invalid and without effect. *See, e.g.*, *First Providian, LLC v. Evans*, 852 So. 2d 908, 908 (Fla. Dist. Ct. App. 2003); *Talcott Resol. Life Ins. Co. v. Novation Cap. LLC*, 261 So. 3d 580, 584 (Fla. Dist. Ct. App. 2018); *R & Q Reinsurance Co. v. Rapid Settlements, Ltd.*, No. 06-CV-14329, 2007 WL 2330899, at *3 (S.D. Fla. Aug. 13, 2007); *Fid. & Guar. Life Ins. Co. v. Harrod*, No. 05-CV-02732, 2007 WL 2781932, at *1 (D. Md. Mar. 6, 2007). Because those assignments are invalid and ineffective under Florida law, the Debtors believe that Recovery Corp. has no right, title, or interest in or to the settlement agreements and judgments it seeks to enforce against the Debtors and it lacks standing to pursue such claims in the Chapter 11 Cases and the Adversary Proceeding. *See In re Approval of Transfer of Structured Settlement Payment Rts.*, 2005 WL 3963846, at *2; *Harrod*, No. 05-CV-02732, 2007 WL 2781932, at *1. Accordingly, Recovery Corp lacks standing to pursue claims as a creditor or plaintiff in either action, and cannot participate in the Bankruptcy as a "Party-in-Interest" under 11 U.S.C.A. § 1109. *See, e.g., In re Gerard*, No. 18-67328-BEM, 2020 WL 272756, at *6 n.6 (Bankr. N.D. Ga. Jan. 17, 2020); *In re Alpha Nat. Res. Inc.*, 544 B.R. 848, 854-56 (Bankr. E.D. Va. 2016); *In re Vega*, No. 6:10-AP-00299-KSJ, 2014 WL 2621118, at *4, 6 (Bankr. M.D. Fla. June 12, 2014); *In re Micron Devices, LLC*, No. 20-23359-LMI, 2021 WL 2021468, at *15 (Bankr. S.D. Fla. May 20, 2021). On September 10 and September 13, 2024, the Debtors served discovery requests on counsel to Recovery Corp. pertaining to these issues.

Additionally, the Debtors understand that counsel to Recovery Corp. filed duplicative proofs of claim on behalf of both Recovery Corp. and the Florida Claimants it purports to represent with respect to the same underlying liability arising from the settlement agreements and judgments that were purportedly assigned to Recovery Corp. The Debtors have concerns that these filings constitute knowingly false proofs of claims and whether counsel to Recovery Corp. had the authority to file such proofs of claim on behalf of the Florida Claimants. On September 10 and September 13, 2024, the Debtors served discovery requests on counsel to Recovery Corp. pertaining to these issues.

As a result of the concerns regarding Recovery Corp.'s lack of standing, the Debtors requested that Recovery Corp. withdraw the following: (a) any proof of claim filed on behalf of Recovery Corp. in the Chapter 11 Cases, (b) all motions, objections, and discovery filed or served in the Chapter 11 Cases and/or the Adversary Proceeding by Recovery Corp., and (c) the complaint filed in the Miami Action. Due to its lack of standing, the Debtors also requested that Recovery Corp. withdraw from its position on the UCC. On September 19, 2024, Recovery Corp. sent a letter to the Debtors, refusing to make any of the requested withdrawals and stating that the issues raised by the Debtors are "of no consequence." The Debtors reserve all rights to take any and all necessary actions in the Chapter 11 Cases and the Adversary Proceeding to the extent that Recovery Corp. refuses to cooperate.

On September 26, 2024, the Debtors Filed the *Debtors' (A) Motion to Strike, (B) Cross-Motion to Compel, and (C) Opposition to Recovery Corp.'s Motion to Compel Discovery Responses* [Docket No. 464], which is set for hearing on October 8, 2024 at 9:30 a.m. (prevailing Eastern Time).

### 13.    AHCA Motion

On August 28, 2024, the Debtors Filed their *Motion for Entry of an Order Granting Limited Relief from the Automatic Stay, to the Extent Applicable, to Permit Debtor Donegan Square Health Care Associates, LLC to Perform Under AHCA Agreement* [Docket No. 360]. On September 11, 2024, the UCC Filed an objection to the relief requested therein. *See* Docket No. 416. In exchange for the consideration and compromises contemplated herein, the UCC agreed to withdraw their objection.

### 14.    365(d)(4) Motion

On September 16, 2024, the Debtors Filed their *Motion for Entry of Order Extending Time to Assume or Reject Unexpired Leases of Nonresidential Real Property Pursuant to 11 U.S.C. § 365(d)(4)* [Docket No. 436]. On September 30, 2024, the Bankruptcy Court entered the *Order Extending Time to Assume or Reject Unexpired Leases of Nonresidential Real Property Pursuant to 11 U.S.C. § 365(d)(4)* [Docket No. 472], extending the Debtors' deadline to assume or reject their leases through and until December 30, 2024.

### 15.    Combined Plan and Disclosure Statement

On July 23, 2024, the Debtors Filed the *Debtors' Combined Disclosure Statement and Joint Chapter 11 Plan of Reorganization* [Docket No. 273]. On August 7, 2024, the Debtors Filed the Solicitation Procedures Motion. On September 17, 2024, the Debtors Filed the *Debtors' Combined Disclosure Statement and Joint First Amended Chapter 11 Plan of Reorganization* [Docket No. 438]. On September 26, 2024, the Debtors Filed the *Debtors' Second Amended Combined Disclosure Statement and Joint Chapter 11 Plan of Reorganization* [Docket No. 461].

On September 30, 2024, the Bankruptcy Court held a hearing with respect to the Solicitation Procedures Motion. On October 1, 2024, the Bankruptcy Court entered the Solicitation Procedures Order, conditionally approving the Disclosure Statement and authorizing the Debtors to solicit acceptances of the Plan. The Solicitation Procedures Order set forth the following key dates and deadlines:

| Approved Timeline | |
| --- | --- |
| Voting Record Date | September 27, 2024 |
| Deadline for Commencement of Solicitation and Service of Confirmation Hearing Notice | Five business days after entry of the Solicitation Procedures Order |

| Approved Timeline | |
|---|---|
| Claims Objection Deadline (for Voting Purposes) | October 14, 2024, at 4:00 p.m. (prevailing Eastern Time) |
| Rule 3018 Motion Deadline | October 28, 2024, at 4:00 p.m. (prevailing Eastern Time) |
| Plan Supplement Deadline | October 28, 2024 |
| Voting Deadline | November 4, 2024, at 4:00 p.m. (prevailing Eastern Time) |
| Disclosure Statement and Confirmation Objection Deadline | |
| Deadline to File Report of Balloting | November 8, 2024 |
| Combined Hearing | November 14, 2024, at 9:30 a.m. (prevailing Eastern Time) |

On October 1, 2024, the Debtors filed a solicitation version of the Second Amended Combined Disclosure Statement and Plan. *See* Docket No. 481.

## E.    Releases, Injunctions, and Exculpation

Article X of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Debtors, Reorganized Debtors, or Released Parties, as applicable. The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved. If the releases are not approved, certain Released Parties may withdraw their support for the Plan. The releases provided to the Released Parties and the exculpation provided to the Exculpated Parties are necessary to the success of the Debtors' reorganization because the Released Parties and Exculpated Parties have agreed to make significant contributions to the Debtors' reorganizational efforts that are important to the success of the Plan. The Plan's release and exculpation provisions are therefore an inextricable component of the Plan.

There are generally two types of releases in chapter 11 plans. The first type is a debtor's release of actual and potential claims held by the debtor against third parties (e.g., directors, officers, vendors, creditors, and other parties). Courts have generally held that a debtor may release claims in a plan under Bankruptcy Code section 1123(b)(3)(A) if the bankruptcy court finds that the decision to grant an estate release is a valid exercise of the debtor's business judgment, fair and reasonable, and in the best interests of the estate.

The second type of is commonly referred to as a "third-party" or "nondebtor" release. A third-party release operates to release and/or enjoin claims creditors or other third-party stakeholders may have against other non-debtor parties, such as debtor's principals, officers, directors, affiliates, guarantors, insurers, lenders, and other stakeholders.

Third-party releases are either consensual or non-consensual. With respect to consensual third-party releases, courts generally agree that consensual third-party releases are permissible to the extent they bind only those creditors who affirmatively consented to the release. Creditors can demonstrate their consent in different ways. For example, courts generally agree that an affirmative vote to accept a plan that contains a third-party release constitutes an express consent to the release.[11] Certain courts also agree that

---

[11]    *See In re Stein Mart, Inc.*, 629, B.R. 516, 523 (Bankr. M.D. Fla. 2021) (citing *In re SunEdison, Inc.*, 576 B.R. 453, 458 (Bankr. S.D.N.Y. 2017)); *In re Akorn, Inc.*, No. 20-11177 (Bankr. D. Del. Sept. 4, 2020) [Docket No.

a creditor consents to a third-party release where the ballot provided to voting claimants gives them the opportunity to opt out of such releases[12] and where non-voting claimants are provided the opportunity to opt out to such releases by objecting to plan confirmation.[13]

With respect to nonconsensual third-party releases, until recently, courts were divided about whether nonconsensual third-party releases were permissible. Even those courts that agreed nonconsensual third-party releases were permissible disagreed about the circumstances under which they would allow them.

The Supreme Court recently settled the debate. On June 27, 2024, the Supreme Court in *Harrington v. Purdue Pharma L.P.* held that the Bankruptcy Code does not authorize nonconsensual third-party releases; if a proposed chapter 11 plan contains a release of a creditor's direct claim against a third-party nondebtor, the creditor must consent to the release of its claim.[14] Importantly, the Supreme

---

673] (confirming plan where non-debtor releasing parties included "all Holders of Claims or Interests who vote to accept the Plan"); *In re Coram Healthcare Corp.*, 315 B.R. 321, 336 (Bankr. D. Del. 2004) (holding that creditors who voted to accept the plan are bound by the releases); *In re Zenith Elecs. Corp.*, 241 B.R. 92, 111 (Bankr. D. Del. 1999) (same).

12   *See, e.g.*, *In re Envistacom, LLC*, Case No. 23-52696 (JWC) (Bankr. N.D. Ga.) [Docket No. 220] (confirming debtor's chapter 11 plan where creditors were required to opt out of third-party release provisions); *In re Mallinckrodt PLC*, 639 B.R. 837, 880 (Bankr. D. Del. 2022) (finding opt-out mechanic sufficient to demonstrate consent to third-party release); *In re Stein Mart, Inc.*, 629, B.R. 516, 523 (Bankr. M.D. Fla. 2021) (finding that the third-party releases contained in the plan were consensual because the decision to return or not return the opt-out form demonstrated "an absolute and unconditional acceptance or rejection of the offered release); *In re Emerge Energy Services LP*, No. 19-11563 (Bankr. D. Del. Dec. 18, 2019) [Docket No. 721] (confirming plan where the non-debtor releasing parties included claimants "that submitted a Ballot to the Voting and Claims Agent, but did not affirmatively opt out of the Third Party Release as provided on their respective Ballots"); *In re Indianapolis Downs, LLC*, 486 B.R. 286, 306 (Bankr. D. Del. 2013) ("As for those impaired creditors . . . who voted to reject the Plan and did not otherwise opt out of the releases, the record reflects these parties were provided detailed instructions on how to opt out, and had the opportunity to do so by marking their ballots. Under these circumstances, the Third Party Releases may be properly characterized as consensual and will be approved."); *In re JRV Group USA L.P.*, No. 19-11095 (Bankr. D. Del.) (CSS) (June 19, 2020) (overruling objection from the United States Trustee and approving third-party release because "people have been given reasonable notice, consistent with due process; an opportunity to object or optout, they've chosen not to do so [and] I believe that's constructive consent"); *In re AtheroGenics, Inc.*, Case No. 08-78200 (Bankr. N.D. Ga. June 9, 2009) [Docket No. 288] (approving third-party release granted by parties who did not check opt out box on ballot); *In re Levitt & Sons, LLC*, Case No. 07-19845 (Bankr. S.D. Fla. Feb. 20, 2009) (same).

13   *In re VER Techs. Holdco LLC*, No. 18-10834 (Bankr. D. Del. July 26, 2018) [Docket No. 647] (overruling objection from the United States Trustee where defined term "Releasing Parties" included "all Holders of Claims or Interests that are deemed to reject the plan that do not 'opt out' of being a releasing party by timely objecting to the Plan's third-party release provisions"); *In re EV Energy Partners, L.P.*, No. 18-10814 (Bankr. D. Del. May 17, 2018) [Docket No. 238] (overruling objections of the United States Trustee, Securities Exchange Commission, and others where defined term "Releasing Parties" included "each holder of a Claim or Existing Equity Interest that is deemed to reject the Plan that does not affirmatively elect to 'opt out' of being a Releasing Party by timely objecting to the Plan's third-party release provision"); Hr'g, Tr., *In re Gibson Brands*, No. 18-11025 (CSS) (Bankr. D. Del. Oct. 2, 2018) (overruling objection from the United States Trustee and holding that "to consent to something, [ ] it's sufficient to say, Here's your notice, this is what's going to happen and if you don't object, you'll have been deemed to consent").

14   603 U.S. –, 144 S. Ct. 2071, 2088 (2024).

Court expressly acknowledged that its opinion was narrow and that its opinion did not express a view on what constitutes consent.

> As important as the question we decide today are ones we do not. ***Nothing in what we have said should be construed to call into question consensual third-party releases offered in connection with a bankruptcy reorganization plan***; those sorts of releases pose different questions and may rest on different legal grounds than the nonconsensual release at issue here. ***Nor do we have occasion today to express a view on what qualifies as a consensual release*** . . . Confining ourselves to the question presented, we hold only that the bankruptcy code does not authorize a release and injunction that, as part of a plan of reorganization under Chapter 11, effectively seeks to discharge claims against a nondebtor without the consent of affected claimants.[15]

Here, the Debtors submit the Third-Party Release complies with *Purdue* because the release is consensual. As explained below, Holders of Claims and Interests—both voting and non-voting Holders of Claims and Interests—can opt out of the proposed releases. Thus, consistent with *Purdue* and applicable precedent, the Debtors submit that the Third-Party Release is consensual.

---

[15]  *Id.* at 2088.

As set forth in greater detail in the Solicitation Procedures Order, the Ballots, and the Notices of Non-Voting Status attached thereto, Holders of Claims are provided with conspicuous the opportunity to "opt-out" of the Third-Party Release as follows:

---

**OPT-OUT ELECTION**

**If you vote to accept the Plan, you shall be deemed to have consented to the Third-Party Release set forth in Article X.D.2 hereof and you cannot opt out of the Third-Party Release.**

**If you do not consent to the Third-Party Release, you may elect not to grant such releases but only if you are:**

- **(i) a Holder of a Claim in Classes 3, 4, 5, 6A, 6B, and 6C and you**

  - **(A) vote to reject the Plan in Item 2 of your Ballot, affirmatively elect to "opt out" of being a Releasing Party by checking the Optional Opt-Out Election in Item 3 of your Ballot, and timely return your Ballot to Verita, or**

  - **(B) abstain from voting by not casting a vote in Item 2 of your Ballot, affirmatively elect to "opt out" of being a Releasing Party by checking the Optional Opt-Out Election in Item 3 of your Ballot, and timely return your Ballot to Verita; or**

- **(ii) a Holder of a Claim in Classes 1, 2, 7, 8, or 9 and you affirmatively elect to "opt out" of being a Releasing Party by checking the box in Item 1 on the "Release Opt-Out Election Form" attached as Annex 2 to your Notice of Non-Voting Status and timely return your "Release Opt-Out Election Form" to Verita.**

**If you exercise either of the foregoing options, you will not be a Releasing Party under the Plan.  If you do not check the "opt-out" box and return your Ballot or Notice of Non-Voting Status, as applicable, you will be deemed to consent to the releases set forth in Article X.D.2 hereof and the related injunction to the fullest extent permitted by applicable law.**

**Please refer to the Ballot and/or Notice of Non-Voting Status you received for more information or contact the Claims and Noticing Agent by (a) clicking the "Submit an Inquiry" option at https://veritaglobal.net/lavie/inquiry; (b) calling (877) 709-4750 (toll-free) or (424) 236-7230 (if calling from outside the U.S. or Canada); or (c) writing to the following address: LaVie Care Centers Claims Processing Center, c/o KCC d/b/a Verita, 222 N. Pacific Coast Highway, Suite 300, El Segundo, CA 90245.  Verita is not authorized to provide legal advice.**

---

## F.      Substantive Consolidation

As set forth in Article V.A herein, the Plan contemplates entry of an order (i) substantively consolidating the OpCo Debtors' Estates (but not the OpCo Debtors themselves, except to the extent set forth in the Restructuring Transactions Memorandum) and Chapter 11 Cases for purposes of voting, distribution, and confirmation; and, separately, (ii) substantively consolidating the DivestCo Debtors' Estates (but not the DivestCo Debtors themselves, except to the extent set forth in the Restructuring Transactions Memorandum) and Chapter 11 Cases for purposes of voting, distribution, and confirmation.[16] Substantive consolidation is an equitable remedy that treats separate legal entities as if they were merged into a single survivor left with all of the cumulative assets and liabilities.  Alternatively, and as explained

---

[16]   As further explained in Article V.A, in the event the Court determines substantive consolidation is not appropriate, the Debtors' Estates will be administratively consolidated for purposes of Distributions under the Plan.

in more detail in Article V.A herein, if the Court determines that substantive consolidation is not appropriate, the Debtors' Estates shall be deemed consolidated solely for administrative purposes to facilitate distributions from the GUC Trust, but the Plan shall function as a separate Plan for each Debtor. Although "deemed" substantive consolidation for administrative purposes treats such assets and liabilities as having been consolidated only for purposes of allowing and satisfying creditor claims, and making distributions, the legal entities continue to operate separately with their own assets and liabilities. In the event of such "deemed" substantive consolidation, the treatment of Claims, including the OpCo GUC Allocation and the DivestCo GUC Allocation, will remain the same as set forth in this Plan. In such case, the Debtors believe that they meet the requirements of Bankruptcy Code section 1129, including for voting purposes, even if the Plan functions as a separate Plan for each Debtor.

The doctrine of substantive consolidation is a construct of federal common law, which has been accepted in the Eleventh Circuit and other circuits. *See, e.g., Eastgroup Properties v. Southern Motel Association Ltd.*, 935 F.2d 245 (11th Cir. 1991). *See also In re No Rust Rebar, Inc.*, No. 21-12188-PDR, 2023 WL 4497328 (Bankr. S.D. Fla. July 12, 2023); *In re Archdiocese of Saint Paul & Minneapolis*, 888 F.3d 944, 951 (8th Cir. 2018); *First Nat'l Bank of El Dorado v. Giller (In re Giller)*, 962 F.2d 796, 798–99 (8th Cir. 1992); *In re Owens Corning*, 419 F.3d 195, 211 (3d Cir. 2005); *Reider v. F.D.I.C. (In re Reider)*, 31 F.3d 1102, 1107-08 (11th Cir. 1994); *Woborn Assoc. v. Kahn (In re Hemingway Transport Inc.)*, 954 F.2d 1, 11–12 (1st Cir. 1992); *Union Sav. Bank v. Augie/Restivo Banking Co. (In re Augie/Restivo Banking Co.)*, 860 F.2d 515, 518 (2d Cir. 1988); *Drabkin v. Midland-Ross Corp. (In re Auto-Train Corp.)*, 810 F.2d 270, 276 (D.C. Cir. 1987). A bankruptcy court's statutory authority to effectuate a substantive consolidation derives from its general equitable powers under Bankruptcy Code section 105(a). *See Archdiocese of Saint Paul & Minneapolis*, 888 F.3d at 951.

In function, substantive consolidation "treat separate legal entities as if they were merged into a single survivor left with all cumulative assets and liabilities (save for inter-entity liabilities, which are erased). The result" is that claims of creditors against separate debtors morph to claims against the consolidated survivor." *Owens Corning*, 419 F.3d at 205 (quoting *Genesis Health Ventures, Inc. v. Stapleton (In re Genesis Health Ventures, Inc.)*, 402 F.3d 416, 423 (3d Cir. 2005)); *Archdiocese of Saint Paul & Minneapolis*, 888 F.3d at 951 (noting that substantive consolidation combines the assets and liabilities of multiple debtors to satisfy creditors from a combined pool of assets); *see In re Clayton General, Inc.*, Case No. 15-64266 (WLH) (Bankr. N.D. Ga. Jun. 8, 2018) [Docket No. 938] ("Substantive consolidation is an equitable remedy that has the effect of creating 'one common pool of assets, liabilities and a single body of creditors, while extinguishing the intercorporate liabilities of the consolidated estates.'" (citing *In re Credit Serv. Corp.*, 195 B.R. 680, 689 (Bankr. S.D. Ohio 1996); *In re Bonham,* 229 F.3d 750, 764 (9th Cir. 2000)); *see also In re Beaulieu Group, LLC*, Case No. 17-41677 (MGD) (Bankr. N. D. Ga. Mar. 16, 2018) [Docket No. 638] (same). The primary purpose of substantive consolidation is to promote the fair and equitable treatment of all creditors. *See Eastgroup Props. v. Southern Motel Assoc., Ltd.*, 935 F.2d 245, 248 (11th Cir. 1991).

In the Eleventh Circuit, the standard for substantive consolidation is governed by *Eastgroup Properties v. Southern Motel Ass'n, Ltd.*, 935 F.2d 245 (11th Cir. 1991). In *Eastgroup*, the Eleventh Circuit held that "bankruptcy courts have the power to order substantive consolidation by virtue of their general equitable powers" and indicated that the criterion by which to evaluate a proposed substantive consolidation is "whether the economic prejudice of continued debtor separateness outweighs the economic prejudice of consolidation." *Id.* at 248–49; *see also In re Reider*, 31 F.3d 1102, 1107–08 (11th Cir. 1994) ("Pursuant to the general equitable power conferred by Bankruptcy Code section 105, a court may order substantive consolidation of corporate entities upon an evaluation of 'whether the economic prejudice of continued debtor separateness' outweighs 'the economic prejudice of consolidation.'"). In other words, a court must "conduct a searching inquiry to ensure that consolidation yields benefits offsetting the harm it inflicts on objecting parties." *Eastgroup Props.*, 935 F.2d at 249.

In setting forth the standard, the *Eastgroup* court indicated that "the proponent of substantive consolidation must show that (1) there is substantial identity between the entities to be consolidated; and (2) consolidation is necessary to avoid some harm or to realize some benefit." *Id.* at 249. Once the proponent has made this prima facie case for consolidation, "the burden shifts to an objecting creditor to show that (1) it has relied on the separate credit of one of the entities to be consolidated; and (2) it will be prejudiced by substantive consolidation." *Id.* If an objecting creditor makes this showing, the court may order consolidation "only if it determines that the demonstrated benefits of consolidation 'heavily' outweigh the harm." *Id.*

In *Eastgroup*, the Eleventh Circuit suggested framing the ask for substantive consolidation using the following seven factors:

1.    The presence or absence of consolidated financial statements;
2.    The unity of interests and ownership between various corporate entities;
3.    The existence of parent and intercorporate guarantees on loans;
4.    The degree of difficulty in segregating and ascertaining individual assets and liabilities;
5.    The existence of transfers of assets without formal observance of corporate formalities;
6.    The commingling of assets and business functions; and
7.    The profitability of consolidation at a single physical location.

The Eleventh Circuit also mentions additional factors that could be presented in some cases, including:

1.    The parent owning the majority of the subsidiary's stock;
2.    The entities having common officers and directors;
3.    The subsidiary being grossly undercapitalized;
4.    The subsidiary transacting business solely with the parent; and
5.    Entities disregarding the legal requirements of the subsidiary as a separate organization.

The Eleventh Circuit noted that the foregoing factors are only "examples of information that may be useful to courts charged with deciding whether there is a substantial identity between the entities to be consolidated and whether consolidation is necessary to avoid some harm or to realize some benefit." *Id.* at 250. "No single factor is likely to be determinative in the court's inquiry." *Id.*

The Debtors will present evidence at the Combined Hearing and in their brief in support of Confirmation to sustain their burden regarding the necessity and appropriateness of substantive consolidation as provided herein.

The compromises contained in the Plan are premised upon substantive consolidation between the OpCo Debtors, on the one hand, and the DivestCo Debtors, on the other, to the extent provided herein, meaning that, subject to Court approval, the OpCo Debtors will be substantively consolidated and the DivestCo Debtors will be substantively consolidated for voting, distribution, and confirmation of the Plan. The parties to the Mediation, including the UCC, the Plan Sponsor, and the Omega Secured Parties, have agreed to support substantive consolidation on this basis. Without substantive consolidation (or "deemed" substantive consolidation), the substantial contributions made by the Released Parties, including the Plan Sponsor, would not be available. Nor would the Plan be able to be confirmed in the event that the Motion to Dismiss were granted, as the compromises reached with the Plan Sponsor and other Released Parties are predicated upon each of the Debtors confirming the Plan.

By way of example, below is some discussion of the aforementioned *Eastgroup* factors and how they demonstrate that the Debtors satisfy the standards for substantive consolidation. The Debtors intend

to provide additional evidence to support substantive consolidation in connection with the Confirmation Hearing.

1.    ***The presence or absence of consolidated financial statements***:   The Debtors utilize consolidated financial statements across their organization, and produce consolidated financial statements to the Debtors' lenders and landlords.

2.    ***The unity of interests and ownership between various corporate entities***:   As explained above, Debtor LV Operations I, LLC wholly owns Debtor LV Operations II, LLC, which wholly owns Debtor LaVie Care Centers, LLC. Each of the Debtor entities are directly or indirectly owned by LaVie Care Centers, LLC.  In addition, the governing body of each of the Debtors prior to the Petition Date was indirectly provided through the Board of Directors of non-Debtor FC XXI.

3.    ***The existence of parent and intercorporate guarantees on loans***:   The Debtors have numerous parent and intercorporate guarantees of loans from third parties.  For example, with respect to the ABL Credit Facility, the borrowing base utilized in connection with the ABL Credit Facility is determined by the accounts receivable of the operating Debtors as a whole.  Each of those Debtors is also jointly and severally liable for the obligations due and owing under the ABL Credit Facility.  The same concept exists with respect to the Omega Term Loan Facility.  As explained above, the obligations due and owing under the Omega Term Loan Credit Agreement are joint and several across all Omega Term Loan Obligors.   Virtually all of the Debtors' operations transfer agreements contain intercorporate guarantees on the obligations contained in those agreements.  The Debtors' master leases, and other documents, including the settlements reached in the CMC II bankruptcy cases, contain intercorporate guarantees.  In addition, many of the Debtors' largest trade vendors have contracts across all Debtors, with joint and several obligations owing thereunder.  The Debtors therefore satisfy this factor.

4.    ***The degree of difficulty in segregating and ascertaining individual assets and liabilities***:   As described in the Cash Management Motion [Docket No. 14], the Debtors utilize an integrated, centralized cash management system in the ordinary course of business to collect, concentrate and disburse funds generated by their operations.  Because the Debtors' accounting systems, policies, and practices were developed for consolidated reporting purposes, rather than reporting by individual legal entity, the Debtors' ability to precisely record all assets, liabilities or amounts of cash disbursements with the correct legal entity is not certain, and the effort to do so would be, at best, significantly burdensome and expensive and potentially may not be possible given the magnitude and volume of intercompany transactions.

5.    ***The existence of transfers of assets without formal observance of corporate formalities***:   In the ordinary course of business, and in furtherance of the Debtors' consolidated entity accounts payable and disbursement systems, the Debtors engage in voluminous intercompany transactions with one another on a daily basis.   These intercompany transactions are sometimes settled by the actual transfer of cash, but in most cases, settled by book entry.  The general ledger of the Debtors' books and records shows millions of entries in connection with intercompany transfers, and the Debtors' Schedules of Assets and Liabilities and Statements of Financial Affairs show very significant intercompany assets and liabilities on the books and records of each of the Debtors.   The full intercompany analysis has not been fully reconciled, and would take substantial efforts to begin to do so.

6.    ***The commingling of assets and business functions***:  As explained above, the Debtors utilize a consolidated cash management system for collection and disbursement activities. In addition, the Debtors' most significant asset – their cash and accounts receivable – are all swept to one main operating account on a daily basis, which then went to paydown the Prepetition ABL Lender and also fund general disbursements.  In addition, each of the operating Debtors receive management services through CMC III, and back-office services are provided on through one consolidated Support Services Agreement between CMC III and non-Debtor Synergy.  These services include IT infrastructure, banking support, and other support that occurs on a consolidated basis. The Debtors' largest trade vendors operate through consolidated contracts.  However, the pools of assets are significantly different between the OpCo Debtors and the DivestCo Debtors.  The OpCo Debtors have substantial "hard" assets, including numerous operating facilities.  The assets of the DivestCo Debtors, by contrast, largely consist of potential Causes of Action and the Divested Accounts Receivable.

For the foregoing reasons, the Debtors and the UCC submit that substantive consolidation between the OpCo Debtors, on the one hand, and the DivestCo Debtors, on the other, is reasonable and appropriate.

## ARTICLE IV.
## TREATMENT AND ALLOWANCE OF UNCLASSIFIED CLAIMS

In accordance with Bankruptcy Code section 1123(a)(1), Administrative Expense Claims, Priority Tax Claims, Professional Fee Claims, and DIP Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article V hereof.

### A.    Administrative Expense Claims

Unless a Holder agrees to less favorable treatment, each Holder of an Allowed Administrative Expense Claim (other than a Professional) shall receive Cash in an amount equal to the Face Amount of such Allowed Administrative Expense Claim either (1) in the ordinary course of business by the Debtors (or Reorganized Debtors, as applicable) or (2) on the later of (x) the Effective Date and (y) the date on which such Claim becomes an Allowed Claim (or as soon as reasonably practicable thereafter) by the Reorganized Debtors; *provided, however*, that Allowed Professional Fee Claims shall be paid from the Professional Fee Reserve pursuant to Article IV.C.  For the avoidance of doubt, Allowed Administrative Expense Claims shall not be paid by the GUC Trust or funded by the GUC Contribution.  Rather, the Reorganized Debtors (not the Plan Sponsor) shall either assume (in the case of Allowed General Administrative Expense Claims) or pay Allowed Administrative Expense Claims subject to the terms and conditions set forth herein.

Requests for payment of an Administrative Expense Claim (including PL/GL Administrative Claims) that was not accrued in the ordinary course of business (other than Professional Fee Claims and the Claims of Governmental Units arising under Bankruptcy Code section 503(b)(1)(B), (C) or (D)) must be Filed on the Docket and served on the Reorganized Debtors no later than the Administrative Expense Claim Bar Date.  Unless otherwise Ordered by the Bankruptcy Court, Holders of Administrative Expense Claims (other than the Holders of Professional Fee Claims and the Claims of Governmental Units arising under Bankruptcy Code section 503(b)(1)(B), (C) or (D)) that do not comply with the provisions set forth herein for the allowance and payment thereof on or before the Administrative Expense Claim Bar Date shall forever be barred from asserting such Administrative Expense Claims against the Reorganized Debtors, the Debtors, or their Estates.  For the avoidance of doubt, Holders of General Administrative Claims shall not be required to file requests for payment of such Claims, and the Debtors or Reorganized Debtors shall pay such General Administrative Claims in the ordinary course.

Objections to Administrative Expense Claims must be Filed and served on the Reorganized Debtors and the requesting party by the Administrative Expense Claim Objection Deadline. The Reorganized Debtors may settle Administrative Expense Claims without further Bankruptcy Court approval. With respect to General Administrative Claims assumed by the Reorganized Debtors, such claims shall be subject to any right, claim, or defense of the Debtors (or Reorganized Debtors, as applicable). Any dispute regarding the allowance and payment of a General Administrative Claim shall be resolved by the Bankruptcy Court.

Unless the Reorganized Debtors, GUC Trustee, or any other party-in-interest objects to an Administrative Expense Claim by the Administrative Expense Claim Objection Deadline, such Administrative Expense Claim shall be deemed Allowed in the amount requested. In the event that the Reorganized Debtors, the GUC Trustee, or any other party-in-interest objects to an Administrative Expense Claim, the Bankruptcy Court shall determine the Allowed amount of such Administrative Expense Claim.

**B.    Priority Tax Claims**

Subject to Article VIII.J hereof, on, or as soon as reasonably practicable after, the later of (1) the Initial Distribution Date if such Priority Tax Claim is an Allowed Priority Tax Claim as of the Effective Date or (2) the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim shall receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Priority Tax Claim, at the election of the Debtors or the Reorganized Debtors, as applicable: (a) Cash equal to the amount of such Allowed Priority Tax Claim; (b) such other less favorable treatment as to which the Debtors or Reorganized Debtors as applicable, and the Holder of such Allowed Priority Tax Claim shall have agreed upon in writing; (c) such other treatment such that it will not be Impaired pursuant to Bankruptcy Code section 1124; or (d) pursuant to and in accordance with Bankruptcy Code sections 1129(a)(9)(C) and 1129(a)(9)(D), Cash in an aggregate amount of such Allowed Priority Tax Claim payable in regular installment payments over a period ending not more than five (5) years after the Petition Date, plus simple interest at the rate required by applicable non-bankruptcy law on any outstanding balance from the Effective Date, or such lesser rate as is agreed to in writing by a particular taxing authority and the Debtors or Reorganized Debtors, as applicable, pursuant to Bankruptcy Code section 1129(a)(9)(C); *provided*, *however*, that Priority Tax Claims incurred by any Debtor in the ordinary course of business may be paid in the ordinary course of business by such Debtor in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court. Any installment payments to be made under clause (c) or (d) above shall be made in equal quarterly Cash payments beginning on the first applicable Subsequent Distribution Date, and continuing on each Subsequent Distribution Date thereafter until payment in full of the applicable Allowed Priority Tax Claim. For the avoidance of doubt, Allowed Priority Tax Claims shall not be paid by the GUC Trust or funded by the GUC Contribution. Rather, the Reorganized Debtors (not the Plan Sponsor) shall either assume or pay Allowed Priority Tax Claims.

**C.    Professional Fee Claims**

**1.    Professional Fee Reserve**

On or prior to the Effective Date, the Debtors shall establish and fund the Professional Fee Reserve with Cash equal to the Professional Fee Estimate. The Professional Fee Reserve shall be maintained in trust solely for the Professionals and for no other Entities until all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court. No Liens, claims, or interests shall encumber the Professional Fee Reserve or Cash held in the Professional Fee Reserve in any way. Such funds shall not be considered property of the Estates, the Debtors, or the Reorganized Debtors.

The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals by the Reorganized Debtors, from the funds held in the Professional Fee Reserve as soon as reasonably practicable after such Professional Fee Claims are Allowed by an order of the Bankruptcy Court; *provided*, that the Reorganized Debtors' obligations to pay Allowed Professional Fee Claims shall not be limited nor be deemed limited to funds held in the Professional Fee Reserve. When all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court, any remaining funds held in the Professional Fee Reserve shall promptly be released to the Reorganized Debtors without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

### 2.    Final Fee Applications and Payment of Professional Fee Claims

All final requests for payment of Professional Fee Claims (the "Final Fee Applications") may be made any time after the Confirmation Date but shall be Filed no later than the Professional Fee Claim Bar Date. Objections, if any, to Final Fee Applications of such Professionals must be Filed and served on the Reorganized Debtors, the GUC Trustee, the requesting Professional, and the U.S. Trustee no later than twenty-one (21) days from the date on which each such Final Fee Application is Filed (the "Professional Fee Claim Objection Deadline"). After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior orders of the Bankruptcy Court, the Allowed amounts of such Professional Fee Claims shall be determined by the Bankruptcy Court.

### 3.    Professional Fee Estimate

The Professionals shall deliver the Professional Fee Estimate to the Debtors and UCC Professionals no later than five (5) Business Days before the anticipated Effective Date; *provided, however*, that the Professional Fee Estimate shall not be considered an admission or limitation with respect to the fees and expenses of such Professional and such Professionals are not bound to any extent by the estimates. If a Professional does not provide the Professional Fee Estimate, the Debtors may estimate a reasonable amount of unbilled fees and expenses of such Professional, taking into account any prior payments; *provided, however*, that such estimate shall not be binding or considered an admission with respect to the fees and expenses of such Professional. The total aggregate amount of the Professional Fee Estimate as of the Effective Date shall be utilized by the Debtors to determine the amount to be funded to the Professional Fee Reserve.

### 4.    Post-Effective Date Fees and Expenses

The Professionals employed by the Debtors shall be entitled to reasonable compensation and reimbursement of actual, necessary expenses for post-Effective Date activities related to implementation and Consummation of this Plan; *provided that* the Professionals employed by the Debtors and the UCC shall be entitled to reasonable compensation and reimbursement of actual, necessary expenses for post-Effective Date activities related to the preparation and filing of Final Fee Applications; *provided further that* the Professionals employed by the Debtors and the UCC shall seek authorization and approval of reasonable compensation and reimbursement of actual, necessary expenses related to any post-Effective Date activities in such Professional's Final Fee Application.

Subject to the foregoing, upon the Effective Date, any requirement that Professionals comply with Bankruptcy Code sections 327 through 331 in seeking retention or compensation for services rendered after such date shall terminate, and, subject to the GUC Trust Agreement, the GUC Trustee may employ and pay any Professional for services rendered or expenses incurred after the Effective Date in the ordinary course of business without any further notice to, or action, Order, or approval of, the Bankruptcy Court.

### D.    DIP Claims

As of the Effective Date, the DIP Claims shall be Allowed and deemed to be Allowed Claims in the full amount outstanding under the DIP Credit Agreement, including, for the avoidance of doubt, (a) the principal amount outstanding under the DIP Facility on such date, (b) all interest accrued and unpaid thereon through and including the date of payment, (c) all accrued and unpaid fees, expenses and noncontingent indemnification obligations payable under the DIP Facility and the Final DIP Order and (d) all other "Obligations" as provided for in the DIP Credit Agreement. On the Effective Date, in full and final satisfaction, settlement, and release of and in exchange for each Allowed DIP Claim, subject in all respects to Confirmation of the Plan and approval of the release, exculpation, injunction and other provisions in Article X hereof, each DIP Claim shall be forever waived, discharged and forgiven by the DIP Lenders. All Liens and security interests granted to secure the DIP Claims shall be automatically terminated and of no further force and effect without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; *provided* that, any indemnification and expense reimbursement obligations of the Debtors that are contingent as of the Effective Date shall survive the Effective Date and be paid by the Reorganized Debtors in Cash as and when due under the DIP Credit Agreement; *provided further* that, any such indemnification and reimbursement obligations shall be consistent with the DIP Credit Agreement in all respects.  For the avoidance of doubt, prior to the Effective Date, the DIP Claims shall not be subject to any avoidance, reduction, setoff, recoupment, recharacterization, subordination (equitable or contractual or otherwise), counter-claim, defense, disallowance, impairment, objection or any challenges under applicable law or regulation.

## ARTICLE V.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

### A.    Substantive Consolidation

The Plan is premised upon the substantive consolidation of the Debtors for the purposes of voting, determining which Claims and Interests have accepted the Plan, confirmation of the Plan, and the resultant treatment of Claims and Interests and Distributions under the terms of the Plan.  Such substantive consolidation, subject to Court approval, shall occur between the OpCo Debtors, on the one hand, and the DivestCo Debtors, on the other, meaning that, subject to Court approval, the OpCo Debtors will be substantively consolidated with each other (but not with the DivestCo Debtors) and the DivestCo Debtors will be substantively consolidated with each other (but not with the OpCo Debtors).  The parties to the Mediation, including the UCC, the Plan Sponsor, and the Omega Secured Parties, have agreed to support substantive consolidation on this siloed basis.  Without substantive consolidation (or "deemed" substantive consolidation), the substantial contributions made by the Released Parties, including the Plan Sponsor, would not be available.  Accordingly, the Plan shall serve as a motion for entry of a Court order approving the substantive consolidation of the Debtors.  For the avoidance of doubt, to the extent a Joint & Several OpCo General Unsecured Claim is determined to be valid and enforceable on a joint and several basis against at least one OpCo Debtor and at least one DivestCo Debtor, such claim shall be (1) Allowed in the full amount of such claim against the applicable OpCo Debtor(s) and be entitled to Distribution as a Class 6A Claim and Class 6C Claim and (2) Allowed once in the full amount of such claim against the applicable DivestCo Debtor(s) and shall be entitled to Distribution as a Class 6B Claim.

In the alternative, if the Court determines substantive consolidation is not appropriate, on the Effective Date, subject to the clarification below, and solely for administrative purposes to facilitate distributions from the GUC Trust: (1) all General Unsecured Claims against each of the Debtors shall be deemed merged or treated as liabilities of the GUC Trust to the extent Allowed; (2) all guaranties by any Debtor of the obligations of any other Debtor shall be deemed eliminated and extinguished so that any General Unsecured Claim against any Debtor and any guarantee thereof executed by any Debtor and any

joint or several General Unsecured Claim against any of the Debtors shall be deemed to be one obligation of the GUC Trust; (3) each and every General Unsecured Claim Filed in any of the Chapter 11 Cases shall be treated as Filed against the consolidated Debtors and shall be treated as one General Unsecured Claim as applicable, against and obligation of the GUC Trust. Notwithstanding the foregoing, (a) the foregoing shall not be deemed to affect the existence of Allowed Joint & Several OpCo General Unsecured Claims, and (b) for purposes of distribution, (i) Holders of Allowed Class 6A Claims shall receive Distributions on a Pro Rata basis solely from the OpCo GUC Allocation, Holders of Allowed Class 6B Claims shall receive Distributions on a Pro Rata basis solely from the DivestCo GUC Allocation, and Holders of Allowed Class 6C Claims shall receive Distributions on a Pro Rata basis solely from the Joint & Several OpCo GUC Allocation, and (ii) if a Joint & Several OpCo General Unsecured Claim is determined to be valid and enforceable on a joint and several basis against at least one DivestCo Debtor, such claim shall be (A) Allowed in the full amount of such claim against the applicable OpCo Debtor(s) and be entitled to Distribution as a Class 6A Claim and Class 6C Claim, and (B) Allowed in the full amount of such claim against the applicable DivestCo Debtor(s) and shall be entitled to Distributions as a Class 6B Claim. For the avoidance of doubt, for purposes of determining the availability of the right of set off under Bankruptcy Code section 553, the Debtors shall be treated as separate entities so that, subject to the other provisions of Bankruptcy Code section 553, debts due to any of the Debtors may not be set off against the liabilities of any of the other Debtors. Such administrative consolidation is solely for the purpose of facilitating distributions to Holders of General Unsecured Claims under this Plan and shall not affect the legal and corporate structures of the Reorganized Debtors. Moreover, such administrative consolidation shall not affect any subordination provisions set forth in any agreement relating to any General Unsecured Claim or the ability of the GUC Trustee to seek to have any General Unsecured Claim subordinated in accordance with any contractual rights or equitable principles.

**B.    Classification of Claims and Interests**

Except for the Claims addressed in Article IV hereof, all Claims and Interests are classified in the Classes set forth below in accordance with Bankruptcy Code sections 1122 and 1123(a)(1). Pursuant to Bankruptcy Code sections 1122 and 1123(a)(1), all Claims against and Interests in the Debtors (except for the Claims addressed in Article IV hereof) are classified for the purposes of voting and Distribution pursuant to this Plan, as set forth herein. A Claim or an Interest shall be deemed classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such other Class. A Claim is placed in a particular Class for the purpose of receiving Distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released, or otherwise settled prior to the Effective Date. Except as otherwise specifically provided for herein, the Confirmation Order, or any other Order of the Bankruptcy Court, or required by applicable bankruptcy law, in no event shall the aggregate value of all property received or retained under the Plan on account of an Allowed Claim exceed 100% of the underlying Allowed Claim.

Bankruptcy Code section 1129(a)(10) shall be satisfied for the purposes of Confirmation by acceptance of the Plan by an Impaired Class of Claims; *provided*, *however*, that in the event no Holder of a Claim with respect to a specific Class timely submits a Ballot in compliance with the deadline established by the Bankruptcy Court indicating acceptance or rejection of this Plan, such Class will be deemed to have accepted this Plan. The Debtors may seek Confirmation of this Plan pursuant to Bankruptcy Code section 1129(b) with respect to any rejecting Class of Claims or Interests.

All Claims and Interests (other than Administrative Expense Claims, Priority Tax Claims, Professional Fee Claims, and DIP Claims) are placed in the Classes set forth below. The following chart provides a summary of treatment of each Class of Claims and Interests (other than Administrative Expense Claims, Priority Tax Claims, Professional Fee Claims, and DIP Claims).

| Class | Claim / Interest | Status | Voting Rights |
|-------|-----------------|--------|---------------|
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 3 | ABL Claims | Impaired | Entitled to Vote |
| 4 | Omega Term Loan Claims | Impaired | Entitled to Vote |
| 5 | Go-Forward Trade Claims | Impaired | Entitled to Vote |
| 6A | OpCo General Unsecured Claims | Impaired | Entitled to Vote |
| 6B | DivestCo General Unsecured Claims | Impaired | Entitled to Vote |
| 6C | Joint & Several OpCo General Unsecured Claims | Impaired | Entitled to Vote |
| 7 | Intercompany Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 8 | Existing Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 9 | Intercompany Interests | Unimpaired | Not Entitled to Vote (Deemed to Accept) |

**C.     Treatment of Claims and Interests**

**1.     Class 1:  Other Secured Claims**

(a)     <u>Classification</u>:  Class 1 consists of all Other Secured Claims.

(b)     <u>Treatment</u>:  On the Effective Date, in full and final satisfaction of such Allowed Other Secured Claim, except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment of its Allowed Claim, each Holder of an Allowed Other Secured Claim shall receive at the option of the Debtors or Reorganized Debtors, as applicable (i) payment in full in cash, (ii) the return of the applicable collateral in satisfaction of the Allowed amount of such Other Secured Claim; or (iii) such other treatment sufficient to render such Allowed Other Secured Claim as Unimpaired.

(c)     <u>Voting</u>: Class 1 is Unimpaired under the Plan.  Holders of Allowed Claims in Class 1 shall be conclusively deemed to have accepted the Plan pursuant to Bankruptcy Code section 1126(f).  Therefore, Holders of Allowed Claims in Class 1 are not entitled to vote to accept or reject the Plan.

**2.     Class 2:  Other Priority Claims**

(a)     <u>Classification</u>:  Class 2 consists of all Other Priority Claims.

(b)     <u>Treatment</u>:  On the Effective Date, or as soon as reasonably practicable thereafter, in full and final satisfaction of such Allowed Other Priority Claim, except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment of its Allowed Claim, each holder of an Allowed Other Priority Claim shall receive at the option of the Debtors or Reorganized Debtors, as applicable

(i) payment in full in cash or (ii) such other treatment in accordance with the Bankruptcy Code in full satisfaction of such Claim.

(c)    <u>Voting</u>: Class 2 is Unimpaired under the Plan.  Holders of Allowed Claims in Class 2 shall be conclusively deemed to have accepted the Plan pursuant to Bankruptcy Code section 1126(f).  Therefore, Holders of Allowed Claims in Class 2 are not entitled to vote to accept or reject the Plan.

**3.      Class 3:  ABL Claims**

(a)    <u>Classification</u>:  Class 3 consists of all ABL Claims.

(b)    <u>Treatment</u>:  On the Effective Date, in full and final satisfaction of such Allowed ABL Claim, except to the extent that a Holder of an Allowed ABL Claim agrees to a less favorable treatment of its Allowed Claim, each Holder of an Allowed ABL Claim shall receive its Pro Rata share of the ABL Exit Facility.

(c)    <u>Voting</u>: Class 3 is Impaired under the Plan.  Holders of Allowed ABL Claims in Class 3 are entitled to vote to accept or reject the Plan.

**4.      Class 4:  Omega Term Loan Claims**

(a)    <u>Classification</u>:  Class 4 consists of all Omega Term Loan Claims.

(b)    <u>Treatment</u>:  On the Effective Date, in full and final satisfaction of such Allowed Omega Term Loan Claim, except to the extent that a Holder of an Allowed Omega Term Loan Claim agrees to a less favorable treatment of its Allowed Claim, each Holder of an Allowed Omega Term Loan Claim shall have the Omega Term Loan Claim assumed, as modified, by the Reorganized Debtors, which such modifications shall be set forth in the Definitive Documents and the Plan Supplement.

(c)    <u>Voting</u>:  Class 4 is Impaired under the Plan.  Holders of Allowed Omega Term Loan Claims in Class 4 are entitled to vote to accept or reject the Plan.

**5.      Class 5:  Go-Forward Trade Claims**

(a)    <u>Classification</u>:  Class 5 consists of all Go-Forward Trade Claims.

(b)    <u>Treatment</u>:  On the Effective Date, in full and final satisfaction of such Allowed Go-Forward Trade Claim, except to the extent that a holder of an Allowed Go-Forward Trade Claim agrees to less favorable treatment of its Allowed Claim, each Holder of an Allowed Go-Forward Trade Claim shall receive an applicable Go-Forward Trade Contract with the Reorganized Debtors, but shall not be entitled to any additional recovery from the GUC Trust or otherwise.

The Debtors will identify potential Holders of Go-Forward Trade Claims in connection with solicitation of the Plan, and may supplement such list at any time prior to the Voting Deadline; *provided*, *however*, that in the event such identified Holders of Go-Forward Trade Claims do not reach agreement with the Debtors regarding the applicable Go-Forward Trade Contract or do not agree in writing to

the treatment in Class 5 on or before the Voting Deadline, such identified claims shall not be Class 5 Go-Forward Trade Claims.   For the avoidance of doubt, (a) Powerback Rehabilitation shall be a Holder of a Go-Forward Trade Claim in Class 5 and shall receive no distribution as a Class 6A, Class 6B, or Class 6C creditor, and (b) no other Claim shall be a Go-Forward Trade Claim absent the affirmative written consent of the Holder of such Claim.

(c)    <u>Voting</u>:  Class 5 is Impaired under the Plan.  Holders of Allowed Go-Forward Trade Claims in Class 5 are entitled to vote to accept or reject the Plan.

**6.    Class 6A: OpCo General Unsecured Claims**

(a)    <u>Classification</u>:  Class 6A consists of all OpCo General Unsecured Claims.

(b)    <u>Treatment</u>:  As soon as reasonably practicable after the Effective Date, in full and final satisfaction of such Allowed OpCo General Unsecured Claim (and, to the extent applicable, subject to the Unliquidated Claim Procedures), except to the extent such Allowed OpCo General Unsecured Claim is also an Allowed Joint & Several OpCo General Unsecured Claim or an Allowed DivestCo General Unsecured Claim and except to the extent that a Holder of an Allowed OpCo General Unsecured Claim agrees to less favorable treatment of its Allowed Claim, each Holder of an Allowed OpCo General Unsecured Claim shall receive such Holder's Pro Rata share of the OpCo GUC Allocation.  To the extent a Holder of an Allowed OpCo General Unsecured Claim also has an Allowed DivestCo General Unsecured Claim and/or an Allowed Joint & Several OpCo General Unsecured Claim (each discussed below), such creditor shall also be entitled to recoveries as a Holder of Allowed General Unsecured Claims in Class 6A and Class 6B and/or Class 6C, as applicable.

(c)    <u>Voting</u>:  Class 6A is Impaired under the Plan.  Holders of Allowed OpCo General Unsecured Claims in Class 6A are entitled to vote to accept or reject the Plan.

**7.    Class 6B: DivestCo General Unsecured Claims**

(a)    <u>Classification</u>:  Class 6B consists of all DivestCo General Unsecured Claims.

(b)    <u>Treatment</u>:  As soon as reasonably practicable after the Effective Date, in full and final satisfaction of such Allowed DivestCo General Unsecured Claim (and, to the extent applicable, subject to the Unliquidated Claim Procedures), except to the extent that such Allowed DivestCo General Unsecured Claim is also an Allowed Joint & Several OpCo General Unsecured Claim or an Allowed OpCo General Unsecured Claim and except to the extent that a Holder of an Allowed DivestCo General Unsecured Claim agrees to less favorable treatment of its Allowed Claim, each Holder of an Allowed  DivestCo General Unsecured Claim shall receive such Holder's Pro Rata share of the  DivestCo GUC Allocation.  To the extent a Holder of an Allowed DivestCo General Unsecured Claim also has an Allowed OpCo General Unsecured Claim and/or an Allowed Joint & Several OpCo General Unsecured Claim (each discussed above and below), such creditor shall be entitled to recoveries as a Holder of Allowed General Unsecured Claims in Class 6B and Class 6A and/or Class 6C, as applicable.

(c)   <u>Voting</u>:  Class 6B is Impaired under the Plan.  Holders of Allowed DivestCo General Unsecured Claims in Class 6B are entitled to vote to accept or reject the Plan.

**8.    Class 6C: Joint & Several OpCo General Unsecured Claims**

(a)   <u>Classification</u>: Class 6C consists of all Joint & Several OpCo General Unsecured Claims.

(b)   <u>Treatment</u>:  As soon as reasonably practicable after the Effective Date, in full and final satisfaction of such Allowed Joint & Several OpCo General Unsecured Claim (and, to the extent applicable, subject to the Unliquidated Claim Procedures), except to the extent that such Allowed Joint & Several OpCo General Unsecured Claim is also an Allowed OpCo General Unsecured Claim or an Allowed DivestCo General Unsecured Claim and except to the extent that a Holder of an Allowed Joint & Several OpCo General Unsecured Claim agrees to less favorable treatment of its Allowed Claim, each Holder of an Allowed Joint & Several OpCo General Unsecured Claim shall receive such Holder's Pro Rata Share of the Joint & Several OpCo GUC Allocation.  To the extent a Holder of an Allowed Joint & Several OpCo General Unsecured Claim has an Allowed OpCo General Unsecured Claim and/or an Allowed DivestCo General Unsecured Claim (each discussed above), such creditor shall be entitled to recoveries as a Holder of Allowed General Unsecured Claims in both Class 6C and Class 6A and/or Class 6B, as applicable.

(c)   <u>Voting</u>:  Class 6C is Impaired under the Plan.  Holders of Allowed Joint & Several OpCo General Unsecured Claims in Class 6C are entitled to vote to accept or reject the Plan.

**9.    Class 7:  Intercompany Claims**

(a)   <u>Classification</u>:  Class 7 consists of Intercompany Claims.

(b)   <u>Treatment</u>:  On the Plan Effective Date, each Intercompany Claim shall be cancelled, released, and extinguished, and each Holder of an Intercompany Claim will not be entitled to, and will not receive or retain, any property or interest in property on account of such Intercompany Claim.

(c)   <u>Voting</u>: Holders of Allowed Intercompany Claims in Class 7 are Impaired, and such Holders are conclusively deemed to have rejected the Plan pursuant to Bankruptcy Code section 1126(g).  Holders of Allowed Intercompany Claims are not entitled to vote to accept or to reject the Plan.

10.    **Class 8:  Existing Equity Interests**

(a)    <u>Classification</u>:  Class 8 consists of Existing Equity Interests.

(b)    <u>Treatment</u>:  On the Effective Date, Holders of Existing Equity Interests shall be cancelled, released and extinguished, and shall not be entitled to receive any distribution on account of their Existing Equity Interests.

(c)    <u>Voting</u>:  Holders of Existing Equity Interests in Class 8 are Impaired under the Plan. Holders of Allowed Existing Equity Interests are conclusively deemed to have rejected the Plan pursuant to Bankruptcy Code section 1126(g).  Holders of Allowed Existing Equity Interests are not entitled to vote to accept or reject the Plan.

11.    **Class 9: Intercompany Interests**

(a)    <u>Classification</u>:  Class 9 consists of Intercompany Interests.

(b)    <u>Treatment</u>:  On the Effective Date, Holders of Intercompany Interests shall receive no recovery or distribution under the Plan and shall be Reinstated solely to the extent necessary to maintain the Debtors' corporate structure unless implementation of the Restructuring Transactions requires otherwise.

(c)    <u>Voting</u>: Holders of Intercompany Interests in Class 9 are either Unimpaired, and such Holders are conclusively deemed to have accepted the Plan pursuant to Bankruptcy Code section 1126(f), or Impaired, and such Holders are conclusively deemed to have rejected the Plan pursuant to Bankruptcy Code section 1126(g). Holders of Intercompany Interests are not entitled to vote to accept or reject the Plan.

**D.    Special Provision Governing Unimpaired Claims**

Except as otherwise provided in the Plan, the Confirmation Order, any other Order of the Bankruptcy Court, or any document or agreement enforceable pursuant to the terms of the Plan, nothing shall affect the rights and defenses, both legal and equitable, of the Debtors and/or the Reorganized Debtors with respect to any Unimpaired Claims, including, but not limited to, all rights with respect to legal and equitable defenses to setoffs or recoupments against Unimpaired Claims.

**E.    Nonconsensual Confirmation**

With respect to Impaired Classes that are deemed to reject the Plan, the Debtors intend to request that the Bankruptcy Court confirm the Plan pursuant to Bankruptcy Code section 1129(b) notwithstanding the deemed rejection of the Plan by such Classes.  If any other Impaired Class of Claims entitled to vote does not accept the Plan by the requisite statutory majority provided in Bankruptcy Code section 1126, the Debtors reserve the right to amend the Plan or to undertake to have the Bankruptcy Court confirm the Plan under Bankruptcy Code section 1129(b) with respect to such Class as well, or both.

**F.    Allowed Claims**

Notwithstanding any provision herein to the contrary, the Distribution Agent shall only make Distributions to Holders of Allowed Claims.  No Holder of a Disputed Claim shall receive any Distribution

on account thereof until (and then only to the extent that) its Disputed Claim becomes an Allowed Claim. The Debtors and/or the GUC Trustee may, in their discretion, withhold Distributions otherwise due hereunder to any Holder until the Claims Objection Deadline, to enable a timely objection thereto to be Filed.  Any Holder of a Claim that becomes an Allowed Claim after the Effective Date shall receive its Distribution in accordance with the terms and provisions of the Plan.

## ARTICLE VI.
## MEANS FOR IMPLEMENTATION OF THE PLAN

### A.    General Settlement of Claims and Interests.

Unless otherwise set forth in the Plan, pursuant to Bankruptcy Code section 1123 and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, or otherwise resolved pursuant to the Plan.

The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, Causes of Action and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under Bankruptcy Code section 1123 and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable and in the best interests of the Debtors and their Estates.  Subject to Article VIII hereof, all distributions made to Holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

### B.    Plan Transaction

### 1.    Plan Transaction Restructuring

On or before the Effective Date, the Debtors or Reorganized Debtors, as applicable, shall take all applicable actions set forth in the Restructuring Steps Memorandum and may take any additional action as may be necessary or appropriate to effectuate the Plan Transaction, and any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan Transaction that are consistent with and pursuant to the terms and conditions of the Plan and the Restructuring Steps Memorandum, which shall be acceptable to the Plan Sponsor, the DIP Lenders, the ABL Lenders, the Omega Secured Parties, and the UCC, and which transactions may include, as applicable: (a) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, reorganization, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan and the Restructuring Steps Memorandum and that satisfy the applicable requirements of applicable law and any other terms to which the applicable parties may agree; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan the Restructuring Steps Memorandum and having other terms to which the applicable parties agree; (c) the filing of appropriate certificates or articles of incorporation, reincorporation, formation, merger, consolidation, conversion, amalgamation, arrangement, continuance, dissolution, or other certificates or documentation pursuant to applicable law; (d) the issuance of the New Equity Interests; (e) the execution and delivery of the New Governance Documents of each Reorganized Debtor; (f) the execution and delivery of the ABL Exit Facility Credit Agreement; (g) the assumption by the Debtors and, if necessary, assignment to the Reorganized Debtors of the Elderberry Facilities, the Harts Harbor Facility, the Omega Facilities, and the Welltower Facilities, each pursuant to the underlying leases and agreements, including the Omega Master Lease Documents and Omega Term Loan Documents, each as modified and

agreed upon by the Omega Secured Parties; and (h) all other actions that the applicable Reorganized Debtors, with the consent of the DIP Lenders, the Omega Secured Parties, the ABL Lenders, and the UCC, determine to be necessary or advisable, including making filings or recordings that may be required by applicable law in connection with the Plan.

The Debtors, the DIP Lenders, the Omega Secured Parties, the ABL Lenders, the Plan Sponsor, and the UCC shall cooperate in good faith to structure the Plan Transaction in a tax efficient manner reasonably acceptable to each such party.

The Confirmation Order shall and shall be deemed to authorize, among other things, all actions as may be necessary or appropriate to effectuate any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including the Plan Transaction, including, for the avoidance of doubt, any and all actions required to be taken under applicable non-bankruptcy law.

## 2.    Issuance and Distribution of New Equity Interests

On the Effective Date, Reorganized Parent shall issue the New Equity Interests to the Plan Sponsor (or its designee(s)) pursuant to the Plan.  Contemporaneously therewith, the Plan Sponsor (or its designee(s) will indefeasibly contribute the GUC Contribution to the GUC Trust.  The issuance of the New Equity Interests by the Reorganized Debtors shall be authorized without the need for any further corporate or other action by the Debtors or Reorganized Debtors or by Holders of any Claims or Interests.  All of the New Equity Interests issued under the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.

Each distribution and issuance of the New Equity Interests under the Plan shall be governed by the terms and conditions set forth in the Plan, including the New Governance Documents, which terms and conditions shall bind each Entity receiving such distribution of the New Equity Interests.  Any Entity's acceptance of New Equity Interests shall be deemed as its agreement to the New Governance Documents, as the same may be amended or modified from time to time following the Effective Date in accordance with their respective terms. The New Equity Interests will not be registered on any exchange as of the Effective Date and shall not meet the eligibility requirements of the Depository Trust Company.

## 3.    ABL Exit Facility

Confirmation of the Plan shall be deemed approval of (a) the ABL Exit Facility and the ABL Exit Facility Credit Agreement and (b) all transactions contemplated thereby, and all actions to be taken and undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, expenses, and other payments provided for therein and authorization of the Reorganized Debtors to enter into and execute the ABL Exit Facility Credit Agreement, and such other documents as may be required to effectuate the ABL Exit Facility.

On the Effective Date, all of the liens and security interests to be granted in accordance with the ABL Exit Facility Documents, (a) shall be deemed to be granted, (b) shall be legal, binding, and enforceable liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the ABL Exit Facility Documents, (c) shall be deemed automatically perfected on the Effective Date, subject only to such liens and security interests as may be permitted under the ABL Exit Facility Documents, and (d) shall not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law.

**4.      The Backstop Note and Backstop Note Guaranty**

As set forth herein, the GUC Contribution includes the assignment of the Debtors' interest in the Divested Accounts Receivable.  In connection therewith, on the Effective Date, the Reorganized Debtors and the Plan Sponsor shall guarantee that the GUC Trust receive a minimum of $2 million in Cash, net of all collection costs and expenses, on account of Divested Accounts Receivable within 12 months of the Effective Date, which shall be evidenced by (a) the Backstop Note and (b) the Backstop Note Guaranty. The form of the Backstop Note and the Backstop Note Guaranty shall be reasonably acceptable to the Debtors, the Plan Sponsor, and the UCC and shall be filed with the Plan Supplement.  In the event that the GUC Trust has not received at least $2 million in Cash on account of Divested Accounts Receivable within 12 months of the Effective Date, then the Reorganized Debtors shall pay the difference to the GUC Trust within ten (10) business days of the maturity of the Backstop Note.  Should the Reorganized Debtors or the Plan Sponsor fail to pay the balance due on the Backstop Note upon maturity, then the GUC Trust shall be entitled to seek entry of the Consent Judgments against the Reorganized Debtors and the Plan Sponsor.  The Backstop Note and Backstop Note Guaranty shall further provide that it shall be an event of default if the equity in any of the Reorganized Debtors, or a material portion of any of the assets of the Reorganized Debtors or Plan Sponsor, are sold or transferred (including, without limitation, to a "New Operator" or an affiliate and including pursuant to the Plan) without the consent of the GUC Trustee, unless such successor/transferee agrees to assume and/or guaranty the obligations under the Backstop Note and is reasonably capable of performing.

Until the earlier to occur of (a) the receipt by the GUC Trust of at least $2 million in Cash on account of Divested Accounts Receivable, and (b) the payment in full of the Backstop Note (the "Date of Satisfaction"), the Reorganized Debtors shall have the right and obligation to collect the Divested Accounts Receivable for the benefit of the GUC Trust.  The Reorganized Debtors may utilize the services of a third party (including, without limitation, Synergy), and shall be paid a 25% contingency fee from the proceeds of Divested Accounts Receivable for collecting the Divested Accounts Receivable.  The Reorganized Debtors (or their agents) shall promptly remit the net collections of Divested Accounts Receivable to the GUC Trust.  The Reorganized Debtors (or their agents) shall provide monthly reports to the GUC Trust regarding the outstanding Divested Accounts Receivable, collections to date, and the status of ongoing collection efforts.  In the event the Reorganized Debtors (or their agents) seek to settle a Divested Account Receivable for a discount of more than 40% of the face amount of such Divested Account Receivable, the Reorganized Debtors shall first obtain written consent from the GUC Trustee, which consent shall not unreasonably be withheld.  Following the Date of Satisfaction, at the election of the GUC Trustee, (i) the GUC Trustee and the Reorganized Debtors shall negotiate in good faith regarding terms for the Reorganized Debtors' continuing collection of the Divested Accounts Receivable, *provided that* neither the GUC Trustee nor the Reorganized Debtors shall be obligated to enter into an agreement if mutually acceptable terms cannot be reached in their respective sole discretion; or (ii) the Reorganized Debtors (and their agents) shall reasonably cooperate in good faith to transition all data and other things reasonably necessary to facilitate the continued collection, sale, or other disposition, at the GUC Trust's expense and at no cost to the Reorganized Debtors (and their agents), of the remaining Divested Accounts Receivable by the GUC Trust.

**5.      [Reserved]**

**6.      Collective Bargaining Agreements**

Unless otherwise provided herein, and subject to Article VII of the Plan, the Reorganized Debtors, with the prior reasonable consent (which consent may be given via email) of the Plan Sponsor, shall assume all existing collective bargaining agreements covering employees at the Facilities, including those by and between the Debtors and (a) the United Food & Commercial Workers Union, (b) United Steel, Paper, and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union,

(c) District Council 86, American Federation of State, County, and Municipal Employees, AFL-CIO, and (d) District Council 87, American Federation of State, County and Municipal Employees, AFL-CIO, all of which are set forth in the Notice of Revised List of Potentially Assumed Executory Contracts and Unexpired Leases and Related Cure Costs [Docket No. 356] at #3345 - #3351.

### 7.    Continued Corporate Existence

Except as otherwise provided in the Plan, the Confirmation Order, the Plan Supplement, or pursuant to the Restructuring Steps Memorandum or Plan Transaction, each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended under the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

### 8.    New Governance Documents

On or immediately prior to the Effective Date, the New Governance Documents shall be automatically adopted by the applicable Reorganized Debtors.  To the extent required under the Plan or applicable non-bankruptcy law, each of the Reorganized Debtors will file its New Governance Documents with the applicable authorities in its respective jurisdiction of organization.  The New Governance Documents will prohibit the issuance of non-voting equity Securities, to the extent required under Bankruptcy Code section 1123(a)(6).

On or after the Effective Date, the Reorganized Debtors may amend and restate their respective New Governance Documents in accordance with the terms thereof, and the Reorganized Debtors may file such amended certificates or articles of incorporation, bylaws, or such other applicable formation documents, and other constituent documents as permitted by the laws of their respective jurisdictions of incorporation or formation and the New Governance Documents.

On and as of the Effective Date, all of the Holders of New Equity Interests shall be deemed to be parties to the applicable New Governance Documents, without the need for execution by such Holder.  The New Governance Documents, as applicable, shall be binding on all Persons receiving, or to which the New Equity Interests are issued or distributed and all Holders of the New Equity Interests (and such Persons' or Holders' respective successors and assigns), whether such New Equity Interest is received or to be received on or after the Effective Date and regardless of whether such Person executes or delivers a signature page to the New Governance Documents.

### 9.    New Board and Officers of the Reorganized Debtors

The New Board or other governing body of the Reorganized Debtors and/or one or more applicable Entities as set forth in the Restructuring Transactions Memorandum shall be identified in the Plan Supplement and shall be subject to approval of the Bankruptcy Court pursuant to Bankruptcy Code section 1129(a)(5).  Pursuant to and to the extent required by Bankruptcy Code section 1129(a)(5), the Debtors will disclose, at or prior to the Combined Hearing, the identity and affiliations of any Person proposed to serve on the initial board or other governing body or as an officer of each of the Reorganized Debtors and/or applicable Entities, and, to the extent such Person is an insider other than by virtue of being a managing

member, manager, director or an officer, the nature of any compensation for such Person. Each such manager, director, managing member and/or officer shall serve from and after the Effective Date pursuant to applicable law and the terms of the New Governance Documents and the other constituent and organizational documents of the applicable Reorganized Debtors and/or Entity. The existing boards of director, manager or members and other governing bodies of the Debtors will be deemed to have resigned on and as of the Effective Date, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person or Entity.

10.    **Exemption from Registration Requirements**

Pursuant to Bankruptcy Code section 1145, the offering, issuance, and distribution of any Securities pursuant to and under the Plan, including the New Equity Interests, is exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable U.S. state or local law requiring registration prior to the offering, issuance, distribution, or sale of Securities. The shares of New Equity Interests to be issued under the Plan (a) are not "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and (b) subject to the terms of the New Shareholders Agreement, are freely tradable and transferable by any initial recipient thereof that (1) is not an "affiliate" of the Debtors as defined in Rule 144(a)(1) under the Securities Act, (2) has not been such an "affiliate" within ninety (90) days of such transfer, and (3) is not an Entity that is an "underwriter" as defined in subsection (b) of Bankruptcy Code section 1145.

11.    **Release of Liens and Claims**

To the fullest extent provided under section 1141(c) and other applicable provisions of the Bankruptcy Code, except as otherwise expressly provided herein or in any contract, instrument, release or other agreement or document entered into or delivered in connection with this Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to Article VIII hereof, all Liens and Claims against the assets or property of the Debtors or the Estates shall be fully released, canceled, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person or Entity. The filing of the Confirmation Order with any federal, state, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens or Claims and other interests to the extent provided in the immediately preceding sentence. Any Entity holding such Liens, Claims or interests shall, pursuant to Bankruptcy Code section 1142, promptly execute and deliver to the Reorganized Debtors such instruments of termination, release, satisfaction and/or assignment (in recordable form) as may be reasonably requested by the Reorganized Debtors. For the avoidance of doubt, the release set forth in this Article VI.B.11 shall not apply to any obligations of the Debtors under the Plan or the Confirmation Order.

12.    **Vesting of Assets in the Reorganized Debtors**

Except as otherwise provided in the Plan, the Confirmation Order, the Restructuring Transactions Memorandum, or any agreement, instrument, or other document incorporated herein or therein, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, all property in each Debtor's Estate, all Causes of Action, and any property acquired by any of the Debtors under the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances. On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

For the avoidance of doubt, and notwithstanding anything to the contrary contained in this Plan, the Debtors shall not transfer or be deemed to have transferred to (or otherwise vest in) the Reorganized Debtors (a) the GUC Contribution or (b) any claims or Causes of Action released pursuant to Article X.D hereof or exculpated pursuant to Article X.E hereof to the extent of any such exculpation.

13.    **Effectuating Documents; Further Transactions**

Prior to the Effective Date, the Debtors are, and on and after the Effective Date, the Reorganized Debtors, and their respective officers, directors, members, and managers (as applicable), are authorized to and may issue, execute, deliver, file, or record to the extent not inconsistent with any provision of this Plan such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the New Equity Interests issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorizations, actions, notices or consents except for those expressly required pursuant to the Plan.

C.    **Sources of Consideration for Plan Distributions**

The Debtors shall fund distributions under the Plan, as applicable, with:  (a) the Plan Sponsor Contribution, (b) proceeds of Accounts Receivable, and (c) the Debtors' Cash on hand.  Each distribution and issuance referred to in Article VIII of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments or other documents evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.  The issuance, distribution, or authorization, as applicable, of certain securities in connection with the Plan, including the New Equity Interests, will be exempt from SEC registration, as described more fully in Article VI.B.10 above.

D.    **Waiver of General Unsecured Claims**

1.    **Waiver of Omega General Unsecured Claims**

Regardless of any Claims or rights that Omega or any of its affiliates may have against the Debtors (including any rights under the Subordination Agreement), neither Omega, nor any of its affiliates will receive any Distributions as Holders of any Claims in Classes 6A, 6B, or 6C.

2.    **Waiver of Powerback Rehabilitation General Unsecured Claim**

Powerback Rehabilitation shall be treated as a Holder of a Go-Forward Trade Claim in Class 5, meaning that it shall receive a Go-Forward Trade Contract and shall not receive any Distributions from the GUC Trust.  In exchange for the compromises contained in the Plan (including, without limitation, its treatment as a Go-Forward Trade Claim in Class 5), subject to the occurrence of the Effective Date, Powerback Rehabilitation agrees to vote in favor of the Plan.

E.    **Corporate Action**

On the Effective Date, all actions contemplated under the Plan shall be deemed authorized and approved in all respects, including implementation of the Plan Transaction, as applicable, and all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the transactions contemplated by the Plan (whether to occur before, on, or after the Effective Date).  All matters provided for in the Plan involving the corporate or organizational structure of the Debtors or the Reorganized Debtors, and any corporate, partnership, limited liability company, or other governance action required by

the Debtors or the Reorganized Debtors, as applicable, in connection with the Plan shall be deemed to have timely occurred and shall be in effect and shall be authorized and approved in all respects, without any requirement of further action by the equity holders, members, directors, or officers of the Debtors or the Reorganized Debtors, as applicable.  On or prior to the Effective Date, as applicable, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and, as applicable, directed, to issue, execute, and deliver the agreements, documents, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Reorganized Debtors.  The authorizations and approvals contemplated by this Article VI.D shall be effective notwithstanding any requirements under non-bankruptcy Law.

## F.      Cancellation of Notes, Interests, Certificates, and Instruments

On the Effective Date, except for the purpose of evidencing a right to a distribution under the Plan and except as otherwise provided in this Plan and the Confirmation Order, all notes, instruments, certificates, credit agreements, indentures, securities and other documents evidencing or governing Claims or Interests (other than those Claims or Interests Reinstated under the Plan) shall be cancelled and the rights of the Holders thereof and obligations of the Debtors thereunder or in any way related thereto shall be deemed satisfied in full, cancelled, discharged, and of no force or effect.  Holders of or parties to such cancelled instruments, Securities, and other documentation will have no rights arising from or relating to such instruments, Securities, and other documentation, or the cancellation thereof, except the rights, distributions, and treatment provided for pursuant to this Plan or the Confirmation Order.  Nothing contained herein shall be deemed to cancel, terminate, release or discharge the obligations of the Debtors or any of their counterparts under any Executory Contract or Unexpired Lease to the extent such Executory Contract or Unexpired Lease has been assumed by the Debtors pursuant to a Final Order or hereunder.

## G.      Preservation of Causes of Action

Unless any Cause of Action against an Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, in accordance with Bankruptcy Code section 1123(b), or, in the case of the D&O Claims, assigned to the GUC Trust, the Debtors shall convey to the Reorganized Debtors all rights to commence, prosecute, or settle, in their sole discretion, any and all Causes of Action, whether arising before or after the Petition Date, which shall vest in the Reorganized Debtors pursuant to the terms of the Plan.  Such Causes of Action shall include, without limitation, those Causes of Action set forth on a schedule to be filed with the Plan Supplement.  The Reorganized Debtors may enforce all rights to commence, prosecute, or settle, in their sole discretion, any and all Causes of Action, whether arising before or after the Petition Date, and the Reorganized Debtors rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date; *provided, however*, that any and all Causes of Action under chapter 5 of the Bankruptcy Code against Holders of General Unsecured Claims shall be settled, released, and waived by the Reorganized Debtors unless a creditor opts out of the Third-Party Release contained in Article X.D.2 herein and pursues a non-Debtor for Claims and/or Causes of Action that arises from or relates to the Debtors and/or the Debtors' assets prior to the Petition Date.  In such instance, the chapter 5 Claim or Cause of Action shall only be used defensively by the Reorganized Debtors to offset any amount determined to be owed by the non-Debtor, plus costs and expenses attendant to the same, and neither the Reorganized Debtors nor the GUC Trust shall receive any positive recovery in such scenario.

The Reorganized Debtors may pursue such Causes of Action and may retain and compensate professionals in the analysis or pursuit of such Causes of Action to the extent the Reorganized Debtors deems appropriate in their sole discretion, including on a contingency fee basis.  No Entity may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes

of Action against them.  The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.  Unless any Cause of Action against an Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, the Reorganized Debtors expressly reserves all Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.  The Reorganized Debtors reserves and shall retain the foregoing Causes of Action notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.  The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to, or action, order, or approval of, the Bankruptcy Court.

**H.     Assignment of D&O Claims/Causes of Action**

Any and all Claims and/or Causes of Action that are or may be covered claims under a current insurance policy of the Debtors or FC XXI (collectively, the "D&O Claims") against the current and former officers and directors of the Debtors, or the current and former members of the board of FC XXI (collectively, the "D&Os") shall be assigned to the GUC Trust and may be pursued by the GUC Trustee subject to the following limitations (collectively, the "D&O Claim Limitations"): (1) the GUC Trust shall use best efforts to file the complaint under seal and to keep confidential all material documents in the case; (2) the total recovery by way of settlement or judgment in all such litigation may not exceed the aggregate total amounts that may be available under any current insurance policies of the Debtors or FC XXI, and any award of damages (inclusive of expenses) may be pursued only against any applicable insurers; (3) the litigation against the D&Os shall be limited to only claims and allegations covered by the insurers and against them solely and specifically in their capacity as current or former board members, directors, employees, agents, and/or officers of the Debtors or FC XXI; (4) the D&Os shall cooperate as reasonably requested by any counsel hired by the insurers to defend the litigation, provided that none of the D&Os shall be required to expend any non-reimbursable funds or costs out-of-pocket with respect to such litigation, provided further that the D&Os may, at their respective sole discretion, elect to incur costs to supplement their defense against the litigation; (5) the GUC Trust shall be solely responsible for promptly making payments to the insurers, or to counsel to the D&Os, as may be required by the insurers to satisfy any demands therefrom for deductibles and, should the GUC Trust fail to honor a demand for payment as directed by the insurers that is not subject to bona fide dispute, the GUC Trust shall immediately abandon any and all Claims and Causes of Action against the D&Os; and (6) the GUC Trust shall not transfer or assign any Claims or Causes of Action against the D&Os to any other party, and to the extent that the GUC Trust abandons any Claims or Causes of Action against any of the D&Os, such Claims and Causes of Action shall be deemed abandoned and forever waived.  For the avoidance of doubt, the D&O Claims shall not include any Claims or Causes of Action against the CRO or the Independent Manager.

**I.      Continuing Effectiveness of Final Orders**

Payment authorization granted to the Debtors under any prior Final Order entered by the Bankruptcy Court shall continue in effect after the Effective Date.  Accordingly, the Debtors or the Reorganized Debtors may pay or otherwise satisfy any Claim to the extent permitted by, and subject to, the applicable Final Order without regard to the treatment that would otherwise be applicable to such Claim under this Plan.

## J.    UCC Dissolution

The UCC shall continue in existence until the Effective Date to exercise those powers and perform those duties specified in Bankruptcy Code section 1103 and shall perform such other duties as it may have been assigned by the Bankruptcy Court prior to the Effective Date. Upon the occurrence of the Effective Date, the UCC shall dissolve automatically, whereupon their members, professionals, and agents shall be discharged and released from any duties and responsibilities in the Chapter 11 Cases and under the Bankruptcy Code, except with respect to (a) obligations arising under confidentiality agreements, which shall remain in full force and effect, and (b) prosecuting applications for payment of fees and reimbursement of expenses of its Professionals or attending to any other issues related to applications for payment of fees and reimbursement of expenses of its Professionals.

## K.    Exemption from Certain Transfer Taxes

Pursuant to Bankruptcy Code section 1146(a), any transfers of property pursuant hereto shall not be subject to any stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, personal property tax, sales tax, use tax, privilege tax, or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct and be deemed to direct the appropriate federal, state or local government officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment. Such exemption specifically applies, without limitation, to (a) the creation of any mortgage, deed of trust, lien or other security interest; (b) the assuming and assigning any contract, lease or sublease; (c) any transaction authorized by this Plan; (d) any sale of an Asset by the GUC Trustee or Reorganized Debtors in furtherance of the Plan, including but not limited to any sale of personal or real property; and (e) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with this Plan.

## L.    GUC Trust

### 1.    Establishment of the GUC Trust

On the Effective Date, the GUC Trust shall be established pursuant to the GUC Trust Agreement for the purpose of, among other things, (a) holding and administering the GUC Trust Assets; (b) prosecuting any objections to Claims that the GUC Trustee deems appropriate and resolving such objections, pursuant to the Unliquidated Claim Procedures or otherwise; (c) retaining professionals or other advisors to assist in the performance of its duties; (d) making Distributions from the GUC Trust to Holders of Allowed General Unsecured Claims as provided for in the Plan and the GUC Trust Agreement; and (e) seeking enforcement of implementation of the provisions of the Plan or any motions. The GUC Trust Agreement may establish certain powers, duties, and authorities in addition to those explicitly stated herein, but only to the extent that such powers, duties, and authorities do not affect the status of the GUC Trust as a liquidating trust for United States federal income tax purposes.

Upon execution of the GUC Trust Agreement, the GUC Trustee shall be authorized to take all steps necessary to complete the formation of the GUC Trust. The GUC Trust shall be administered by the GUC Trustee in accordance with the GUC Trust Agreement.

### 2.    Assets of the GUC Trust

On the Effective Date, the Debtors shall transfer and assign to the GUC Trust all of their right, title, and interest in and to all of the GUC Trust Assets, and in accordance with Bankruptcy Code section 1141,

all such assets shall automatically vest in the GUC Trust free and clear of all Claims and Liens, subject only to the Allowed Claims of the Holders of GUC Trust Interests as set forth in the Plan and the expenses of the GUC Trust as set forth herein and in the GUC Trust Agreement. Thereupon, the Debtors and the Reorganized Debtors shall not have any interest in or with respect to the GUC Trust Assets, and the GUC Trust shall be responsible for any and all costs and expenses associated with the GUC Trust Assets.

### 3. GUC Trust Interests

On the Effective Date, each Holder of an Allowed General Unsecured Claim shall, by operation of the Plan, be deemed to have received its uncertificated Pro Rata share of the GUC Trust Interests pursuant to and consistent with the Class 6A, Class 6B, and Class 6C distribution terms of the Plan. For the avoidance of doubt, Holders of Allowed Class 6A Claims shall have Pro Rata beneficial interests in, and only in, the OpCo GUC Allocation, Holders of Allowed Class 6B Claims shall have Pro Rata beneficial interests in, and only in, the DivestCo GUC Allocation, and Holders of Allowed Class 6C Claims shall have Pro Rata beneficial interests in, and only in, the Joint & Several OpCo GUC Allocation. GUC Trust Interests shall be reserved for Holders of Disputed Claims and issued by the GUC Trust to, and held by, the GUC Trustee, pending allowance or disallowance of such Claims. No other Person or Entity shall have any interest, legal, beneficial, or otherwise, in the GUC Trust Assets upon the assignment and transfer of such assets to the GUC Trust.

As set forth in the GUC Trust Agreement, Distributions from the GUC Trust on account of GUC Trust Interests shall be made from the GUC Trust Assets after paying, reserving against, or satisfying, among other things, the operating and administrative expenses of the GUC Trust, including but not limited to all costs, expenses, and obligations incurred by the GUC Trustee (or professionals who may be employed by the GUC Trustee in administering the GUC Trust) in carrying out their responsibilities to the GUC Trust under the GUC Trust Agreement, or in any manner connected, incidental, or related thereto.

The GUC Trust Interests shall be uncertificated and shall be nontransferable except upon death of the Holder or by operation of law. Holders of GUC Trust Interests, in such capacity, shall have no voting rights or any authority over the activities of the GUC Trust.

### 4. Appointment of a GUC Trustee

The identity of the GUC Trustee shall be disclosed pursuant to a notice filed in the Plan Supplement. The appointment of the GUC Trustee shall be approved in the Confirmation Order, and such appointment shall be effective as of the Effective Date. The GUC Trustee shall have and perform all of the duties, responsibilities, rights, and obligations set forth in the Plan and GUC Trust Agreement.

## M. Resident Medical Records

Subject to any alternative language in the Confirmation Order, the Notice of Effective Date shall act as the notice pursuant to Bankruptcy Code section 351 apprising residents and/or insurance providers, as applicable, that, if the medical records of the Debtors' former residents (the "Resident Medical Records") are not claimed by the applicable resident or insurance provider within one year after the date of such notification, the Reorganized Debtors shall be authorized to destroy, abandon, or otherwise dispose of any Resident Medical Records. If the Resident Medical Records are not claimed by a resident or insurance provider within one year after such notice is provided, the Reorganized Debtors shall be and hereby is authorized to destroy, abandon, or otherwise dispose of the Resident Medical Records.

**N.**      **Dissolution of the Debtors**

Subject in all respects to the terms of this Plan, and as further addressed in the Restructuring Transactions Memorandum, certain Debtors shall be dissolved as soon as practicable on or after the Effective Date, but in no event later than the closing of the Chapter 11 Cases.

Subject in all respects to the terms of this Plan, the Reorganized Debtors shall have the power and authority to take any action necessary to wind down and dissolve any of the Debtors, and shall: (a) file a certificate of dissolution for any of the Debtors, together with all other necessary corporate and company documents, to effect the dissolution of each Debtor under the applicable laws of its state of formation; and (b) complete and file all final or otherwise required federal, state, and local tax returns and shall pay taxes required to be paid for any of the Debtors, and pursuant to Bankruptcy Code section 505(b), request an expedited determination of any unpaid tax liability of any of the Debtors or their Estates for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws. The filing by the Reorganized Debtors of any of the Debtors' certificate of dissolution shall be authorized and approved in all respects without further action under applicable law, regulation, order, or rule.

**O.**      **Transfer of Provider Agreements**

Entry of the Confirmation Order shall constitute the assumption and/or transfer, free and clear of all liens, claims and encumbrances (including any applicable overpayments) of the applicable Debtor's Medicare provider agreement and Medicare provider number to the applicable Reorganized Debtor.  The Reorganized Debtors shall promptly and diligently execute and file any and all forms, notices, consents, and applications with the applicable state regulatory agencies and Centers for Medicare & Medicaid Services as may be necessary to timely obtain any Medicare provider number and assume any provider certification and agreement utilized by the applicable Debtor in connection with the operation of the applicable Facility.

## ARTICLE VII.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**A.**      **Rejection of Executory Contracts and Unexpired Leases**

On the Effective Date, all Executory Contracts and Unexpired Leases of the Debtors will be rejected by the Debtors in accordance with, and subject to, the provisions and requirements of Bankruptcy Code sections 365 and 1123, except for: (1) the Assumed Executory Contracts and Unexpired Leases; (2) Executory Contracts and Unexpired Leases that have been previously assumed or rejected by the Debtors pursuant to a Final Order; or (3) Executory Contracts and Unexpired Leases that are the subject of a motion to assume filed on or before the Confirmation Date.  Without amending or altering any prior order of the Bankruptcy Court approving the assumption or rejection of any Executory Contract or Unexpired Lease, entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions or rejections pursuant to Bankruptcy Code sections 365(a) and 1123 and effective on the occurrence of the Effective Date.

To the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned (as applicable) pursuant to this Plan or any prior order of the Bankruptcy Court (including, without limitation, any "change of control" provision) prohibits, restricts or conditions, or purports to prohibit, restrict or condition, or is modified, breached or terminated, or deemed modified, breached or terminated by, (1) the commencement of these Chapter 11 Cases or the insolvency or financial condition of any Debtor at any time before the closing of its respective Chapter 11 Case, (2) any Debtor's or any Reorganized Debtor's assumption or assumption and assignment (as applicable) of such Executory Contract

or Unexpired Lease, or (3) the Confirmation or Consummation of this Plan, then such provision shall be deemed modified such that the transactions contemplated by this Plan shall not entitle the non-debtor party thereto to modify or terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights or remedies with respect thereto, and any required consent under any such contract or lease shall be deemed satisfied by the Confirmation of the Plan.

Each Executory Contract and Unexpired Lease assumed and/or assigned pursuant to this Plan shall revest in and be fully enforceable by the applicable Reorganized Debtor or the applicable assignee in accordance with its terms and conditions, except as modified by the provisions of this Plan, any order of the Bankruptcy Court approving its assumption and/or assignment, or applicable law. The inclusion or exclusion of a contract or lease on any schedule or exhibit shall not constitute an admission by any Debtor that such contract or lease is an Executory Contract or Unexpired Lease or that any Debtor has any liability thereunder. Notwithstanding anything to the contrary in the Plan, the Debtors or the Reorganized Debtors, as applicable, with the consent of the DIP Lenders, the Omega Secured Parties, the ABL Lenders, and the UCC, reserve the right to alter, amend, modify, or supplement the Assumed Executory Contracts and Unexpired Leases List at any time up to forty-five (45) days after the Effective Date.

## B.    Cure of Defaults; Assignment of Executory Contracts and Unexpired Leases

Any defaults under each Executory Contract and Unexpired Lease to be assumed, or assumed and assigned, pursuant to this Plan shall be satisfied solely by the Plan Sponsor, pursuant to and to the extent required by Bankruptcy Code section 365(b)(1), by payment of the applicable default amount in Cash on the Effective Date or on such other terms as the Bankruptcy Court may order or the parties to such Executory Contracts or Unexpired Leases may otherwise agree in writing (the "Cure Claim Amount").

In the event of an assumption, or an assumption and assignment, of an Executory Contract or Unexpired Lease under this Plan, at least seven (7) days prior to the deadline to object to the Plan, the Debtors shall File and serve upon counterparties to such Executory Contracts and Unexpired Leases, a notice (each, an "Assumption Notice") of the proposed assumption, or proposed assumption and assignment, which will: (1) list the applicable Cure Claim Amount, if any; (2) if applicable, identify the party to which the Executory Contract or Unexpired Lease will be assigned; (3) describe the procedures for filing objections thereto; and (4) explain the process by which related disputes will be resolved by the Bankruptcy Court. The Filing and service of any such Assumption Notice shall not obligate the Debtors to assume or assume and assign any Executory Contract or Unexpired Lease set forth in such Assumption Notice.

Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption, or proposed assumption and assignment under this Plan, or any related cure amount, must be Filed, served and actually received by the Debtors and the Plan Sponsor on or prior to the later of (1) the deadline to object to the Plan or (2) seven (7) days after the filing and service of an Assumption Notice that first identifies such Executory Contract or Unexpired Lease. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption, or proposed assumption and assignment, or cure amount will be deemed to have consented to such matters and will be deemed to have forever released and waived any objection to such proposed assumption, proposed assumption and assignment, and cure amount. The Confirmation Order shall constitute an order of the Bankruptcy Court approving each proposed assumption, or proposed assumption and assignment, of Executory Contracts and Unexpired Leases pursuant to Bankruptcy Code sections 365 and 1123 as of the Effective Date.

In the event of a dispute regarding (1) the amount of any Cure Claim Amount, (2) the ability of any Debtor or assignee to provide "adequate assurance of future performance" (within the meaning of Bankruptcy Code section 365) under the Executory Contract or Unexpired Lease to be assumed, or assumed

and assigned, or (3) any other matter pertaining to assumption or assignment, the applicable payment of the Cure Claim Amount required by Bankruptcy Code section 365(b)(1) shall be made following the entry of a Final Order resolving the dispute and approving such assumption, or assumption and assignment. If such objection is sustained by Final Order of the Bankruptcy Court, the Plan Sponsor may elect the Debtors to reject such Executory Contract or Unexpired Lease in lieu of assuming it. The Debtors (with the consent of the Plan Sponsor) or the Reorganized Debtors, as applicable, shall be authorized to effect such rejection by filing a written notice of rejection with the Bankruptcy Court and serving such notice on the applicable counterparty within thirty (30) days of the entry of such Final Order.

Subject to any cure claims Filed with respect thereto, assumption or assumption and assignment of any Executory Contract or Unexpired Lease pursuant to this Plan shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption or assumption and assignment, in each case as provided in Bankruptcy Code section 365. Any Proofs of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed or assumed and assigned by Final Order shall be deemed disallowed and expunged (subject to any cure claims Filed with respect thereto), without further notice to or action, order, or approval of the Bankruptcy Court.

With respect to any Executory Contract or Unexpired Lease assumed and assigned pursuant to this Plan, upon and as of the Effective Date, the Plan Sponsor or its assignee shall be deemed to be substituted as a party thereto for the applicable Debtor party to such assigned Executory Contract or Unexpired Lease and, accordingly, the Debtors and the Reorganized Debtors shall be relieved, pursuant to and to the extent set forth in Bankruptcy Code section 365(k), from any further liability under such assigned Executory Contract or Unexpired Lease.

## C.     Rejection Bar Date

If the rejection of an Executory Contract or Unexpired Lease pursuant to Article VII.A gives rise to a Claim by the other party or parties to such contract or lease, such Claim shall be forever barred and shall not be enforceable against the Debtors, Reorganized Debtors, or their Estates, or their respective successors or properties unless a Proof of Claim is Filed with the Claims and Noticing Agent and served on counsel for the Reorganized Debtors or the GUC Trustee by the Rejection Bar Date. Any Proofs of Claim not Filed and served by the Rejection Bar Date will be forever barred from assertion against the Debtors, Reorganized Debtors, and their Estates. Unless otherwise Ordered by the Bankruptcy Court, all Claims arising from the rejection of Executory Contracts and Unexpired Leases shall be treated as Class 6A, Class 6B, or Class 6C Claims, as applicable, under the Plan

## D.     Extension of Time to Assume or Reject

Notwithstanding anything to the contrary set forth in Article VII of this Plan, in the event of a dispute as to whether a contract is executory or a lease is unexpired, the right of the Reorganized Debtors to move to assume or reject such contract or lease shall be extended until the date that is thirty (30) days after entry of a Final Order by the Bankruptcy Court determining that the contract is executory or the lease is unexpired. Any deemed assumption provided for in Article VII.A of this Plan shall not apply to any such contract or lease, and any such contract or lease shall be assumed or rejected only upon motion of the Reorganized Debtors or the filing of a notice following the Bankruptcy Court's determination that the contract is executory or the lease is unexpired.

E.      **Modifications, Amendments, Supplements, Restatements, or Other Agreements**

Unless otherwise provided in this Plan, each Executory Contract or Unexpired Lease that is assumed by the Debtors or the Reorganized Debtors pursuant to this Plan shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing has been previously rejected or repudiated or is rejected or repudiated hereunder.  Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

F.      **Indemnification and Reimbursement**

Any obligations of the Debtors pursuant to their organizational documents, including amendments, entered into any time prior to the Effective Date, to indemnify, reimburse, or limit the liability of any Person pursuant to the Debtors' operating agreements, bylaws, policy of providing employee indemnification, applicable state law or specific agreement in respect of any claims, demands, suits, causes of action, or proceedings against such Persons based upon any act or omission related to such Persons' service with, for or on behalf of the Debtors prior to the Effective Date with respect to all present and future actions, suits and proceedings relating to the Debtors shall survive confirmation of the Plan and except as set forth herein, remain unaffected thereby, and shall not be discharged, irrespective of whether such defense, indemnification, reimbursement or limitation of liability accrued or is owed in connection with an occurrence before or after the Petition Date; *provided, however*, that all related monetary obligations shall be limited solely to available insurance coverage.  This provision for indemnification obligations shall not apply to or cover any Claims, suits or actions against a Person that result in a final order determining that such Covered Person is liable for fraud, willful misconduct, gross negligence, bad faith, self-dealing or breach of the duty of loyalty.

G.      **Insurance Policies**

Notwithstanding anything contained in the Plan or the Confirmation Order to the contrary, unless specifically rejected by order of the Bankruptcy Court or under the Plan or at the direction of the Plan Sponsor, all Insurance Policies related to the Facilities shall be assumed under the Plan as executory contracts, and nothing in the Plan or the Confirmation Order shall alter the rights and obligations of the Debtors or the insurers under the Insurance Policies (which rights and obligations shall be determined under the applicable Insurance Policies and applicable non-bankruptcy law relating thereto) or modify the coverage thereunder, and all of the Insurance Policies shall continue in full force and effect according to their terms and conditions; *provided*, *however*, in the event the underlying claim arose prior to the Petition Date, the Reorganized Debtors shall have no obligation to fund any self-insured retention.

H.      **Nonoccurrence of Effective Date**

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to Bankruptcy Code section 365(d)(4), unless such deadline(s) have expired.

I.    **Contracts and Leases Entered Into After the Petition Date**

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the applicable Debtor or the Reorganized Debtors in the ordinary course of their business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

# ARTICLE VIII.
# PROVISIONS GOVERNING DISTRIBUTIONS

A.    **Distributions on Allowed Claims**

Distributions to be made on account of Claims that are Allowed Claims as of the Effective Date or become Allowed Claims thereafter shall be made by the Distribution Agent pursuant to the terms and conditions of the Plan and the GUC Trust Agreement. Notwithstanding any other provision of the Plan to the contrary, no Distribution shall be made on account of any Allowed Claim or portion thereof that (1) has been satisfied after the Petition Date; (2) is listed in the Schedules as contingent, unliquidated, disputed or in a zero amount, and for which a Proof of Claim has not been timely Filed; or (3) is evidenced by a Proof of Claim that has been amended by a subsequently Filed Proof of Claim.

B.    **Distribution Agent**

The Distribution Agent may make any or all Distributions required under the Plan, subject to the terms and provisions of the Plan and the GUC Trust Agreement. If the Distribution Agent is an independent third party designated to serve in such capacity, such Distribution Agent shall receive, without further Court approval, reasonable compensation from the GUC Trust Assets for distribution services rendered for General Unsecured Claims pursuant to the Plan and reimbursement of reasonable out-of-pocket expenses. No Distribution Agent shall be required to give any bond or surety or other security for the performance of its duties. The Distribution Agent shall be authorized and directed to rely upon the Debtors' Books and Records and the Reorganized Debtors' representatives and professionals in determining Allowed Claims entitled to Distributions under the Plan in accordance with the terms and conditions of the Plan.

C.    **Delivery of Distributions and Undeliverable or Unclaimed Distributions**

1.    **Delivery of Distributions in General**

Distributions to Holders of Allowed Claims shall be made by the Distribution Agent (a) at the addresses set forth on the Proofs of Claim Filed by such Holders (or at the last known addresses of such Holders if no Proof of Claim is Filed or if the Debtors have been notified of a change of address), (b) at the addresses set forth in any written notices of address changes delivered to the Distribution Agent after the date of any related Proof of Claim, after sufficient evidence of such addresses as may be requested by the Distribution Agent is provided, (c) at the addresses reflected in the Schedules if no Proof of Claim has been Filed and the Distribution Agent has not received a written notice of a change of address, (d) at the addresses set forth in the other records of the Debtors or the Distribution Agent at the time of the Distribution, or (e) in the case of the Holder of a Claim that is governed by an agreement and is administered by an agent or servicer, at the addresses contained in the official records of such agent or servicer.

In making Distributions under the Plan, the Distribution Agent may rely upon the accuracy of the claims register maintained by the Claims and Noticing Agent in the Chapter 11 Cases, as modified by any Final Order of the Bankruptcy Court disallowing Claims in whole or in part.

**2.      Undeliverable Distributions and Unclaimed Property.**

In the event that any distribution to any holder of Allowed Claims or Allowed Interests (as applicable) is returned as undeliverable, no further distribution to such holder shall be made unless and until the Distribution Agent is notified in writing of the then-current address of such holder, at which time all currently-due, missed distributions shall be made to such holder as soon as reasonably practicable thereafter without interest; provided that such distributions shall be deemed unclaimed property under Bankruptcy Code section 347(b) at the expiration of one year from the Effective Date. After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial, or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any holder of Claims and Interests to such property or Interest in property shall be discharged and forever barred.

Notwithstanding the foregoing, if any distribution made by or on behalf of the GUC Trust are returned as undeliverable and for which a new address is not provided within 90 days of the issuance of such distribution or in the event an unreturned distribution check has not been cashed within 90 days of issuance, then the GUC Trustee may cancel any outstanding checks and return the funds for distribution to the same class of creditors from which such distribution arose, and such creditor shall, in the GUC Trustee's sole discretion not be entitled to any further distribution from the GUC Trust.

In the event the GUC Trustee determines the remaining funds in the OpCo GUC Allocation or DivestCo GUC Allocation are too small to economically make a Distribution to Holders of Allowed Claims entitled to Distributions from such allocation, such remaining funds shall be reallocated from the OpCo GUC Allocation to the DivestCo GUC Allocation, or from the DivestCo GUC Allocation to the OpCo GUC Allocation, as applicable. In the event the GUC Trustee determines the remaining funds in the GUC Trust are too small to economically make any further Distributions, then after payment of any remaining GUC Trust fees or expenses, such GUC Trustee may make a contribution of the remaining funds to the charity of his or her choice, subject to the GUC Trustee filing a motion with the Bankruptcy Court and obtaining an Order from the Bankruptcy Court authorizing the proposed course of action.

**D.      Timing of Distributions**

Unless otherwise provided herein, on each Distribution Date, each Holder of a Claim and Holder of an Interest entitled to a Distribution under the Plan shall receive such Distributions in accordance with Article VIII hereof. Because the GUC Trustee will need to liquidate assets and resolved Disputed and Unliquidated Claims, it may be a significant time before Distributions can be made from the GUC Trust. In the event that any payment or act under this Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. The GUC Trustee shall have no obligation to recognize any transfer of Claims or Interests occurring on or after the Effective Date.

**E.      Means of Cash Payment**

Cash payments made pursuant to the Plan shall be in U.S. dollars and shall be made at the option and in the sole discretion of the Distribution Agent by (1) checks drawn on or (2) wire transfers from a domestic bank selected by the Distribution Agent. In the case of foreign creditors, Cash payments may be made, at the option of the Distribution Agent, in such funds and by such means as are necessary or customary in a particular jurisdiction; *provided* that the Distribution Agent receives a signed receipt or otherwise verifiable record of any such Cash payment.

F.      **Interest on Claims**

Unless otherwise specifically provided for in the DIP Orders, the Plan, or the Confirmation Order, or required by applicable law, postpetition interest shall not accrue or be paid on any Claims, and no Holder shall be entitled to interest accruing on or after the Petition Date on any Claim.  Except as otherwise specifically provided for in the Plan, or the Confirmation Order, or required by applicable law, interest shall not accrue or be paid upon any Disputed Claim in respect of the period from the Petition Date to the date a final Distribution is made thereon if and after such Disputed Claim becomes an Allowed Claim.

G.      **No Creditor to Receive More than Payment in Full**

Notwithstanding any other provision hereof, no Holder of an Allowed Claim shall receive more than full payment of its applicable Allowed Claim, including any interest, costs or fees that may be payable with respect thereto under or pursuant to the Plan.

H.      **Withholding and Reporting Requirements**

In accordance with Bankruptcy Code section 346 and in connection with the Plan and all Distributions hereunder, the Distribution Agent shall, to the extent applicable, comply with all withholding and reporting requirements imposed by any federal, state, provincial, local, or foreign taxing authority.  The Distribution Agent shall be authorized to take any and all actions necessary and appropriate to comply with such requirements.

All Distributions hereunder shall be subject to withholding and reporting requirements.  As a condition of making any Distribution under the Plan, each Person and Entity holding an Allowed Claim is required to provide any information necessary in writing, including returning W-9 statements, to effect the necessary information reporting and withholding of applicable taxes with respect to Distributions to be made under the Plan as the Distribution Agent may request.  The Distribution Agent shall be entitled in its sole discretion to withhold any Distributions to a Holder of an Allowed Claim who fails to provide tax identification or social security information within the timeframe requested in writing by the Distribution Agent to such Holder of an Allowed Claim, which timeframe shall not be less than thirty (30) days.  **Unless the Distribution Agent agrees otherwise in its sole discretion, all Distributions to any Holder of an Allowed Claim that fails to timely respond to a request for tax information deemed necessary or appropriate by the Distribution Agent shall be waived and forfeited and the applicable Claim shall be deemed Disallowed without further order of the Bankruptcy Court.**

Notwithstanding any other provision of the Plan, each Person and Entity receiving a Distribution pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of tax obligations on account of any such Distribution.

I.      **Setoffs**

Except as expressly provided in the DIP Orders and this Plan, including pursuant to Article X hereof, each Reorganized Debtor may, pursuant to Bankruptcy Code section 553, set off and/or recoup against any Distributions to be made on account of any Allowed Claim, any and all claims, rights, and Causes of Action that such Reorganized Debtor may hold against the holder of such Allowed Claim to the extent such setoff or recoupment is either (1) agreed in amount among the relevant Reorganized Debtor(s) and the holder of the Allowed Claim or (2) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; *provided*, that neither the failure to effectuate a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by a Reorganized Debtor or its

successor of any and all claims, rights, and Causes of Action that such Reorganized Debtor or its successor may possess against the applicable holder.

**J.      Procedure for Treating and Resolving Disputed, Contingent, and/or Unliquidated Claims**

**1.      Objection Deadline; Prosecution of Objections**

Except as set forth in the Plan with respect to Professional Fee Claims and Administrative Expense Claims, all objections to Claims must be Filed and served on the Holders of such Claims by the Claims Objection Deadline, as the same may be extended by the Bankruptcy Court from time to time upon motion and notice by the GUC Trustee.  If an Objection has not been Filed to a Proof of Claim or the Schedules have not been amended with respect to a Claim that (a) was Scheduled by the Debtors but (b) was not Scheduled as contingent, unliquidated and/or disputed, by the Claims Objection Deadline, as the same may be extended by order of the Bankruptcy Court, the Claim to which the Proof of Claim or Scheduled Claim relates shall be treated as an Allowed Claim if such Claim has not been Allowed earlier.  Notice of any motion for an Order extending the Claims Objection Deadline shall be required to be given only to those Persons or Entities that have requested notice in the Chapter 11 Cases in accordance with Bankruptcy Rule 2002.

Notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, on and after the Effective Date, the GUC Trustee shall have the authority to, in accordance with the Unliquidated Claims Procedures: (a) File, withdraw or litigate to judgment Objections to and requests for estimation of Claims; (b) settle or compromise any Disputed Claim without any further notice to or action, order or approval by the Bankruptcy Court; and (c) administer and adjust the Claims register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court; *provided, however*, that the objection to and settlement of Professional Fee Claims shall not be subject to this Article VIII.J, but rather shall be governed by Article IV.C hereof.  In the event that any Objection Filed by the Debtors remains pending as of the Effective Date, the GUC Trustee shall be deemed substituted for the Debtors, as applicable, as the objecting party.

The Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any Objection to such Claim or during the appeal relating to such Objection.  In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of Distributions), and the GUC Trustee may elect to pursue any supplemental proceedings to object to any ultimate Distribution on such Claim.

Detailed procedures for the determination of unliquidated tort Claims will be filed as part of the Plan Supplement, which are expected to provide that the GUC Trustee may delay the liquidation of such claims until there are sufficient funds to make a distribution. It is expected that the GUC Trust Agreement will also implement a streamlined claims reconciliation procedure to allow the economical resolution of tort claims, but will not deny such claimants the ability to seek to have their claims determined by the district court or another court of competent jurisdiction.

**2.      No Distributions Pending Allowance**

Notwithstanding any other provision of the Plan, if any portion of a Claim or Interest is a Disputed Claim or Interest, as applicable, no payment or distribution provided hereunder shall be made on account of such Claim or Interest unless and until such Disputed Claim or Interest becomes an Allowed Claim or Interest; provided that if only the Allowed amount of an otherwise valid Claim or Interest is Disputed, such

Claim or Interest shall be deemed Allowed in the amount not Disputed and payment or distribution shall be made on account of such undisputed amount.

### 3. Distributions After Allowance

To the extent that a Disputed Claim or Interest ultimately becomes an Allowed Claim or Interest, distributions (if any) shall be made to the holder of such Allowed Claim or Interest in accordance with the provisions of the Plan. As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court Allowing any Disputed Claim or Interest becomes a Final Order, the Distribution Agent shall provide to the holder of such Claim or Interest the distributions (if any) to which such holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim or Interest.

### 4. De Minimis Interim Distributions

The Distribution Agent shall not be required to make any interim Distributions to Holders of Allowed Claims aggregating less than $50.00 or final Distributions to Holders of Allowed Claims aggregating less than $25.00.  Cash that otherwise would be payable under the Plan to Holders of Allowed Claims and Holders of Allowed Interests but for this Article VIII.J.4 shall remain GUC Trust Assets to be used in accordance with the GUC Trust Agreement.

### 5. Fractional Dollars

Notwithstanding any other provision of the Plan, the Distribution Agent shall not be required to make Distributions or payments of fractions of dollars.  Whenever any payment of a fraction of a dollar under the Plan would otherwise be called for, the actual payment may reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars being rounded down.

### 6. Allocation of Distributions Between Principal and Interest

To the extent that any Allowed Claim entitled to a Distribution under the Plan is composed of indebtedness and accrued but unpaid interest thereon, such Distribution shall, for all income tax purposes, be allocated to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest.

### 7. Distribution Record Date

The Distribution Agent shall have no obligation to recognize the transfer of or sale of any participation in any Allowed Claim that occurs after the close of business on the Distribution Record Date. Instead, the Distribution Agent shall be entitled to recognize and deal for all purposes under the Plan with only those record Holders stated on the official Claims register or the Debtors' Books and Records, as applicable, as of the close of business on the Distribution Record Date.

## ARTICLE IX.
## CONDITIONS PRECEDENT TO CONFIRMATION AND
## CONSUMMATION OF THE PLAN

### A. Conditions Precedent to Confirmation

The following are conditions precedent to confirmation of the Plan, each of which must be satisfied or waived:

1.      The Second Amended Combined Disclosure Statement and Plan, Plan Supplement(s), the Confirmation Order, and the Definitive Documents shall be in form and substance acceptable to the Debtors, the ABL Lenders, the DIP Lenders, and the UCC.

2.      Powerback Rehabilitation shall have consented to the treatment of its Claim as a Go-Forward Trade Claim in Class 5 and shall have agreed to vote to accept the Plan.

3.      There shall be no default or Event of Default (as defined in the DIP Credit Agreement) under the DIP Orders or the DIP Credit Agreement.

4.      The Confirmation Order shall have been entered by the Bankruptcy Court.

**B.      Conditions Precedent to Effective Date**

The following are conditions precedent to the occurrence of the Effective Date, each of which must be satisfied or waived:

1.      The Debtors shall have paid or reimbursed all reasonable and documented fees and expenses of the DIP Lenders and the ABL Lenders pursuant to the Final DIP Order.

2.      All Definitive Documents shall have been executed, shall remain in full force and effect, and shall be in form and substance satisfactory to the Debtors and the Plan Sponsor, the Omega Secured Parties, the ABL Lenders, the DIP Lenders, and the UCC.

3.      The Reorganized Debtors shall have entered in the ABL Exit Facility Documents, and the closing of the ABL Exit Facility shall have occurred.

4.      The GUC Trust shall be formed and funded with the GUC Contribution.

5.      The Backstop Note shall have been executed and provided to the GUC Trustee.

6.      The Backstop Note Guaranty shall have been executed and provided to the GUC Trustee.

7.      The Consent Judgments shall have been executed and provided to the GUC Trustee.

8.      The Omega Master Lease shall have been assumed by the Reorganized Debtors.

9.      The Bankruptcy Court shall have entered the Confirmation Order, and the Confirmation Order shall not be stayed, modified, or vacated, and shall not be subject to any pending appeal, and the appeals period for the Confirmation Order shall have expired.

10.      The Confirmation Order shall include a finding that, as of the Plan Effective Date, the Challenges (as defined in the Final DIP Order), if any, to the stipulations in paragraph E of the Final DIP Order applicable to the Prepetition Secured Parties are deemed overruled and the stipulations are true and correct in all respects.

11.      The Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan.

12.      All governmental approvals and consents that are legally required for the consummation of the Plan Transaction shall have been obtained, not be subject to unfulfilled conditions and be in full force

and effect, and all applicable waiting periods under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, shall have expired.

13.     Any and all adversary proceedings, to which any of the Prepetition Secured Parties is/are a party, are dismissed with prejudice by order of the Bankruptcy Court, and such order shall have become a final and non-appealable order and shall not have been stayed, reversed, vacated, amended, supplemented or otherwise modified, unless waived by the Debtors and the applicable Prepetition Secured Party.

14.     Either (a) the Reorganized Debtors shall assume the existing Services Agreement with Synergy (with such modifications as shall be set forth in the Definitive Documents and the Plan Supplement), or (b) the Plan Sponsor and Synergy shall enter into a Transition Services Agreement on terms and conditions acceptable to the Plan Sponsor.

15.     The Reorganized Debtors shall have Available Cash of not less than $7.0 million.

16.     The Reorganized Debtors shall have Working Capital of not less than $10.7 million (the "Minimum Working Capital").

17.     The Administrative and Priority Claim Estimate shall not exceed $14.8 million; *provided, however*, that $300,000 of the Administrative and Priority Claim Estimate shall be earmarked for payment of employee-related Other Priority Claims in Class 2.

18.     Excluding Minimum Working Capital, the Debtors shall have sufficient funds available to pay (or reserve for) all Administrative Expense Claims, Priority Claims, and Professional Fee Claims (other than Assumed Administrative and Priority Claims which shall be assumed by the Reorganized Debtors).

19.     The Debtors and the Plan Sponsor have not sought approval of a sale of the Debtors' Assets pursuant to Bankruptcy Code section 363.

**C.      Establishing the Effective Date**

The calendar date to serve as the Effective Date shall be a Business Day of, on, or promptly following the satisfaction or waiver of all conditions to the Effective Date, which date will be selected by the Debtors.  On or within two (2) Business Days of the Effective Date, the Debtors shall File and serve a notice of occurrence of the Effective Date.  Such notice shall contain, among other things, the Administrative Expense Claim Bar Date, the Professional Fee Claims Bar Date, and the Rejection Bar Date with respect to Executory Contracts or Unexpired Leases rejected pursuant to the Plan.

**D.      Waiver of Conditions**

Each of the conditions to Confirmation and the occurrence of the Effective Date set forth in Article IX hereof may be waived in whole or in part by the Debtors with the consent (which may be withheld or granted in their sole discretion) of each of the Plan Sponsor, the DIP Lenders, the ABL Lenders, the Omega Secured Parties, and the UCC, and without any other notice to or approval of any other parties-in-interest or the Bankruptcy Court.  The failure to satisfy or waive any condition to Confirmation or the occurrence of the Effective Date may be asserted by the Debtors regardless of the circumstances giving rise to the failure of such condition to be satisfied.  The failure of any party to exercise any of its foregoing rights shall not be deemed a waiver of any of its other rights, and each such right shall be deemed an ongoing right that may be asserted thereby at any time.

E.      **Consequences of Non-Occurrence of Effective Date**

If the Effective Date does not occur within one hundred twenty (120) days following the Confirmation Date, or by such later date after notice and hearing, as is proposed by the Debtors, then upon motion by the Debtors and upon notice to such parties-in-interest as the Bankruptcy Court may direct, (1) the Plan shall be null and void in all respects; (2) any settlement of Claims shall be null and void without further order of the Bankruptcy Court; and (3) the time within which the Debtors may assume and assign or reject all Executory Contracts shall be extended for a period of thirty (30) days after such motion is granted.

# ARTICLE X.
# EFFECTS OF CONFIRMATION

A.      **Compromise and Settlement of Claims and Controversies**

Pursuant to Bankruptcy Code section 1123 and Bankruptcy Rule 9019 and in consideration for the classification, Distributions, releases, and other benefits provided pursuant to the Second Amended Combined Disclosure Statement and Plan, on the Effective Date, the provisions of the Second Amended Combined Disclosure Statement and Plan shall constitute a good faith compromise and settlement of all Claims, Interests, and controversies resolved pursuant to the Second Amended Combined Disclosure Statement and Plan or relating to the contractual, legal and subordination rights that a Holder of a Claim or Interest may have with respect to any Claim or Interest, or any Distribution to be made on account of such Claim or Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable and reasonable.

The Debtors expressly reserve the right (with Court approval, following appropriate notice and opportunity for a hearing) to compromise and settle any and all Claims against it and claims that it may have against other Persons and Entities at any time up to and including the Effective Date. After the Effective Date, such right shall pass to the Reorganized Debtors or the GUC Trustee, as applicable, and shall be governed by the terms of the Plan and the GUC Trust Agreement.

B.      **Binding Effect**

The Second Amended Combined Disclosure Statement and Plan shall be binding upon and inure to the benefit of the Debtors, all present and former Holders of Claims and Interests, whether or not such Holders shall receive or retain any property or interest in property under the Second Amended Combined Disclosure Statement and Plan, and their respective successors and assigns, including, but not limited to, all other parties-in-interest in the Chapter 11 Cases.

C.      **Discharge of the Debtors**

To the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code, except as otherwise expressly provided by this Plan or the Confirmation Order, effective as of the Effective Date, all consideration distributed under this Plan shall be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims, Interests and Causes of Action of any kind or nature whatsoever against the Debtors or any of their respective assets or properties, including any interest accrued on such Claims or Interests from and after the Petition Date, and regardless of whether any property shall have been abandoned by order of the Bankruptcy Court, distributed or retained pursuant to this Plan on account of such Claims, Interests or Causes of Action.

Except as otherwise expressly provided by this Plan or the Confirmation Order, upon the Effective Date, the Debtors and their Estates shall be deemed discharged and released under and to the fullest extent provided under sections 524 and 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code from any and all Claims of any kind or nature whatsoever, including, but not limited to, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in Bankruptcy Code sections 502(g), 502(h), or 502(i).  Such discharge shall void any judgment obtained against the Debtors or the Reorganized Debtors at any time, to the extent that such judgment relates to a discharged Claim.

Except as otherwise expressly provided by this Plan or the Confirmation Order, upon the Effective Date: (1) the rights afforded herein and the treatment of all Claims and Interests shall be in exchange for and in complete satisfaction, settlement, discharge, and release of all Claims and Interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Debtors or any of their respective assets, property, or Estates; (2) all Claims and Interests shall be satisfied, discharged, and released in full, and each of the Debtor's liability with respect thereto shall be extinguished completely without further notice or action; and (3) all Entities shall be precluded from asserting against the Debtors, the Estates, the Reorganized Debtors, each of their respective successors and assigns, and each of their respective assets and properties, any such Claims or Interests, whether based upon any documents, instruments or any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date or otherwise.

D.    **Releases**

1.    **Debtor Release**

**Effective as of the Effective Date, pursuant to Bankruptcy Code section 1123(b), for good and valuable consideration, including the obligations of the Debtors under the Plan and the contributions and services of the Released Parties in facilitating the expeditious reorganization of the Debtors and implementation of the restructuring contemplated by the Plan, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors, the Reorganized Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives (including any GUC Trustee that may be appointed), and any and all other Entities who may purport to assert any claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of any of the Debtors or their Estates, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, that the Debtors, the Reorganized Debtors, their Estates or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to (including the formulation, preparation, dissemination, negotiation, entry into, or filing of, as applicable), or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, the decision to file the Chapter 11 Cases, any intercompany transactions, the Chapter 11 Cases, the Plan (including the Plan Supplement), the Disclosure Statement, the DIP Facility, the DIP Documents, the ABL Credit Agreement, the Omega Term Loan Credit Agreement, the Omega Master Lease, the Omega Note Agreement, the ABL Exit Facility, the ABL Exit Facility Credit Agreement, the pursuit of Confirmation and Consummation, the**

95

administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, but not, for the avoidance of doubt, any legal opinion effective as of the Effective Date requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan, or upon any other act, omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct, fraud or gross negligence.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (a) any obligations arising on or after the Effective Date of any party or Entity under the Plan, the Plan Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan as set forth in the Plan; or (b) any retained Causes of Action.

The foregoing release shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization, or approval of any Person and the Confirmation Order shall permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively, or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities pursuant to this Debtor Release.  Notwithstanding the foregoing, nothing in this Article X.D.1 shall or shall be deemed to prohibit the Debtors or the Reorganized Debtors from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, Causes of Action, or liabilities they may have against any Person that is based upon an alleged breach of a confidentiality or non-compete obligation owed to the Debtors or the Reorganized Debtors, unless otherwise expressly provided for in this Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (a) in exchange for the good and valuable consideration provided by the Released Parties, including the Released Parties' contributions to facilitating the Plan Transaction and implementing the Plan; (b) a good faith settlement and compromise of the Claims released by the Debtor Release; (c) in the best interests of the Debtors and all Holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any Claim or Cause of Action of any kind whatsoever released pursuant to the Debtor Release.  Notwithstanding the foregoing, nothing in this paragraph shall be deemed to impair or affect the assignment of D&O Claims to the GUC Trust as set forth in Article VI.H herein.

2.      **Third-Party Releases**

Effective as of the Effective Date, in exchange for good and valuable consideration, including the obligations of the Debtors under the Plan and the contributions and services of the Released Parties in facilitating the expeditious reorganization of the Debtors and implementation of the restructuring contemplated by the Plan, pursuant to section 1123(b) of the Bankruptcy Code, in each case except for Claims arising under, or preserved by, the Plan, to the fullest extent permissible under applicable Law, each Releasing Party (other than the Debtors or the Reorganized Debtors), in each case on behalf of itself and its respective successors, assigns, and representatives, and any and all other entities who may purport to assert any Claim, Cause of Action, directly or derivatively, by, through, for, or because of a Releasing Party, is deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged each Debtor, Reorganized Debtor, and each other Released Party from any and all claims, interests, obligations, rights, suits, damages,

Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, including any derivative claims, asserted or assertable on behalf of any of the Debtors, their Estates or their Affiliates, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to (including the formulation, preparation, dissemination, negotiation, entry into, or filing of, as applicable), or in any manner arising from, in whole or in part, the Debtors (including the management, ownership or operation thereof), the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, the decision to file the Chapter 11 Cases, any intercompany transactions, the Chapter 11 Cases, the Plan (including the Plan Supplement), the Disclosure Statement, the DIP Facility, the DIP Documents, the Disclosure Statement, the DIP Facility, the DIP Documents, the ABL Credit Agreement, the Omega Term Loan Credit Agreement, the Omega Master Lease, the Omega Note Agreement, the ABL Exit Facility, the ABL Exit Facility Credit Agreement, the pursuit of Confirmation and Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, but not, for the avoidance of doubt, any legal opinion effective as of the Effective Date requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan, or upon any other act, omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct, fraud or gross negligence.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any obligations arising on or after the Effective Date of any party or Entity under the Plan, the Plan Transaction or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan as set forth in the Plan.

The foregoing release shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization, or approval of any Person and the Confirmation Order shall permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to this Third-Party Release.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained in this Plan, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (a) consensual; (b) essential to the confirmation of the Plan; (c) given in exchange for the good and valuable consideration provided by the Released Parties, including the Released Parties' contributions to facilitating the Plan Transaction and implementing the Plan; (d) a good faith settlement and compromise of the Claims released by the Third-Party Release; (e) in the best interests of the Debtors and their Estates; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any claim or Cause of Action of any kind whatsoever released pursuant to the Third-Party Release.

E.      Exculpation and Limitation of Liability

Effective as of the Effective Date, the Exculpated Parties shall neither have nor incur any liability to any Entity for any claims or Causes of Action arising prior to or on the Effective Date for

any act taken or omitted to be taken in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming or effecting the Confirmation or Consummation of this Plan, the Disclosure Statement, the Definitive Documents or any contract, instrument, release or other agreement or document created or entered into in connection with this Plan or any other postpetition act taken or omitted to be taken in connection with the restructuring of the Debtors, the approval of the Disclosure Statement or Confirmation or Consummation of this Plan; *provided, however*, that the foregoing provisions of this exculpation shall not operate to waive, release or otherwise impair: (1) any Causes of Action expressly set forth in and preserved by this Plan or the Plan Supplement; (2) any Causes of Action arising from willful misconduct, actual fraud or gross negligence of such applicable Exculpated Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction; (3) any of the indebtedness or obligations of the Debtors and/or the Reorganized Debtors under this Plan and the contracts, instruments, releases, indentures, and other agreements and documents delivered under or in connection with the Plan or assumed pursuant to this Plan or assumed pursuant to Final Order of the Bankruptcy Court, (4) the rights of any Entity to enforce this Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with this Plan or assumed pursuant to this Plan or assumed pursuant to Final Order of the Bankruptcy Court; and/or (5) any objections with respect to any Professional's final fee application or accrued Professional Fee Claims in these Chapter 11 Cases; *provided, further*, that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning its respective duties pursuant to, or in connection with, the above referenced documents, actions or inactions.

The foregoing exculpation shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person. Notwithstanding the foregoing, nothing in this Article X.E shall or shall be deemed to prohibit the Debtors or the Reorganized Debtors from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, Causes of Action or liabilities they may have against any Person that is based upon an alleged breach of a confidentiality or non-compete obligation owed to the Debtors or the Reorganized Debtors, in each case unless otherwise expressly provided for in this Plan.

F.    **Injunction**

Except as otherwise expressly provided in the Plan, or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold claims or interests that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties:  (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such claims or interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests unless such holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a claim or interest or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in

connection with or with respect to any such claims or interests released or settled pursuant to the Plan.

No enjoined party may commence, continue, or otherwise pursue, join in, or otherwise support any other party commencing, continuing, or pursuing, a Claim or Cause of Action transferred to the Reorganized Debtors or the GUC Trust pursuant to the terms of the Plan, or a Claim or Cause of Action of any kind against the Debtors, the GUC Trustee, the Exculpated Parties, the Released Parties, or the Debtor Professionals that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a Claim or Cause of Action, as applicable, subject to Article X.D and Article X.E hereof, or the Chapter 11 Cases, including, but not limited to, the negotiation of the Plan, the administration of the Plan or property to be distributed under the Plan, the administration of the GUC Trust, or any transaction in furtherance of the foregoing, without the Bankruptcy Court (1) first determining after notice and a hearing, that such Claim or Cause of Action (i) represents a colorable claim of any kind, including, but not limited to, negligence, bad faith, criminal misconduct, willful misconduct, actual fraud, or gross negligence against a Protected Party, and (ii) was not otherwise released or transferred to the Reorganized Debtors or the GUC Trust under the terms hereof, and (2) specifically authorizing such enjoined party to bring such Claim or Cause of Action against any such Debtor, Reorganized Debtor, Exculpated Party, or Released Party, as applicable.  At the hearing before the Bankruptcy Court to determine whether such Claim or Cause of Action represents a colorable Claim of any kind, the Bankruptcy Court may, or shall if any Debtor, Reorganized Debtor, Exculpated Party, or Released Party, or other party in interest requests by motion (oral motion being sufficient), direct that such Person or Entity seeking to commence or pursue such Claim or Cause of Action file a proposed complaint with the Bankruptcy Court embodying such Claim or Cause of Action, such complaint satisfying the applicable Federal Rules of Civil Procedure, including, but not limited to, Rule 8 and Rule 9 (as applicable), which the Bankruptcy Court shall assess before making a determination. The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a Claim or Cause of Action is colorable and, only to the extent legally permissible and as provided for in Article XI of the Plan, shall have jurisdiction to adjudicate the underlying colorable Claim or Cause of Action.

## ARTICLE XI.
## RETENTION OF JURISDICTION

### A.    Retention of Jurisdiction

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, following the Effective Date, the Bankruptcy Court shall retain such jurisdiction over the Chapter 11 Cases as is legally permissible, including, without limitation, such jurisdiction as is necessary to ensure that the interests and purposes of the Second Amended Combined Disclosure Statement and Plan are carried out. The Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of the Chapter 11 Cases and the Second Amended Combined Disclosure Statement and Plan pursuant to, and for the purposes of, Bankruptcy Code sections 105(a) and 1142 and for, among other things, the following purposes:

1.    To the extent not otherwise determined by the Second Amended Combined Disclosure Statement and Plan, to determine (a) the allowance, classification, or priority of Claims upon objection by any party-in-interest entitled to File an objection, or (b) the validity, extent, priority, and nonavoidability of consensual and nonconsensual Liens and other encumbrances against assets of the Estates or the Reorganized Debtors;

2.    To issue injunctions or take such other actions or make such other orders as may be necessary or appropriate to restrain interference with the Second Amended Combined Disclosure Statement

and Plan or its execution or implementation by any Person or Entity, to construe and to take any other action to enforce and execute the Second Amended Combined Disclosure Statement and Plan, the Confirmation Order, or any other order of the Bankruptcy Court, to issue such orders as may be necessary for the implementation, execution, performance, and Consummation of the Second Amended Combined Disclosure Statement and Plan and all matters referred to herein, and to determine all matters that may be pending before the Bankruptcy Court in the Chapter 11 Cases on or before the Effective Date with respect to any Person or Entity;

3.    To protect the assets or property of the Estates or the Reorganized Debtors, including Causes of Action, from claims against, or interference with, such assets or property, including actions to quiet or otherwise clear title to such property or to resolve any dispute concerning Liens or other encumbrances on any assets of the Estates or the Reorganized Debtors;

4.    To determine any and all applications for allowance of Professional Fee Claims;

5.    To determine any Priority Tax Claims, Other Priority Claims, or Administrative Expense Claims entitled to priority under Bankruptcy Code section 507(a);

6.    To resolve disputes concerning any reserves with respect to Disputed Claims, including under the Unliquidated Claim Procedures, or the administration thereof;

7.    To resolve any dispute arising under or related to the implementation, execution, Consummation, or interpretation of the Second Amended Combined Disclosure Statement and Plan and the making of Distributions hereunder;

8.    To modify the Second Amended Combined Disclosure Statement and Plan under Bankruptcy Code section 1127, remedy any defect, cure any omission, or reconcile any inconsistency in the Second Amended Combined Disclosure Statement and Plan or the Confirmation Order so as to carry out their intent and purposes;

9.    To issue such orders in aid of Consummation of the Second Amended Combined Disclosure Statement and Plan and the Confirmation Order notwithstanding any otherwise applicable non-bankruptcy law, with respect to any Person or Entity, to the full extent authorized by the Bankruptcy Code;

10.    To enter and implement such Orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, or vacated;

11.    To determine any and all motions related to the rejection, assumption, or assignment of Executory Contracts or Unexpired Leases or determine any issues arising from the deemed rejection of Executory Contracts and Unexpired Leases set forth in Article VII.A hereof;

12.    Except as otherwise provided herein, to determine all applications, motions, adversary proceedings, contested matters, actions, and any other litigated matters instituted in and prior to the closing of the Chapter 11 Cases;

13.    Enforce the terms and conditions of this Second Amended Combined Disclosure Statement and Plan, the Confirmation Order, and the Definitive Documents;

14.    To enter one or more final decrees closing the Chapter 11 Cases;

15.　　To hear and determine any tax disputes concerning the Debtors and to determine and declare any tax effects under this Plan; *provided, however*, that nothing herein shall be construed to confer jurisdiction upon the Bankruptcy Court to make determinations as to federal tax liabilities and federal tax treatment, except as provided under 11 U.S.C. § 505;

16.　　To enforce, interpret, and determine any disputes arising in connection with any stipulations, orders, judgments, injunctions, exculpations, and rulings entered in connection with the Chapter 11 Cases (whether or not the Chapter 11 Cases has been closed);

17.　　To resolve any disputes concerning whether a Person or Entity had sufficient notice of the Chapter 11 Cases, the Bar Date, the Governmental Bar Date, the Rejection Bar Date, the Administrative Expense Claim Bar Date, the Professional Fee Claim Bar Date, and/or the Combined Hearing for the purpose of determining whether a Claim, or Interest is released, satisfied and/or enjoined hereunder or for any other purpose;

18.　　To ensure that Distributions to Holders of Allowed Claims and Interests entitled to a Distribution under the Plan are accomplished pursuant to the provisions of the Plan;

19.　　To determine any other matters that may arise in connection with or related to the Second Amended Combined Disclosure Statement and Plan, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document created or implemented in connection with the Second Amended Combined Disclosure Statement and Plan; and

20.　　To hear any other matter not inconsistent with the Bankruptcy Code.

**B.　　Alternative Jurisdiction**

In the event that the Bankruptcy Court is without jurisdiction to resolve any matter, then the District Court or such other administrative tribunal or court of competent jurisdiction shall hear and determine such matter.  If the District Court does not have jurisdiction, then the matter may be brought before any court having jurisdiction with regard thereto.

**C.　　Failure of Court to Exercise Jurisdiction**

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Cases, including the matters set forth in Article XI.A hereof, the provisions of Article XI.A hereof shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having jurisdiction with respect to such matter.

**ARTICLE XII.**
**MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN**

**A.　　Modifications and Amendments**

Alterations, amendments, or modifications of the Second Amended Combined Disclosure Statement and Plan may be proposed in writing by the Debtors, at any time before the Confirmation Date; *provided that* the Second Amended Combined Disclosure Statement and Plan, as altered, amended or modified, satisfies the conditions of Bankruptcy Code sections 1122 and 1123, shall be satisfactory to the Plan Sponsor, the DIP Lenders, the ABL Lenders, the UCC, and the Omega Secured Parties, in their reasonable discretion, and the Debtors shall have complied with Bankruptcy Code section 1125.

Additionally, after the Confirmation Date and prior to substantial consummation of the Plan, the Debtors may, under Bankruptcy Code section 1127(b), institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Second Amended Combined Disclosure Statement and Plan or the Confirmation Order, and such matters as may be necessary to carry out the purpose and effect of the Second Amended Combined Disclosure Statement and Plan so long as such proceedings do not adversely affect the treatment of Holders of Claims under the Second Amended Combined Disclosure Statement and Plan; *provided, however*, that prior notice of such proceedings shall be served in accordance with the Bankruptcy Rules or order of the Bankruptcy Court.

## B.     Effect of Confirmation on Modifications

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to Bankruptcy Code section 1127(a) and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

## C.     Revocation or Withdrawal of the Plan

The Debtors reserves the right to revoke or withdraw the Plan before the Confirmation Date.  If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation of the Plan does not occur, then (1) the Plan shall be null and void in all respects, (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Class of Claims), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void, and (3) nothing contained in the Plan, and no acts taken in preparation for Consummation of the Plan, shall (i) constitute or be deemed to constitute a waiver or release of any Claims by or against, or any Interests in, the Debtors or any other Person or Entity, (ii) prejudice in any manner the rights of such Debtor or any other Person or Entity, or (iii) constitute an admission of any sort by the Debtors or any other Person or Entity.

## ARTICLE XIII.
## CONFIRMATION AND VOTING PROCEDURES

## A.     Confirmation Procedure

### 1.     Combined Hearing

On October 1, 2024, the Bankruptcy Court entered the Solicitation Procedures Order, conditionally approving the Disclosure Statement and authorizing the Debtors to solicit acceptances of the Plan.  The Combined Hearing has been scheduled for November 14, 2024 at 9:30 a.m. (prevailing Eastern Time) to consider final approval of the Disclosure Statement pursuant to Bankruptcy Code section 1125 and confirmation of the Plan pursuant to Bankruptcy Code section 1129.  The Combined Hearing may be continued from time to time without further notice other than the announcement by the Debtors in open court of the adjourned date(s) at the Combined Hearing or any continued hearing or as indicated in any notice Filed with the Bankruptcy Court.

The Combined Hearing will be held in person before the Honorable Paul M. Baisier at the United States Bankruptcy Court for the Northern District of Georgia, Courtroom 1202, The Richard B. Russell Federal Building and United States Courthouse, 75 Ted Turner Drive, SW, Atlanta, GA 30303.  Parties or counsel unable to appear in person may appear virtually via Judge Baisier's Virtual Hearing Room, which can        be        accessed        via        the        following        link, https://www.zoomgov.com/j/1617069079?pwd=WG16TGpyM1Z6dFZ6YVlrUkZwQ2RiZz09, or via telephone by calling:

**Dial-in Number: 833-568-8864**
**Meeting ID: 161 706 9079**

2.        **Procedure for Objections**

Any objection to Confirmation of the Plan must (a) be in writing, (b) conform to the Bankruptcy Rules, the Local Rules, and any orders of the Bankruptcy Court, (c) set forth the name and address of the objecting party and the nature and amount of Claims or Interests held or asserted by the objecting party, (d) state, with particularity, the legal and factual basis for the objection and, if practicable, a proposed modification to the Plan (or related materials) that would resolve such objection, and (e) be Filed with the Bankruptcy Court on the following parties: (i) LaVie Care Centers, LLC, 1040 Crown Pointe Parkway, Suite 600, Atlanta, GA 30338; (ii) counsel to the Debtors, McDermott Will & Emery LLP, 1180 Peachtree St. NE, Suite 3350, Atlanta, Georgia 30309 (Attn: Daniel M. Simon) and 444 West Lake Street, Suite 4000, Chicago, IL 60606 (Attn: Emily C. Keil); (iii) counsel to the UCC, Troutman Pepper Hamilton Sanders LLP, 3000 Two Logan Square, Eighteenth and Arch St., Philadelphia, PA 19103 (Attn: Francis J. Lawall) and 875 Third Avenue, New York, NY 10022 (Attn: Deborah Kovsky-Apap) and; (iv) the United States Trustee of the Northern District of Georgia, 362 Richard B. Russell Building, 75 Ted Turner Drive, S.W., Atlanta, GA 30303 (Attn: Jonathan S. Adams) **by 4:00 p.m. (prevailing Eastern Time) on November 4, 2024. Unless an objection is timely Filed, it may not be considered by the Bankruptcy Court at the Combined Hearing.**

B.        **UCC's Support of Confirmation**

The UCC believes that the Plan offers Holders of Allowed General Unsecured Claims the best reasonable opportunity for recoveries on behalf of Allowed General Unsecured Claims and urges Holders of Allowed General Unsecured Claims to vote to **accept** the Plan. In exchange for the compromises and consideration set forth herein, the UCC has agreed to support final approval of the Disclosure Statement and Confirmation of the Plan, as well as support the Debtors' opposition to any objecting parties.

C.        **Statutory Requirements for Confirmation**

1.        **General Requirements**

The Bankruptcy Court will confirm the Plan only if it meets all the applicable requirements of Bankruptcy Code section 1129, as discussed herein.  Among other requirements, the Plan (a) must be accepted by all Impaired Classes of Claims and Interests or, if rejected by an Impaired Class, the Plan must not "discriminate unfairly" against and be "fair and equitable" with respect to such Class; and (b) must be feasible.  The Bankruptcy Court must also find that (a) the Plan has classified Claims and Interests in a permissible manner; (b) the Plan complies with the technical requirements of chapter 11 of the Bankruptcy Code; and (c) the Plan has been proposed in good faith.

2.        **Classification of Claims and Interests**

Bankruptcy Code section 1123 provides that a plan must classify the claims and interests of a debtor's creditors and equity interest holders.  In accordance with Bankruptcy Code section 1123, Article V of the Plan divides Claims and Interests into Classes and sets forth the treatment for each Class (other than those Claims which, pursuant to Bankruptcy Code section 1123(a)(1), need not be and have not been classified).  A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim also is placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an

Allowed Claim in that Class and such Claim has not been paid, released, or otherwise settled prior to the Effective Date.

The Debtors are also required, under Bankruptcy Code section 1122, to classify Claims and Interests into Classes that contain Claims or Interests that are substantially similar to the other Claims or Interests in such Class.  In accordance with Bankruptcy Code section 1122, the Plan creates separate Classes to deal respectively with secured Claims, unsecured Claims, and Interests.  The Debtors believe that the Plan's classifications place substantially similar Claims or Interests in the same Class and thus, meet the requirements of Bankruptcy Code section 1122.[17]

The Bankruptcy Code also requires that a plan provide the same treatment for each Claim or Interest of a particular Class unless a Holder agrees to a less favorable treatment of its Claim or Interest.  The Debtors believe that the Plan complies with such standard. If the Bankruptcy Court finds otherwise, however, it could deny confirmation of the Plan if the Holders of Claims or Interests affected do not consent to the treatment afforded them under the Plan.

### 3.        Confirmation Pursuant to Bankruptcy Code Sections 1129(a)(10) and 1129(b)

In the event that any impaired class of claims or interests does not accept a plan, a debtor nevertheless may move for confirmation of the plan.  A plan may be confirmed, even if it is not accepted by all impaired classes, if the plan has been accepted by at least one impaired class of claims, determined without including any acceptance of the plan by any insider holding a claim in that class, and the plan meets the "cramdown" requirements set forth in Bankruptcy Code section 1129(b).  Bankruptcy Code section 1129(b) requires that a court find that a plan (a) "does not discriminate unfairly" and (b) is "fair and equitable," with respect to each non-accepting impaired class of claims or interests.

If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of Bankruptcy Code section 1129(b).  To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors may request Confirmation of the Plan, as it may be modified from time to time, under Bankruptcy Code section 1129(b).  The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of Bankruptcy Code section 1129(b).

The Debtors believe that the requirements of Bankruptcy Code section 1129(b) are satisfied.  The Bankruptcy Code does not provide a standard for determining when "unfair discrimination" exists; courts typically examine the facts and circumstances of each particular case to determine whether unfair discrimination exists.  At a minimum, however, the unfair discrimination standard prevents creditors and interest holders with similar legal rights from receiving materially different treatment under a proposed plan without sufficient justifications for doing so.  The Debtors believe that, under the Plan, all Impaired Classes of Claims or Interests are treated in a manner that is consistent with the treatment of other Classes of Claims or Interests that are similarly situated, if any, except where there is sufficient justification for different

---

[17]    It is possible that a Holder of a Claim or Interest may challenge the Debtors' classification of Claims or Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed. If such a situation develops, the Debtors intend, in accordance with the terms of the Plan, to make such permissible modifications to the Plan as may be necessary to permit its Confirmation.  Any such reclassification could adversely affect Holders of Claims by changing the composition of one or more Classes and the vote required of such Class or Classes for approval of the Plan.

treatment.  Accordingly, the Debtors believe that the Plan does not discriminate unfairly as to any Impaired Class of Claims or Interests.

The Bankruptcy Code provides a nonexclusive definition of the phrase "fair and equitable." To determine whether a plan is "fair and equitable," the Bankruptcy Code establishes "cramdown" tests for secured creditors, unsecured creditors, and equity holders, as follows:

- <u>Secured Creditors</u>. Either (i) each impaired secured creditor retains its liens securing its secured claim and receives on account of its secured claim deferred cash payments having a present value at least equal to the amount of its allowed secured claim as of the effective date, (ii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim, or (iii) the property securing the claim is sold free and clear of liens with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as provided in clause (i) or (ii) above.

- <u>Unsecured Creditors</u>. Either (i) each impaired unsecured creditor receives or retains under the plan property of a value as of the effective date equal to the amount of its allowed claim, or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan on account of such junior claim or interest.

- <u>Interests</u>. Either (i) each holder of an equity interest will receive or retain under the plan property of a value equal to the greater of the allowed amount of any fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled or the value of such interest, or (ii) the holder of any Interest that is junior to such non-accepting class will not receive or retain any property under the plan on account of such junior interest.

The Debtors submit that if the Debtors "cramdown" the Plan pursuant to Bankruptcy Code section 1129(b), the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement.  With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank.  With respect to the fair and equitable requirement, no Class under the Plan will receive more than 100 percent of the amount of Allowed Claims or Interests in that Class.  The Debtors believe that the Plan and the treatment of all Classes of Claims or Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

**4.      Best Interests of Creditors Test and Liquidation Analysis**

**i.      Best Interests of Creditors Test**

Even if a plan is accepted by the Holders of each Class of Claims and Interests, the "best interests" test, as set forth in Bankruptcy Code section 1129(a)(7), requires that each Holder of an Impaired Claim or Interest either (a) accept the Plan or (b) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such Holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

To calculate the probable distribution to holders of each impaired class of claims and interests if the debtor were liquidated under chapter 7, a court must first determine the aggregate dollar amount that would be generated from the debtor's assets if the Chapter 11 Cases were converted to chapter 7 cases under the Bankruptcy Code.  To determine if a plan is in the best interests of each impaired class, the present value of the distributions from the proceeds of a liquidation of the debtor's unencumbered assets and

properties, after subtracting the amounts attributable to the costs, expenses, and administrative expense claims associated with a chapter 7 liquidation, must be compared with the value offered to such impaired classes under the plan. If the hypothetical liquidation distribution to holders of claims or interests in any impaired class is greater than the distributions to be received by such parties under the plan, then such plan is not in the best interests of the holders of claims or interests in such impaired class.

To make these findings, the Bankruptcy Court must (a) estimate the cash liquidation proceeds that a chapter 7 trustee would generate if the Chapter 11 Cases were converted to a chapter 7 case and the Assets of the Debtors' Estates were liquidated; (b) determine the liquidation distribution that each non-accepting Holder of a Claim or Interest would receive from such liquidation proceeds under the priority scheme dictated in chapter 7; and (c) compare such Holder's liquidation distribution to the distribution under the Plan that such Holder would receive if the Plan were confirmed and consummated.

The Debtors believe that in a chapter 7 liquidation, there would be additional costs and expenses that would be incurred as a result of the ineffectiveness associated with replacing existing management and professionals in a chapter 7 case. Accordingly, the Debtors believe that anticipated recoveries to each Class of Impaired Claims under the Plan implies a greater or equal recovery to Holders of Claims in Impaired Classes than the recovery available to them in a chapter 7 liquidation. Accordingly, the Debtors believe that the "best interests" test promulgated by Bankruptcy Code section 1129 is satisfied.

### ii.    Liquidation Analysis

The Debtors believe that liquidation under chapter 11 is more beneficial to the Holders of Claims than a liquidation under chapter 7 because the Plan allows the Estates to be promptly administered by the GUC Trustee in accordance with the Plan.

Costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of counsel and other professionals retained by the chapter 7 trustee, all unpaid expenses incurred by the Debtors in their Chapter 11 Cases (such as compensation of attorneys, financial advisors and accountants that are allowed in the chapter 7 case), litigation costs, and claims arising from the operations of the Debtors during the pendency of the Chapter 11 Cases. Moreover, a chapter 7 trustee would be entitled to statutory fees relating to the Distribution of the Debtors' already monetized Assets.

The Debtors, with the assistance of their advisors, prepared the Liquidation Analysis, attached hereto as **Exhibit A**, that summarizes the Debtors' best estimate of recoveries by Holders of Claims and Interests if the Chapter 11 Cases were converted to cases under chapter 7 of the Bankruptcy Code. The Liquidation Analysis reflects a consolidated liquidation analysis across all Debtors. The Debtors do not believe that it is necessary or appropriate to prepare 282 separate liquidation analyses on a Debtor-by-Debtor basis, because no recovery would inure to the benefit of Holders of General Unsecured Claims, either on a consolidated basis or on a Debtor by Debtor basis. Each of the 282 Debtors are obligors under the DIP Facility. Second, substantially all of the Debtors are obligors and/or guarantors on the Debtors' prepetition debt (either the Prepetition ABL Loan, or the Omega Second Lien Term Loan, or both). Even if the Debtors engaged in the foregoing Debtor-by-Debtor exercise, each analysis would illustrate that the DIP Facility will not be repaid in full in a chapter 7 scenario, further demonstrating that Holders of General Unsecured Claims are significantly out of the money in a liquidation scenario. Accordingly, given the extensive costs and burden to the Debtors in setting forth the results of the Liquidation Analysis for each Debtor, when such outcome does not change, the Debtors submit it is not necessary or appropriate to replicate these results 282 times.

As set forth in the Liquidation Analysis, if the Chapter 11 Cases were to be converted to a chapter 7 case, the benefits of this Plan would not be available and the Debtors would incur the additional costs of

a chapter 7 trustee, as well as the costs of counsel and other professionals retained by the chapter 7 trustee. These costs would reduce potential distribution to Allowed Impaired Claims on a dollar-for-dollar basis. Conversion also would likely result in no recovery for unsecured creditors or, if there were any distribution to unsecured creditors, would delay the ultimate distribution.  Accordingly, the Debtors believe that Holders of Allowed Claims would receive less than anticipated under the Plan if the Chapter 11 Cases were converted to chapter 7 cases.

### 5. Feasibility

Bankruptcy Code section 1129(a)(11) requires that confirmation of a plan not be likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors (unless such liquidation or reorganization is proposed in the Plan).

The Debtors believe that the Plan satisfies this requirement.  For purposes of determining whether the Plan meets this requirement, the Debtors, in consultation with their financial advisors, have analyzed their ability to meet the obligations that they will incur or assume under the Plan.

As part of that analysis, for purposes of the Plan Transaction, the Debtors have prepared consolidated projected financial results (the "Financial Projections") for each fiscal year following the Effective Date through 2027.  These Financial Projections, and the assumptions on which they are based, are attached to this Second Amended Combined Disclosure Statement and Plan as **Exhibit B**.  All holders of Claims who are entitled to vote to accept or reject the Plan are urged to examine carefully, in consultation with professional financial advisors, all of the assumptions on which the Financial Projections are based.

The Financial Projections have not been audited by a certified public accountant and have not necessarily been prepared in accordance with generally accepted accounting principles. The Debtors' management and advisors have prepared the Financial Projections. While the Financial Projections have been presented with numerical specificity, the Financial Projections are necessarily based on a variety of estimates and assumptions which, though considered reasonable by management, may not be realized and are inherently subject to significant business, economic, competitive, industry, regulatory, and market and financial uncertainties and contingencies, many of which will be beyond the Reorganized Debtors' control. The Debtors caution that they cannot make any representations as to the accuracy of the Financial Projections or to the Reorganized Debtors' ability to achieve the projected results. Some assumptions will inevitably differ from actual conditions. Furthermore, events and circumstances occurring after the date on which the Financial Projections were prepared may differ from any assumed facts and circumstances and may affect financial results in a materially adverse or materially beneficial manner. The Financial Projections, therefore, should not be relied upon as a guarantee or other assurance of the actual results that will occur.

### D. Acceptance or Rejection of the Plan

### 1. Presumed Acceptances by Vacant Classes

Any Class or sub-Class of Claims that is not occupied as of the date of the Combined Hearing by at least one Allowed Claim, or at least one Claim temporarily Allowed under Bankruptcy Rule 3018, shall not be included for purposes of (a) voting on the acceptance or rejection of the Plan and (b) determining acceptance or rejection of the Plan by such Class under Bankruptcy Code section 1129(a)(8).

### 2.      Presumed Acceptances to Accept Plan

Pursuant to Bankruptcy Code section 1126(f), only the Holders of Claims in Classes Impaired by the Plan and receiving a payment or Distribution under the Plan may vote on the Plan.  Classes 1, 2 and 9 and certain Holders of Claims in Class 7 are Unimpaired by the Plan.  Therefore, under Bankruptcy Code section 1126(f), such Holders of Claims are conclusively presumed to accept the Plan and the votes of Holders of such Claims shall not be solicited.

### 3.      Class Deemed to Reject Plan

Pursuant to Bankruptcy Code section 1124, a Class of Claims or Interests may be Impaired if the Plan alters the legal, equitable or contractual rights of the Holders of such Claims or Interests treated in such Class.  Holders of Claims and Interests in Class 8 are not entitled to receive or retain any property under the Plan.  Under Bankruptcy Code section 1126(g), such Holders are deemed to reject the Plan, and the votes of such Holders of Claims and Interests shall not be solicited.

### 4.      Impaired Classes of Claims Entitled to Vote

Because Claims in Classes 3, 4, 5, 6A, 6B, and 6C are Impaired under the Plan and Holders of such Claims may receive or retain property under the Plan, Holders of Claims in such Classes are entitled to vote and shall be solicited with respect to the Plan.  **ACCORDINGLY, A BALLOT FOR ACCEPTANCE OR REJECTION OF THE PLAN IS BEING PROVIDED ONLY TO HOLDERS OF CLAIMS IN CLASSES 3, 4, 5, 6A, 6B, and 6C.**

For the Plan to be accepted by an Impaired Class of Claims, a majority in number (*i.e.*, more than half) and at least two-thirds in dollar amount of the Claims voting (of each Impaired Class of Claims) must vote to accept the Plan.  At least one Impaired Class of Creditors, excluding the votes of Insiders, must actually vote to accept the Plan.

### E.      Voting Procedures

### 1.      Eligibility to Vote on the Plan

Unless otherwise ordered by the Bankruptcy Court, only Holders of Allowed Claims in Classes 3, 4, 5, 6A, 6B, and 6C may vote on the Plan.  Further, subject to the tabulation procedures that were approved by the Solicitation Procedures Order, to vote on the Plan, you must hold an Allowed Claim in Classes 3, 4, 5, 6A, 6B, and 6C or be the Holder of a Claim in such Class that has been temporarily Allowed for voting purposes only under Bankruptcy Rule 3018(a).  **IF YOU ARE ENTITLED TO VOTE ON THE PLAN, YOU ARE URGED TO COMPLETE, DATE, SIGN, AND PROMPTLY SUBMIT YOUR BALLOT. PLEASE BE SURE TO COMPLETE THE BALLOT PROPERLY AND LEGIBLY IDENTIFY THE EXACT AMOUNT OF YOUR CLAIM AND THE NAME OF THE CREDITOR.**

### 2.      Solicitation Packages and Notice

All Holders of Allowed Claims in Classes 3, 4, 5, 6A, 6B, and 6C will receive (a) a copy of the solicitation and voting procedures, (b) notice of the Combined Hearing (the "Combined Hearing Notice") setting forth: (i) the deadline to vote on the Plan, (ii) the deadline to object to final approval of the Disclosure Statement and confirmation of the Plan, (iii) procedures for filing objections and responses to confirmation of the Plan, and (iv) the time, date, and place of the Combined Hearing, (c) the Second Amended Combined Disclosure Statement and Plan, (d) the Solicitation Procedures Order (excluding exhibits), (e) a Ballot, including instructions on how to complete the Ballot, (f) a pre-addressed return envelope, (g) a letter from

the UCC urging Holders of General Unsecured Claims to vote to accept the Plan, and (h) such other materials as the Bankruptcy Court may direct to include in the Solicitation Package. All other Creditors and parties-in-interest not entitled to vote on the Plan will receive a non-voting status notice, which will include (a) instructions for obtaining copies of the Second Amended Combined Disclosure Statement and Plan (including the exhibits), the Solicitation Procedures Order, and all other materials in the Solicitation Package (other than Ballots) from the Claims and Noticing Agent, (b) disclosure regarding the settlement, release, exculpation, and injunction language set forth in Article X of the Plan, and instructions for opting out of the Third-Party Releases, (c) notice of the deadline to object to the Plan, and (d) notice of the Combined Hearing.

**IF YOU ARE A HOLDER OF A CLAIM ENTITLED TO VOTE ON THE PLAN AND YOU DID NOT RECEIVE A BALLOT, YOU RECEIVED A DAMAGED BALLOT, OR YOU LOST YOUR BALLOT, OR IF YOU HAVE ANY QUESTIONS CONCERNING THE PLAN OR PROCEDURES FOR VOTING ON THE PLAN, PLEASE CONTACT THE CLAIMS AND NOTICING AGENT BY (A) CLICKING THE "SUBMIT AN INQUIRY" OPTION AT HTTPS://VERITAGLOBAL.NET/LAVIE/INQUIRY, (B) CALLING (877) 709-4750 (TOLL-FREE, U.S. OR CANADA) OR (424) 236-7230 (INTERNATIONAL), OR (C) WRITING TO THE FOLLOWING ADDRESS: LAVIE CARE CENTERS BALLOT PROCESSING, C/O KCC D/B/A VERITA, 222 N. PACIFIC COAST HIGHWAY, SUITE 300, EL SEGUNDO, CA 90245.**

**THE CLAIMS AND NOTICING AGENT IS NOT AUTHORIZED TO, AND WILL NOT, PROVIDE LEGAL ADVICE. IF YOU BELIEVE YOU REQUIRE LEGAL ADVICE, YOU SHOULD CONSULT WITH AN ATTORNEY.**

### 3. Voting Deadlines

For your Ballot to count, you must either (a) complete an electronic ballot at https://veritaglobal.net/lavie or (b) complete, date, sign, and deliver by first class mail, overnight courier, messenger, or hand delivery to the following address: LaVie Care Centers Ballot Processing, c/o KCC d/b/a Verita, 222 N. Pacific Coast Highway, Suite 300, El Segundo, CA 90245. **BALLOTS SENT BY FACSIMILE TRANSMISSION OR E-MAIL ARE NOT ALLOWED AND WILL NOT BE COUNTED.**

(i)     Ballots must be submitted electronically, or the Claims and Noticing Agent must physically receive original ballots by mail or overnight delivery, on or before **November 4, 2024, at 4:00 p.m. (prevailing Eastern Time)**. Subject to the tabulation procedures approved by the Solicitation Procedures Order, you may not change your vote once a ballot is submitted electronically or once the Claims and Noticing Agent receives your original paper ballot.

(ii)    Subject to the tabulation procedures approved by the Solicitation Procedures Order, any ballot that is timely and properly submitted electronically or received physically will be counted and will be deemed to be cast as an acceptance, rejection or abstention, as the case may be, of the Plan.

## ARTICLE XIV.
## CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING

THE PLAN AND ITS IMPLEMENTATION ARE SUBJECT TO CERTAIN RISKS, INCLUDING, BUT NOT LIMITED TO, THE RISK FACTORS SET FORTH BELOW. HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE ON THE PLAN SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS, AS WELL AS THE OTHER INFORMATION SET FORTH IN THE

SECOND AMENDED COMBINED DISCLOSURE STATEMENT AND PLAN AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH OR REFERRED TO OR INCORPORATED BY REFERENCE HEREIN, BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.  THESE FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION

## A.    General Bankruptcy Law and Plan Considerations

### 1.    The Plan May Not be Accepted

The Debtors can make no assurances that the requisite acceptances to the Plan will be received, and the Debtors may need to obtain acceptances to an alternative plan of reorganization or liquidation for the Debtors, or otherwise, may be forced to liquidate under chapter 7 of the Bankruptcy Code.  There can be no assurance that the terms of any such alternative restructuring arrangement or plan would be similar to or as favorable to Holders of Allowed Claims as those proposed in the Plan.

### 2.    The Plan May Not be Confirmed

Even if the Debtors receive the requisite acceptances, there is no assurance that the Bankruptcy Court, which may exercise substantial discretion as a court of equity, will confirm the Plan.  Even if the Bankruptcy Court determined that the Plan and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation had not been met. Moreover, there can be no assurance that modifications to the Plan will not be required for confirmation or that such modifications would not necessitate the resolicitation of votes. If the Plan is not confirmed, it is unclear what distributions Holders of Allowed Claims ultimately would receive with respect to their Claims in a subsequent plan of liquidation.

### 3.    Distributions to Holders of Allowed Claims Under the Plan May be Inconsistent with Projections

Projected Distributions are based upon good faith estimates of the total amount of Claims and Interests ultimately Allowed and the GUC Trust Assets available for Distribution.  There can be no assurance that the estimated Claim amounts set forth in herein are correct.  These estimated amounts are based on certain assumptions with respect to a variety of factors, including, but not limited to, the resolution of objections Filed to certain Claims.  Both the actual amount of Allowed Claims in a particular Class and the GUC Trust Assets available for Distribution may differ from the Debtors' estimates.  If the total amount of Allowed Claims in a Class is higher than the Debtors' estimates, or the funds available for Distribution to such Class are lower than the Debtors' estimates, the percentage recovery to Holders of Allowed Claims in such Class will be less than projected.

### 4.    Objections to Classifications of Claims

The Debtors believe that all Claims and Interests have been appropriately classified in the Plan.  To the extent that the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed, the Debtors would seek to (a) modify the Plan to provide for whatever classification might be required for Confirmation and (b) use the acceptances received from any Holder of Claims pursuant to this solicitation for the purpose of obtaining the approval of the Class or Classes of which such Holder ultimately is deemed to be a member.  Any such reclassification of Claims, although subject to the notice and hearing requirements of the Bankruptcy Code, could adversely affect the Class in which such Holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required for approval of the Plan. There can be no assurance that the Bankruptcy Court, after finding that a

classification was inappropriate and requiring a reclassification, would approve the Plan based upon such reclassification. Except to the extent that modification of classification in the Plan requires resolicitation, the Debtors will, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Bankruptcy Court that acceptance of the Plan by any Holder of Claims pursuant to this solicitation will constitute a consent to the Plan's treatment of such Holder, regardless of the Class as to which such Holder is ultimately deemed to be a member. The Debtors believe that under the Bankruptcy Rules, it would be required to resolicit votes for or against the Plan only when a modification adversely affects the treatment of the Claim or Interest of any Holder.

The Bankruptcy Code also requires that the Plan provide the same treatment for each Claim or Interest of a particular Class unless the Holder of a particular Claim or Interest agrees to a less favorable treatment of its Claim or Interest. The Debtors believe that the Plan complies with the requirement of equal treatment. To the extent that the Bankruptcy Court finds that the Plan does not satisfy such requirement, the Bankruptcy Court could deny confirmation of the Plan. Issues or disputes relating to classification and/or treatment could result in a delay in the confirmation and consummation of the Plan and could increase the risk that the Plan will not be consummated.

### 5.    Failure to Consummate the Plan

Article IX of the Plan provides for certain conditions that must be satisfied (or waived) prior to confirmation and for certain other conditions that must be satisfied (or waived) prior to the Effective Date. As of the date hereof, there can be no assurance that any or all of the conditions in the Plan will be satisfied (or waived). Accordingly, there can be no assurance that the Plan will be confirmed by the Bankruptcy Court. Further, if the Plan is confirmed, there can be no assurance that the Plan will go effective.

### 6.    Releases, Exculpation, and Injunction Provisions May Not be Approved

Article X of the Plan contains certain releases, exculpations, and injunction language. Parties are urged to read these provisions carefully to understand how Confirmation and Consummation of the Plan will affect any Claim, Interest, right, or action regarding the Debtors and certain third parties.

**THE PLAN SHALL BIND ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS TO THE FULLEST EXTENT AUTHORIZED OR PROVIDED UNDER THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE AND ALL OTHER APPLICABLE LAW.**

There can be no assurance that the releases, exculpation, and injunction provisions, as provided in Article X.D, Article X.E, and Article X.F hereof, will be granted. Failure of the Bankruptcy Court to grant such relief may result in a plan of reorganization or liquidation that differs from the Plan or the Plan not being confirmed.

### B.    Risks Related to the Business and Industry

### 1.    Medicare and Medicaid Risks

The rules of Medicare and Medicaid, including reductions of reimbursement rates, changes to spending requirements, data reporting, measurement and evaluation standards could have a material, adverse effect on the Debtors' revenues, financial condition and results of operations. Additionally, delays in reimbursement may cause liquidity problems.

### 2. Reforms to the U.S. Healthcare System

Reforms to the U.S. healthcare system, including new regulations under the Affordable Care Act, new transparency and disclosure requirements, potential federal and state standards for minimum nurse staffing levels, continue to impose new requirements upon the Debtors that could materially impact their business. Also, state efforts to regulate or deregulate the healthcare services industry or the construction or expansion of healthcare facilities could result in increased competition.

### 3. Review and Audit Risks

The Debtors are subject to various government reviews, audits and investigations that could adversely affect their business, including an obligation to refund amounts previously paid to the Debtors, potential criminal charges, loss of licensure, the imposition of fines and sanctions.

### 4. Regulatory Compliance Risks

The Debtors are subject to extensive and complex laws and government regulations. If the Debtors are not operating in compliance with these laws and regulations or if these laws and regulations change, the Debtors could be required to make significant expenditures or change their operations in order to bring our facilities and operations into compliance.

### 5. Government Enforcement Actions

Public and government calls for increased enforcement efforts toward skilled nursing facilities, potential rulemaking that may result in enhanced enforcement and penalties, and new guidance for surveyors regarding the review of skilled nursing facilities and enforcement of their requirements of participation, could result in increased scrutiny by state and federal survey agencies, including sanctions that could negatively affect the Debtors' financial condition and results of operations.

### 6. Staffing Risks

Federal minimum staffing mandates may adversely affect the Debtors' labor costs, ability to maintain desired levels of patient or resident capacity, and profitability. Additionally, increased competition for, or a shortage of, nurses and other skilled personnel, could increase the Debtors' staffing and labor costs and subject the Debtors to monetary fines resulting from a failure to maintain minimum staffing requirements, or may affect reimbursement.

### 7. Cost Containment and Reimbursement Risks

Future cost containment initiatives undertaken by payors may limit the Debtors' revenue and profitability. Moreover, changes in Medicare reimbursements for physician and non-physician services could impact reimbursement for medical professionals. Additionally, annual caps, uncertainty regarding reimbursement and other cost-reductions for outpatient therapy services may reduce the Debtors' future revenue and profitability or cause the Debtors to incur losses.

### 8. Cash Flow Risks

Failure to generate sufficient cash flow to cover required payments or meet operating covenants under our long-term debt, and long-term operating leases could result in defaults under such agreements and cross-defaults under other debt or operating lease arrangements, which could harm the Debtors' financial condition.

**C.    Risks Associated with Forward Looking Statements**

The financial information contained in this Second Amended Combined Disclosure Statement and Plan has not been audited.  In preparing this Second Amended Combined Disclosure Statement and Plan, the Debtors relied on financial data derived from their Books and Records that was available at the time of such preparation.  Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information provided in this Second Amended Combined Disclosure Statement and Plan, and while the Debtors believe that such financial information fairly reflects the financial condition of the Debtors, the Debtors are unable to warrant or represent that the financial information contained herein and attached hereto is without inaccuracies.

**D.    Alternatives to Confirmation and Consummation of the Plan**

The Debtors believe that the Plan affords the Holders of Claims the potential for a better realization on the Debtors' assets than a chapter 7 liquidation, and therefore, is in the best interests of such Holders.  If, however, the Plan is not confirmed, the theoretical alternatives include (1) formulation of an alternative plan or plans of reorganization or liquidation under chapter 11, or (2) liquidation of the Debtors under chapter 7 of the Bankruptcy Code.  Each of these possibilities is discussed in turn below.

**1.    Alternative Plan(s) of Reorganization**

If the requisite acceptances are not received or if the Plan is not confirmed, the Debtors could attempt to formulate and propose a different plan or plans of reorganization.  With respect to an alternative reorganization plan, the Debtors have explored various other alternatives in connection with the development and formulation of the Plan.  The Debtors believe that the Plan enables creditors to realize the greatest possible value under the circumstances, and that, as compared to any alternative plan of liquidation, has the greatest chance to be confirmed and consummated.

**2.    Liquidation under Chapter 7**

If the Plan is not confirmed, the Debtors' Chapter 11 Cases could be converted to a liquidation case under chapter 7 of the Bankruptcy Code.  In a case under chapter 7 of the Bankruptcy Code, a trustee would be appointed to promptly liquidate the assets of the Debtors.  It is impossible to predict precisely how the proceeds of the liquidation would be distributed to the Holders of Claims and Interests.  The Debtors believe that in a liquidation under chapter 7 of the Bankruptcy Code, before creditors received any distributions, additional administrative expenses would likely be required in the appointment of a trustee and attorneys, accountants, and other professionals to assist such trustee, which could cause a substantial diminution in the value of the estate.  The assets available for distribution to the Holders of Claims and Interests would be reduced by such additional expenses.  Further, it is unclear whether a chapter 7 trustee could appropriately maximize the value of the Causes of Action.  Therefore, the Debtors believe that the Plan enables Holders of Claims and Interests to realize the greatest possible value under the circumstances, and that, as compared to a chapter 7 liquidation, provides the best opportunity for unsecured creditor recoveries.

**3.    Conversion of Non-Operating Debtors**

Instead of proceeding towards confirmation of the Plan with respect to all 282 Debtors, as proposed in the Motion to Dismiss, the Chapter 11 Cases of the non-operating Debtors could be converted to liquidation cases under chapter 7 of the Bankruptcy Code, while the operating Debtors could remain in chapter 11 and reorganize through the Plan.  Though Recovery Corp asserts that this option would result in greater recoveries for creditors of the non-operating Debtors, the Debtors do not believe this will result in any recovery for any Holders of General Unsecured Claims.  First, conversion of some of the Debtors will

result in a potential default of the DIP Financing, rendering it challenging to confirm a Plan with respect to any of the Debtors.  Further, the Debtors' independent investigation found that the various Claims and Causes of Action do not have a meaningful likelihood of success, and even if pursued successfully (which is unlikely), many of the causes of action would be challenging to collect.  Even if the chapter 7 trustee were able to collect any value, such amounts would be reduced by the DIP Facility Claims, additional secured claims and unpaid Administrative Expense Claims and Priority Claims before unsecured creditors received any distributions.  Therefore, the Debtors believe that the Plan enables Holders of Claims and Interests to realize the greatest possible value under the circumstances, and that, as compared to chapter 7 conversion (whether on some of the Debtors, or all of the Debtors), provides the best opportunity for unsecured creditor recoveries.

Furthermore, even if recoveries ultimately flowed down to Holders of General Unsecured Claims on account of certain Debtors, the conversion of the non-operating Debtors would likely complicate, rather than simplify, the path to unsecured creditor recoveries.  The Debtors believe that there may be significant Causes of Action *between* Debtors, which means that any recovery on behalf of a Debtor—if not resolved under a Plan—would likely generate additional litigation between Debtors to determine how such amounts would be allocated.  This could further dilute, or likely reduce to $0 any such recoveries, even where the Causes of Action are pursued and collected successfully.  Because of these complexities, unwinding the non-operating Debtors from the Debtors' broader corporate enterprise will be an expensive and time-consuming endeavor that does not benefit any creditor.  As such, the Debtors believe that Holders of General Unsecured Claims are better served through the Plan that addresses all 282 Debtors, rather than only the operating Debtors.

## ARTICLE XV.
## CERTAIN FEDERAL INCOME TAX CONSEQUENCES

### A.    Overview

The following discussion is a summary of certain material U.S. federal income tax consequences of the Plan to the Debtors and to certain holders (which solely for purposes of this discussion means the beneficial owner for U.S. federal income tax purposes) of Claims as of the date of filing of this Plan and all of which are subject to change as may be set forth in the Restructuring Transactions Memorandum.  The following summary does not address the U.S. federal income tax consequences to Holders of Claims or Interests not entitled to vote on the Plan.  This summary is based on the Internal Revenue Code of 1986, as amended (the "Internal Revenue Code"), Treasury Regulations promulgated and proposed thereunder (the "Treasury Regulations"), judicial decisions, and published administrative rules and pronouncements of the Internal Revenue Service, all as in effect on the date hereof and all of which are subject to change or differing interpretations, possibly with retroactive effect.  No legal opinions have been requested or obtained from counsel with respect to any of the tax aspects of the Plan and no rulings have been or will be requested from the Internal Revenue Service with respect to any of the issues discussed below.  The discussion below is not binding upon the Internal Revenue Service or the Bankruptcy Courts. No assurance can be given that the Internal Revenue Service would not assert, or that a court would not sustain, a different position than any position discussed herein.

This summary does not address non-U.S., state, local, or non-income tax consequences of the Plan (including such consequences with respect to the Debtor), nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a Holder in light of its individual circumstances or to a Holder that may be subject to special tax rules (such as persons who are related to the Debtors within the meaning of the Internal Revenue Code, U.S. Holders whose functional currency is not the U.S. dollar, U.S. expatriates, certain former citizens or long-term residents of the United States, broker-dealers, banks, mutual funds, insurance companies, financial institutions, retirement plans, small business investment

companies, regulated investment companies, real estate investment trusts, tax-exempt organizations, controlled foreign corporations, passive foreign investment companies, partnerships (or other entities treated as partnerships or other pass-through entities), beneficial owners of partnerships (or other entities treated as partnerships or other pass-through entities), subchapter S corporations, Holders of Claims as part of a straddle, hedge, conversion transaction, or other integrated investment, persons using a mark-to-market method of accounting, and Holders of Claims who are themselves in bankruptcy).  Furthermore, this summary assumes that a Holder of a Claim holds only Claims in a single Class and holds such a Claim only as a "capital asset" (within the meaning of section 1221 of the Internal Revenue Code).  This summary also assumes that the Claims against the Debtors will be respected for U.S. federal income tax purposes in accordance with their form, and that the Claims constitute interests in the Debtors "solely as a creditor" for purposes of section 897 of the Internal Revenue Code (and thus are not subject to withholding under the Foreign Investment in Real Property Tax Act). This discussion does not address the U.S. federal income tax consequences to Holders (a) whose Claims are unimpaired or otherwise entitled to payment in full under the Plan, or (b) that are deemed to accept or deemed to reject the Plan.  Additionally, this discussion does not address any consideration being received other than in a person's capacity as a Holder of a Claim.

For purposes of this discussion, the term "U.S. Holder" means a Holder of a Claim (including a beneficial owner of a Claim), that is, for U.S. federal income tax purposes, (1) an individual citizen or resident of the United States, (2) a corporation, or other entity treated as a corporation, created or organized in or under the laws of the United States or any state thereof or the District of Columbia, (3) a trust if (a) a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more U.S. persons (within the meaning of section 7701(a)(30) of the Internal Revenue Code) have the authority to control all substantial decisions of the trust or (b) such trust has made a valid election under applicable Treasury Regulations to be treated as a U.S. person for U.S. federal income tax purposes, or (4) an estate, the income of which is includible in gross income for U.S. federal income tax purposes regardless of its source.

For purposes of this discussion, a "Non-U.S. Holder" is any Holder of a Claim that is neither a U.S. Holder nor a partnership (or other entity treated as a partnership or other passthrough entity for U.S. federal income tax purposes). In the case of a Holder that is classified as a partnership for U.S. federal income tax purposes, the tax treatment of a partner generally will depend upon the status of the partner and the activities of the partner or the partnership.  If you are a partner (or other beneficial owner) of a partnership (or other entity treated as a partnership or other pass-through entity) that is, or will be, a Holder of a Claim, then you should consult your own tax advisors.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO YOU. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE U.S. FEDERAL, STATE, LOCAL, NON-U.S., NON-INCOME, AND OTHER TAX CONSEQUENCES OF THE PLAN.**

**B.      Certain U.S. Federal Income Tax Consequences to the Debtors, the Reorganized Debtors, and Holders of Existing Equity Interests**

Debtors are currently treated as a partnership or as an entity that is disregarded as separate from its parent for U.S. federal income tax purposes. Accordingly, the U.S. federal income tax consequences of consummating the Plan will generally not be borne by the Debtors, but by their partners (i.e., the Holders of equity in the Debtors).

In general, absent an exception, a taxpayer will realize and recognize cancelation of indebtedness income ("COD Income") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income, in general, is the excess of (1) the adjusted issue price of the indebtedness satisfied, over (2) the sum of (a) the amount of any cash paid, (b) the issue price of any new indebtedness of the debt issued, and (c) the fair market value of any other consideration given in satisfaction of such indebtedness at the time of the exchange; except to the extent that payment of the indebtedness would have given rise to a deduction.

Under section 108 of the Tax Code, a taxpayer is not required to include COD Income in gross income (1) if the taxpayer is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that case (the "Bankruptcy Exception"), or (2) to the extent that the taxpayer is insolvent immediately before the discharge (but only to the extent of the taxpayer's insolvency) (the "Insolvency Exception"). Instead, as a consequence of such exclusion, a taxpayer-debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income. In general, tax attributes will be reduced in the following order: (1) net operating losses; (2) most tax credits, including minimum tax credit carryovers; (3) capital loss carryovers; (4) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject); (5) passive activity loss and credit carryovers; and (6) foreign tax credits. Alternatively, the taxpayer can elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the Tax Code.

Under section 108(d)(6) of the Tax Code, when an entity that is a flow-through entity (such as the Debtors) realizes COD Income, its partners are treated as receiving their allocable share of such COD Income and the Bankruptcy Exception and the Insolvency Exception (and related attribute reduction) are applied at the partner level rather than at the entity level. Accordingly, the Holders of equity in the Debtors will be treated as receiving their allocable share, if any, of the COD Income realized by the Debtors. If a Holder has suspended loss with respect to its equity interest in the Debtors, the allocation of COD Income may allow some or all of such suspended losses to be used to offset the COD Income.

## C.    Tax Consequences to U.S. Holders of Certain Allowed Claims

### 1.    Gain or Loss Recognition

A U.S. Holder of Allowed Claims that receives Cash will be treated as receiving payment in a taxable exchange under section 1001 of the Internal Revenue Code. Other than with respect to any amounts received that are attributable to accrued but untaxed interest or original issue discount ("OID"), each U.S. Holder of such Claims should recognize gain or loss equal to the difference between the (a) sum of the Cash received in exchange for the Claim, and (b) such U.S. Holder's adjusted basis, if any, in such Claim. A U.S. Holder's ability to deduct any loss recognized on the exchange of its Claims will depend on such U.S. Holder's own circumstances and may be restricted under the Internal Revenue Code.

**HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE RECOGNITION OF GAIN OR LOSS, FOR FEDERAL INCOME TAX PURPOSES, ON THE SATISFACTION OF THEIR CLAIMS.**

### 2.    Accrued Interest

A portion of the payment received by Holders of Allowed Claims may be attributable to accrued interest on such Claims or OID. Such amount should be taxable to that U.S. Holder as interest income if such accrued interest has not been previously included in the Holder's gross income for United States federal income tax purposes. Conversely, U.S. Holders of Claims may be able to recognize a deductible

116

loss to the extent any accrued interest on the Claims was previously included in the U.S. Holder's gross income but was not paid in full by the Debtors.

If the payment does not fully satisfy all principal and interest on Allowed Claims, the extent to which payment will be attributable to accrued interest is unclear.   Under the Plan, the aggregate consideration to be distributed to Holders of Allowed General Unsecured Claims will be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that accrued on such Claims, if any.  Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan may be binding for U.S. federal income tax purposes, but certain Treasury Regulations generally treat payments as allocated first to any accrued but unpaid interest and then as a payment of principal. Thus, the Internal Revenue Service could take the position that the payment received by the U.S. Holder should be allocated in some way other than as provided in the Plan.

**HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE ALLOCATION OF CONSIDERATION RECEIVED IN SATISFACTION OF THEIR CLAIMS AND THE FEDERAL INCOME TAX TREATMENT OF ACCRUED INTEREST.**

**3.      Market Discount**

Under the "market discount" provisions of the Internal Revenue Code, some or all of any gain realized by a U.S. Holder of a Claim who exchanges the Claim for an amount may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt instruments constituting the exchanged Claim. In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if its U.S. Holder's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with original issue discount, its adjusted issue price, in each case, by at least a de minimis amount (equal to 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the taxable disposition of Allowed Claim (determined as described above) that were acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Allowed Claims were considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued).

**D.      Tax Consequences to Non-U.S. Holders of Certain Allowed Claims**

The following discussion includes only certain U.S. federal income tax consequences of the payments to Non-U.S. Holders for Claims. The discussion does not include any non-U.S. tax considerations.  The rules governing the U.S. federal income tax consequences to Non-U.S. Holders are complex.  Each Non-U.S. Holder should consult its own tax advisor regarding the U.S. federal, state, and local and the foreign tax consequences of the payments to such Non-U.S. Holder.

Whether a Non-U.S. Holder realizes gain or loss on the payment of a Claim and the amount of such gain or loss is generally determined in the same manner as set forth above in connection with U.S. Holders.

**1.      Gain or Loss Recognition**

Any gain realized by a Non-U.S. Holder on the exchange of its Claim generally will not be subject to U.S. federal income taxation unless (a) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the exchange occurs or who otherwise

meets the so-called "substantial presence test" under Section 7701(b)(3) of the Internal Revenue Code, or (b) such gain is effectively connected with the conduct by such non-U.S. Holder of a trade or business in the United States (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the
United States).

If the first exception applies, to the extent that any gain is taxable, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such non-U.S. Holder's gains allocable to U.S. sources exceed losses allocable to U.S. sources during the taxable year of the exchange.

If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange if such gain is effectively connected with the Non-U.S. Holder's conduct of a trade or business in the United States in the same manner as a U.S. Holder. To claim an exemption from withholding tax, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates). In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30 percent (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

## 2. Accrued Interest

The United States generally imposes a 30% U.S. federal withholding tax on payments of interest to Non-U.S. Holders. Subject to the discussion below of an interest effectively connected with the conduct of a trade or business within the United State, a Non-U.S. Holder will not be subject to the 30% U.S. federal withholding tax with respect to payments of interest on the notes, provided that:

(a)     it does not own, actually or constructively, 10% or more of the total combined voting power of all classes of our stock entitled to vote;

(b)     it is not a "controlled foreign corporation" with respect to which we are, directly or indirectly, a "related person"; and

(c)     it provides its name and address, and certify, under penalties of perjury, that it is not a U.S. person (on a properly executed IRS Form W-8BEN or W- 8BEN-E (or other applicable form)), or it holds its notes through certain foreign intermediaries and the foreign intermediaries satisfy the certification requirements of applicable Treasury Regulations.

If you cannot satisfy the requirements described above, you will be subject to the 30% U.S. federal withholding tax with respect to payments of interest on the notes, unless you provide us (or other applicable withholding agent) with a properly executed IRS Form W-8BEN or W- 8BEN-E or other applicable form claiming an exemption from or reduction in withholding under the benefit of an applicable U.S. income tax treaty.

If such interest is effectively connected with the conduct by the Non-U.S. Holder of a trade or business within the United States, provided the Non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the Non-U.S. Holder (x) generally will not be subject to withholding tax, but (y) will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-

U.S. Holder's effectively connected earnings and profits that are attributable to the accrued but untaxed interest at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty)).

### 3.    FATCA

Under the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account Holders and investors or be subject to withholding on the receipt of "withholdable payments." For this purpose, "withholdable payments" are generally U.S. source payments of interest on certain types of obligations. FATCA withholding may apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding tax. U.S. Holders that hold Claims through foreign financial institutions and Non-U.S. Holders are encouraged to consult their tax advisors regarding the possible implications of these rules on their Claim.

## E.    Information Reporting and Back-Up Withholding

Information reporting requirements may apply to payments under the Plan. Additionally, under the backup withholding rules, a Holder of a Claim may be subject to backup withholding (currently at a rate of 24%) with respect to payments made pursuant to the Plan unless that Holder: (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (b) timely provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding (generally in the form of a properly executed IRS Form W-9 for a U.S. Holder, and, for a Non-U.S. Holder, in the form of a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption)). Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax; *provided* that the required information is timely provided to the IRS.

The Debtors, or the applicable agent, will withhold all amounts required by law to be withheld from payments of interest and comply with all applicable information reporting requirements.

## F.    Tax Treatment of the GUC Trust

Upon the Effective Date, the GUC Trust will be established for, among other things, Distributions to Holders of General Unsecured Claims whether Allowed on or after the Effective Date.

### 1.    Classification of the GUC Trust

The GUC Trust is intended to qualify as liquidating trusts for federal income tax purposes. In general, a liquidating trust is not a separate taxable entity but rather is treated for federal income tax purposes as a "grantor" trust (i.e., a pass-through entity). The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan. The GUC Trust has been structured with the intention of complying with such general criteria. Pursuant to the Plan, and in conformity with Revenue Procedure 94-45, all parties (including the GUC Trustee and the Holders of GUC Trust Interests) are required to treat for United States federal income tax purposes the GUC Trust as a grantor trust of which the Holders of Allowed General Unsecured Claims are the owners and grantors. While the following discussion assumes that the GUC Trust would be so treated for United States federal income tax purposes, no ruling has been requested from the IRS concerning the tax status of the GUC Trust as a grantor trust. Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the GUC Trust as a grantor

trust. If the IRS were to challenge successfully such classification, the United States federal income tax consequences to the GUC Trust and the Holders of Allowed General Unsecured Claims could vary from those discussed herein.

### 2. General Tax Reporting by the GUC Trust and Beneficiaries

For all United States federal income tax purposes, all parties (including the GUC Trustee and the Holders of GUC Trust Interests) will be required to treat the transfer of assets to the GUC Trust, in accordance with the terms of the Plan, as a transfer of those assets directly to the Holders of Claims followed by the transfer of such assets by such Holders to the GUC Trust. Consistent therewith, all parties are required to treat the GUC Trust as a grantor trust of which such Holders are to be owners and grantors. Thus, such Holders (and any subsequent Holders of GUC Trust Interests) will be treated as the direct owners of an undivided beneficial interest in the assets of the GUC Trust for all federal income tax purposes. Accordingly, each Holder of a GUC Trust Interest will be required to report on its federal income tax return(s) the Holder's allocable share of all income, gain, loss, deduction, or credit recognized or incurred by the GUC Trust.

The United States federal income tax reporting obligation of a Holder of a GUC Trust Interest is not dependent upon the GUC Trust distributing any Cash or other proceeds. Therefore, a Holder of a GUC Trust Interest may incur a United States federal income tax liability although the GUC Trust has not made, or will not make, any concurrent or subsequent Distributions to the Holder. If a Holder incurs a federal tax liability but does not receive Distributions commensurate with the taxable income allocated to it in respect of its GUC Trust Interests, the Holder may be allowed a subsequent or offsetting loss.

The GUC Trustee will file tax returns with the IRS for the GUC Trust as a grantor trust pursuant to Treasury Regulations section 1.671-4(a). The GUC Trustee will also send to each Holder of a GUC Trust Interest a separate statement setting forth the Holder's share of items of income, gain, loss, deduction, or credit and will instruct the Holder to report such items on its federal income tax return.

All payments to Holders of Claims are subject to any applicable withholding (including employment tax withholding). Under the Tax Code, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" then in effect. Backup withholding generally applies if the holder (a) fails to furnish his or her social security number or other taxpayer identification number ("TIN"), (b) furnishes an incorrect TIN, (c) fails to properly report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is his correct number and that he is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax if an appropriate refund claim is filed with the IRS. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

### 3. Allocations of Taxable Income and Loss

Allocations of taxable income of the GUC Trust among Holders of General Unsecured Claims will be determined by reference to the manner in which an amount of Cash equal to such taxable income would be distributed (were such Cash permitted to be distributed at such time) if, immediately prior to such deemed Distribution, the GUC Trust had distributed all of its respective assets to the Holders of the GUC Trust Interests adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the GUC Trust. Similarly, taxable loss of the GUC Trust will be allocated by reference to the way an economic loss would be borne immediately after a liquidating Distribution of the remaining GUC Trust Assets.

After the Effective Date, any amount a Holder receives as a Distribution from the GUC Trust in respect of its beneficial Interests therein should not be included, for United States federal income tax purposes, in the Holder's amount realized in respect of its Allowed Claim but should be separately treated as a Distribution received in respect of such Holder's beneficial GUC Trust Interest(s).

In general, a Holder's aggregate tax basis in its undivided beneficial interest in the assets transferred to the GUC Trust will equal the fair market value of such undivided beneficial interest as of the Effective Date and the Holder's holding period in such assets will begin the day following the Effective Date. Distributions to any Holder of an Allowed Claim will be allocated first to the original principal portion of such Claim as determined for United States federal income tax purposes, and then, to the extent the consideration exceeds such amount, to the remainder of such Claim. However, there is no assurance that the IRS will respect such allocation for United States federal income tax purposes.

The tax book value of the GUC Trust Assets for this purpose will equal their fair market value on the Effective Date, adjusted in accordance with tax accounting principles prescribed by the Tax Code, applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements. Uncertainties with regard to United States federal income tax consequences of the Plan may arise due to the inherent nature of estimates of value that will impact tax liability determinations.

As soon as practicable after the Effective Date, the GUC Trustee (to the extent that it deems necessary or appropriate in the reasonable exercise of its discretion) will, in good faith, value the GUC Trust Assets and, as appropriate, will apprise the Holders of the GUC Trust Interests of such valuation. The valuation is required to be used consistently by all parties (including the Debtors, the GUC Trustee, and the Holders of GUC Trust Interests) for all United States federal income tax purposes. The Court will resolve any dispute regarding the valuation of the assets. No valuation will be deemed an admission or be admissible in any cause of action.

The GUC Trust's taxable income will be allocated to the Holders of beneficial GUC Trust Interests in accordance with each such Holder's pro rata share of such beneficial GUC Trust Interests. The character of items of income, deduction, and credit to any Holder and the ability of such Holder to benefit from any deductions or losses may depend on the particular situation of such Holder.

Events subsequent to the date of the Disclosure Statement, such as the enactment of additional tax legislation, could also change the United States federal income tax consequences of the Plan and the transactions contemplated thereunder.

**THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTION CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

## ARTICLE XVI.
## MISCELLANEOUS PROVISIONS

**A.      Terminations of Injunctions or Stays**

Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays provided for in the Chapter 11 Cases under Bankruptcy Code sections 105 or 362 or otherwise, and extant on the Confirmation Date, shall remain in full force and effect until the Effective Date.

**B.      Severability of Provisions**

If, prior to Confirmation, any term or provision of the Second Amended Combined Disclosure Statement and Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, then the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Second Amended Combined Disclosure Statement and Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Second Amended Combined Disclosure Statement and Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**C.      Payment of Statutory Fees**

All fees payable through the Effective Date pursuant to 28 U.S.C. § 1930 shall be paid on or as soon as practicable after the Effective Date.  The Debtors, for periods accruing prior to the Effective Date, and the GUC Trust, for periods accruing on and after the Effective Date, shall pay Statutory Fees to the U.S. Trustee in accordance with 28 U.S.C. § 1930 until the Chapter 11 Cases are closed or converted and/or the entry of a final decree.  Quarterly fees shall continue to accrue for the Debtors and be timely paid until the Chapter 11 Cases are closed, dismissed or converted.  In addition, the GUC Trustee shall File post-confirmation quarterly reports or any pre-confirmation monthly operating reports not Filed as of the Combined Hearing in conformance with the U.S. Trustee Guidelines.  The U.S. Trustee shall not be required to File a request for payment of its quarterly fees, which shall be deemed an Administrative Expense Claim against the Debtors and their Estates.

**D.      Service of Documents**

All notices, requests and demands (each, a "Notice") to or upon the Debtors, the Reorganized Debtors, or the GUC Trustee, as applicable, to be effective shall be in writing and, unless otherwise expressly provided herein, shall be (i) served by (a) certified mail, return receipt requested, (b) hand delivery, (c) overnight delivery service, (d) first class mail, or (e) facsimile transmission; (ii) deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed; and (iii) addressed as follows:

| Debtors | Counsel to Debtors |
|---|---|
| LaVie Care Centers, LLC | McDermott Will & Emery LLP |
| c/o Ankura Consulting Group, LLC | 1180 Peachtree St. NE, Suite 3350 |
| 485 Lexington Avenue, 10th Floor | Atlanta, Georgia 30309 |
| New York, NY 10017 | Attention:  Daniel M. Simon |

122

| | |
|---|---|
| Attention:  M. Benjamin Jones, Chief Restructuring Officer<br>Email:  Ben.Jones@ankura.com | Email: dsimon@mwe.com<br><br>-and-<br><br>McDermott Will & Emery LLP<br>444 West Lake Street, Suite 4000<br>Chicago, Illinois 60606-0029<br>Attention:  Emily C. Keil<br>Email: ekeil@mwe.com |
| **Counsel to the UCC** | **Counsel to the Omega Secured Parties** |
| Troutman Pepper Hamilton Sanders LLP<br>600 Peachtree Street, NE, Suite 3000<br>Atlanta, Georgia 30308<br>Attention:  Matthew R. Brooks<br>Email: matthew.brooks@troutman.com<br><br>-and-<br><br>3000 Two Logan Square<br>Eighteenth and Arch Streets<br>Philadelphia, Pennsylvania 19103-2799<br>Attention:  Francis J. Lawall<br>Email:  francis.lawall@troutman.com<br><br>-and-<br><br>875 Third Avenue<br>New York, New York 10022<br>Attention:  Deborah Kovsky-Apap<br>Email: deborah.kovsky@troutman.com | Scroggins, Williamson & Ray, P.C.<br>4401 Northside Parkway, Suite 230<br>Atlanta, Georgia 30327<br>Attention: Matthew W. Levin<br>Email:  mlevin@swlawfirm.com<br><br>-and-<br><br>Goodwin Proctor LLP<br>The New York Times Building<br>620 Eighth Avenue<br>New York, New York 10018<br>Attention: Robert J. Lemons<br>Email:  rlemons@goodwinlaw.com<br><br>-and-<br><br>Ferguson Braswell Fraser Kubasta PC<br>2500 Dallas Parkway, Suite 600<br>Plano, Texas 75093<br>Attention: Leighton Aiken<br>Email:  laiken@fbfk.law |
| **Counsel to the DIP Lenders** | **Counsel to the ABL Lenders** |
| DLA Piper LLP<br>1900 N. Pearl St., Suite 2200<br>Dallas, Texas 75201<br>Attention: James Muenker<br>Email:  james.muenker@us.dlapiper.com<br><br>-and-<br><br>Scroggins, Williamson & Ray, P.C.<br>4401 Northside Parkway, Suite 230<br>Atlanta, Georgia 30327<br>Attention: Matthew W. Levin<br>Email: mlevin@swlawfirm.com<br><br>-and- | Proskauer Rose LLP<br>One International Place<br>Boston, Massachusetts 02110-2600<br>Attention: Charles A. Dale<br>Email:  cdale@proskauer.com<br><br>-and-<br><br>Proskauer Rose LLP<br>Eleven Times Square<br>New York, New York 10036-8299<br>Attention:  Dylan J. Marker<br>Email:  dmarker@proskauer.com<br><br>-and- |

| | |
|---|---|
| Goodwin Proctor LLP<br>The New York Times Building<br>620 Eighth Avenue<br>New York, New York 10018<br>Attention: Robert J. Lemons<br>Email: rlemons@goodwinlaw.com<br><br>-and-<br><br>Ferguson Braswell Fraser Kubasta PC<br>2500 Dallas Parkway, Suite 600<br>Plano, Texas 75093<br>Attention: Leighton Aiken<br>Email: laiken@fbfk.law | Vedder Price PC<br>222 North LaSalle Street<br>Chicago, Illinois 60601<br>Attention: Kathryn L. Stevens<br>Email: kstevens@vedderprice.com |

A Notice is deemed to be given and received (a) if sent by personal delivery or courier, on the date of delivery if it is a Business Day and the delivery was made prior to 4:00 p.m. (local time in place of receipt) and otherwise on the next Business Day, or (b) if sent by electronic mail, when the sender receives an email from the recipient acknowledging receipt, provided that an automatic "read receipt" does not constitute acknowledgment of an email for purposes of this Section. Any party may change its address for service from time to time by providing a Notice in accordance with the foregoing. Any element of a party's address that is not specifically changed in a Notice will be assumed not to be changed. Sending a copy of a Notice to a party's legal counsel as contemplated above is for information purposes only and does not constitute delivery of the Notice to that party. The failure to send a copy of a Notice to legal counsel does not invalidate delivery of that Notice to a party.

**E.    2002 Service List**

After the Effective Date, any Entities or Persons that want to continue to receive notice in these Chapter 11 Cases must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002 no later than thirty (30) days after the Effective Date; *provided, however*, that the U.S. Trustee shall be excused from this requirement and shall remain on the Bankruptcy Rule 2002 service list. To the extent a renewed request is not timely Filed with the Bankruptcy Court, the GUC Trustee is authorized to limit notice and not include such Entities or Persons on any post-Effective Date Bankruptcy Rule 2002 service list.

**F.    Filing of Additional Documents**

On or before substantial consummation of the Plan, the Debtors shall File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

**G.    Plan Supplement(s)**

Exhibits to the Second Amended Combined Disclosure Statement and Plan not attached hereto shall be Filed in one or more Plan Supplements by the Plan Supplement Filing Date. Any Plan Supplement (and amendments thereto) Filed by the Debtors shall be deemed an integral part of the Second Amended Combined Disclosure Statement and Plan and shall be incorporated by reference as if fully set forth herein. Substantially contemporaneously with their Filing, the Plan Supplements may be viewed at the Debtors' case website (https://veritaglobal.net/lavie) or the Bankruptcy Court's website (https://ecf.ganb.uscourts.gov/). Unless otherwise ordered by the Bankruptcy Court, to the extent any exhibit or document in the Plan Supplement is inconsistent with the terms of any part of the Second

Amended Combined Disclosure Statement and Plan that does not constitute the Plan Supplement, the Plan Supplement shall control.  The documents considered in the Plan Supplement are an integral part of the Second Amended Combined Disclosure Statement and Plan and shall be deemed approved by the Bankruptcy Court pursuant to the Confirmation Order.

**H.    Votes Solicited in Good Faith**

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to Bankruptcy Code section 1125(e), the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code and, therefore, no such parties will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan.

**I.    Closing of Chapter 11 Cases**

The Reorganized Debtors or the GUC Trustee (as applicable) shall, promptly after the full administration of the Chapter 11 Cases, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order necessary to close the Chapter 11 Cases.

**J.    No Admissions**

Notwithstanding anything herein to the contrary, nothing contained in the Second Amended Combined Disclosure Statement and Plan shall be deemed as an admission by any Entity with respect to any matter set forth herein.

**K.    Inconsistency**

In the event of any inconsistency among the Second Amended Combined Disclosure Statement and Plan and any other instrument or document created or executed pursuant to the Second Amended Combined Disclosure Statement and Plan, the provisions of the Second Amended Combined Disclosure Statement and Plan shall govern.

**L.    Request for Expedited Determination of Taxes**

The Debtors, the Reorganized Debtors, and the GUC Trustee, as applicable, shall have the right to request an expedited determination under Bankruptcy Code section 505(b) with respect to tax returns filed, or to be filed, for any and all taxable periods ending after the Petition Date through the Effective Date.

**M.    Reservation of Rights**

Except as expressly set forth herein, the Second Amended Combined Disclosure Statement and Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order.  None of the Filing of the Second Amended Combined Disclosure Statement and Plan, any statement or provision contained herein, or the taking of any action by the Debtors with respect to the Second Amended Combined Disclosure Statement and Plan shall be or shall be deemed to be an admission or waiver of any rights of the Debtors, Holders of Claims or Interests before the Effective Date.

*[Remainder of Page Intentionally Left Blank]*

Dated:  October 1, 2024

LaVie Care Centers, LLC, *et al.*
Debtors and Debtors-in-Possession

By:    */s/ M. Benjamin Jones*
Name:   M. Benjamin Jones
Title:   Chief Restructuring Officer

Submitted By:

**MCDERMOTT WILL & EMERY LLP**

*/s/ Daniel M. Simon*
Daniel M. Simon (Georgia Bar No. 690075)
1180 Peachtree St. NE, Suite 3350
Atlanta, Georgia 30309
Telephone:    (404) 260-8535
Facsimile:    (404) 393-5260
Email:         dsimon@mwe.com

- and -

Emily C. Keil (admitted *pro hac vice*)
Jake Jumbeck (admitted *pro hac vice*)
Catherine Lee (admitted *pro hac vice*)
444 West Lake Street, Suite 4000
Chicago, Illinois 60606
Telephone:    (312) 372-2000
Facsimile:     (312) 984-7700
Email:          ekeil@mwe.com
               jjumbeck@mwe.com
               clee@mwe.com

*Counsel for Debtors and Debtors-in-Possession*

126

## EXHIBIT A

**Liquidation Analysis**

## I. Introduction

The Liquidation Analysis[1] estimates potential cash distributions to holders of Allowed Claims and interests in a hypothetical chapter 7 liquidation of all of the Debtors' (also referred to herein collectively as the "<u>Company</u>") assets.

The "best interests" test in section 1129(a)(7) of the Bankruptcy Code requires that the Bankruptcy Court finds, as a condition to Confirmation of the Plan, that each holder of a Claim or Interest in each Impaired Class: (i) has accepted the Plan; or (ii) will receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the amount that such holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. To make these findings, the Bankruptcy Court must: (1) estimate the cash proceeds that a chapter 7 trustee would generate if each Debtors' chapter 11 cases were converted to chapter 7 cases and the assets of such Debtors' estates were liquidated as of the Effective Date; (2) determine the distribution that each non-accepting holder of a Claim or Interest would receive from the net proceeds available for distribution under the priority scheme dictated in chapter 7; and (3) compare each holder's estimated recovery under liquidation to the distribution under the Plan (the "<u>Plan Recovery</u>") that such holder would receive if the Plan were confirmed and consummated.

Based on the following hypothetical Liquidation Analysis, the Debtors submit that because of, among other things, discounts to asset values and the incurrence of additional priority claims in chapter 7 if these cases were converted, holders of Impaired Claims will receive at least as great of a recovery under the proposed Plan as in a chapter 7 liquidation scenario. The Plan thus satisfies the best interests test under section 1129(a)(7) of the Bankruptcy Code. The Debtors caution that many assumptions used herein are conservative and actual recoveries in a chapter 7 liquidation could be substantially less than recoveries set forth in this Liquidation Analysis.

## II. Basis of Presentation

The Debtors prepared the Liquidation Analysis assuming chapter 7 liquidation commences on or about November 1, 2024 (the "<u>Liquidation Date</u>"). The pro forma values referenced herein are based upon projected results of operations and cash flow over the projection period. The Liquidation Analysis is presented on a consolidated basis between OpCo Debtors and DivestCo Debtors.

In preparing the Liquidation Analysis, the Debtors estimated Allowed Claims based on a review of the Debtors' financial statements and projected results of operations and cash flows over the projection period to account for estimated liabilities, as necessary. The cessation of business in a liquidation is likely to trigger substantial Claims and funding requirements that would otherwise not exist under the Plan absent a liquidation. Such Claims could include significant deficiency Claims, lease rejection claims, additional litigation claims and chapter 7 administrative expense Claims, including, wind-down costs, chapter 7 trustee fees (the "<u>Trustee</u>"), and professional fees, among other Claims. Some of these Claims and funding obligations could be significant and would be entitled to administrative or priority status in payment from liquidation proceeds. **The Debtors' estimates of Allowed Claims set forth in the Liquidation Analysis should not be relied on for the purpose of determining the value of any distribution to be made on account of Allowed Claims or Interests under the Plan.**

Chapter 7 administrative expense claims that arise in a liquidation scenario would be paid in full from the liquidation proceeds (the "<u>Gross Liquidation Proceeds</u>") prior to proceeds being made available for distribution to Holders of Allowed Claims. Under the "absolute priority rule," no junior creditor may receive any distribution until all senior creditors are paid in full, and no equity holder may receive any distribution until all creditors are paid in full. The assumed distributions to creditors as reflected in the Liquidation Analysis are estimated in accordance with the absolute priority rule.

The Liquidation Analysis does not include estimates for the tax consequences, both federal and state, that may be triggered upon the liquidation and sale of assets in the manner described above. Such tax consequences could also be material and reduce recoveries in a chapter 7 liquidation.

---

[1]    Capitalized terms used but not otherwise defined herein shall have the same meanings ascribed to them in the *Debtors' Second Amended Combined Disclosure Statement and Joint Chapter 11 Plan of Reorganization*.

### III. Liquidation Process

This Liquidation Analysis assumes that a liquidation would be conducted pursuant to chapter 7 of the Bankruptcy Code by a chapter 7 trustee (the "Trustee"). The Debtors have assumed that their liquidation would occur over approximately six months during which the Trustee would monetize substantially all the assets on the Debtors' balance sheet and administer and wind-down the estates[2]. To the extent that causes of action are pursued, that process would likely take additional time; however, for the reasons described in this Liquidation Analysis, the Debtors have not assumed any such recoveries herein.

As part of the Trustee's liquidation process, the initial step would be to develop a liquidation plan designed to generate proceeds from asset monetization that it would then distribute to creditors. This liquidation process would have four major components:

- cash proceeds from accounts receivable collections and asset sales;

- costs to liquidate the business and administer the estates under chapter 7 ("Chapter 7 Liquidation Costs");

- costs associated with accrued post-petition accounts payable and other chapter 11 Administrative Expense Claims; and

- remaining proceeds available for distribution to claimants.

The Liquidation Analysis assumes that the Debtors' will cease facility operations and transition the current portfolio of facilities to new operators, as designated by the respective landlords upon conversion to chapter 7, effectively triggering lease defaults and rejection damages. As a result, the Debtors will not generate further revenues as a going-concern and outsource services to a third-party to assist with the collection of the Debtors' primary assets, accounts receivable.

Given that the ABL Lenders have valid liens on accounts receivable, the ABL Lenders may obtain relief from the automatic stay to exercise remedies against such assets under non-bankruptcy law. In such event, the ultimate conclusion of this Liquidation Analysis would remain the same.

### a. Gross Liquidation Proceeds of Encumbered Assets

The Gross Liquidation Proceeds reflect the proceeds the Trustee would generate from a hypothetical chapter 7 liquidation. The Liquidation Analysis assumes the Trustee will retain lawyers and/or financial advisors to assist in the liquidation. The Liquidation Analysis further assumes the Trustee will successfully monetize the AR with the help of a third-party within six months from the Liquidation Date. Asset values in the liquidation process could be affected by, among other things: (a) the accelerated time frame in which the assets are monetized; (b) payor setoff provisions; and (c) claim-level record keeping available to successfully liquidate accounts receivable balances. The asset categories that the Trustee would be required to sell or otherwise monetize include the following:

- Cash;

- Gross Accounts Receivable;

- Other Assets; and

---

[2] Although this Liquidation Analysis assumes the liquidation process would occur over a six-month period, it is possible the disposition and recovery from certain assets could vary.

- Causes of Action.

**b. Chapter 7 Liquidation Costs**

The Chapter 7 Liquidation Costs reflect the costs the Trustee would incur to monetize the assets and wind-down the estates in chapter 7 and include the following:

- Expenses necessary to efficiently and effectively monetize the assets (the "Liquidation Wind-Down Expenses");

- Accounts Receivable collection costs (20.0%);

- Outstanding payroll obligations;

- Chapter 7 Trustee fees; and

- Trustee professional fees.

**c. Carve-Out Claims**

Pursuant to paragraph 21(a) of the Final DIP Order, the Company's secured lenders have agreed to a carve-out of certain amounts from their collateral (the "Carve-Out Claims"). Amounts included in the Carve-Out Claims include the following:

- Allowed administrative expenses pursuant to 28 U.S.C. §1930(a)(6) for statutory fees payable to the U.S. Trustee, together with the statutory rate of interest, and 28 U.S.C. §156(c) for fees required to be paid to the Clerk of this Court, which shall not be subject to any budget (collectively, the "Statutory Fees") (allocated between OpCo and DivestCo Debtors based on Debtors entities within the individual consolidated groups and their estimated disbursements);

- Fees and expenses incurred by a chapter 7 trustee under section 726(b) of the Bankruptcy Code in an amount not to exceed $50,000;

- To the extent allowed at the time, whether by interim order, procedural order, or otherwise, all accrued and unpaid fees (other than any "success," "restructuring," "transaction," or similar fees), any disbursements, costs, and expenses ("Allowed Professional Fees") incurred by persons or firms retained by the Debtors at any time on or before the first (1st) Business Day following the delivery of the Carve-Out Trigger Notice by the DIP Lenders (as defined in the DIP Order) whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; and

- Allowed Professional Fee of Professional Persons in an aggregate amount not to exceed $500,000 incurred after the first (1st) Business Day following the delivery of a Carve Out Trigger Notice (allocated between OpCo and DivestCo Debtors based on value of Gross Liquidation Proceeds).

**d. Net Liquidation Proceeds Available for Distribution**

Net Liquidation Proceeds Available for Distribution reflect the amounts available to Holders of Claims from Gross Liquidation Proceeds, as reduced by the Chapter 7 Liquidation Costs and Carve-Out Administrative Claims.

Under this analysis, the Net Liquidation Proceeds Available for Distribution are distributed to the Holders of Claims against, and Interests in, the Debtors in accordance with the Bankruptcy Code.

3

The Liquidation Analysis does not include any recoveries or related litigation costs resulting from any potential preferences, fraudulent transfer, or other litigation or causes of action that may be available under the Bankruptcy Code because of the uncertainty on the cost of such litigation, the uncertainty of the outcome, and the potential disputes regarding these matters. Moreover, given the substantial additional claims triggered in a chapter 7 liquidation, and the need to pay Administrative Expense Claims and Priority Claims before General Unsecured Claims, recoveries from potential causes of actions would need to be significant in order to exceed recoveries under the Plan.

### e.    Chapter 11 Administrative Claims and Priority Claims

The Administrative Expense Claims and Priority Claims reflect the unpaid administrative costs and priority costs as of the Liquidation Date.

The Liquidation Analysis assumes that gross liquidation proceeds of unencumbered assets would be used to fund Administrative Expense Claims and Priority Claims prior to the payment of any General Unsecured Claims or any deficiency or intercompany claims that are *pari passu* with General Unsecured Claims.

### IV.   Conclusion

The Debtors have determined that the Plan will provide Holders of Allowed Claims and Interests with a recovery that is not less than what they would otherwise receive pursuant to a liquidation of the Debtors' assets under chapter 7 of the Bankruptcy Code. Accordingly, the Plan satisfies the requirement of 1129(a)(7) of the Bankruptcy Code.

### V.    Specific Notes to the Liquidation Analysis

*Gross Liquidation Proceeds*

### a.    Cash

The Debtors' cash balance is based on a projection as of the Liquidation Date. The Liquidation Analysis assumes no additional cash for distribution will be generated from operations during the chapter 7 cases. The Liquidation Analysis estimates that Cash is recoverable at 100.0% in both the low and high recovery estimates. All cash balances are held within the OpCo Debtors and therefore, presented under the OpCo Debtors for the purposes of the Liquidation Analysis.

### b.    Gross Accounts Receivable

The Debtors assume that challenges are likely to arise with respect to the collectability of outstanding accounts receivable in a chapter 7 liquidation scenario. Recovery estimates are based on account aging by payor types. The Liquidation Analysis estimates that Gross Accounts Receivable for the consolidated Debtors is recoverable at 33.9% and 36.2% in the low and high recovery scenarios, respectively, prior to assumed third-party collection costs of 20.0% of proceeds and potential third-party overpayment setoffs. Recoveries for the OpCo Debtors are estimated to be between 77.4% and 79.6% and for DivestCo Debtors are estimated to be between 2.3% and 4.6% in the low and high recovery scenarios, respectively. Under the Plan of Reorganization, the Divested Accounts Receivables are part of the DivestCo GUC Allocation provided to the GUC Trust for the benefit of the Holders of DivestCo General Unsecured Claims.

### c.    Facility Portfolio Sale Proceeds

The Debtors assume that the Debtors' current portfolios of 43 leased facilities with Omega, Welltower, Elderberry, and Harts Harbor will be transitioned back to the landlords on the Liquidation Date. The Debtors further assume that no proceeds would be available from the sale of the assets and the conversion to chapter 7 will result in lease defaults

and rejection damages claims. All of the lease rejection damage claims are assumed to be allocated to the OpCo Debtors for the purposes of the Liquidation Analysis.

**d.    Other Assets**

The Debtor assume that prepaids / escrows will be applied against outstanding balances. No other material assets exists for the estate to monetize.

**e.    Causes of Action**

The Debtors believe that the chapter 7 trustee would likely pursue causes of actions in connection with certain prepetition transactions. For the purposes of the Liquidation Analysis, the Debtors have not estimated the amounts that may be recovered pursuant to the causes of action and any such recoveries may be reduced by legal fees, court filing costs, and other collection-related costs.

*Chapter 7 Liquidation Costs*

**f.    Liquidation Wind-Down Expenses**

The Liquidation Wind-Down Expenses include the expenses the Trustee will incur to efficiently and effectively monetize the assets over the liquidation period. The Liquidation Analysis assumes total wind-down costs of approximately $0.6 million to $1.0 million under the low and high recovery scenarios, respectively, for the combined OpCo and DivestCo Debtors. Liquidation Wind-Down Expenses allocated between the OpCo and DivestCo Debtors based on Gross Liquidation Proceeds.

**g.    Accounts Receivable Collection Costs**

The Liquidation Analysis assumes a third-party is retained to liquidate the Debtors' outstanding balance of accounts receivable for a 20.0% fee on gross AR collections. The Liquidation Analysis assumes the total AR Collections Costs to be approximately $7.7 million to $8.2 million under the low and high recovery scenarios, respectively, for the combined OpCo and DivestCo Debtors.

**h.    Outstanding Payroll Obligations**

The Liquidation Analysis assumes that there will be approximately three weeks of accrued and unpaid payroll and payroll related obligations as of the Liquidation Date. The Liquidation Analysis estimates outstanding payroll obligations of $5.7 million under both the low and high recovery scenarios. Outstanding payroll obligations are assumed to be related to the OpCo Debtors only.

**i.    Chapter 7 Trustee Fees**

Section 326(a) of the Bankruptcy Code provides that Trustee Fees may not exceed 3.0% of total recoveries, excluding cash and net recoveries of accounts receivable.

**j.    Liquidation Professionals Fees**

The post-conversion Trustee Professional Fees include estimates for certain professionals to assist and provide services during the wind-down period. The Liquidation Analysis assumes the Trustee will retain counsel and/or financial advisors to assist in the liquidation. These advisors will assist in litigating claims, resolving litigation matters, and resolving other matters relating to the wind-down of the Debtors' estates. The Liquidation Analysis estimates Trustee Professional Fees of approximately $1.0 million in the low recovery scenario and $1.5 million in the high

recovery scenario for the combined OpCo and DivestCo Debtors. Liquidation Professional Fees allocated between the OpCo and DivestCo Debtors based on Gross Liquidation Proceeds.

*Carve-Out Claims*

**k.  Total Carve-Out Claims**

Total Carve-Out Administrative Claims includes all amounts entitled to be funded from the Carve-Out pursuant to the Final DIP Order and as outlined above.

*Secured Claims*

**l.  ABL Claims**

The ABL Lenders have an estimated claim of $32.3 million and are assumed to receive recoveries of 93.1% to 96.5% under the Chapter 7 Liquidation low and high recovery scenarios, respectively, for the combined OpCo and DivestCo Debtors.

**m.  DIP Loan Claims**

The Final DIP Order grants the DIP Facility priority status over the Omega Term Loan Claims but subordinate to the ABL Claims. The Liquidation Analysis states that the DIP Loan balance as of the Liquidation Date is approximately $21.7 million, including unpaid principal, interest, and fees. The DIP Claims are projected to receive no recovery under the Chapter 7 Liquidation.

**n.  Omega Secured Term Loan Claims**

Omega Term Loan Claims are assumed to have an estimated claim of $27.0 million and are assumed to receive no recovery in a Chapter 7 Liquidation.

**o.  Other Secured Claims**

The Debtors estimate that there are no Other Secured Claims.

*Chapter 11 Administrative and Priority Claims*

**p.  Administrative Expense Claims**

Administrative Expense Claims are assumed to include postpetition unpaid employee health insurance claims, unpaid utilities, trade, and provider taxes for a total estimate of $7.0 million and are assumed to receive no recovery under the Chapter 7 Liquidation. All Administrative Claims are assumed to be within the OpCo Debtors.

**q.  503(b)(9) Claims**

503(b)(9) Claims are estimated in an amount of $1.4 million based on filed claims; subject to reconciliation and are assumed to receive no recovery under the Chapter 7 Liquidation. All Administrative Claims are assumed to be within the OpCo Debtors.

**r.  Priority Claims**

Priority Claims include prepetition accrued and unpaid vacation, severance, health insurance claims, and unclaimed wages. Priority claims are estimated to be approximately $0.3 million and are assumed to receive no recovery under the Chapter 7 Liquidation. All Priority Claims are assumed to be within the OpCo Debtors.

**s.   Priority Tax Claims**

The Liquidation Analysis assumes there are no prepetition Priority Tax Claims as of the Liquidation Date.

*Unsecured Claims*

**t.   General Unsecured Claims**

 General Unsecured Claims consist of trade payables, deferred rent obligations, unsecured vendor notes, unsecured term loans, non-priority government obligations, tort claim liabilities, workers' compensation liabilities, lease rejection damages, deficiency claims, intercompany claims, and other pre-petition liabilities not subject to first-day relief. The actual amount of General Unsecured Claims could vary materially from these estimates. No order has been entered by the Bankruptcy Court estimating or otherwise fixing the amount of General Unsecured Claims. The Liquidation Analysis assumes an aggregate of approximately $654.2 million in General Unsecured Claims for the combined OpCo and DivestCo Debtors at the Liquidation Date, including third-party settlement obligations that may be subject to offset against A/R collections. Deficiency claims are based on secured claim recoveries in the low recovery scenario and are assumed to be *pari passu* with all other General Unsecured Claims. The Liquidation Analysis further illustrates the Liquidation Proceeds will provide Class 7, 8, and 9 Creditors with no recovery in the Chapter 7 Liquidation.

*Disclaimer*

The Liquidation Analysis was prepared for the sole purpose of assisting the Bankruptcy Court and holders of Impaired Claims or Interests in making this determination, and should not be used for any other purpose. The determination of the hypothetical proceeds, and costs of the liquidation of the Debtors' assets, is an uncertain process involving the use of estimates and assumptions that, although considered reasonable by the Debtors, are inherently subject to significant business and economic uncertainties and contingencies beyond the control of the Debtors, their management, and their advisors. Inevitably, some assumptions in the Liquidation Analysis would not materialize in an actual chapter 7 liquidation, and unanticipated events and circumstances could affect the ultimate results. The Company prepared the Liquidation Analysis for the sole purpose of generating a reasonable good-faith estimate of the proceeds that would be generated if the Debtors were liquidated in accordance with chapter 7 of the Bankruptcy Code after conversion of the chapter 11 case. The Liquidation Analysis is not intended and should not be used for any other purpose. The underlying financial information in the Liquidation Analysis was not compiled or examined by any independent accountants. No independent appraisals were conducted in preparing the Liquidation Analysis.

**ACCORDINGLY, WHILE DEEMED REASONABLE BASED ON THE FACTS CURRENTLY AVAILABLE, NEITHER THE DEBTORS NOR THEIR PROFESSIONALS MAKE ANY REPRESENTATIONS OR WARRANTIES THAT THE ACTUAL RESULTS WOULD OR WOULD NOT APPROXIMATE THE ESTIMATES AND ASSUMPTIONS REPRESENTED IN THE LIQUIDATION ANALYSIS. ACTUAL RESULTS COULD VARY MATERIALLY.**

In preparing the Liquidation Analysis, the Debtors estimated Allowed Claims based upon a review of Claims listed on the Debtors' statements of assets and liabilities and the Debtors' books and records. In addition, the Liquidation Analysis includes estimates for Claims not currently asserted in the Chapter 11 Cases or currently contingent, but which could be asserted and Allowed in a chapter 7 liquidation. To date, the Bankruptcy Court has not estimated or otherwise fixed the total amount of Allowed Claims used for purposes of preparing the Liquidation Analysis. For purposes of the Liquidation Analysis, the Debtors' estimates of Allowed Claims contained in the Liquidation Analysis reference specific Claims estimates, even though the Debtors' estimates of ranges of projected recoveries under the

Plan to holders of Allowed Claims and Interests are based on ranges of Allowed Claims and Interests. Therefore, the Debtors' estimate of Allowed Claims set forth in the Liquidation Analysis should not be relied on for any other purpose, including determining the value of any distribution to be made on account of Allowed Claims and Interests under the Plan.

**NOTHING CONTAINED IN THE LIQUIDATION ANALYSIS IS INTENDED TO BE OR CONSTITUTES A CONCESSION OR ADMISSION OF THE DEBTORS. THE ACTUAL AMOUNT OF ALLOWED CLAIMS IN THE CHAPTER 11 CASES COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH IN THE LIQUIDATION ANALYSIS.**

In addition, the following are some, but not all, of the considered factors that could negatively impact the recoveries estimated: turnover of key personnel and delays in the liquidation process. These factors may limit the amount of the proceeds generated by the liquidation of the Debtors' assets. For example, it is possible that the liquidation would be delayed while the Trustee and his or her professionals become knowledgeable about the Chapter 11 Cases and the Debtors' businesses and operations. This delay could materially reduce the value, on a "present value" basis, of the liquidation proceeds, the effect of which has not been contemplated in this analysis.

The cessation of business in a liquidation is likely to trigger certain claims that otherwise would not exist under a Plan absent a liquidation. These types of administrative and priority claims have not been accounted for in the Liquidation Analysis. However, it is important to note certain of these will need to be paid in full before any balance of liquidation proceeds would be available to pay general unsecured creditors. Examples of Claims triggered in a liquidation include various potential employee claims (for such items as severance and potential WARN Act liabilities), tax liabilities, claims related to the rejection of unexpired leases and executory contracts that would otherwise be assumed, and other potential Allowed Claims. These additional claims could be significant; some may be administrative expenses, others may be entitled to priority in payment over General Unsecured Claims.

8

Carve-Out Illustration

| ($ in millions) | Combined Est. Value | Combined Est. Recovery (%) Low | High | Combined Est. Recovery ($) Low | High | OpCo Est. Value | OpCo Est. Recovery (%) Low | High | OpCo Est. Recovery ($) Low | High | DivestCo Est. Value | DivestCo Est. Recovery (%) Low | High | DivestCo Est. Recovery ($) Low | High |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Illustrative Sources for Recovery** | | | | | | | | | | | | | | | |
| **1. Assets** | | | | | | | | | | | | | | | |
| 2. Cash and Cash Equivalents | $8.3 | 100.0% | 100.0% | $8.3 | $8.3 | $8.3 | 100.0% | 100.0% | $8.3 | $8.3 | $- | -% | -% | $- | $- |
| 3. Gross Accounts Receivable | 113.3 | 33.9% | 36.2% | 38.4 | 41.0 | 47.7 | 77.4% | 79.6% | 36.9 | 38.0 | 65.6 | 2.3% | 4.6% | 1.5 | 3.0 |
| 4. Other Assets | - | -% | -% | - | - | - | -% | -% | - | - | - | -% | -% | - | - |
| 5. Implied Plan Sponsor Consideration | | | | | | | | | | | | | | | |
| 6. OpCo GUC Allocation (Class 6A) | | | | | | | | | | | | | | | |
| 7. Joint & Several OpCo GUC Allocation (Class 6C) | | | | | | | | | | | | | | | |
| 8. DivestCo GUC Allocation (Class 6B) | | | | - | - | | | | - | - | | | | - | - |
| **9. Gross Liquidation Proceeds** | | | | $46.7 | $49.3 | | | | $45.2 | $46.3 | | | | $1.5 | $3.0 |
| **Illustrative Claims Waterfall** | | | | | | | | | | | | | | | |
| **10. Ch. 7 Liquidation Costs** | | | | | | | | | | | | | | | |
| 11. Liquidation Wind-Down Expenses | | | | (0.6) | (1.0) | | | | (0.6) | (0.9) | | | | (0.0) | (0.1) |
| 12. AR Collection Costs (20%) | | | | (7.7) | (8.2) | | | | (7.4) | (7.6) | | | | (0.3) | (0.6) |
| 13. Outstanding Payroll Obligations | | | | (5.7) | (5.7) | | | | (5.7) | (5.7) | | | | - | - |
| 14. Chapter 7 Trustee Fees | | | | (0.9) | (1.0) | | | | (0.9) | (0.9) | | | | (0.0) | (0.1) |
| 15. Trustee Professional Fees | | | | (1.0) | (1.5) | | | | (1.0) | (1.4) | | | | (0.0) | (0.1) |
| **16. Total Chapter 7 Liquidation Costs** | | | | $(15.9) | $(17.4) | | | | $(15.5) | $(16.5) | | | | $(0.4) | $(0.8) |
| **17. Proceeds Available for Carve-Out Claims** | | | | $30.8 | $31.9 | | | | $29.7 | $29.7 | | | | $1.1 | $2.2 |
| **18. Carve-Out Claims** | | | | | | | | | | | | | | | |
| 19. Outstanding Professional Fees | | | | - | - | | | | - | - | | | | - | - |
| 20. Post-Carve Out Trigger Notice Cap | | | | (0.5) | (0.5) | | | | (0.5) | (0.5) | | | | (0.0) | (0.0) |
| 21. Outstanding UST Fees | | | | (0.3) | (0.3) | | | | (0.2) | (0.2) | | | | (0.1) | (0.1) |
| **22. Total Carve-Out Claims** | | | | $(0.8) | $(0.8) | | | | $(0.7) | $(0.7) | | | | $(0.1) | $(0.1) |
| **23. Net Liquidation Proceeds Available for Distribution** | | | | $30.1 | $31.2 | | | | $29.0 | $29.1 | | | | $1.0 | $2.1 |
| **24. Administrative Claims** | | | | | | | | | | | | | | | |
| 25. Outstanding Payroll Obligations | | | | - | - | | | | - | - | | | | - | - |
| 26. Postpetition Admin Claims | | | | - | - | | | | - | - | | | | - | - |
| 27. Outstanding Professional Fees Above Budget | | | | - | - | | | | - | - | | | | - | - |
| 28. Outstanding UST Fees | | | | - | - | | | | - | - | | | | - | - |
| 29. 503(b)(9) Claims | | | | - | - | | | | - | - | | | | - | - |
| **30. Total Chapter 11 Administrative** | | | | $- | $- | | | | $- | $- | | | | $- | $- |
| **31. Proceeds Available for Secured Claims** | | | | $30.1 | $31.2 | | | | $29.0 | $29.1 | | | | $1.0 | $2.1 |
| **32. Secured Claims** | | | | | | | | | | | | | | | |
| 33. DIP Claims | (21.7) | -% | -% | - | - | (21.7) | -% | -% | - | - | (21.7) | -% | -% | - | - |
| 34. Class 1 - Other Secured Claims | - | -% | -% | - | - | - | -% | -% | - | - | - | -% | -% | - | - |
| 35. Class 3 - ABL Claims | (32.3) | 93.1% | 96.5% | (30.1) | (31.2) | (32.3) | 89.9% | 90.0% | (29.0) | (29.1) | (32.3) | 3.2% | 6.5% | (1.0) | (2.1) |
| 36. Class 4 - Omega Term Loan Claims | (27.0) | -% | -% | - | - | (27.0) | -% | -% | - | - | (27.0) | -% | -% | - | - |
| **37. Total Secured Claims** | $(80.9) | 37.2% | 38.5% | $(30.1) | $(31.2) | $(80.9) | 35.9% | 35.9% | $(29.0) | $(29.1) | $(80.9) | 1.3% | 2.6% | $(1.0) | $(2.1) |
| **38. Proceeds Available for Admin & Priority Claims** | | | | $- | $- | | | | $- | $- | | | | $- | $- |
| **39. Ch. 11 Administrative & Priority Claims** | | | | | | | | | | | | | | | |
| 40. Administrative Claims | (7.0) | -% | -% | - | - | (7.0) | -% | -% | - | - | - | -% | -% | - | - |
| 41. 503(b)(9) Claims | (1.4) | -% | -% | - | - | (1.4) | -% | -% | - | - | - | -% | -% | - | - |
| 42. Class 2 - Other Priority Claims | (0.3) | -% | -% | - | - | (0.3) | -% | -% | - | - | - | -% | -% | - | - |
| **43. Total Ch. 11 Administrative & Priority Claims** | $(8.7) | -% | -% | $- | $- | $(8.7) | -% | -% | $- | $- | $- | -% | -% | $- | $- |
| **44. Amount Remaining for GUCs** | | | | $- | $- | | | | $- | $- | | | | $- | $- |
| **45. General Unsecured Claims - Plan Assumed** | | | | | | | | | | | | | | | |
| 46. Class 5 - Go-Forward Trade Claims | | | | | | | | | | | | | | | |
| 47. Class 6 - Government | | | | | | | | | | | | | | | |
| **48. Subtotal GUC (Plan Assumed)** | | | | | | | | | | | | | | | |
| **49. Amount Remaining for GUCs (GUC Contribution)** | | | | $- | $- | | | | $- | $- | | | | $- | $- |
| **50. General Unsecured Claims** | | | | | | | | | | | | | | | |
| 51. Class 6 - Government | (9.6) | -% | -% | - | - | (3.1) | -% | -% | - | - | (6.5) | -% | -% | - | - |
| 52. Class 6 A,B, & C - Joint & Several OpCo GUC | (84.2) | -% | -% | - | - | (84.2) | -% | -% | - | - | - | -% | -% | - | - |
| 53. Class 6A (OpCo) & 6B (DivestCo) - Trade Claims | (182.6) | -% | -% | - | - | (57.7) | -% | -% | - | - | (124.9) | -% | -% | - | - |
| 54. Class 6A (OpCo) & 6B (DivestCo) - Tort Claims | (155.3) | -% | -% | - | - | (9.4) | -% | -% | - | - | (145.9) | -% | -% | - | - |
| 55. Class 6A (OpCo) & 6B (DivestCo) - Workers Comp. Claims | (11.8) | -% | -% | - | - | (3.0) | -% | -% | - | - | (8.9) | -% | -% | - | - |
| 56. Class 6A (OpCo) & 6B (DivestCo) - Omega Claims | (40.2) | -% | -% | - | - | (40.2) | -% | -% | - | - | - | -% | -% | - | - |
| 57. Class 6 - Lease Rejection Damages | (111.1) | -% | -% | - | - | (111.1) | -% | -% | - | - | - | -% | -% | - | - |
| 58. Class 6 - Deficiency Claims | (59.5) | -% | -% | - | - | (57.5) | -% | -% | - | - | (2.1) | -% | -% | - | - |
| 59. Class 7 - Intercompany Claims | - | -% | -% | - | - | - | -% | -% | - | - | - | -% | -% | - | - |
| 60. Class 8 - Existing Equity Interests | - | -% | -% | - | - | - | -% | -% | - | - | - | -% | -% | - | - |
| 61. Class 9 - Intercompany Interests | - | -% | -% | - | - | - | -% | -% | - | - | - | -% | -% | - | - |
| **62. Subtotal General Unsecured Claims** | $(654.2) | -% | -% | $- | $- | $(366.0) | -% | -% | $- | $- | $(288.2) | -% | -% | $- | $- |
| **63. Total General Unsecured Claims** | $(654.2) | -% | -% | $- | $- | $(366.0) | -% | -% | $- | $- | $(288.2) | -% | -% | $- | $- |
| **64. Grand Total Claims** | $(743.8) | 4.0% | 4.2% | $(30.1) | $(31.2) | $(455.6) | 6.4% | 6.4% | $(29.0) | $(29.1) | $(369.1) | 0.3% | 0.6% | $(1.0) | $(2.1) |

Plan of Reorganization

| ($ in millions) | Combined Est. Value | Combined Est. Recovery (%) Low | High | Combined Est. Recovery ($) Low | High | OpCo Est. Value | OpCo Est. Recovery (%) Low | High | OpCo Est. Recovery ($) Low | High | DivestCo Est. Value | DivestCo Est. Recovery (%) Low | High | DivestCo Est. Recovery ($) Low | High |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Illustrative Sources for Recovery** | | | | | | | | | | | | | | | |
| **1.   Assets** | | | | | | | | | | | | | | | |
| 2.   Cash and Cash Equivalents | $8.3 | 100.0% | 100.0% | $8.3 | $8.3 | $8.3 | 100.0% | 100.0% | $8.3 | $8.3 | $- | -% | -% | $- | $- |
| 3.   Gross Accounts Receivable | 113.3 | 32.6% | 33.5% | 36.9 | 38.0 | 47.7 | 77.4% | 79.6% | 36.9 | 38.0 | 65.6 | -% | -% | N/A | N/A |
| 4.   Other Assets | - | -% | -% | - | - | - | -% | -% | - | - | - | -% | -% | - | - |
| 5.   Implied Plan Sponsor Consideration | | | | 59.8 | 58.8 | | -% | -% | 53.3 | 52.3 | | | | 6.5 | 6.5 |
| 6.   OpCo GUC Allocation (Class 6A) | | | | 6.1 | 6.1 | | | | 6.1 | 6.1 | | | | - | - |
| 7.   Joint & Several OpCo GUC Allocation (Class 6C) | | | | 3.1 | 3.1 | | | | 3.1 | 3.1 | | | | - | - |
| 8.   DivestCo GUC Allocation (Class 6B) | | | | 3.5 | 28.5 | | | | - | - | | | | 3.5 | 28.5 |
| **9.   Gross Liquidation Proceeds** | | | | **$117.8** | **$142.8** | | | | **$107.8** | **$107.8** | | | | **$10.0** | **$35.0** |
| **Illustrative Claims Waterfall** | | | | | | | | | | | | | | | |
| **10.  Ch. 7 Liquidation Costs** | | | | | | | | | | | | | | | |
| 11.  Liquidation Wind-Down Expenses | | | | - | - | | | | - | - | | | | - | - |
| 12.  AR Collection Costs (20%) | | | | - | - | | | | - | - | | | | - | - |
| 13.  Outstanding Payroll Obligations | | | | - | - | | | | - | - | | | | - | - |
| 14.  Chapter 7 Trustee Fees | | | | - | - | | | | - | - | | | | - | - |
| 15.  Trustee Professional Fees | | | | - | - | | | | - | - | | | | - | - |
| **16.  Total Chapter 7 Liquidation Costs** | | | | **$-** | **$-** | | | | **$-** | **$-** | | | | **$-** | **$-** |
| **17.  Proceeds Available for Carve-Out Claims** | | | | **$117.8** | **$142.8** | | | | **$107.8** | **$107.8** | | | | **$10.0** | **$35.0** |
| **18.  Carve-Out Claims** | | | | | | | | | | | | | | | |
| 19.  Outstanding Professional Fees | | | | - | - | | | | - | - | | | | - | - |
| 20.  Post-Carve Out Trigger Notice Cap | | | | - | - | | | | - | - | | | | - | - |
| 21.  Outstanding UST Fees | | | | - | - | | | | - | - | | | | - | - |
| **22.  Total Carve-Out Claims** | | | | **$-** | **$-** | | | | **$-** | **$-** | | | | **$-** | **$-** |
| **23.  Net Liquidation Proceeds Available for Distribution** | | | | **$117.8** | **$142.8** | | | | **$107.8** | **$107.8** | | | | **$10.0** | **$35.0** |
| **24.  Administrative Claims** | | | | | | | | | | | | | | | |
| 25.  Outstanding Payroll Obligations | | | | (5.7) | (5.7) | | | | (5.7) | (5.7) | | | | - | - |
| 26.  Postpetition Admin Claims | | | | (7.0) | (7.0) | | | | (7.0) | (7.0) | | | | - | - |
| 27.  Outstanding Professional Fees Above Budget | | | | - | - | | | | - | - | | | | - | - |
| 28.  Outstanding UST Fees | | | | (0.3) | (0.3) | | | | (0.2) | (0.2) | | | | (0.1) | (0.1) |
| 29.  503(b)(9) Claims | | | | (1.4) | (1.4) | | | | (1.4) | (1.4) | | | | - | - |
| **30.  Total Chapter 11 Administrative** | | | | **$(14.3)** | **$(14.3)** | | | | **$(14.2)** | **$(14.2)** | | | | **$(0.1)** | **$(0.1)** |
| **31.  Proceeds Available for Secured Claims** | | | | **$103.5** | **$128.5** | | | | **$93.6** | **$93.6** | | | | **$10.0** | **$35.0** |
| **32.  Secured Claims** | | | | | | | | | | | | | | | |
| 33.  DIP Claims | (21.7) | 100.0% | 100.0% | (21.7) | (21.7) | (21.7) | 100.0% | 100.0% | (21.7) | (21.7) | (21.7) | -% | -% | - | - |
| 34.  Class 1 - Other Secured Claims | - | -% | -% | - | - | - | -% | -% | - | - | - | -% | -% | - | - |
| 35.  Class 3 - ABL Claims | (32.3) | 100.0% | 100.0% | (32.3) | (32.3) | (32.3) | 100.0% | 100.0% | (32.3) | (32.3) | (32.3) | -% | -% | - | - |
| 36.  Class 4 - Omega Term Loan Claims | (27.0) | 100.0% | 100.0% | (27.0) | (27.0) | (27.0) | 100.0% | 100.0% | (27.0) | (27.0) | (27.0) | -% | -% | - | - |
| **37.  Total Secured Claims** | **(80.9)** | **100.0%** | **100.0%** | **$(80.9)** | **$(80.9)** | **(80.9)** | **100.0%** | **100.0%** | **$(80.9)** | **$(80.9)** | **(80.9)** | **-%** | **-%** | **$-** | **$-** |
| **38.  Proceeds Available for Admin & Priority Claims** | | | | **$22.6** | **$47.6** | | | | **$12.7** | **$12.7** | | | | **$10.0** | **$35.0** |
| **39.  Ch. 11 Administrative & Priority Claims** | | | | | | | | | | | | | | | |
| 40.  Administrative Claims | - | -% | -% | - | - | - | -% | -% | - | - | - | -% | -% | - | - |
| 41.  503(b)(9) Claims | - | -% | -% | - | - | - | -% | -% | - | - | - | -% | -% | - | - |
| 42.  Class 2 - Other Priority Claims | (0.3) | 100.0% | 100.0% | (0.3) | (0.3) | (0.3) | 100.0% | 100.0% | (0.3) | (0.3) | - | -% | -% | - | - |
| **43.  Total Ch. 11 Administrative & Priority Claims** | **$(0.3)** | **100.0%** | **100.0%** | **$(0.3)** | **$(0.3)** | **$(0.3)** | **100.0%** | **100.0%** | **$(0.3)** | **$(0.3)** | **$-** | **-%** | **-%** | **$-** | **$-** |
| **44.  Amount Remaining for GUCs** | | | | **$22.3** | **$47.3** | | | | **$12.4** | **$12.4** | | | | **$10.0** | **$35.0** |
| **45.  General Unsecured Claims - Plan Assumed** | | | | | | | | | | | | | | | |
| 46.  Class 5 - Go-Forward Trade Claims | (92.3) | -% | -% | - | - | (70.7) | -% | -% | - | - | (21.6) | -% | -% | - | - |
| 47.  Class 6 - Government | (9.6) | 100.0% | 100.0% | (9.6) | (9.6) | (3.1) | 100.0% | 100.0% | (3.1) | (3.1) | (6.5) | 100.0% | 100.0% | (6.5) | (6.5) |
| **48.  Subtotal GUC (Plan Assumed)** | **$(101.8)** | **9.4%** | **9.4%** | **$(9.6)** | **$(9.6)** | **$(73.8)** | **4.2%** | **4.2%** | **$(3.1)** | **$(3.1)** | **$(28.1)** | **23.0%** | **23.0%** | **$(6.5)** | **$(6.5)** |
| **49.  Amount Remaining for GUCs (GUC Contribution)** | | | | **$12.8** | **$37.8** | | | | **$9.3** | **$9.3** | | | | **$3.5** | **$28.5** |
| **50.  General Unsecured Claims** | | | | | | | | | | | | | | | |
| 51.  Class 6 - Government | - | -% | -% | - | - | - | -% | -% | - | - | - | -% | -% | - | - |
| 52.  Class 6A, B & C - Joint & Several OpCo GUC | (26.6) | 13.0% | 21.8% | (3.5) | (5.8) | (26.6) | 11.8% | 11.8% | (3.1) | (3.1) | (26.6) | 1.2% | 10.0% | (0.3) | (2.7) |
| 53.  Class 6A (OpCo) & 6B (DivestCo) - Trade Claims | (147.9) | 4.1% | 10.2% | (6.1) | (15.1) | (44.6) | 10.8% | 10.8% | (4.8) | (4.8) | (103.2) | 1.2% | 10.0% | (1.3) | (10.3) |
| 54.  Class 6A (OpCo) & 6B (DivestCo) - Tort Claims | (155.3) | 1.8% | 10.1% | (2.8) | (15.6) | (9.4) | 10.8% | 10.8% | (1.0) | (1.0) | (145.9) | 1.2% | 10.0% | (1.8) | (14.6) |
| 55.  Class 6A (OpCo) & 6B (DivestCo) - Workers Comp. Claims | (11.8) | 3.6% | 10.2% | (0.4) | (1.2) | (3.0) | 10.8% | 10.8% | (0.3) | (0.3) | (8.9) | 1.2% | 10.0% | (0.1) | (0.9) |
| 56.  Class 6A (OpCo) & 6B (DivestCo) - Omega Claims | (40.2) | -% | -% | - | - | (40.2) | -% | -% | - | - | - | -% | -% | - | - |
| 57.  Class 5 - Lease Rejection Damages | - | -% | -% | - | - | - | -% | -% | - | - | - | -% | -% | - | - |
| 58.  Class 6 - Deficiency Claims | - | -% | -% | - | - | - | -% | -% | - | - | - | -% | -% | - | - |
| 59.  Class 7 - Intercompany Claims | - | -% | -% | - | - | - | -% | -% | - | - | - | -% | -% | - | - |
| 60.  Class 8 - Existing Equity Interests | - | -% | -% | - | - | - | -% | -% | - | - | - | -% | -% | - | - |
| 61.  Class 9 - Intercompany Interests | - | -% | -% | - | - | - | -% | -% | - | - | - | -% | -% | - | - |
| **62.  Subtotal General Unsecured Claims** | **$(381.8)** | **3.3%** | **9.9%** | **$(12.8)** | **$(37.8)** | **$(123.7)** | **7.5%** | **7.5%** | **$(9.3)** | **$(9.3)** | **$(284.6)** | **1.2%** | **10.0%** | **$(3.5)** | **$(28.5)** |
| **63.  Total General Unsecured Claims** | **$(483.6)** | **4.6%** | **9.8%** | **$(22.3)** | **$(47.3)** | **$(197.5)** | **6.3%** | **6.3%** | **$(12.4)** | **$(12.4)** | **$(312.7)** | **3.2%** | **11.2%** | **$(10.0)** | **$(35.0)** |
| **64.  Grand Total Claims** | **$(564.8)** | **18.3%** | **22.8%** | **$(103.5)** | **$(128.5)** | **$(278.7)** | **33.6%** | **33.6%** | **$(93.6)** | **$(93.6)** | **$(393.6)** | **2.5%** | **8.9%** | **$(10.0)** | **$(35.0)** |

**Notes:**

1.  Implied Plan Sponsor Consideration includes Administrative Claims, DIP Claims, Class 1, 3, and 4 Secured Claims, Class 2 Priority Claims, and Class 5 Go-Forward Trade Claims, less cash and cash equivalents, collections from Gross AR, and outstanding Professional Fees Above DIP Budget.

2.  DivestCo GUC Allocation includes $1.5M Cash, all proceeds of the D&O claims, all proceeds from Divested Accounts Receivable, and all proceeds of the Backstop Note, including any attendant costs and/or penalties associated therewith, if applicable. Plan of Reorganization recovery analysis assumes D&O claims range from $0 to $25.0M (policy limit) and the Divested Accounts Receivable result in $2.0M in recoveries.

**<u>EXHIBIT B</u>**

**Financial Projections**

## Financial Projections

The Debtors believe that the Plan[1] meets the feasibility requirements set forth in section 1129(a)(11) of the Bankruptcy Code, as confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors or any successor under the Plan. In connection with the planning and development of a plan of reorganization and for the purposes of determining whether such plan would satisfy this feasibility standard, the Debtors analyzed their ability to satisfy their financial obligations while maintaining sufficient liquidity and capital resources.

The Debtors do not, as a matter of course, publish their business plans, budgets or strategies or disclose projections or forecasts of their anticipated financial positions, results of operations or cash flows. Accordingly, the Debtors do not anticipate that they will, and disclaim any obligation to, furnish updated business plans, budgets, strategies, projections or forecasts of their anticipated financial positions, results of operations or cash flows to creditors or equity interest holders prior to the Effective Date of the Plan or to include such information in documents required to be filed with the SEC or otherwise make such information publicly available.

In connection with the Disclosure Statement, the Debtors have prepared the financial projections (the "Financial Projections") for the years 2024 through 2027 (the "Projection Period"). The Financial Projections were prepared by the Debtors with the assistance of their advisors and Synergy and are based on a number of assumptions with respect to the potential future performance of the Reorganized Debtors' operations assuming the consummation of the Plan. The Financial Projections are presented on a consolidated basis, including estimates of operating results for the Reorganized Debtors' businesses. The Financial Projections will also assist each Holder of a Claim entitled to vote on the Plan in determining whether to vote to accept or reject the Plan. In general, as illustrated by the Projections, the reduction of debt on the Reorganized Debtors' balance sheet will substantially improve future cash flows. Based on the Financial Projections, the Reorganized Debtors should have sufficient cash flow to pay and service their post-restructuring debt obligations and to operate their businesses. The Debtors believe that the Confirmation Date and Effective Date of the Plan are not likely to be followed by the liquidation or further reorganization of the Reorganized Debtors. Accordingly, the Debtors believe that the Plan satisfies the feasibility requirements of section 1129(a)(11) of the Bankruptcy Code.

The Debtors, with assistance from their advisors and Synergy, have prepared the Financial Projections based on information available to them, including information derived from public sources that have not been independently verified. No independent auditors have examined, compiled, or performed any procedures with respect to the accompanying prospective financial information. No representations or warranties, express or implied, are provided in relation to the fairness, accuracy, correctness, completeness, or reliability of the information, opinions, or conclusions expressed herein.

---

[1] Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the *Debtors' Second Amended Combined Disclosure Statement and Joint Chapter 11 Plan of Reorganization*, to which these Financial Projections are attached as **Exhibit B**.

THESE FINANCIAL PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD COMPLIANCE WITH PUBLISHED GUIDELINES OF THE SEC OR GUIDELINES ESTABLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS FOR PREPARATION AND PRESENTATION OF PROSPECTIVE FINANCIAL INFORMATION. THE PROJECTED BALANCE SHEETS DO NOT REFLECT THE IMPACT OF A COMPREHENSIVE FRESH START ACCOUNTING ANALYSIS, WHICH COULD RESULT IN A MATERIAL CHANGE TO ANY OF THE PROJECTED VALUES.

ALTHOUGH THE DEBTORS, WITH THE ASSISTANCE OF THEIR ADVISORS AND SYNERGY, HAS PREPARED THE PROJECTIONS IN GOOD FAITH AND BELIEVES THE ASSUMPTIONS TO BE REASONABLE, IT IS IMPORTANT TO NOTE THAT THE DEBTORS OR THE REORGANIZED DEBTORS CAN PROVIDE NO ASSURANCE THAT SUCH ASSUMPTIONS WILL BE REALIZED. AS DESCRIBED IN DETAIL IN THE DISCLOSURE STATEMENT, A VARIETY OF RISK FACTORS COULD AFFECT THE REORGANIZED DEBTORS' FINANCIAL RESULTS AND MUST BE CONSIDERED. ACCORDINGLY, THE PROJECTIONS SHOULD BE REVIEWED IN CONJUNCTION WITH A REVIEW OF THE DISCLOSURE STATEMENT, THE RISK FACTORS SET FORTH THEREIN, AND THE ASSUMPTIONS DESCRIBED HEREIN, INCLUDING ALL RELEVANT QUALIFICATIONS AND FOOTNOTES.

The Financial Projections contain certain forward-looking statements, all of which are based on various estimates and assumptions. Such forward-looking statements are subject to inherent uncertainties and to a wide variety of significant business, economic, and competitive risks, including those summarized herein. When used in the Financial Projections, the words "anticipate," "believe," "estimate," "will," "may," "intend," and "expect" and similar expressions generally identify forward-looking statements. Although the Debtors believe that their plans, intentions, and expectations reflected in the forward-looking statements are reasonable, they cannot be sure that they will be achieved. These statements are only predictions and are not guarantees of future performance or results. Forward-looking statements are subject to risks and uncertainties that could cause actual results to differ materially from those contemplated by a forward-looking statement. All forward-looking statements attributable to the Debtors or Persons or Entities acting on their behalf are expressly qualified in their entirety by the cautionary statements set forth herein. Forward-looking statements speak only as of the date on which they are made. Except as required by law, the Debtors expressly disclaim any obligation to update any forward-looking statement, whether as a result of new information, future events, or otherwise.

**General Assumptions**

A. **Overview**

The Debtors provide a broad range of services in their Facilities, including short-term rehabilitation, comprehensive post-acute skilled care, long-term care, assisted living, and therapy services. The Debtors operate the Facilities in Pennsylvania, Virginia, North Carolina, Mississippi, and Florida. These Facilities provide much-needed services to the communities that they serve and also provide meaningful employment in such communities. Across the Facilities, the Debtors employ approximately 3,600 employees, including nurses, certified nursing assistants, other caregivers, maintenance workers, and corporate and administrative personnel.

### B.       Presentation

The Financial Projections are presented on a fully consolidated basis.

### C.       Accounting Policies

The Financial Projections have been prepared using accounting policies that are materially consistent with those applied in the Debtors' historical financial statements.  The Financial Projections do not reflect all of the adjustments necessary to implement fresh start accounting pursuant to Accounting Standards Certification ("ASC") 852-10, as issued by the Financial Accounting Standards Board, and are not prepared in accordance with International Financial Reporting Standards ("IFRS"). Additionally, the Financial Projections are not prepared in accordance ASC 842 Right of Use lease guidance.

### D.       Methodology

In preparation of the Financial Projections, the Debtors, with the assistance of their advisors and Synergy considered a number of factors including, historical operating performance, expected changes in reimbursement trends and projected changes in operating costs including current and expected contracts. The Financial Projections were developed on a bottoms-up basis and incorporate multiple sources of information, with respect to general business and economic conditions.

### E.       Capital Structure

The Reorganized Debtors' estimated post-emergence capital structure is based upon the anticipated Effective Date of November 30, 2024, or shortly thereafter. The Financial Projections assume the following key assumptions at emergence:

a. A first lien asset-based lending credit facility (the "Revolving Line of Credit") of approximately $32.3 million, that accrues interest at SOFR + 4.0% per annum.
b. The approximately $27.0 million Omega Term Loan Credit Facility, with interest payable-in-kind at 2.0% per annum.

**Summary of Significant Assumptions with Respect to the Projected Income Statement**

### 1.       Net Revenue

The Financial Projections include reference to Net Revenue, which is derived from Medicare, Medicaid, insurance and patient payment receipts related to services rendered by the Reorganized Debtors. The Financial Projections for Net Revenue are based on historical and anticipated revenues on a per-facility basis based on their respective occupancy levels, patient mix, and reimbursement rates. Net Revenue also includes non-recurring revenues from state-specific payor programs, rebates, and other non-patient ancillary revenues. The Financial Projections incorporate estimates for future increases and/or decreases with respect to reimbursement rates by state and payor.

### 2.       Operating Expenses

The Financial Projections assume that Operating Expenses will be consistent with historical costs, taking into account inflation and changes in occupancy, and include certain projections for incremental

Facility activity.  Operating Expenses include the following expense categories: (i) staff labor expenses for the wages and benefits accrued to staff employees; (ii) contract labor expenses for amounts accrued to staffing agencies; (iii) supplies expenses for costs of medical and other supplies used in the Debtors' operations; (iv) purchased services expenses, which include costs related to therapy services, housekeeping and laundry, and other patient care related services purchased from third-party providers; (v) maintenance and repair expenses; (vi) insurance expenses; (vii) state-specific provider taxes; (viii) management fees, and (ix) other expenses, which include utilities and other operating expenses incurred by the Debtors in the ordinary course of business.

The Financial Projections do not reflect the full implementation of the Centers for Medicare and Medicaid Services minimum staffing mandate (the "CMS Staffing Rule") announced on May 10, 2024. Implementation of the CMS Staffing Rule in the Financial Projections would result in significant reduction to projected Net Income based current staffing levels at the Debtors' active facilities.

### 3.  Contractual Cash Rent

The Financial Projections reflect contractual cash rent expense on account of the Debtors' leases in connection with Omega, Welltower, Elderberry, and Harts Harbor portfolios. For the sake of simplicity, the Financial Projections are not prepared in accordance ASC 842 Right of Use lease guidance. The Financial Projections include annual rent escalators as provided in the leases.

### 4.  Depreciation and Amortization

Depreciation and amortization reflect the anticipated expenses based on historical run-rates, projected annual capital expenditures, and book depreciation.

### 5.  Interest Expense and Fees

Post-emergence interest expense is projected based on the Reorganized Debtors' pro forma capital structure described above. The Financial Projections include fees associated with post-Effective Date financing, annual admin fees, and quarterly audit fees related to the Revolving Line of Credit.

### 6.  Income Taxes

The Financial Projections assume the Reorganized Debtors are taxed at the current 21.0% corporate tax rate.

**Summary of Significant Assumptions with Respect to the Projected Balance Sheet**

### 7.  Cash and Cash Equivalents

The Reorganized Debtors' Effective Date cash and cash equivalents balance is expected to be approximately $7.1 million.

### 8.  Net Accounts Receivable

Net Accounts Receivables represent amounts due from the Medicare and Medicaid programs, managed care health plans, commercial insurance, veteran's association, etc. The projected balance as of November 30, 2024, reflects the balance for the current 43 active facilities. The Financial Projections assume a flat days sales outstanding (DSO) assumption over the Projection Period of approximately 37 days, consistent with historical trends.

### 9.  Other Receivables

Other Receivables represent third-party payor settlements, primarily with Medicare and Medicaid. These receivables represent assets that materialize as a result of underpayments from third-party payors. There is a corresponding liability on the balance sheet for third-party settlement within other current liabilities.

### 10.  Other Assets

Other current and long-term assets include prepaid expenses and restricted cash. Restricted cash primarily includes (i) amounts held by insurance carriers for payment of losses under insurance programs, (ii) escrows and letters of credit held by the Debtors' workers' compensation insurance carriers, (iii) property tax escrows required by certain landlords, (iv) escrows held by the Company's medical insurance carrier to pay claims under its self-funded medical insurance plan, and (v) capital improvement escrows required by certain leases. The Financial Projections assume no material changes to these accounts during the Projection Period other than activity related to prepaid insurance through premium financings.

### 11.  Fixed Assets, Net

Fixed Assets, Net rolls forward the book value of the asset with projected capital expenditures and depreciation and does not include a re-valuation of the Debtors' fixed assets.

### 12.  Revolving Line of Credit

Revolving Line of Credit reflects the Reorganized Debtors' asset-based loan that is re-financed as of the Effective Date.

### 13.  Other Liabilities

Other current liabilities include accrued payroll, third-party payor settlements, customer deposits, entrance fees, and insurance payable reserves. Other long-term liabilities include insurance reserves payable and capital lease liabilities. Changes in Other Current liabilities are related to amortization of insurance premium financings.

### 14.  Reorganized Members' Equity

In preparation of the Financial Projections, the Debtors did not perform a fair market valuation of the Reorganized Debtors' assets, liabilities, or reorganized equity. However, for purposes of the Disclosure

Statement, the Debtors utilized the book value of the Reorganized Debtor's assets and liabilities and assumed negative $148.5 million of Reorganized Members' Equity value.

**Summary of Significant Assumptions with Respect to the Projected Cashflow**

### 15. Capital Expenditures ("CapEx")

The Financial Projections assume maintenance capital expenditures, growth capital expenditures, and FF&E expenditures required to achieve the projected revenues and expenses will need to be in excess of historical expenditures. The Financial Projections reflect additional CapEx spend in 2025 to catch-up on projected deferred with annual capex estimates normalizing in 2026 and 2027.

## Financial Projections

| ($ in millions) | Projection Nov-24 | 1 Month 2024 | Projection 2025 | Projection 2026 | Projection 2027 |
|---|---|---|---|---|---|
| **Income Statement** | | | | | |
| 1. **Net Revenue** | | **$ 33.7** | **$ 411.7** | **$ 408.4** | **$ 416.9** |
| 2. Operating Expenses | | (28.3) | (344.1) | (338.9) | (345.7) |
| 3. Contractual Cash Rent | | (4.4) | (54.0) | (54.8) | (56.1) |
| 4. **EBITDA** | | **$ 0.9** | **$ 13.6** | **$ 14.8** | **$ 15.1** |
| 5. Depreciation and Amortization | | (0.3) | (3.0) | (3.0) | (3.0) |
| 6. Interest Expense and Fees | | (0.8) | (4.0) | (3.9) | (3.1) |
| 7. **Net Income before Taxes** | | **$ (0.1)** | **$ 6.7** | **$ 7.8** | **$ 9.0** |
| 8. Income Taxes | | 0.0 | (1.4) | (1.6) | (1.9) |
| 9. **Net Income** | | **$ (0.0)** | **$ 5.3** | **$ 6.2** | **$ 7.1** |
| **Balance Sheet** | | | | | |
| 10. **Assets:** | | | | | |
| 11. Cash and Cash Equivalents | $ 7.1 | $ 11.7 | $ 11.9 | $ 12.5 | $ 12.5 |
| 12. Accounts Receivable, Net | 40.3 | 40.3 | 41.7 | 41.4 | 42.3 |
| 13. Other Receivables | 2.9 | 2.9 | 2.9 | 2.9 | 2.9 |
| 14. Other Current Assets | 24.4 | 31.7 | 31.4 | 31.5 | 31.6 |
| 15. **Total Current Assets** | **74.7** | **86.6** | **87.8** | **88.3** | **89.3** |
| 16. Fixed Assets, Net | 453.9 | 454.1 | 456.7 | 458.3 | 460.0 |
| 17. Other Assets | 10.7 | 10.7 | 10.7 | 10.7 | 10.7 |
| 18. **Total Assets** | **$ 539.3** | **$ 551.3** | **$ 555.2** | **$ 557.3** | **$ 560.0** |
| 19. **Liabilities and equity** | | | | | |
| 20. Accounts Payable & Accrued Expense | 5.5 | 13.0 | 13.1 | 12.9 | 13.1 |
| 21. Revolving Line of Credit | 32.3 | 32.5 | 33.4 | 28.8 | 23.4 |
| 22. Other Current Liabilities | 21.4 | 25.7 | 22.8 | 22.9 | 23.1 |
| 23. **Total Current Liabilities** | **59.2** | **71.2** | **69.3** | **64.6** | **59.6** |
| 24. Long-Term Debt | 27.0 | 27.0 | 27.6 | 28.1 | 28.7 |
| 25. Other Liabilities | 601.6 | 601.6 | 601.6 | 601.6 | 601.6 |
| 26. **Total Liabilities** | **$ 687.8** | **$ 699.9** | **$ 698.4** | **$ 694.4** | **$ 690.0** |
| 27. **Total Reorganized Members' Equity** | **$ (148.5)** | **$ (148.5)** | **$ (143.3)** | **$ (137.1)** | **$ (130.0)** |
| 28. **Total Liabilities and Equity** | **$ 539.3** | **$ 551.3** | **$ 555.2** | **$ 557.3** | **$ 560.0** |
| **Statement of Cash Flows** | | | | | |
| 29. **Net Income** | | **$ (0.0)** | **$ 5.3** | **$ 6.2** | **$ 7.1** |
| 30. Depreciation and Amortization | | 0.3 | 3.0 | 3.0 | 3.0 |
| 31. Change in Working Capital | | 4.0 | (6.4) | (7.8) | (8.6) |
| 32. **Cash Flows From Operating Activities** | | **4.2** | **1.8** | **1.4** | **1.6** |
| 33. Capex | | (0.4) | (5.6) | (4.7) | (4.7) |
| 34. **Cash Flows From Investing Activities** | | **(0.4)** | **(5.6)** | **(4.7)** | **(4.7)** |
| 35. Non-Cash Interest | | 0.8 | 4.0 | 3.9 | 3.1 |
| 36. **Cash Flows From Financing Activities** | | **0.8** | **4.0** | **3.9** | **3.1** |
| 37. **Total Net Cash Flow** | | **$ 4.6** | **$ 0.2** | **$ 0.6** | **$ 0.0** |
| 38. **Cash Roll forward** | | | | | |
| 39. **Beginning Balance** | | 7.1 | 11.7 | 11.9 | 12.5 |
| 40. Net Cash Flow | | 4.6 | 0.2 | 0.6 | 0.0 |
| 41. **Ending Balance** | | **$ 11.7** | **$ 11.9** | **$ 12.5** | **$ 12.5** |

7

## <u>EXHIBIT C</u>

**Debtors' Corporate Structure**



**LaVie Care Centers, LLC**
**Organizational Structure**

The membership interest for each parent entity is 100%.

# LaVie Care Centers, LLC
## Organizational Structure



Genoa Healthcare Group, LLC

Florida Health Care Properties, LLC

Genoa Healthcare Consulting, LLC

Coastal Management Investment, LLC

Sea Crest Management Investment, LLC

RAC Insurance Investors, LLC

Salus Management Investment, LLC

Alpha Health Care Properties, LLC

Epsilon Health Care Properties, LLC

Augusta Health Care Properties, LLC

Coastal Administrative Services, LLC

**Epsilon Health Care Properties, LLC**

- 9035 Bryan Dairy Road Operations LLC d/b/a Bardmoor Oaks Healthcare and Rehabilitation Center
- 1026 Albee Farm Road Operations LLC d/b/a Bay Breeze Health and Rehabilitation Center
- 6305 Cortez Road West Operations LLC d/b/a Bradenton Health Care
- 1465 Oakfield Drive Operations LLC d/b/a Brandon Health and Rehabilitation Center
- 2333 North Brentwood Circle Operations LLC d/b/a Health Center at Brentwood
- Brentwood Meadow Health Care Associates, LLC d/b/a Brentwood Retirement Community
- Capital Health Care Associates, LLC
- 15204 West Colonial Drive Operations LLC d/b/a Colonial Lakes Health Care
- 216 Santa Barbara Boulevard Operations LLC d/b/a Coral Trace Health Care
- 3825 Countryside Boulevard Operations LLC d/b/a Countryside Rehab and Healthcare Center
- Cypress Manor Health Care Associates, LLC

- Cypress Square Health Care Associates, LLC
- 1851 Elkcam Boulevard Operations LLC d/b/a Deltona Health Care
- 195 Mattie M. Kelly Boulevard Operations LLC d/b/a Destin Healthcare and Rehabilitation Center
- 626 North Tyndall Parkway Operations LLC d/b/a Emerald Shores Health and Rehabilitation
- 1111 Drury Lane Operations LLC d/b/a Englewood Healthcare and Rehabilitation Center
- 3735 Evans Avenue Operations LLC d/b/a Evans Health Care
- 518 West Fletcher Avenue Operations LLC d/b/a Fletcher Health and Rehabilitation Center
- 611 South 13th Street Operations LLC d/b/a Fort Pierce Health Care
- 3001 Palm Coast Parkway Operations LLC d/b/a Grand Oaks Health and Rehabilitation Center
- Green Cove Facility Operations LLC d/b/a Green Cove Springs Rehabilitation and Care Center

- 2916 Habana Way Operations LLC d/b/a Habana Health Care Center
- 1615 Miami Road Operations LLC d/b/a Harbor Beach Nursing and Rehabilitation Center
- 11565 Harts Road Operations LLC d/b/a Harts Harbor Health Care Center
- 3101 Ginger Drive Operations LLC d/b/a Heritage Healthcare Center
- 777 Ninth Street North Operations LLC d/b/a Heritage Healthcare and Rehabilitation Center
- 2826 Cleveland Avenue Operations LLC d/b/a Heritage Park Rehabilitation and Healthcare
- 1445 Howell Avenue Operations LLC d/b/a Heron Pointe Health and Rehabilitation Center
- 4200 Washington Street Operations LLC d/b/a Hillcrest Nursing and Rehabilitation Center
- 125 Alma Boulevard Operations LLC d/b/a Island Health and Rehabilitation Center
- 1120 West Donegan Avenue Operations LLC d/b/a Keystone Rehabilitation and Health Center
- Donegan Square Health Care Associates, LLC d/b/a Keystone Villas

- 710 North Sun Drive Operations LLC d/b/a Lake Mary Health and Rehabilitation Center
- 1061 Virginia Street Operations LLC d/b/a Lakeside Oaks Care Center
- 1507 South Tuttle Avenue Operations LLC d/b/a Magnolia Health and Rehabilitation Center
- 6700 NW 10th Place Operations LLC d/b/a North Florida Rehabilitation and Specialty Care
- 650 Reed Canal Road Operations LLC d/b/a Oaktree Healthcare
- Perry Facility Operations LLC d/b/a Perry Oaks Health Care
- 4641 Old Canoe Creek Road Operations LLC d/b/a Plantation Bay Rehabilitation Center
- 5065 Wallis Road Operations LLC d/b/a Renaissance Health and Rehabilitation
- 7950 Lake Underhill Road Operations LLC d/b/a University Hills Health and Rehabilitation
- 3920 Rosewood Way Operations LLC d/b/a Rosewood Health and Rehabilitation Center

- 9355 San Jose Boulevard Operations LLC d/b/a San Jose Health and Rehabilitation Center
- 1937 Jenks Avenue Operations LLC d/b/a Sea Breeze Health Care
- 2401 NE 2nd Street Operations LLC d/b/a SeaView Nursing and Rehabilitation Center
- 500 South Hospital Drive Operations LLC d/b/a Shoal Creek Rehabilitation Center
- 12170 Cortez Boulevard Operations LLC d/b/a Spring Hill Health and Rehabilitation Center
- Tarpon Health Care Associates, LLC
- 5405 Babcock Street Operations LLC d/b/a The Palms Rehabilitation and Healthcare Center
- Edinborough Square Health Care Associates, LLC d/b/a The Villas at Lakeside Oaks
- 10040 Hillview Road Operations LLC d/b/a University Hills Health and Rehabilitation
- 1550 Jess Parrish Court Operations LLC d/b/a Vista Manor
- 1010 Carpenters Way Operations LLC d/b/a Wedgewood Healthcare Center

**Augusta Health Care Properties, LLC**

- 741 South Beneva Road Operations LLC d/b/a Beneva Lakes Healthcare and Rehabilitation Center
- 702 South Kings Avenue Operations LLC d/b/a Central Park Healthcare and Rehabilitation Center
- 2939 South Haverhill Road Operations LLC d/b/a Coral Bay Healthcare and Rehabilitation
- 3110 Oakbridge Boulevard Operations LLC d/b/a Oakbridge Healthcare Center
- Catalina Gardens Health Care Associates, LLC d/b/a The Brookshire
- 9311 South Orange Blossom Trail Operations LLC d/b/a The Parks Healthcare and Rehabilitation Center
- Paloma Blanca Health Care Associates, LLC
- Southpoint Health Care Associates, LLC
- 6414 13th Road South Operations LLC d/b/a Wood Lake Nursing and Rehabilitation Center

**Catalina Health Care Associates, LLC**

- 1820 Shore Drive Operations LLC d/b/a The Health and Rehabilitation Centre at Dolphins View

---

Non Operational Entity

Operational Legal Entity

The membership interest for each parent entity is 100%.

Non-Debtor



LaVie Care Centers, LLC
Organizational Structure

**LaVie Care Centers, LLC**
**Organizational Structure**



- - - - Non Operational Entity

_____ Operational Legal Entity

The membership interest for each parent entity is 100%.

Non-Debtor



**LaVie Care Centers, LLC
Organizational Structure**

**LaVie Care Centers, LLC**
**Organizational Structure**



- - - - Non Operational Entity

_____ Operational Legal Entity

The membership interest for each parent entity is 100%.

Non-Debtor

**LaVie Care Centers, LLC**
**Organizational Structure**

LV CHC Holdings I, LLC

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Ambassador Ancillary Services, LLC | Consulate Facility Leasing, LLC | Jacksonville Facility Operations, LLC d/b/a Raydiant Health Care of Jacksonville | Luther Ridge Facility Operations, LLC d/b/a Luther Ridge at Seiders Hill | Retirement Village of North Strabane Facility Operations, LLC | Piketon Facility Operations, LLC | Pavilion at St. Luke Village Facility Operations, LLC d/b/a The Pavilion at St. Luke Village | Wellston Facility Operations, LLC |
| Ambassador Rehabilitative Services, LLC | Country Meadow Facility Operations, LLC | Kenton Facility Operations, LLC | LVFH Master Tenant, LLC | Orange Park Facility Operations, LLC d/b/a Raydiant Health Care of Orange Park | Port Charlotte Facility Operations, LLC | St. Petersburg Facility Operations, LLC d/b/a Independence Living Center at St. Petersburg | West Altamonte Facility Operations, LLC |
| Ashland Facility Operations, LLC d/b/a Ashland Nursing and Rehabilitation Ctr. | Crestline Facility Operations, LLC | Kings Daughters Facility Operations, LLC d/b/a Kings Daughters Community Health & Rehab | Melbourne Facility Operations, LLC | Parkside Facility Operations, LLC | QCPMT, LLC | Stratford Facility Operations, LLC | West Palm Beach Facility Operations, LLC |
| Augusta Facility Operations, LLC d/b/a Augusta Nursing and Rehab Center | FLLVMT, LLC | Kissimmee Facility Operations, LLC | Miami Facility Operations, LLC | Parkview Facility Operations, LLC | Reeders Facility Operations, LLC | Summit Facility Operations, LLC | Westerville Facility Operations, LLC |
| Bayonet Point Facility Operations, LLC | Assisted Living at Frostburg Village Facility Operations, LLC | Lake Parker Facility Operations, LLC | Mount Royal Facility Operations, LLC | Penn Village Facility Operations, LLC d/b/a The Manor at Penn Village | Ridgewood Facility Operations, LLC | Susquehanna Village Facility Operations, LLC | Whispering Hills Facility Operations, LLC |
| Brandon Facility Operations, LLC | Frostburg Facility Operations, LLC | Lakeland Facility Operations, LLC | New Port Richey Facility Operations, LLC | Pennknoll Village Facility Operations, LLC d/b/a Pennknoll Village | Safety Harbor Facility Operations, LLC d/b/a Independence Living Center of Safety Harbor | Swan Pointe Facility Operations, LLC | Williamsburg Facility Operations, LLC d/b/a Consulate Health Care of Williamsburg |
| Briley Facility Operations, LLC | Grayson Facility Operations, LLC d/b/a Grayson Rehabilitation and Health Care Center | Legends Facility Operations, LLC | Newport News Facility Operations, LLC d/b/a Newport News Nursing and Rehabilitation Center | Pensacola Facility Operations, LLC | Sarasota Facility Operations, LLC | Tallahassee Facility Operations, LLC d/b/a Independence Living Center of Tallahassee | Windsor Facility Operations, LLC d/b/a Consulate Health Care of Windsor |
| Canonsburg Property Investors, LLC | Greenfield Facility Operations, LLC | Locust Grove Facility Operations, LLC d/b/a Locust Grove Retirement Village | Norfolk Facility Operations, LLC d/b/a Consulate Health Care of Norfolk | Perry Village Facility Operations, LLC | Skyline Facility Operations, LLC d/b/a Skyline Nursing and Rehabilitation Ctr. | VAPAMT, LLC | Winter Haven Facility Operations, LLC |
| Carey Facility Operations, LLC | Harbor Pointe Facility Operations, LLC | Lucasville I Facility Operations, LLC | North Fort Myers Facility Operations, LLC d/b/a Raydiant Health Care of North Fort Myers | Pheasant Ridge Facility Operations, LLC d/b/a Pheasant Ridge Nursing and Rehab Ctr | Manor at St. Luke Village Facility Operations, LLC d/b/a The Manor at St. Luke Village | Vero Beach Facility Operations, LLC | Woodstock Facility Operations, LLC d/b/a Consulate Health Care of Woodstock |
| Cheswick Facility Operations, LLC | HFLLVMT, LLC | Lucasville II Facility Operations, LLC | North Strabane Facility Operations, LLC | | | | |

Non-Debtor

- - - - Non Operational Entity
———— Operational Legal Entity

The membership interest for each parent entity is 100%.

**LaVie Care Centers, LLC
Organizational Structure**



- - - Non Operational Entity

_____ Operational Legal Entity

The membership interest for each parent
entity is 100%.

Non-Debtor

**<u>EXHIBIT D</u>**

**List of DivestCo Debtors**

**LaVie Care Centers, LLC, et al.**
**List of DivestCo Debtors**

| # | Case ID | Debtor Name | DBA |
|---|---------|-------------|-----|
| 1. | 24-55721 | 10040 Hillview Road Operations, LLC | University Hills Health and Rehabilitation |
| 2. | 24-55558 | 1010 Carpenters Way Operations, LLC | Wedgewood Healthcare Center |
| 3. | 24-55562 | 1026 Albee Farm Road Operations, LLC | Bay Breeze Health and Rehabilitation Center |
| 4. | 24-55567 | 1061 Virginia Street Operations, LLC | Lakeside Oaks Care Center |
| 5. | 24-55571 | 1111 Drury Lane Operations, LLC | Englewood Healthcare and Rehabilitation Center |
| 6. | 24-55575 | 1120 West Donegan Avenue Operations, LLC | Keystone Rehabilitation and Health Center |
| 7. | 24-55730 | 12170 Cortez Boulevard Operations, LLC | Spring Hill Health and Rehabilitation Center |
| 8. | 24-55509 | 125 Alma Boulevard Operations, LLC | Island Health and Rehabilitation Center |
| 9. | 24-55577 | 1445 Howell Avenue Operations, LLC | Heron Pointe Health and Rehabilitation |
| 10. | 24-55579 | 1465 Oakfield Drive Operations, LLC | Brandon Health and Rehabilitation Center |
| 11. | 24-55583 | 1507 South Tuttle Avenue Operations, LLC | Magnolia Health and Rehabilitation Center |
| 12. | 24-55734 | 15204 West Colonial Drive Operations, LLC | Colonial Lakes Health Care |
| 13. | 24-55589 | 1550 Jess Parrish Court Operations, LLC | Vista Manor |
| 14. | 24-55596 | 1615 Miami Road Operations, LLC | Harbor Beach Nursing and Rehabilitation Center |
| 15. | 24-55598 | 1820 Shore Drive Operations, LLC | The Health and Rehabilitation Centre at Dolphins View |
| 16. | 24-55605 | 1851 Elkcam Boulevard Operations, LLC | Deltona Health Care |
| 17. | 24-55610 | 1937 Jenks Avenue Operations, LLC | Sea Breeze Health Care |
| 18. | 24-55512 | 195 Mattie M. Kelly Boulevard Operations, LLC | Destin Healthcare and Rehabilitation Center |
| 19. | 24-55514 | 216 Santa Barbara Boulevard Operations, LLC | Coral Trace Health Care |
| 20. | 24-55624 | 2333 North Brentwood Circle Operations, LLC | Health Center at Brentwood |
| 21. | 24-55629 | 2401 NE 2nd Street Operations, LLC | SeaView Nursing and Rehabilitation Center |
| 22. | 24-55634 | 2826 Cleveland Avenue Operations, LLC | Heritage Park Rehabilitation and Healthcare |
| 23. | 24-55641 | 2916 Habana Way Operations, LLC | Habana Health Care Center |
| 24. | 24-55645 | 2939 South Haverhill Road Operations, LLC | Coral Bay Healthcare and Rehabilitation |
| 25. | 24-55653 | 3001 Palm Coast Parkway Operations, LLC | Grand Oaks Health and Rehabilitation Center |
| 26. | 24-55656 | 3101 Ginger Drive Operations, LLC | Heritage Healthcare Center at Tallahassee |
| 27. | 24-55657 | 3110 Oakbridge Boulevard Operations, LLC | The SWAN Center at Oakbridge |
| 28. | 24-55660 | 3735 Evans Avenue Operations, LLC | Evans Health Care |
| 29. | 24-55664 | 3825 Countryside Boulevard Operations, LLC | Countryside Rehab and Healthcare Center |
| 30. | 24-55675 | 3920 Rosewood Way Operations, LLC | Rosewood Health and Rehabilitation Center |
| 31. | 24-55680 | 4200 Washington Street Operations, LLC | Hillcrest Health Care and Rehabilitation Center |
| 32. | 24-55684 | 4641 Old Canoe Creek Road Operations, LLC | Plantation Bay Rehabilitation Center |
| 33. | 24-55518 | 500 South Hospital Drive Operations, LLC | Shoal Creek Rehabilitation Center |
| 34. | 24-55686 | 5065 Wallis Road Operations, LLC | Renaissance Health and Rehabilitation |
| 35. | 24-55521 | 518 West Fletcher Avenue Operations, LLC | Fletcher Health and Rehabilitation Center |
| 36. | 24-55689 | 5405 Babcock Street Operations, LLC | The Palms Rehabilitation and Healthcare Center |
| 37. | 24-55524 | 611 South 13th Street Operations, LLC | Fort Pierce Health Care |
| 38. | 24-55529 | 626 North Tyndall Parkway Operations, LLC | Emerald Shores Health and Rehabilitation |
| 39. | 24-55693 | 6305 Cortez Road West Operations, LLC | Bradenton Health Care |
| 40. | 24-55696 | 6414 13th Road South Operations, LLC | Wood Lake Health and Rehabilitation Center |
| 41. | 24-55535 | 650 Reed Canal Road Operations, LLC | Oaktree Healthcare |
| 42. | 24-55700 | 6700 NW 10th Place Operations, LLC | North Florida Rehabilitation and Specialty Care |
| 43. | 24-55542 | 702 South Kings Avenue Operations, LLC | Central Park Healthcare and Rehabilitation Center |
| 44. | 24-55546 | 710 North Sun Drive Operations, LLC | Lake Mary Health and Rehabilitation Center |
| 45. | 24-55550 | 741 South Beneva Road Operations, LLC | Beneva Lakes Healthcare and Rehabilitation Center |
| 46. | 24-55554 | 777 Ninth Street North Operations, LLC | Heritage Healthcare and Rehabilitation Center |
| 47. | 24-55704 | 7950 Lake Underhill Road Operations, LLC | Rio Pinar Health Care |
| 48. | 24-55707 | 9035 Bryan Dairy Road Operations, LLC | Bardmoor Oaks Healthcare and Rehabilitation Center |
| 49. | 24-55711 | 9311 South Orange Blossom Trail Operations, LLC | The Parks Healthcare and Rehabilitation Center |
| 50. | 24-55717 | 9355 San Jose Boulevard Operations, LLC | San Jose Health and Rehabilitation Center |
| 51. | 24-55511 | Alpha Health Care Properties, LLC | Alpha Health Care Properties |
| 52. | 24-55513 | Ambassador Ancillary Services, LLC | Amabassador Anc Srvs LLC |
| 53. | 24-55517 | Ambassador Rehabilitative Services, LLC | Ambassador Rehab |
| 54. | 24-55526 | Ashton Court HealthCare, LLC | Ashton Court Care and Rehabilitation Centre |

**LaVie Care Centers, LLC, et al.**
**List of DivestCo Debtors**

| # | Case ID | Debtor Name | DBA |
|---|---------|-------------|-----|
| 55. | 24-55532 | Assisted Living at Frostburg Village Facility Operations, LLC | Assisted Living at Frostburg Village |
| 56. | 24-55540 | Augusta Health Care Properties, LLC | Augusta Health Care Properties |
| 57. | 24-55551 | Baya Nursing and Rehabilitation, LLC | Baya Pointe Nursing and Rehabilitation Center |
| 58. | 24-55555 | Bayonet Point Facility Operations, LLC | Bayonet Point Living Center |
| 59. | 24-55559 | Bossier HealthCare, LLC | Heritage Manor of Bossier |
| 60. | 24-55563 | Brandon Facility Operations, LLC | Raydiant Health Care of Brandon |
| 61. | 24-55568 | Brentwood Meadow Health Care Associates, LLC | Brentwood Retirement Community |
| 62. | 24-55572 | Briley Facility Operations, LLC | Briley Nursing and Rehabilitation Center |
| 63. | 24-55582 | Brownsboro Hills HealthCare, LLC | Brownsboro Hills Health Care and Rehabilitation Center |
| 64. | 24-55588 | Canonsburg Property Investors, LLC | Canonsburg Property Investors, LLC |
| 65. | 24-55593 | Capital Health Care Associates, LLC | Capital Healthcare Center |
| 66. | 24-55606 | Carey Facility Operations, LLC | Carey Nursing and Rehabilitation Center |
| 67. | 24-55616 | Catalina Gardens Health Care Associates, LLC | The Brookshire |
| 68. | 24-55620 | Catalina Health Care Associates, LLC | Catalina Health Care Center |
| 69. | 24-55630 | Centennial Acquisition Corporation | Centennial Acquistion Corporation |
| 70. | 24-55635 | Centennial Employee Management, LLC | Centennial Employee Management Corp |
| 71. | 24-55640 | Centennial Five Star Master Tenant, LLC | Centennial Five Star Master Tenant |
| 72. | 24-55504 | Centennial HealthCare Corporation | Centennial HealthCare Corporation |
| 73. | 24-55651 | Centennial HealthCare Investment Corporation | Centennial HealthCare Investment Corp |
| 74. | 24-55655 | Centennial HealthCare Management Corporation | Centennial Healthcare Management Corp |
| 75. | 24-55659 | Centennial HealthCare Properties Corporation | Centennial HealthCare Properties Corp |
| 76. | 24-55670 | Centennial HealthCare Properties, LLC | Centennial HealthCare Properties |
| 77. | 24-55673 | Centennial Management Investment, LLC | Centennial Management Investment |
| 78. | 24-55678 | Centennial Master Subtenant, LLC | Centennial Master Subtenant |
| 79. | 24-55682 | Centennial Master Tenant, LLC | Centennial Master Tenant |
| 80. | 24-55687 | Centennial Newco Holding Company, LLC | Centennial Newco Holding Company |
| 81. | 24-55690 | Centennial Professional Therapy Services Corporation | Centennial Professional Therapy Services |
| 82. | 24-55699 | Centennial SEHC Master Tenant, LLC | Centennial SEHC Master Tenant |
| 83. | 24-55703 | Centennial Service Corporation - Grant Park | Centennial Service Corporation - GP |
| 84. | 24-55708 | Charlwell HealthCare, LLC | Charlwell House |
| 85. | 24-55712 | Chenal HealthCare, LLC | Chenal Rehabilitation and Healthcare Center |
| 86. | 24-55718 | Cheswick Facility Operations, LLC | Consulate Health Care of Cheswick |
| 87. | 24-55723 | CHIC Holding Company, LLC | CHIC Holding Company |
| 88. | 24-55727 | CHMC Holding Company, LLC | CHMC Holding Company |
| 89. | 24-55733 | CHPC Holding Company, LLC | CHPC Holding Company |
| 90. | 24-55741 | Clearwater HealthCare, LLC | Clearwater Health and Rehabilitation |
| 91. | 24-55745 | Coastal Administrative Services, LLC | Coastal Administrative Services |
| 92. | 24-55747 | Coastal Management Investment, LLC | Coastal Management Investment |
| 93. | 24-55750 | Consulate EV Acquisition, LLC | Consulate EV Acquisition, LLC |
| 94. | 24-55752 | Consulate EV Master Tenant, LLC | Consulate EV Master Tenant, LLC |
| 95. | 24-55754 | Consulate EV Operations I, LLC | Consulate EV Operations I, LLC |
| 96. | 24-55508 | Consulate Facility Leasing, LLC | Consulate Facs. Lsg LLC |
| 97. | 24-55520 | Consulate MZHBS Leaseholdings, LLC | Consulate MZHBS Leasehold |
| 98. | 24-55523 | Consulate NHCG Leaseholdings, LLC | Consulate NHCG |
| 99. | 24-55527 | Country Meadow Facility Operations, LLC | Country Meadow Care Center |
| 100. | 24-55533 | Crestline Facility Operations, LLC | Crestline Nursing Center |
| 101. | 24-55538 | Cypress Manor Health Care Associates, LLC | Cypress Manor Health and Rehabilitation Center |
| 102. | 24-55543 | Cypress Square Health Care Associates, LLC | Cypress Square Villas |
| 103. | 24-55547 | D.C. Medical Investors Limited Partnership | D.C. Medical Investors Limited Partnership |
| 104. | 24-55561 | Donegan Square Health Care Associates, LLC | Keystone Villas Assisted Living Center |
| 105. | 24-55566 | Down East HealthCare, LLC | Down East Health and Rehabilitation Center |
| 106. | 24-55570 | Edinborough Square Health Care Associates, LLC | The Villas at Lakeside Oaks |
| 107. | 24-55590 | Envoy Management Company, LLC | Envoy Management Company, LLC |
| 108. | 24-55594 | Envoy of Alexandria, LLC | Envoy of Alexandria |
| 109. | 24-55601 | Envoy of Denton, LLC | Envoy of Denton |

**LaVie Care Centers, LLC, et al.**
**List of DivestCo Debtors**

| # | Case ID | Debtor Name | DBA |
|---|---------|-------------|-----|
| 110. | 24-55604 | Envoy of Forest Hills, LLC | Bonview Rehabilitation and Healthcare |
| 111. | 24-55611 | Envoy of Fork Union, LLC | Envoy at the Village |
| 112. | 24-55615 | Envoy of Goochland, LLC | Envoy at the Meadows |
| 113. | 24-55618 | Envoy of Lawrenceville, LLC | Envoy of Lawrenceville |
| 114. | 24-55622 | Envoy of Norfolk, LLC | Envoy of Thornton Hall |
| 115. | 24-55625 | Envoy of Pikesville, LLC | Envoy of Pikesville |
| 116. | 24-55628 | Envoy of Richmond, LLC | Envoy of Westover Hills |
| 117. | 24-55633 | Envoy of Somerset, LLC | Siemon's Lakeview Manor Nursing and Rehabilitation Center |
| 118. | 24-55638 | Envoy of Staunton, LLC | Envoy of Staunton |
| 119. | 24-55643 | Envoy of Williamsburg, LLC | Envoy of Williamsburg |
| 120. | 24-55649 | Envoy of Winchester, LLC | Envoy of Winchester |
| 121. | 24-55652 | Envoy of Woodbridge, LLC | Envoy of Woodbridge |
| 122. | 24-55668 | Epsilon Health Care Properties, LLC | Epsilon Parent |
| 123. | 24-55672 | Ferriday HealthCare, LLC | Heritage Manor Health and Rehabilitation Center |
| 124. | 24-55677 | FLLVMT, LLC | FLLVMT, LLC |
| 125. | 24-55714 | Floridian Facility Operations, LLC | The Floridean Nursing and Rehabilitation Center |
| 126. | 24-55732 | Franklinton HealthCare, LLC | Heritage Manor of Franklinton |
| 127. | 24-55739 | Frostburg Facility Operations, LLC | Frostburg Village |
| 128. | 24-55743 | Garden Court HealthCare, LLC | Garden Court Health and Rehabilitation Center |
| 129. | 24-55749 | Genoa Healthcare Consulting, LLC | Genoa Healthcare Consulting |
| 130. | 24-55756 | Genoa Healthcare Group, LLC | Genoa Healthcare Group |
| 131. | 24-55762 | Grant Park Nursing Home Limited Partnership | Grant Park Nursing Home Ltd Partnership |
| 132. | 24-55767 | Green Cove Facility Operations, LLC | Green Cove Springs Rehabilitation and Care Center |
| 133. | 24-55769 | Greenfield Facility Operations, LLC | Edgewood Manor of Greenfield |
| 134. | 24-55772 | Harbor Pointe Facility Operations, LLC | Village at Harbor Pointe, The |
| 135. | 24-55773 | HFLLVMT, LLC | HFLLVMT, LLC |
| 136. | 24-55778 | Hilltopper Holding Corp. | Hilltopper Holding Corp. |
| 137. | 24-55510 | Hollywell HealthCare, LLC | Hollywell HealthCare |
| 138. | 24-55525 | Hurstbourne HealthCare, LLC | Hurstbourne Care Centre at Stony Brook |
| 139. | 24-55531 | Jacksonville Facility Operations, LLC | Raydiant Health Care of Jacksonville |
| 140. | 24-55534 | Jennings HealthCare, LLC | Jennings Healthcare Center |
| 141. | 24-55539 | Josera, LLC | Independence Living Centers |
| 142. | 24-55549 | KD HealthCare, LLC | Kathleen Daniel |
| 143. | 24-55552 | Kenton Facility Operations, LLC | Kenton Nursing & Rehabilitation Center |
| 144. | 24-55556 | Kenwood View HealthCare, LLC | Kenwood View Health and Rehabilitation Center |
| 145. | 24-55560 | Kimwell HealthCare, LLC | Kimwell |
| 146. | 24-55569 | Kissimmee Facility Operations, LLC | Living Center of Kissimmee |
| 147. | 24-55574 | Lake Parker Facility Operations, LLC | Consulate Health Care at Lake Parker |
| 148. | 24-55576 | Lakeland Facility Operations, LLC | Consulate Health Care of Lakeland |
| 149. | 24-55581 | Legends Facility Operations, LLC | Legends Care Center |
| 150. | 24-55591 | Libby HealthCare, LLC | Libby Care Center |
| 151. | 24-55595 | Lidenskab, LLC | Raydiant Health Care |
| 152. | 24-55599 | Lincoln Center HealthCare, LLC | Lincoln Centers for Rehabilitation and Healthcare |
| 153. | 24-55607 | LTC Insurance Associates, LLC | LTC Insurance Associates |
| 154. | 24-55613 | Lucasville I Facility Operations, LLC | Edgewood Manor of Lucasville I |
| 155. | 24-55617 | Lucasville II Facility Operations, LLC | Edgewood Manor of Lucasville II |
| 156. | 24-55505 | LV Operations I, LLC | LV Operations I, LLC |
| 157. | 24-55506 | LV Operations II, LLC | LV Operations II, LLC |
| 158. | 24-55642 | LVE Holdco, LLC | LVE Holdco, LLC |
| 159. | 24-55648 | LVE Master Tenant 1, LLC | LVE Master Tenant 1, LLC |
| 160. | 24-55666 | LVE Master Tenant 2, LLC | LVE Master Tenant 2, LLC |
| 161. | 24-55669 | LVE Master Tenant 3, LLC | LVE Master Tenant 3, LLC |
| 162. | 24-55671 | LVE Master Tenant 4, LLC | LVE Master Tenant 4, LLC |
| 163. | 24-55674 | LVFH Master Tenant, LLC | LVFH Master Tenant, LLC |
| 164. | 24-55679 | LVLUPH, LLC | LVLUPH, LLC |

**LaVie Care Centers, LLC, et al.**
**List of DivestCo Debtors**

| # | Case ID | Debtor Name | DBA |
|---|---------|-------------|-----|
| 165. | 24-55681 | MA Healthcare Holding Company, LLC | MA HealthCare Holding Company |
| 166. | 24-55691 | Melbourne Facility Operations, LLC | NSPIRE Healthcare Melbourne |
| 167. | 24-55695 | Miami Facility Operations, LLC | Franco Nursing & Rehabilitation Center |
| 168. | 24-55698 | Milton HealthCare, LLC | Milton Health Care |
| 169. | 24-55702 | Montclair HealthCare, LLC | Montclair Nursing and Rehabilitation Center |
| 170. | 24-55706 | Mount Royal Facility Operations, LLC | Mount Royal Villa |
| 171. | 24-55709 | NENC HealthCare Holding Company, LLC | NENC HealthCare Holding Company |
| 172. | 24-55713 | New Harmonie HealthCare, LLC | New Harmonie Healthcare Center |
| 173. | 24-55719 | New Port Richey Facility Operations, LLC | Raydiant Health Care of New Port Richey |
| 174. | 24-55731 | North Carolina Master Tenant, LLC | North Carolina Master Tenant |
| 175. | 24-55736 | North Fort Myers Facility Operations, LLC | Raydiant Health Care of North Fort Myers |
| 176. | 24-55740 | North Strabane Facility Operations, LLC | Consulate Health Care of North Strabane |
| 177. | 24-55530 | Omro HealthCare, LLC | Omro Care Center |
| 178. | 24-55537 | Onetete, LLC | Onetete, LLC |
| 179. | 24-55545 | Orange Park Facility Operations, LLC | Orange Park Health and Rehabilitation |
| 180. | 24-55584 | Osprey Nursing and Rehabilitation, LLC | Osprey Point Nursing Center |
| 181. | 24-55592 | Paloma Blanca Health Care Associates, LLC | Paloma Blanca Health and Rehabilitation |
| 182. | 24-55597 | Parkside Facility Operations, LLC | Parkside Manor |
| 183. | 24-55603 | Parkview Facility Operations, LLC | Parkview Care Center |
| 184. | 24-55608 | Parkview HealthCare, LLC | Parkview Nursing and Rehabilitation Center |
| 185. | 24-55614 | Parkview Manor HealthCare, LLC | Parkview Manor Health and Rehabilitation Center |
| 186. | 24-55619 | Parkwell HealthCare, LLC | Parkwell |
| 187. | 24-55637 | Pensacola Facility Operations, LLC | Living Center of Pensacola |
| 188. | 24-55644 | Perry Facility Operations, LLC | Perry Oaks Health Care |
| 189. | 24-55650 | Perry Village Facility Operations, LLC | Manor at Perry Village, The |
| 190. | 24-55663 | Piketon Facility Operations, LLC | Piketon Nursing Center |
| 191. | 24-55667 | Pine River HealthCare, LLC | Pine River Healthcare Center |
| 192. | 24-55676 | Pinelake HealthCare, LLC | Pinelake Health and Rehabilitation Center |
| 193. | 24-55694 | Pinewood HealthCare, LLC | Coeur d'Alene Health Care and Rehabilitation Center |
| 194. | 24-55697 | Port Charlotte Facility Operations, LLC | Port Charlotte Living Center |
| 195. | 24-55701 | QCPMT, LLC | QCPMT, LLC |
| 196. | 24-55705 | RAC Insurance Investors, LLC | RAC Insurance Investors |
| 197. | 24-55710 | Reeders Facility Operations, LLC | Reeders Memorial Home |
| 198. | 24-55715 | Retirement Village of North Strabane Facility Operations, LLC | Consulate Retirement Village of North Strabane |
| 199. | 24-55720 | Ridgewood Facility Operations, LLC | Ridgewood Manor |
| 200. | 24-55729 | Rispetto, LLC | Rispetto, LLC |
| 201. | 24-55735 | Riverbend HealthCare, LLC | Riverbend Health Care Center |
| 202. | 24-55738 | Riverview of Ann Arbor HealthCare, LLC | Riverview of Ann Arbor HealthCare, LLC |
| 203. | 24-55742 | Royal Terrace HealthCare, LLC | Royal Terrace Nursing and Rehabilitation Center |
| 204. | 24-55748 | Safety Harbor Facility Operations, LLC | Living Center of Safety Harbor |
| 205. | 24-55751 | Salus Management Investment, LLC | Salus Management Investment |
| 206. | 24-55753 | Sarasota Facility Operations, LLC | NSPIRE Healthcare Sarasota |
| 207. | 24-55755 | Sea Crest Management Investment, LLC | Sea Crest Management Investment |
| 208. | 24-55757 | Sheridan Indiana HealthCare, LLC | Sheridan Rehabilitation and Healthcare Center |
| 209. | 24-55758 | Shoreline Healthcare Management, LLC | Shoreline Healthcare Management |
| 210. | 24-55760 | Southpoint Health Care Associates, LLC | Southpoint Nursing and Rehabilitation Center |
| 211. | 24-55763 | St. Petersburg Facility Operations, LLC | Living Center of St. Petersburg |
| 212. | 24-55768 | Stratford Facility Operations, LLC | Consulate Health Care of Chattanooga |
| 213. | 24-55770 | Summit Facility Operations, LLC | Summit Villa Care Center |
| 214. | 24-55774 | Susquehanna Village Facility Operations, LLC | Manor at Susquehanna Village |
| 215. | 24-55775 | Swan Pointe Facility Operations, LLC | Addison Heights Health and Rehabilitation Center |
| 216. | 24-55777 | Tallahassee Facility Operations, LLC | Tallahassee Living Center |
| 217. | 24-55779 | Tarpon Health Care Associates, LLC | Tarpon Health and Rehabilitation Center |
| 218. | 24-55780 | THS Partners I, Inc. | THS Partners I |
| 219. | 24-55528 | THS Partners II, Inc. | THS Partners II |

**LaVie Care Centers, LLC, et al.**
**List of DivestCo Debtors**

| # | Case ID | Debtor Name | DBA |
|---|---------|-------------|-----|
| 220. | 24-55548 | Tosturi, LLC | Tosturi, LLC |
| 221. | 24-55557 | Transitional Health Partners | Transitional Health Partners |
| 222. | 24-55565 | Transitional Health Services, Inc. | Transitional Health Services, Inc. |
| 223. | 24-55578 | VAPAMT, LLC | VAPAMT, LLC |
| 224. | 24-55587 | Vero Beach Facility Operations, LLC | Consulate Health Care of Vero Beach |
| 225. | 24-55609 | VNTG HD Master Tenant, LLC | VNTG HD Master Tenant, LLC |
| 226. | 24-55626 | Wayne HealthCare, LLC | Transitional Health Services of Wayne |
| 227. | 24-55646 | Wellston Facility Operations, LLC | Edgewood Manor of Wellston |
| 228. | 24-55654 | West Altamonte Facility Operations, LLC | Living Center at West Altamonte |
| 229. | 24-55658 | West Palm Beach Facility Operations, LLC | Consulate Health Care of West Palm Beach |
| 230. | 24-55662 | Westerville Facility Operations, LLC | Edgewood Manor of Westerville |
| 231. | 24-55692 | Whispering Hills Facility Operations, LLC | Whispering Hills Care Center |
| 232. | 24-55716 | Whitehall of Ann Arbor HealthCare, LLC | Whitehall Healthcare Center of Ann Arbor |
| 233. | 24-55765 | Whitehall of Novi HealthCare, LLC | Whitehall Healthcare Center of Novi |
| 234. | 24-55785 | Winter Haven Facility Operations, LLC | Consulate Health Care of Winter Haven |
| 235. | 24-55786 | Woodbine HealthCare, LLC | Woodbine Healthcare and Rehabilitation Centre |

## <u>EXHIBIT E</u>

**List of OpCo Facility Debtors**

**LaVie Care Centers, LLC, et al.**
**List of Facility OpCo Debtors**

| # | Case ID | Debtor Name | DBA |
|---|---------|-------------|-----|
| 1. | 24-55725 | 11565 Harts Road Operations, LLC | Harts Harbor Health Care Center |
| 2. | 24-55522 | Ashland Facility Operations, LLC | Ashland Nursing and Rehabilitation Center |
| 3. | 24-55536 | Augusta Facility Operations, LLC | Augusta Nursing & Rehab Center |
| 4. | 24-55600 | Cardinal North Carolina HealthCare, LLC | Cardinal Healthcare and Rehabilitation Center |
| 5. | 24-55612 | Cary HealthCare, LLC | Cary Health and Rehabilitation Center |
| 6. | 24-55737 | Clay County HealthCare, LLC | Clay County Care Center |
| 7. | 24-55580 | Emerald Ridge HealthCare, LLC | Emerald Ridge Rehabilitation and Care Center |
| 8. | 24-55726 | Forrest Oaks HealthCare, LLC | Forrest Oaks Healthcare Center |
| 9. | 24-55746 | Gateway HealthCare, LLC | Gateway Rehabilitation and Healthcare |
| 10. | 24-55761 | Glenburney HealthCare, LLC | Glenburney Health Care and Rehabilitation Center |
| 11. | 24-55764 | Grayson Facility Operations, LLC | Grayson Rehabilitation and Health Care Center |
| 12. | 24-55776 | Hilltop Mississippi HealthCare, LLC | Hilltop Manor Health and Rehabilitation Center |
| 13. | 24-55519 | Hunter Woods HealthCare, LLC | Hunter Woods Nursing and Rehabilitation Center |
| 14. | 24-55544 | Kannapolis HealthCare, LLC | Transitional Health Services of Kannapolis |
| 15. | 24-55564 | Kings Daughters Facility Operations, LLC | Kings Daughters Community Health & Rehab |
| 16. | 24-55602 | Locust Grove Facility Operations, LLC | Locust Grove Retirement Village |
| 17. | 24-55632 | Luther Ridge Facility Operations, LLC | Luther Ridge at Seiders Hill |
| 18. | 24-55685 | Manor at St. Luke Village Facility Operations, LLC | The Manor at St. Luke Village |
| 19. | 24-55688 | McComb HealthCare, LLC | Courtyard Rehabilitation and Healthcare |
| 20. | 24-55722 | Newport News Facility Operations, LLC | Newport News Nursing and Rehabilitation Center |
| 21. | 24-55728 | Norfolk Facility Operations, LLC | Consulate Health Care of Norfolk |
| 22. | 24-55744 | Oak Grove HealthCare, LLC | Oak Grove Healthcare Center |
| 23. | 24-55515 | Oaks at Sweeten Creek HealthCare, LLC | The Oaks at Sweeten Creek |
| 24. | 24-55623 | Pavilion at St. Luke Village Facility Operations, LLC | The Pavilion at St. Luke Village |
| 25. | 24-55627 | Penn Village Facility Operations, LLC | The Manor at Penn Village |
| 26. | 24-55631 | Pennknoll Village Facility Operations, LLC | Pennknoll Village |
| 27. | 24-55661 | Pheasant Ridge Facility Operations, LLC | Pheasant Ridge Nursing & Rehab Center |
| 28. | 24-55724 | Riley HealthCare, LLC | The Oaks Rehabilitation and Healthcare Center |
| 29. | 24-55759 | Skyline Facility Operations, LLC | Skyline Nursing & Rehabilitation Center |
| 30. | 24-55766 | Starkville Manor HealthCare, LLC | Starkville Manor Health Care and Rehabilitation Center |
| 31. | 24-55573 | Valley View HealthCare, LLC | Valley View Care and Rehabilitation Center |
| 32. | 24-55621 | Walnut Cove HealthCare, LLC | Walnut Cove Health and Rehabilitation Center |
| 33. | 24-55636 | Wellington HealthCare, LLC | Wellington Rehabilitation and Healthcare |
| 34. | 24-55665 | Westwood HealthCare, LLC | Westwood Health and Rehabilitation Center |
| 35. | 24-55771 | Williamsburg Facility Operations, LLC | Consulate Health Care of Williamsburg |
| 36. | 24-55781 | Willowbrook HealthCare, LLC | Willowbrook Rehabilitation and Care Center |
| 37. | 24-55782 | Wilora Lake HealthCare, LLC | Wilora Lake Healthcare Center |
| 38. | 24-55783 | Windsor Facility Operations, LLC | Consulate Health Care of Windsor |
| 39. | 24-55784 | Winona Manor HealthCare, LLC | Winona Manor Health Care and Rehabilitation Center |
| 40. | 24-55787 | Woodstock Facility Operations, LLC | Consulate Health Care of Woodstock |

## **EXHIBIT F**

**List of OpCo Non-Facility Debtors**

**LaVie Care Centers, LLC, et al.**
**List of Non-Facility OpCo Debtors**

| # | Case ID | Debtor Name | DBA |
|---|---------|-------------|-----|
| 1. | 24-55647 | Centennial HealthCare Holding Company, LLC | Centennial HealthCare Holding Company |
| 2. | 24-55516 | Consulate Management Company III, LLC | Consulate Health Care |
| 3. | 24-55585 | Envoy Health Care, LLC | Envoy Health Care |
| 4. | 24-55683 | Florida Health Care Properties, LLC | FHCP Parent |
| 5. | 24-55507 | LaVie Care Centers, LLC | LaVie Care Centers, LLC |
| 6. | 24-55586 | Level Up Staffing, LLC | LevelUp Staffing, LLC |
| 7. | 24-55639 | LV CHC Holdings I, LLC | LV CHC Holdings I, LLC |

## <u>EXHIBIT G</u>

**List of Facilities**

**LaVie Care Centers, LLC, et al.**
List of OpCo Debtors

| # | Case ID | Debtor Name | DBA | Address | City | State | Zip |
|---|---------|-------------|-----|---------|------|-------|-----|
| 1. | 24-55726 | Forrest Oakes HealthCare, LLC | Forrest Oakes Healthcare Center | 620 Heathwood Dr | Albemarle | NC | 28001-8604 |
| 2. | 24-55573 | Valley View HealthCare, LLC | Valley View Care and Rehabilitation Center | 551 Kent St | Andrews | NC | 28901-8088 |
| 3. | 24-55665 | Westwood HealthCare, LLC | Westwood Health and Rehabilitation Center | 625 Ashland St | Archdale | NC | 27263-2943 |
| 4. | 24-55725 | 11565 Harts Road Operations, LLC | Harts Harbor Health Care Center | 11565 Harts Rd | Jacksonville | FL | 32218-3777 |
| 5. | 24-55600 | Cardinal North Carolina HealthCare, LLC | Cardinal Healthcare and Rehabilitation Center | 931 N Aspen Street | Lincolnton | NC | 28092-2113 |
| 6. | 24-55612 | Cary HealthCare, LLC | Cary Health and Rehabilitation Center | 6590 Tryon Road | Cary | NC | 27518-7052 |
| 7. | 24-55737 | Clay County HealthCare, LLC | Clay County Care Center | 86 Valley Hideaway Drive | Hayesville | NC | 28904-9674 |
| 8. | 24-55580 | Emerald Ridge HealthCare, LLC | Emerald Ridge Rehabilitation and Care Center | 25 Reynolds Mountain Boulevard | Asheville | NC | 28804-1270 |
| 9. | 24-55746 | Gateway HealthCare, LLC | Gateway Rehabilitation and Healthcare | 2030 Harper Ave NW | Lenoir | NC | 28645-4953 |
| 10. | 24-55761 | Glenburney HealthCare, LLC | Glenburney Health Care and Rehabilitation Center | 555 John R. Junkin Dr | Natchez | MS | 39120-4709 |
| 11. | 24-55776 | Hilltop Mississippi HealthCare, LLC | Hilltop Manor Health and Rehabilitation Center | 101 Kirkland St | Union | MS | 39365-3205 |
| 12. | 24-55519 | Hunter Woods HealthCare, LLC | Hunter Woods Nursing and Rehabilitation Center | 620 Tom Hunter Rd | Charlotte | NC | 28213-5511 |
| 13. | 24-55544 | Kannapolis HealthCare, LLC | Transitional Health Services of Kannapolis | 1810 Concord Lake Rd | Kannapolis | NC | 28083-6434 |
| 14. | 24-55688 | McComb HealthCare, LLC | Courtyard Rehabilitation and Healthcare | 501 S Locust St | McComb | MS | 39648-4336 |
| 15. | 24-55744 | Oak Grove HealthCare, LLC | Oak Grove Healthcare Center | 518 Old US 221 Hwy | Rutherfordton | NC | 28139-8670 |
| 16. | 24-55515 | Oaks at Sweeten Creek HealthCare, LLC | The Oaks at Sweeten Creek | 3864 Sweeten Creek Rd | Arden | NC | 28704-3136 |
| 17. | 24-55724 | Riley HealthCare, LLC | The Oaks Rehabilitation and Healthcare Center | 3716 Highway 39 N | Meridian | MS | 39301-1013 |
| 18. | 24-55766 | Starkville Manor HealthCare, LLC | Starkville Manor Health Care and Rehabilitation Center | 1001 Hospital Rd | Starkville | MS | 39759-2125 |
| 19. | 24-55621 | Walnut Cove HealthCare, LLC | Walnut Cove Health and Rehabilitation Center | 511 Windmill St | Walnut Cove | NC | 27052-7706 |
| 20. | 24-55636 | Wellington HealthCare, LLC | Wellington Rehabilitation and Healthcare | 1000 Tandal Pl | Knightdale | NC | 27545-8842 |
| 21. | 24-55781 | Willowbrook HealthCare, LLC | Willowbrook Rehabilitation and Care Center | 333 E Lee Ave | Yadkinville | NC | 27055-8132 |
| 22. | 24-55782 | Wilora Lake HealthCare, LLC | Wilora Lake Healthcare Center | 6001 Wilora Lake Rd | Charlotte | NC | 28212-2833 |
| 23. | 24-55784 | Winona Manor HealthCare, LLC | Winona Manor Health Care and Rehabilitation Center | 627 Middleton Rd | Winona | MS | 38967-2021 |
| 24. | 24-55536 | Augusta Facility Operations, LLC | Augusta Nursing & Rehab Center | 83 Cross Road Ln | Fishersville | VA | 22939-2331 |
| 25. | 24-55728 | Norfolk Facility Operations, LLC | Consulate Health Care of Norfolk | 3900 Llewellyn Ave | Norfolk | VA | 23504-1203 |
| 26. | 24-55661 | Pheasant Ridge Facility Operations, LLC | Pheasant Ridge Nursing & Rehab Center | 4355 Pheasant Ridge Rd | Roanoke | VA | 24014-5272 |
| 27. | 24-55722 | Newport News Facility Operations, LLC | Newport News Nursing and Rehabilitation Center | 12997 Nettles Dr | Newport News | VA | 23602-6913 |
| 28. | 24-55564 | Kings Daughters Facility Operations, LLC | Kings Daughters Community Health & Rehab | 1410 N Augusta St | Staunton | VA | 24401-2401 |
| 29. | 24-55764 | Grayson Facility Operations, LLC | Grayson Rehabilitation and Health Care Center | 400 S. Independence Ave | Independence | VA | 24348-3972 |
| 30. | 24-55787 | Williamsburg Facility Operations, LLC | Consulate Health Care of Williamsburg | 1811 Jamestown Rd | Williamsburg | VA | 23185-2326 |
| 31. | 24-55783 | Windsor Facility Operations, LLC | Consulate Health Care of Windsor | 23352 Courthouse Hwy | Windsor | VA | 23487-5333 |
| 32. | 24-55787 | Woodstock Facility Operations, LLC | Consulate Health Care of Woodstock | 803 S Main St | Woodstock | VA | 22664-1125 |
| 33. | 24-55759 | Skyline Facility Operations, LLC | Skyline Nursing & Rehabilitation Center | 237 Franklin Pike SE | Floyd | VA | 24091-2893 |
| 34. | 24-55522 | Ashland Facility Operations, LLC | Ashland Nursing and Rehabilitation Center | 906 Thompson St | Ashland | VA | 23005-1128 |
| 35. | 24-55648 | Manor at St. Luke Village Facility Operations, LLC | The Manor at St. Luke Village | 1711 E Broad St | Hazleton | PA | 18201-5691 |
| 36. | 24-55632 | Luther Ridge Facility Operations, LLC | Luther Ridge at Seiders Hill | 160 Red Horse Rd | Pottsville | PA | 17901-4209 |
| 37. | 24-55631 | Pennknoll Village Facility Operations, LLC | Pennknoll Village | 208 Pennknoll Rd | Everett | PA | 15537-6940 |
| 38. | 24-55627 | Penn Village Facility Operations, LLC | The Manor at Penn Village | 51 Route 204 | Selinsgrove | PA | 17870-8066 |
| | | | Consulate Health Care of Penn Village-ILF | 51 Route 204 | Selinsgrove | PA | 17870-8066 |
| 39. | 24-55602 | Locust Grove Facility Operations, LLC | Locust Grove Retirement Village | 69 Cottage Rd | Mifflin | PA | 17058-7030 |
| | | | Consulate Health Care of Locust Grove-ILF | 69 Cottage Rd | Mifflin | PA | 17058-7030 |
| 40. | 24-55623 | Pavilion at St. Luke Village Facility Operations, LLC | The Pavilion at St. Luke Village | 1000 Stacie Dr | Hazleton | PA | 18201-5690 |