

**IT IS ORDERED as set forth below:**

**Date: December 5, 2024**

_____
**Paul Baisier**
**U.S. Bankruptcy Court Judge**

_____

### UNITED STATES BANKRUPTCY COURT
### NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| LAVIE CARE CENTERS, LLC, *et al.,*[1] | ) | Case No. 24-55507- PMB |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Related to Docket Nos. 481, 571, 593, 623, 630,** |
| | ) | **633, 655, 656, 657, 659, 662, 678, 679, 680, 730,** |
| | ) | **and 731** |

### MEMORANDUM DECISION ON OPT OUT
### THIRD-PARTY RELEASES INCLUDED IN DEBTORS'
### JOINT SECOND AMENDED PLAN OF REORGANIZATION

---

[1] The last four digits of LaVie Care Centers, LLC's federal tax identification number are 5592. There are 282 Debtors in these chapter 11 cases, which are being jointly administered for procedural purposes only. A complete list of the Debtors and the last four digits of their federal tax identification numbers are not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://www.veritaglobal.net/lavie. The location of LaVie Care Centers, LLC's corporate headquarters and the Debtors' service address is 1040 Crown Pointe Parkway, Suite 600, Atlanta, GA 30338.

This matter is before the Court on the request by the debtors and debtors-in-possession in the above-captioned Chapter 11 cases (the "Debtors") for confirmation of *Debtors' Second Amended Combined Disclosure Statement and Joint Chapter 11 Plan of Reorganization* filed on October 1, 2024 (Docket No. 481) and *Notice of Filing of Modifications [to] Debtors' Second Amended Combined Disclosure Statement and Joint Chapter 11 Plan of Reorganization* filed on November 13, 2024 (Docket No. 679)(as further amended to date, the "Plan" and the "Disclosure Statement"),[2] which came before the Court for confirmation of the Plan under 11 U.S.C. § 1129 and final approval of the Disclosure Statement under 11 U.S.C. § 1125 on November 14, 2024 at 9:30 a.m. (the "Confirmation Hearing").  The Plan includes among its provisions what is generally known in bankruptcy parlance as a "third party release."

The third party release included in Article X.D.2 of the Plan (the "Release") can be more particularly described as an "opt out third party release," meaning that in order not to be bound by the Release under the terms of the Plan, a creditor or interest-holder of the Debtors must not vote to accept the Plan, and in either voting to reject the Plan or in not voting at all they must check a box on a form provided to them pursuant to which they "opt out" of the Release.[3]  Under the Plan, creditors and interest-holders that vote for the Plan, that vote to reject the Plan but do not check an "opt out" box on the ballot, or that do not submit a ballot or an "opt out" form are all deemed to

---

[2] The Plan also includes supplements filed by the Debtors on October 21 and 28, November 5 and 13, and December 4, 2024 (Docket Nos. 571, 593, 630, 678,  679, 730, & 731, respectively).

[3] Under the Plan, only creditors in Classes 3, 4, 5, 6A, 6B and 6C are considered impaired and thus entitled to vote. Creditors in those classes received ballots that included an opt out box to be checked.  The Debtors also served "opt out" forms on parties that were not permitted to vote on the Plan, either because they were being paid in full under the Plan and thus were deemed to accept (Classes 1, 2, and 9) or they were not getting anything under the Plan and thus were deemed to reject (Classes 7 and 8).

have consented to the Release.  This Memorandum Decision[4] addresses only the propriety of the inclusion of the Release in the Plan on these terms.

Ten (10) objections to confirmation of the Plan were filed;[5] however, only three (3) of the objections included objections to the inclusion of the Release in the Plan.  Those were: (1) the *United States Trustee's Objection to Debtors' Second Amended Combined Disclosure Statement and Joint Chapter 11 Plan of Reorganization*, filed on November 4, 2024 (Docket No. 623)(the "U.S. Trustee Objection"); (2) *Recovery Corp.'s Omnibus Objection to the Operative Combined Plan*, filed on September 30, 2024 (Docket No. 470)(the "Recovery Corp. Objection"); and (3) the *United States of America's Objection to Second Amended Combined Disclosure Statement and Joint Chapter 11 Plan of Reorganization* (Docket No. 633)(the "HSS/VA Objection").  At the Confirmation Hearing, the Debtors announced that the parties associated with the Recovery Corp. Objection[6] had reached a settlement with certain non-debtors, and that because of the settlement the Recovery Corp. Objection (and all other papers filed in these cases by Healthcare Negligence Settlement Recovery Corp. ("Recovery Corp.") and/or those parties) would be withdrawn.  Counsel for the Recovery Corp. parties confirmed this on the record.  Because the HSS/VA

---

[4] Based on the argument and evidence presented, the Court makes the following findings of fact and conclusions of law pursuant to Federal Rules of Bankruptcy Procedure 9014(c) and 7052.

[5] Pursuant to the  *Order (I) Conditionally Approving Disclosure Statement, (II) Scheduling Combined Hearing For November 14, 2024 At 9:30 A.M. (Prevailing Eastern Time), (III) Establishing Procedures For Solicitation And Tabulation Of Votes On Plan, (IV) Approving Certain Forms And Notices, And (V) Granting Related Relief,* entered on October 1, 2024 (Docket No. 480), objections to confirmation were required to be filed no later than November 4, 2024.  Three (3) of the filed objections, including the HSS/VA Objection, were filed after the deadline.  The Debtors did not raise the untimeliness of any of these three (3) objections at the Confirmation Hearing.

[6] *See infra*, pp. 5-9, and notes 11, 14, & 16.

Objection included a statement that its filing agencies opted out of the Release, they lack standing to object to the Release.[7] That left only the U.S. Trustee Objection pending as to the Release.

At the conclusion of the Confirmation Hearing, the Court took all of the matters addressed at the Confirmation Hearing under advisement. On November 22, 2024, the Court announced its ruling during a virtual hearing (the "Oral Ruling"). That Oral Ruling, as it relates to the propriety of the Release, is reduced to writing here.[8]

The Case and the Plan

*Prepetition Activity*

Before addressing the issue before the Court, some background on these Chapter 11 cases is in order. The Debtors are in the business of operating skilled nursing facilities. *See* Plan, Article III. The Debtors at one time operated approximately one hundred forty (140) such facilities and were the largest operator of such facilities in the State of Florida. The Debtors historically faced industry headwinds that were exacerbated by the COVID pandemic and the post-COVID regulatory environment. In 2023 and the first five (5) months of 2024, they transferred more than half of their facilities to new operators, such that when they filed these bankruptcy cases, they operated only forty-three (43) facilities. The remaining facilities have more than three thousand seven hundred (3,700) residents, employ over three thousand six hundred (3,600) employees, and are located in Pennsylvania, Virginia, North Carolina, Mississippi, and Florida – with only one (1) facility remaining open in Florida.

---

[7] *See In re Stein Mart, Inc.*, 629 B.R. 516, 523 (Bankr. M.D. Fla. 2021)(citing *In re SunEdison, Inc.*, 576 B.R. 453, 458 (Bankr. S.D. N.Y. 2017). Also, no one advocated at the Confirmation Hearing in support of the HSS/VA Objection.

[8] In the Oral Ruling, the Court also announced its ruling on the other objections raised by the U.S. Trustee in the U.S. Trustee Objection, and its basis for final approval of the Disclosure Statement and the confirmation of the Plan. These matters, including final approval of the Disclosure Statement and confirmation of the Plan, are addressed by the substantially contemporaneous entry of a separate order.

During the period leading to the filing of these bankruptcy cases, the Debtors worked collaboratively with the Omega Secured Parties (Plan, Article III.A.4.i.d.1, pp. 36-ff), the Debtors' largest landlord and secured lender.[9]   The Omega Landlords (Plan, Article II.A.1.176) are landlords on thirty (30) of the Debtors' remaining licensed facilities.  The Omega Landlords hold a secured position (variously including senior and junior security interests and liens) on substantially all the Debtors' assets, coupled with the substantial payment arrearage on the Omega Master Lease,[10] such that any viable restructuring path required the consent and cooperation of the Omega Secured Parties.

On April 22, 2024, Recovery Corp., asserting that it owns approximately one hundred (100) personal injury and wrongful death settlements against certain of the Debtors, filed a lawsuit in the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida Civil Division, captioned *Healthcare Negligence Settlement Recovery Corp. v. 5405 Babcock Street Operations, LLC, et al.*, No. 2024-007342-CA-01 (the "Miami Action").  The Miami Action was filed against several of the Debtors (collectively, the "Debtor Defendants") and nine (9) non-debtor people and entities (the "Non-Debtor Defendants").   Recovery Corp. asserted various claims against the Debtor Defendants and the Non-Debtor Defendants, including claims for intentional

---

[9] *See also* Plan, Article II.A.1.170 – 1.203 (setting forth other defined terms relating to Omega entities and interests).

[10] In terms of the Debtors' secured debt obligations, "[a]s of the Petition Date, the Debtors were justly and lawfully indebted and liable to the ABL Agent and ABL Lenders [as defined in the Plan], without defense, counterclaim, or offset of any kind, in the aggregate amount of $34,381,211.58 on account of the ABL Loans outstanding under the ABL Documents, plus any and all unpaid interest."  Article III.A.4.i.a.  Further, as stated in the Plan, "[a]s of the Petition Date, the Debtors were justly and lawfully indebted and liable to the Omega Term Loan Agent and the Omega Term Loan Lenders [as defined in the Plan], without defense, counterclaim, or offset of any kind, in the aggregate amount of not less than $26,952,146.54 on account of Omega Term Loans outstanding under the Omega Term Loan Documents, plus any and all unpaid interest."  Article III.A.4.i.b.  In addition, "[a]s of the Petition Date, the Omega Master Lease Obligors were justly and lawfully indebted and liable to the Omega Landlords, without defense, counterclaim or offset of any kind, with respect to $31,954,950.71 in principal amount of unpaid Rent (as defined in the Omega Master Lease), plus accrued and unpaid interest thereon and fees, expenses…."  Article III.A.4.i.d.1.

and constructive fraudulent transfers, successor liability, veil piercing, unfair and deceptive trade practices, civil conspiracy, breach of fiduciary duty, and unjust enrichment.[11]

*Chapter 11 Cases*

These two hundred eighty-two (282) Chapter 11 bankruptcy cases were initially filed late in the evening of June 2, 2024 (the "Petition Date") and early in the morning of June 3, 2024. The Debtors promptly sought junior secured debtor-in-possession post-petition financing of roughly $9 million on an immediate basis and an ultimate amount of $20 million. *See* Docket Nos. 15, 49, & 189.[12] On the Petition Date, the Debtors also filed several other first-day motions (*see* Docket Nos. 3-15) pursuant to which they were ultimately authorized to pay certain prepetition creditors.

The Official Committee of Unsecured Creditors (the "Committee") was appointed by the United States Trustee as of June 13, 2024 (Docket No. 112) and reconstituted on August 30, 2024 (Docket No. 369). The initial members of Committee were Healthcare Services Group, Inc., Omnicare, Inc., Twin Med, LLC, ShiftMed, LLC, CBD Services USA, LLC, Amidon Nurse Staffing, Recovery Corp., The Estate of Nancy Walsh (which later resigned), and Theodore Horrobin. Recovery Corp. also subsequently left the Committee after the Court ruled on the issue of its standing described *infra*.

---

[11] On June 30, 2024, the Debtors filed an adversary complaint, No. 24-5127 (the "Adversary Proceeding"), against Recovery Corp seeking an injunction to prohibit Recovery Corp. from continuing to prosecute claims (a) against certain Non-Debtor Defendants that they contend share an identity of interest with the Debtors due to, among other things, the Debtors' indemnification obligations to them and/or (b) that the Debtors state belong to the Debtors' estates, including, among others, claims for fraudulent conveyances and corporate veil piercing. This injunction was granted and has been continued through these proceedings, as it was generally not opposed by Recovery Corp., which professed no intention to pursue the Miami Action during these cases and never sought stay relief to do so. *See* Adversary Proceeding Docket Nos. 1, 2, & 25.

[12] As defined in the Plan, the DIP Lenders are, collectively, TIX 33433 LLC and OHI DIP Lender, LLC. *See* Plan, Article II.A.1.85, *see also* Article II.A.1.77 – 1.88 (setting forth other defined terms relating to the DIP credit facility).

Initially, the Debtors pursued a dual track sale procedure and plan in which they sought and obtained approval of certain bid procedures to sell substantially all their assets. (*See* Docket Nos. 104 (the "Bidding Procedures Motion," filed on June 10, 2024) and 177 (the "Bidding Procedures Order," entered on June 27, 2024)).[13]    On July 23, 2024, the Debtors filed the *Debtors' Combined Disclosure Statement and Joint Chapter 11 Plan of Reorganization* (Docket No. 273)(the "First Plan"). On August 7, 2024, the Debtors filed the *Debtors' Motion For Entry Of Order (I) Approving Disclosure Statement, (II) Scheduling Confirmation Hearing, (III) Establishing Procedures For Solicitation And Tabulation Of Votes On Plan, (IV) Approving Certain Forms And Notices, And (V) Granting Related Relief* (Docket No. 316)(the "Solicitation Procedures Motion").

On August 6, 2024, Recovery Corp. filed a motion with this Court seeking to convert or dismiss the Chapter 11 cases of fifty (50) of the Debtors. *See* Docket No. 310 (the "Motion to Dismiss"). The targets of the Motion to Dismiss were non-operating Debtors who, before the Petition Date, operated or assisted with the operations of, skilled nursing facilities in Florida.[14]

On August 26, 2024, the Debtors, along with the Committee and the DIP Lenders, filed the *Joint Motion for Order Authorizing and Directing Mediation* (Docket No. 346). Upon this Court's approval, the matter was submitted to mediation by The Honorable Jeffery W. Cavender to facilitate settlement discussions between the Debtors, the Committee, the Plan Sponsor,[15] and Omega (the "Mediation"). The Mediation commenced on September 9, 2024.

---

[13] Although a broad marketing process was conducted by their agent, the Debtors did not receive any qualified bids by the stated deadline of September 5, 2024, and the proposed auction sale was canceled. *See* Plan, pp. 47-48.

[14] The Debtors filed the *Debtors' Preliminary Objection to Recovery Corp.'s Motion to Dismiss or Convert Florida DivestCo Reorganizations* (Docket No. 401) on September 5, 2024. By agreement of the parties, the hearing on this matter was to be heard contemporaneously with confirmation at the Confirmation Hearing. Like the other Recovery Corp. matters, the Motion to Dismiss was withdrawn on the record at the Confirmation Hearing.

[15] The Plan Sponsor is TIX 33433 LLC or its designee. Article II.A.1.212.

On September 15, 2024, the Debtors sent a letter to counsel for Recovery Corp., apprising counsel of certain issues with respect to Recovery Corp.'s standing in the Chapter 11 Cases and in the Miami Action.  Among other issues, the Debtors argued that the assignment of rights and claims purportedly made to Recovery Corp. by approximately one hundred (100) tort claimants (collectively, the "Florida Claimants") were not made in compliance with Florida law, specifically Florida's Structured Settlement Protection Act (Fla. Stat. §§ 626.99296 *et seq.*).  As a result of the concerns regarding Recovery Corp.'s alleged lack of standing, the Debtors requested that Recovery Corp. withdraw the following: (a) any proof of claim filed on behalf of Recovery Corp. in the Chapter 11 cases, (b) all motions, objections, and discovery filed or served in the Chapter 11 cases and/or the Adversary Proceeding by Recovery Corp., and (c) the complaint filed in the Miami Action.  Due to its lack of standing, the Debtors also requested that Recovery Corp. withdraw from its position on the Committee.  On September 19, 2024, Recovery Corp. sent a letter to counsel for the Debtors, refusing to make any of the requested withdrawals and stating that the issues raised by the Debtors are "of no consequence."  The Court ultimately addressed these standing matters.[16]

---

[16] On September 26, 2024, the Debtors filed the *Debtors' (A) Motion to Strike, (B) Cross-Motion to Compel, and (C) Opposition to Recovery Corp.'s Motion to Compel Discovery Responses* on September 26, 2024 (Docket No. 464)(the "Motion to Strike").  The Court heard the Motion to Strike, along with other matters (including the Standing Motion defined below), on October 8, 2024.  The Court subsequently determined that Recovery Corp. did not have standing to participate in these cases because the claims against the Debtors that it purported to hold (all personal injury settlement claims) had not been properly assigned to it under applicable Florida law; however, the Court permitted the individual personal injury claimants whose claims Recovery Corp. claimed to own to substitute into all of its filed papers, including the Recovery Corp. Objection and the Motion to Dismiss, which they did.  *See Order Granting In Part Debtors' (I) Motion To Strike And Denying (II) Cross-Motion To Compel Discovery Responses*, entered on October 11, 2024 (Docket No. 541); *Order Granting Florida Claimants' Motion to Substitute Party*, entered on November 1, 2024 (Docket No. 614).
.

Around the same time, on September 16, 2024, Recovery Corp. filed its *Motion to Establish Standing to Challenge Final DIP Financing Order* (Docket No. 433)(the "<u>Standing Motion</u>"). The Standing Motion was unrelated to the standing issues raised by the Debtors. Instead, in the Standing Motion, Recovery Corp. sought an order granting it standing to object to the *Final Order (I) Authorizing The Debtors To (A) Obtain Postpetition Financing And (B) Utilize Cash Collateral, (II) Granting Adequate Protection To Prepetition Secured Parties, (III) Modifying The Automatic Stay, And (IV) Granting Related Relief* entered on June 28, 2024 (Docket No. 189)(the "<u>Final DIP Order</u>") and thus to challenge the binding stipulations contained therein.[17] The Debtors filed a response in opposition.[18] On September 17, 2024, the Debtors filed the *Debtors' Combined Disclosure Statement and Joint First Amended Chapter 11 Plan of Reorganization* (Docket No. 438).

*The Settlement, the Plan and Solicitation Procedures*

On September 20, 2024, after two (2) weeks of Mediation. the Debtors, the Committee, the Plan Sponsor, and Omega agreed to the terms of a revised mediator's proposal, as set forth in the Plan on pages 48-50.   The structure of the Plan is a settlement between the Debtors, their secured creditors, including the DIP lender, their primary landlord, the Plan Sponsor and the Committee that resulted from that agreed upon mediator's proposal.  It provides for $10.75 million to be paid by the Plan Sponsor, the waiver of the $20 million DIP loan, the restructuring and assumption of the obligations of the secured lenders and landlords of the Debtors, and the payment of administrative and priority creditors.  And it proposes to make distributions to general unsecured

---

[17] A request to be granted standing was required by the terms of the Final DIP Order.  That request, however, had to be filed no later than September 15, 2024.

[18] *See Debtors' Objection to Recovery Corp.'s Motion to Establish Standing to Challenge Final DIP Financing Order*, filed October 2, 2024 (Docket No. 486).

Case 24-55507-pmb    Doc 736    Filed 12/05/24    Entered 12/05/24 17:20:29    Desc Main
Document    Page 10 of 33

creditors as set forth *infra*.  The mediated global settlement also includes a broad release of all claims belonging to the Debtors against various parties.  It further provides for a full release of claims against various third parties who made substantial contributions to this case and their affiliates by any creditor who does not affirmatively opt out of the release (the Release).  Without the significant consideration provided by the non-debtors, the Plan would not be possible, and unsecured creditors (and even certain of the secured creditors) would most likely get nothing from any other possible resolution of these cases.

The Debtors filed the *Debtors' Second Amended Combined Disclosure Statement and Joint Chapter 11 Plan of Reorganization* (Docket No. 461)(the "Second Amended Plan") incorporating the mediated settlement on September 26, 2024, six (6) days after the conclusion of the Mediation.  On September 30, 2024, this Court held a hearing on the Second Amended Plan and the Solicitation Procedures Motion.  On October 1, 2024, the Debtors filed the Plan and the Court entered the *Order (I) Conditionally Approving Disclosure Statement, (II) Scheduling Combined Hearing For November 14, 2024 At 9:30 A.M. (Prevailing Eastern Time), (III) Establishing Procedures For Solicitation And Tabulation Of Votes On Plan, (IV) Approving Certain Forms And Notices, And (V) Granting Related Relief* (Docket No. 480)(the "Solicitation Procedures Order"), conditionally approving the Disclosure Statement and authorizing the Debtors to solicit acceptances of the Plan.

As an integral part of the Plan, the solicitation process included ballots containing certain instructions through which a claim or interest holder could elect to opt-out of the Release.  *See* Plan, pp. 56-59, and Article X.  This instruction to make an opt-out election is stated in pertinent part as follows:

> **If you vote to accept the Plan**, you shall be deemed to have consented to the **Third-Party Release** set forth in Article X.D.2 hereof and you cannot opt out of the Third-Party Release.
>
> **If you do not consent to the Third-Party Release, you may elect not to grant such releases but only if you are:**
>
> • **(i) a Holder of a Claim in Classes 3, 4, 5, 6A, 6B, and 6C and you**
>
> > o **(A) <u>vote to reject the Plan</u> in Item 2 of your Ballot, <u>affirmatively elect to "opt out" of being a Releasing Party by checking the Optional Opt-Out Election in Item 3 of your Ballot</u>, and <u>timely return your Ballot</u> to Verita, or**
>
> > o **(B) <u>abstain from voting</u> by not casting a vote in Item 2 of your Ballot, affirmatively elect to "opt out" of being a Releasing Party by <u>checking the Optional Opt-Out Election in Item 3 of your Ballot</u>, <u>and timely return your Ballot</u> to Verita….**

Plan, p. 57 (emphasis in original). *See also Form of Ballot for Class 6A, Class 6B, and Class 6C*, attached as Exhibits 1-D, 1-E, and 1-F, respectively, to the Solicitation Procedures Order. As further provided in the Plan, the OpCo Debtors' Estates and the DivestCo Debtors' Estates (each as defined in the Plan) were to be separately substantively consolidated on a siloed basis for purposes of voting, distribution, and confirmation. *See* Plan, Article III.F, pp. 58-61, and Article V, pp. 64-65; *see also* Article II.A.1.204 & 1.99.

With respect to the treatment of various general unsecured claims as set forth in Class 6A, 6B, and 6C, respectively, each Holder of an Allowed OpCo General Unsecured Claim in Class 6A is to receive such Holder's Pro Rata share of the OpCo GUC Allocation with a projected recovery of 10.9%.[19] Each Holder of an Allowed DivestCo General Unsecured Claim in Class 6B is to receive such Holder's Pro Rata share of the DivestCo GUC Allocation with a projected recovery

---

[19] This treatment is described as "the allocation of the GUC Contribution attributed to Holders of OpCo General Unsecured Claims in the amount of $9.25 million in Cash, *less* the Joint & Several OpCo GUC Allocation." Plan, Article II.A.1.207. Terms with initial capital letters used in this paragraph and not defined in this Order are used as defined in the Plan.

of 1.2% to 10.1%.[20]  And, finally, each Holder of an Allowed Joint & Several OpCo General Unsecured Claim in Class 6C has an Allowed OpCo General Unsecured Claim and/or an Allowed DivestCo General Unsecured Claim (each discussed above), [and] such creditor shall be entitled to recoveries as a Holder of Allowed General Unsecured Claims in both Class 6C and Class 6A and/or Class 6B, as applicable, with a projected recovery of 1%.  Plan, pp. 9-12, 68-69.[21]

<u>Confirmation Hearing</u>

At the Confirmation Hearing, the Debtor submitted four (4) declarations in support of confirmation (Docket Nos. 647, 655-657)(the "<u>Declarations</u>").  These were admitted without objection as the direct testimony of the related witnesses.  Although cross-examination was offered, no party requested to cross-examine any of those witnesses.  The Debtors also tendered their hearing Exhibits A-J into evidence without objection.  The Committee further tendered an additional declaration, of its financial advisor, which was also admitted without objection.  See *Statement of The Official Committee of Unsecured Creditors in Support of Confirmation of Debtors' Second Amended Combined Disclosure Statement and Joint Chapter 11 Plan of Reorganization* (Docket No. 662)**.**

Among the Declarations was the Declaration of Jennifer Westwood on behalf of Kurzman Carson Consultants LLC d/b/a Verita Global ("<u>Verita</u>")(Docket No. 647)(the "<u>Voting</u>

---

[20] This treatment is described as:

    the allocation of the GUC Contribution attributed to Holders of DivestCo General Unsecured Claims, which shall include (a) a minimum of $3.5 million in Cash consideration, which shall include (i) $1.5 million in Cash from the Plan Sponsor Contribution and (ii) all proceeds of the Backstop Note (including any attendant costs and/or penalties associated therewith, if applicable), *plus* (b) all proceeds of the D&O Claims, *plus* (c) all proceeds of the Divested Accounts Receivable.

Plan, Article II.A.1.101.

[21] *See also* Plan, Article II.A.1.128-1.133 (defining the GUC Trust and associated terms as the principal funding mechanism under the plan for these claims).

Declaration"). The Voting Declaration consisted of the voting results on the Plan and a description of the approved tabulation procedures used by Verita. Under the terms of the Plan, only Classes 3 (ABL Claims), 4 (Omega Claims), 6A (OpCo General Unsecured Creditors), 6B (DivestCo General Unsecured Creditors), and 6C (Joint & Several General Unsecured Creditors) were impaired and thus entitled to vote on the Plan.[22] Based on the Voting Declaration, Classes 3, 4, 6A, and 6C voted to accept the Plan by the requisite majorities.[23] Only Class 6B did not accept the Plan by the requisite majorities. Nevertheless, confirmation by "cramdown" is required as result of the failure of Class 6B to accept the Plan.[24]

Also, according to Exhibit A to the Voting Declaration (and counsel for the Debtors at the Confirmation Hearing), around eight hundred fifty (850) unique ballots were cast. Of those ballots, well over four hundred (400) included an "opt out" selection by the party voting.[25] Although there were both creditors who voted to accept that Plan but elected to "opt out",[26] and creditors who voted to reject the Plan who did not opt out, the vast majority of those that voted for the Plan did not attempt to "opt out", and vast majority of the "opt out" ballots were submitted by those who voted against the Plan. A relatively few creditors submitted ballots in which they "abstained" from voting,[27] and a few other creditors submitted ballots that were received after the November 4, 2024, voting deadline, or were otherwise deemed invalid.[28] Upon inquiry by the Court, the

---

[22] *See* 11 U.S.C. § 1126(f).

[23] *See* 11 U.S.C. § 1126(c).

[24] 11 U.S.C. §§ 1129(a)(8) & 1129(b).

[25] Voting Declaration, Exhibit D.

[26] This combination is not permitted by the terms of the Plan or the ballots, both of which indicate that if the creditor votes to accept that Plan it cannot "opt out" of the Release.

[27] Voting Declaration, Exhibit C.

[28] *Id*.

Debtors (and Ms. Westwood, who was in the courtroom available for cross-examination) confirmed that Verita sent out around six thousand four hundred (6,400) ballots, excluding duplicates. Consequently, roughly thirteen percent (13%) of the ballots sent out were returned. Said differently, around five thousand five hundred fifty (5,550) creditors did not vote on the Plan or return any related portion of the ballot or an opt-out form.

### *Purdue* and the Release in the Plan

The remaining dispute, and the subject of this Memorandum Decision, is the propriety of the "opt out third party release" (the Release) in the Plan. The U.S. Trustee objects to the Release. More specifically, the U.S. Trustee argues that the Plan's mechanism allowing creditors and interest-holders to opt-out of the Release does not make the Release consensual, and thus it is a nonconsensual release that is impermissible pursuant to the recent decision of the United States Supreme Court in *Harrington v. Purdue Pharma L.P.*, 603 U.S. ___, 144 S.Ct. 2071, 2024 WL 3187799 (June 27, 2024).

Whether a bankruptcy court can grant a "third party release" has been the subject of substantial case law and scholarly discussion since the advent of the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.*, in 1978. Such a release, as the terms are used in bankruptcy, can either be "nonconsensual" or "consensual." A nonconsensual third-party release is a release of the claims of creditors against non-debtors that is simply included in a proposed plan. Creditors can vote to accept or reject the plan, but their vote has no bearing on whether they are subject to the release, and they have no mechanism to decline to give the release – if the plan is confirmed, they are bound by the release. In the places where such a release has historically been available, including in this Circuit, [29] the criteria for granting it have been stringent.

---

[29] *In re Seaside Eng'g and Surveying, Inc.*, 780 F.3d 1070 (11th Cir. 2015).

By contrast, with a consensual release, the creditor must be given some form of choice as to whether to give the release. This choice can take different forms. First, the plan can say that all those voting for the plan are bound by the release. More prevalent recently are "opt in" or "opt out" releases. For an "opt in" release, the creditors (and sometimes interest-holders) are sent a ballot and a form to "opt in" to the release. Only those who "opt in" are bound by the release. By contrast, for an "opt out" release, all creditors (and sometimes interest-holders) are deemed to give the release unless they check a box to "opt out". There are of course permutations and combinations of these general forms.

Until this year, the case law was split on the propriety of a nonconsensual third-party release. Eight (8) circuit courts had decided the issue – five (5) in favor, including the Eleventh Circuit, and three (3) against. That split was resolved when the United States Supreme Court decided that bankruptcy courts are not allowed to include a nonconsensual third-party release in a Chapter 11 plan. *See, Purdue, supra*.

The Plan is this case does not purport to include a nonconsensual release. It includes an "opt out" release the Debtors contend is consensual. Consequently, for the purposes of confirmation of the Plan, *Purdue* is as important for what it did not decide as for what it did. In *Purdue*, the Supreme Court stated affirmatively that nothing in *Purdue* should "call into question *consensual* third-party releases offered in connection with a bankruptcy reorganization plan...." 144 S.Ct. at 2087 (emphasis in original). The Supreme Court went on to say: "nor do we have occasion today to express a view on what qualifies as a consensual release…." 144 S.Ct. at 2088.[30] That is the question this Court has occasion to address in this Memorandum Decision.

---

[30] In making this statement, the Supreme Court cited with favor specifically only the Seventh Circuit opinion in *In re Specialty Equip. Cos.*, 3 F.3d 1043 (7th Cir. 1993).

<u>Arguments</u>

*U.S. Trustee Objection*

In the U.S. Trustee Objection, the U.S. Trustee takes the position that the "opt out" Release contained in the Plan is not truly "consensual", and that as a nonconsensual release it is precluded by *Purdue*. The U.S. Trustee asserts that no federal law, including the Bankruptcy Code, applies to this Release, that state law applies to settlements in bankruptcy, and that thus state contract law must apply to the enforceability of the Release, citing certain cases that so hold.[31] The U.S. Trustee Objection then provides an expurgation of general contract law, including numerous cites to the *Restatement of Contracts*, explaining that silence cannot constitute *acceptance*, except in two (2) circumstances – where the offeree silently accepts offered benefits, and where the offeror relies on the other party's manifestation of intention. No explanation is provided about why "acceptance" is required, rather than consent, nor is there any significant discussion about whether either (or both) of the exceptions might apply here.

The U.S. Trustee then moves to its "refutation" of the substantial bankruptcy case law that finds that notice and an opportunity to opt out is adequate in a bankruptcy case to constitute consent. It sweeps all that caselaw aside without discussion of any specific case based on one recent Delaware bankruptcy court case (*In re Smallhold*, *Inc.*, 2024 WL 4296938 (Bankr. D. Del. Sept. 25, 2024)), in which Judge Goldblatt changes his mind[32] and decides that after *Purdue*, notice and opportunity to opt out is inadequate to bind those that do not respond – although he then goes on to reach conclusions as to those that did respond that are inconsistent with those advocated by

---

[31] *In re Tonawanda Coke Corp.*, 2024 WL 4024385 at *2 (Bankr. W.D.N.Y. Aug.27, 2024); *Stein Mart, supra*, 629 B.R. 516, 523; *SunEdison, supra*, 576 B.R. 453, 458; *In re Arrowmill Dev. Corp.*, 211 B.R. 497, 506 (Bankr. D. N.J. 1997).

[32] Judge Goldblatt had previous decided the opposite in *In re Arsenal Intermediate Holdings, LLC*, 2023 WL 2655592 (Bankr. D. Del. Mar. 27, 2023). This is discussed at greater length, *infra*.

the U.S. Trustee here, for which he is scolded later in the U.S. Trustee Objection as having "failed to faithfully apply" contract-based principles.[33]

Having set state contract law as the benchmark, the U.S. Trustee goes through the various categories of voters, explaining why none can be bound by the "opt out" procedure. First, the U.S. Trustee asserts that even those who voted for the Plan with a ballot that said that if they voted for the Plan they would be giving the Release, should not be bound (even if they did not check the box to opt out) as, inexplicably, such an affirmative act does not "reflect the unambiguous assent necessary to find consent." The U.S. Trustee tries to explain this position by noting that impaired creditors have a right to vote on the Plan.[34] No explanation is provided as to why this indisputable right includes the right to vote[35] in favor of a Plan despite apparently not actually accepting all its provisions, or how this right includes the right to ignore express portions of the Plan and the ballot with which the vote is cast.[36]

---

[33] The U.S. Trustee similarly sweeps away the only decision in this District on consensual releases, *In re Envistacom LLC*, Case No. 23-52696-JWC (Bankr. N.D. Ga. Nov. 8, 2023), decided by Judge Cavender, as also being based on *Arsenal*, *supra*.

[34] The U.S. Trustee cites three (3) cases for this proposition: *In re Congoleum Corp.*, 362 B.R. 167, 194 (Bankr. D. N.J. 2007); *In re Digital Impact, Inc.*, 223 B.R. 1, 14 (Bankr. N.D. Okla. 1998); and *Arrowmill, supra*, 211 B.R. at 507. The U.S. Trustee again makes no mention of the substantially more numerous cases holding to the contrary, cited by the Debtors in their brief. *See Debtors' (I) Memorandum of Law in Support of Confirmation and Final Approval of the Debtors Second Amended Combined Disclosure Statement and Joint Chapter 11 Plan of Reorganization and (II) Omnibus Reply to Objections to Confirmation*, pp. 56-57, fn. 122 (filed November 12, 2024)(Docket No. 659)(the "Debtors' Brief"). Further, *Congoleum* relies solely on *Arrowmill* in which the statement about parties voting yes is *dicta*, as the creditor at issue had not done so, and *Digital Impact* relies not on consent issues but on jurisdictional arguments not made here.

[35] The U.S. Trustee here also criticized *Smallhold, supra*, stating that voting might be an "affirmative step", but somehow it is nevertheless not a "manifestation of intention", which it asserts is needed to overcome silence. The U.S. Trustee does not explain how the act of voting, either to accept or to reject the Plan, constitutes silence.

[36] It is further not clear how the ballot could have been any clearer that a vote for the Plan would result in consent to giving the Release and would result in the forfeiture of any right to opt out. For instance, it states that "**If you vote to accept the Plan, you shall be deemed to have consented to the Third-Party Release set forth in Article X.D.2 hereof and you cannot opt out of the Third-Party Release.**" Plan, p. 59 (emphasis in original). These provisions were included in the ballots per the Solicitation Order.

Next, the U.S. Trustee argues that those that voted to reject the Plan who did not also "opt out" should not be bound by the Release.  In essence, the U.S. Trustee says that a vote to reject the Plan is necessarily an indication that the voting party also rejects the Release, citing a case that suggests that requiring a party to "opt out" in such a circumstance is a "trap for the careless or inattentive creditor."[37]   However, having paid adequate attention to the documents received to have completed them, signed them, and returned them timely, it is not reasonable for the Court to assume that these parties nevertheless did not understand[38] the same documents.[39]

Lastly, the U.S. Trustee Objection addresses creditors and interest-holders who did not vote or otherwise return an opt-out form.  Here the U.S. Trustee suggests that these parties may never have received the materials, or that they may have completed the materials and returned them in the mail, only to have them be lost or delayed.  As discussed below, it is these parties' consent that is the most difficult to evaluate, as a decision to consider their failure to respond when properly noticed as consent must balance the concerns expressed by the U.S. Trustee with the processes established for plan approval in the Bankruptcy Code[40] and Federal Rules of Bankruptcy Procedure ("FRBP")[41] and the general principle that parties ignore legal documents that are

---

[37]*In re Chassix Holdings, Inc.*, 533 B.R. 64, 79 (Bankr. S.D. N.Y. 2015).

[38] A vote to reject without an "opt out" could reflect nothing more complicated than the view of the creditor or interest-holder that it is dissatisfied with its treatment under the Plan but that it has no concern about the requested Release, perhaps because it does not think it has any such claims.

[39] It is further not clear how the ballot could have been any clearer that a rejection AND an opt out would be required so as not to give the Release in the event the Plan were ultimately confirmed.  Again, the Plan stated, "**you may elect not to grant such releases but only if you…vote to reject the Plan in Item 2 of your Ballot, affirmatively elect to "opt out" of being a Releasing Party by checking the Optional Opt-Out Election in Item 3 of your Ballot, and timely return your Ballot**."  Plan, p. 59 (emphasis in original).  These provisions were included in the ballots per the Solicitation Order.

[40] *See* 11 U.S.C. §§ 1109; 1121-1129.

[41] *See* FRBP 2002, 3001-3022, 9006-9008, 9013, 9014, 9024, & 9036.

properly served on them at their peril.  This is a balancing that the Court endeavors to perform below.

*The Debtors' Response*

As noted above, in support of the Plan, on November 12, 2024, the Debtors filed the Debtors' Brief in which they, among other things, responded to the U.S. Trustee Objection.   The Debtors begin by asserting generally that the Release is consensual based on the opt-out process and should be approved as a matter of federal, rather than state, law.   They note the express statements in *Purdue, supra,* about its lack of effect on consensual third-party releases, as well as a post-*Purdue* opinion by Judge Christopher Lopez in the Southern District of Texas that applies pre-*Purdue* 5th Circuit and Southern District of Texas caselaw in holding an opt-out release to be consensual.[42]

The Debtors next assert that federal law, rather than state contract law, controls the issue of consent.  For that proposition they cite three (3) cases from the District of Delaware,[43] and *Envistacom*, a recent oral ruling on opt-out releases by Judge Cavender in this District.[44]  None of those cases cite any particular tenet of federal law in approving opt-out releases.  Judge Cavender, while saying that he has not found a case that he finds entirely satisfactory, cites with approval Judge Goldblatt's decision adopting a federal law approach in *Arsenal*, *supra*.   As mentioned above, that decision was recently abrogated by Judge Goldblatt himself in *Smallhold, supra*, in favor of a contract-based approach.

---

[42] *In re Robertshaw U.S. Holding Corp.*, 662 B.R. 300 (Bankr. S.D. Tex. 2024).

[43] *In re Millenium Lab Holdings II, LLC*, 575 B.R. 252 (Bankr. D. Del. 2017); *In re Mallinckrodt PLC*, 639 B.R. 837 (Bankr. D. Del. 2022); *In re Extraction Oil & Gas, Inc.*, Case No. 20-11548 (CSS) (Bankr. D. Del. Dec. 22, 2020).

[44] *See Envistacom, supra*, n. 33.

The Debtors then assert that the form of "opt out" utilized in this case results in adequate consent to satisfy the aforementioned federal law. Finally, the Debtors address the U.S. Trustee's arguments as to each group of creditors. First, as to those that voted in favor of the Plan, they state that courts generally[45] hold that voting for a plan that contains a third-party release constitutes consent. As to the remaining creditors, the Debtors rely on the pre-*Purdue* case law that permits opt out releases to be considered consensual. In particular, the Debtors rely on Judge Cavender's *Envistacom* ruling in. In *Envistacom*, Judge Cavender found that the opt-out mechanism was clear and conspicuous in the plan, notices, and ballots, was simple to understand, and was unopposed when proposed. He further found it favorable the fact that the distributions under the plan were not contingent on consent to the releases,[46] that the releases were limited to certain appropriate parties, that the releases were an integral part of the plan, that the plan, which included a global settlement, including the opt-out releases, was supported by all the major constituents in the case, including the committee of unsecured creditors, and that the plan was accepted by a large majority of the voting creditors numerically. The Debtors assert, not entirely accurately,[47] that all these factors are present in this case, such that the Release should be considered universally consensual.

---

[45] *See Stein Mart, supra,* 629 B.R. 516, 523 (citing *SunEdison, supra,* 576 B.R. 453, 458); *In re Akorn, Inc.*, No. 20-11177 (Bankr. D. Del. Sept. 4, 2020) (Docket No. 673); *Chassix Holdings, supra,* 533 B.R. at 80; *In re Metromedia Fiber Network, Inc.*, 416 F.3d 316, 142 (2d Cir. 2005); *In re Coram Healthcare Corp.*, 315 B.R. 321, 336 (Bankr. D. Del. 2004); *In re Zenith Elecs. Corp.*, 241 B.R. 92, 111 (Bankr. D. Del. 1999).

[46] It is not clear to this Court why this is necessarily a favorable factor. Perhaps making the entire distribution contingent on failure to opt out might convert the release to a less consensual one, but having separate distribution levels for those that do and do not provide a release to non-debtor parties that are providing substantial consideration in support of the plan may make sense in some circumstances.

[47] Most consequentially, the Debtors assert that that all impaired classes voted for the Plan. As noted previously, Class 6B voted numerically against the Plan. Even accounting for the change of votes by the Florida Claimants at the Confirmation Hearing, Class 6B voted against the Plan 363-283, and overall, the votes were 439 for and 411 against the Plan, which does not match Judge Cavender's "large majority" finding. Secondarily, the Debtors assert that the balloting process and form of ballots were not objected to except by the U.S. Trustee as to the form of the ballots, which the Debtors further assert was resolved by changes to the ballots. Although it is true that the U.S. Trustee provided comments to the form of the ballot which were accommodated, the U.S. Trustee also objected to the entire opt out process at the disclosure statement stage. This objection, as is often the case with confirmation objections, was deferred to the Confirmation Hearing, along with the final approval of the Disclosure Statement itself.

<u>Analysis</u>

As noted above, the Plan's third-party Release provides broad releases of all creditors' claims related to the Debtors against certain non-debtors, including: the Committee and each of its members (solely in their respective capacities as such); Omega; the ABL Secured Parties; OHI DIP Lender, LLC;  TIX 33433 LLC; the CRO; the Independent Manager; and affiliates of parties related to each of the foregoing (all the foregoing as defined in the Plan).  The Plan, however, provides any creditor or interest-holder with the opportunity to opt out of the Release if they do not vote for the Plan and instead take affirmative action to either file an objection to the Release or check the opt-out box on their voting ballots or opt out form and timely returned the ballot or form to the claims' agent.  Any creditor or interest-holder that either votes in favor of the Plan or fails to affirmatively opt out is deemed to be a "Releasing Party" under the Plan, and thus grants the Release.

The question before the Court is whether this opt-out mechanism creates a consensual release, as the Debtors contend, or a nonconsensual release that is foreclosed by *Purdue*, *supra*, as the U.S. Trustee asserts.  No one has cited, nor has this Court found, any circuit level decisions addressing the issue of whether an opt-out mechanism renders a third-party release consensual, but many cases at the bankruptcy court level address the issue.  Together with *Purdue* they confirm that consensual releases are permitted in bankruptcy plans.  And, contrary to the few cases cited by the U.S. Trustee, an overwhelming majority of cases find that a creditor's vote to accept a plan containing a third-party release (like the Plan) makes the release consensual, and this Court agrees.

A somewhat harder question is whether a party that votes to reject the Plan or sends a ballot abstaining from voting has consented to the Release if they do not choose to opt out.  But the hardest question is what to do with creditors that take no action.  As is true in most bankruptcy

cases, notwithstanding the significant efforts undertaken to make sure all creditors and interest holders received notice of an opportunity to vote on this Plan and to opt out, a substantial majority of creditors failed to return a ballot and did nothing. In this case, that is how roughly 5,550 out of 6,400, or around 87 percent (87%), of the parties that were sent voting materials proceeded. Should these non-voting, non-acting creditors and interest-holders be deemed to have consented to the Release?

Maybe not surprisingly, there has been significant activity since *Purdue, supra,* was decided concerning its effect on consensual third-party releases. As Judge Cavender found last year in *Envistacom*, *supra*, a review of the case law on what constitutes a consensual release indicates that there is a case to support every view. Some cases apply state law contract principles (usually to deny approval of opt-out releases), and others apply federal bankruptcy principles (usually to approve them). Regardless of the framework of analysis, courts are markedly split on the issue, with some categorically finding that a release cannot be consensual absent an affirmative act to opt in, and others finding that opt-out mechanisms that (as is the case here) provide adequate notice and a simple opt-out process can result in a consensual release. Also, like Judge Cavender, this Court has yet to find a case, or even a basic method of analysis, that it finds completely satisfying.

A number of cases have been confirmed since *Purdue* with a variety of release options included, but few have produced a written opinion.[48] One exception is the already-mentioned recent decision by Judge Goldblatt in *Smallhold, supra*. Judge Goldblatt abrogated his earlier

---

[48] *See e.g. In re Fisker, Inc.,* Case No. 24-11390 (TMH) (Bankr. D. Del. Oct. 16, 2024); *In re FTX Trading Ltd.*, Case No. 22-11068 (JTD) (Bankr. D. Del. Oct. 8, 2024); *In re 2U, Inc.*, Case No. 24-11279 (MEW) (Bankr. S.D. N.Y. Sept. 6, 2024); *In re Red Lobster Mgmt. LLC*, Case No. 6:24-bk-02486-GER (Bankr. M.D. Fla. Sept. 6, 2024); *In re BowFlex Inc.*, Case No. 24-12364 (ABA) (Bankr. D. N.J. Aug. 19, 2024); and *In re Acorda Therapeutics, Inc.*, Case No. 24-22284 (DSJ) (Bankr. S.D. N.Y. Aug. 7, 2024).

decision, *Arsenal, supra*,[49] in which he had approved as consensual an "opt out" third party release, based on *Purdue*.  Judge Goldblatt did this, in short, because he decided *Arsenal* on a "default" theory that he no longer believes is viable after *Purdue*.  The default theory held that the creditor has an obligation to object to the giving of the release, and failing to object led to the release being granted by default.  However, for the theory to apply (per Judge Goldblatt), the creditor would have to have some obligation to respond (or, said differently, the relief that it failed to object to would have to be something that was available absent objection).  Because *Purdue* has now declared that nonconsensual releases are inappropriate, no such obligation to respond or object can now be imposed.

In *Smallhold, supra*, Judge Goldblatt transitioned away from a default model of determining consent to a third-party release to another model for making that determination – a contract model.  In that model, the creditor must be seen to have agreed with (or accepted) the giving of the release.[50]  The U.S. Trustee relies heavily on *Smallhold* in the U.S. Trustee Objection in urging this Court to adopt a contract-based model here.  Based on the requirements of the general law of contract, the U.S. Trustee objects to the "opt out" process in this case *in toto*, even objecting to binding those that voted for the Plan to the Release.

---

[49] This abrogation casts some doubt on the continued vitality of Judge Cavender's thoughtful and thorough ruling in *Envistacom*, *supra,* the only decision in this District cited by the parties on these issues.  In *Envistacom*, Judge Cavender approved an opt-out regime similar to the one in the Plan.  To the extent *Envistacom* was based on *Arsenal*, which is the only case cited in the deciding section of the transcript and which Judge Cavender described as the "most thorough" discussion of these issues, the *Envistacom* decision may have lost some of its considerable force after *Purdue* and *Smallhold*, *supra*.

[50] Judge Goldblatt also expressed interest in a theory on the enforceability of consensual releases through "opt out" based on Federal Rule of Civil Procedure ("FRCP") 23.  To use FRCP 23, presumably the official committee of unsecured creditors would serve as the class representative, and parties wishing to "opt out" of a settlement approved by the committee would have to affirmatively do so.  However, no one in this case advocated for enforcing the Release on this basis.

*Smallhold* is one of the most recent decisions on consensual releases, but is only the latest in a long line of cases on what constitutes consent for the purposes of a consensual third party release in a Chapter 11 plan.  The Debtors cite to numerous cases that approve "opt-out releases" and refer to the law on them as making up the "federal law" on the subject.  Conversely, as noted above, the U.S. Trustee insists that consensual releases must pass muster under state contract law to be enforced against each individual creditor.

As Judge Cavender stated in *Envistacom*, neither approachfits the bill precisely.  On the one hand, as Judge Goldblatt notes in *Smallhold*, there must be some underlying law that supports the inclusion of releases in a plan and their enforceability.  Saying, as Judge Sontchi did in *In re Extraction Oil & Gas, Inc.*, Case No. 20-11548 (CSS) (Bankr. D. Del. Dec. 22, 2020), that the release arises "out of the Bankruptcy Code and Rules," is not entirely satisfactory in the absence of the identification of the particular Bankruptcy Code section or sections, or one or more FRBP, from which it germinates.

The best this Court can do on that score is to say that consensual releases are permitted in Chapter 11 plans under 11 U.S.C. §§ 105 and 1123(b)(6).  Although the Supreme Court majority in *Purdue, supra,* held that these two (2) specific provisions are not available to support the inclusion of *nonconsensual* provisions in a plan, it took great pains to say that the Court was not calling into question to validity of consensual releases, without explaining how one could be included in a plan but the other could not.[51]  To the extent that Sections 105 and 1123(b)(6) are relevant, the standard then is whether such a provision is "appropriate" or "necessary or appropriate."  If Sections 105 and 1123(b)(6) are not relevant, the federal support must come from

---

[51] The statement in *Purdue* that consensual releases might "pose different questions and rest on different legal grounds" might be read to suggest that this Court should look elsewhere for support for consensual releases.  *Purdue*, *supra,* 144 S.Ct at 2087.  However, other than state contract law, which has its own difficulties discussed *infra*, none has been suggested, by the Supreme Court or by the other courts that have considered the question.

the structure of Bankruptcy Code and the FRBP as they relate to confirmation more generally –
which, as noted previously, is not particularly satisfactory.

This Court also agrees with Judge Cavender that analogies to other circumstances under
the Bankruptcy Code and the FRBP where a response is required or rights can be lost are not
entirely apt, as they are all based on specific Bankruptcy Code provisions or one or more FRBP.
This Court notes that, to the extent they are relevant, they also do not necessarily result in the
immediate and irrevocable loss of those rights, as defaults can be opened, late proofs of claim
deemed timely or otherwise allowed, and objections to claims reconsidered.[52]

Although it seems from the foregoing that assessing the viability of a release based on
"federal law" might be problematic, assessing it based on state contract law is no better.  First,
there is no answer to the question "which state's law should be applied?"  The law of the state
where the bankruptcy court sits?  The law where the debtor is headquartered?  Some other state's
law?  Primarily for that reason the U.S. Trustee relied almost entirely in the U.S. Trustee Objection
on the *Restatement of Contracts*, which itself is not the law anywhere.  Second, do we mean to
incorporate all of state contract law, or just the part dealing with "offer and acceptance"?  That is
often the only part that is discussed when state contract law is proposed, and the few cases that
address the point say that specific "consideration" (which is generally required for a contract) is
not required for a consensual release – that either it is not relevant to the analysis or that there does
not have to be any separate consideration (other than what is being provided in the plan) to support
the release.[53]

---

[52] *See* note 56, *infra.*

[53] *See e.g. Stein Mart, supra*, 629 B.R. at 528-29.

Finally, and maybe most importantly, the basis for the enforcement of consensual releases has not as far as this Court has been able to determine been described anywhere as a "contract" for them, or an "agreement" to them. The Supreme Court did not describe them that way or use those words in *Purdue*. They are referred to as "consensual" releases because what they rely on is the "consent" of the releasing party. So, evidence of consent, rather than whether the release is a "necessary or appropriate" plan provisions or constitutes a "contract", appears to be the touchstone for determining whether a creditor can be bound to a release. Or maybe said differently, finding consent is what is necessary to make the Release either a binding contract or "necessary or appropriate" as to an individual creditor in the bankruptcy plan context.

Based on that standard, the following creditors can clearly be bound in this case under contract-like notions of offer and acceptance, or federal law regarding "necessary or appropriate" plan provisions:

(1) Parties that voted for the Plan. When the Plan and the ballot say explicitly that if you vote for the Plan, you are giving the Release, if you vote for the Plan, you have consented to the Release. That conclusion is supported by many cases, including *Specialty Equipment*, *supra*, 3 F.3d 1043, the only case on consensual releases cited by the majority in *Purdue*.[54]

(2) Parties that voted to reject the Plan but did not opt out. Similarly, if the Plan says that if you vote to reject the Plan and you do not want to give the Release in the event the Plan is nevertheless confirmed you must check the conspicuous box located on the ballot to indicate that you do not wish to give the Release,, you must check the box to avoid giving the Release. Said differently, if you send in the ballot, having filled out your name and the amount of your claim,

---

[54] *Purdue, supra*, 144 S.Ct. at 2087-88. A small number of creditors voted for the Plan but checked the opt out box. As they voted for the Plan and are presumed to have read the associated materials, their "opt out" is not effective.

having signed it, and indicating you reject the Plan, but you do not check the conspicuous opt out

box on the ballot, you have communicated consent to give the Release if the Plan is confirmed.

(3) Parties that  sent in a ballot in which the party abstains or that is not counted for voting

for any reason and on which the voter does not opt out.  For essentially the same reasons as the

rejecting voters.

The last group of creditors and interest holders in this case is the largest – roughly 5,550

persons and entities – who were sent the lengthy Plan and voting and/or opt out package and took

no action whatsoever.  What of them?  This Court generally agrees with the courts that say that,

service by mail being the rule in bankruptcy,[55] creditors are obligated to pay attention to, and read,

their mail, and that failure to do so has consequences.[56]  So, if a creditor gets materials in a

bankruptcy case, and the materials say if you do not take an action, you will be bound by the

consensual release, you must do something.  You cannot simply ignore it.  If you do, you may be

"deemed" to consent to the release.  Or you may have waived those rights.  Or you may be estopped

from enforcing them. [57]

---

[55] F.R.B.P. 7004(b); 9014(b).

[56] *See e.g. In re Richard D. Van Lunen Charitable Tr.*, 598 F.Supp.3d 1114 (D. Colo. 2022).  However, this Court may not agree with all the purported dire consequences of similar matters outlined in other cases.  This Court instead finds those matters to generate results more like the "rebuttable presumption" outlined below than the immediate and dire consequences purported to apply in those other cases.  For example, if a defendant defaults on a filed and served complaint, the court does not automatically enter a judgment for the plaintiff.  It reviews the allegations to see if adequate allegations have been made to support the relief.  *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1370 n. 41 (11th Cir. 1997).  And any entered judgment would be subject to later overturn if service turns out not to have actually been made.  *See Harris v. Koch Indus.*, 2024 WL 1591006, at *1 (N.D. Ga. Mar. 11, 2024), report and recommendation adopted, 2024 WL 1591015 (N.D. Ga. Mar. 28, 2024); *cf. Insituform Tech., Inc. v. Amerik Supplies, Inc.*, 588 F.Supp.2d 1349 (N.D. Ga. 2008).  Similarly, if a proof of claim is not timely filed, that is not always the end of the story.  Like the procedure required below, the creditor can seek to establish "cause" for filing the claim late. *See generally Pioneer Inv. Serv. Co. v. Brunswick Assoc. Ltd. P'ship*, 507 U.S. 380 (1993).  Failing that, in a Chapter 7, the creditor is in some cases simply subordinated to timely creditors, not locked out entirely.  *See* 11 U.S.C. § 726. Finally, if a claim objection does not draw a timely response, it still must, like a default judgment, still state a valid basis to object to the claim.

[57] It is not without moment in this analysis that the most likely claims that might be brought against the Released Parties by creditors of the Debtors are, like those previously asserted by Recovery Corp. in the Miami Action, mostly claims that the Debtors (as debtors) own and control in the first instance and are already being releasing pursuant to

Regarding a limiting principle on this rule,[58] it might be the difference between a simple waiver or release of rights (which can happen through inaction) and a requirement to take affirmative action.  Also, as noted by the Debtors at the Confirmation Hearing, the good faith confirmation requirement[59] would likely preclude requiring actions entirely unrelated to the Debtors like making a contribution to a college education fund.

As far as it goes, that rule would bind all the creditors who did not respond in this case, as they all were sent a solicitation package that provided an opportunity to opt out.  However, that is not the end of the story.  That does not end the story because, although it may be reasonable (and even necessary) in general to assume that the creditors who were mailed a solicitation package received the package in a timely fashion, recognized that it was related to this case, and made a determination to do something or nothing with/about it, that may not be the case as to every creditor.  In other words, such an assumption can give rise to a presumption, but the presumption must be rebuttable.[60]  As to any individual creditor there may be some set of facts, some circumstances, that would make it unreasonable to assume that their failure to respond constitutes their consent to the result.   Maybe the creditor was in an acute care hospital during the voting period.  Maybe they were not living at the place where the voting materials were sent at the time.  Maybe they were deployed overseas in service of our country.  Maybe, as the U.S. Trustee posits,

---

the Debtors' Release that is included in the Plan and that is also part of the mediated settlement negotiated by the Committee.

[58] In *Smallhold*, the court expressed concern over the apparent lack of a limiting principle for distinguishing between the enforceability of a third-party release and a plan provision "that required creditors to donate to [a] college education fund" for the children of a debtor's CEO if they did not respond.  *Smallhold, supra,* 2024 WL 4296938, at *2, *13.

[59] 11 U.S.C. § 1129(a)(3).  It may also be limited by the need for the provision to be otherwise "appropriate" under 11 U.S.C. § 1123(b)(6), as it is not the case that anything that could be put in a plan would necessarily be "appropriate."

[60] *See Mallinckrodt, supra,* 639 B.R. at 881 (providing any creditor that claims they did not receive notice of their right to opt out an opportunity to seek relief from the court); *see also Stein Mart, supra*, 629 B.R. at 528 (refusing to make any determination that the third-party release binds any individual shareholder).

they mailed their ballot and opt-out form timely but it was never received.  The possibilities are myriad.

As a result, an opportunity for those people and entities to make a case to this Court sometime after confirmation that they should not be bound, that they should not be "deemed" to have consented, must be provided in the Order confirming the Plan.  That opportunity cannot be time-bounded but should include some provision that requires the party seeking relief to identify the claims or types of claims they seek to pursue and the identities or types of defendants they intend to seek them against.  To be clear, this process need only be available to those who did not respond at all – those who responded in any way are bound by their response and the consequences of it under the Plan, whatever it may have been.

<u>Additional Findings</u>

As is the case with numerous other aspects of this analysis, this Court agrees with Judge Cavender in *Envistacom, supra,* that third-party releases should not become commonplace, or be reduced to a matter of procedural routine, but instead they should be uncommon, should meet certain procedural requirements, and should be justified under the particular circumstances of the case.

In that regard, the Court finds that the opt out Release in this case is clear and conspicuous, properly noticed, justified under the facts, and provided a consensual third-party release, subject to the right of those who failed to respond to prove that the facts and circumstances that would rebut the presumption of consent.

Also, like Judge Cavender, this Court declines the opportunity to create a universal test or set of standards for approving all opt-out third-party release plans, as the analysis in each case

must be fact and case specific.  But highlighting the facts relevant in approving the opt-out Release in this case is important.   Here, those facts are as follows:

1. The opt out mechanism used here is clear and conspicuous in the Plan and the associated notices and ballots.  The notices and ballots are clear and conspicuous, and those are the shorter documents most creditors are likely to read.  The precise form of ballot was approved by, and included revisions recommended by, the U.S. Trustee.

2. The opt out mechanism is relatively simple and easy to understand.  For all creditors and interest-holders, they needed only to check a box on a ballot or an opt-out form and return it to the claims' agent timely.  They can also simply object to the Plan.

3. Creditors and interest-holders not entitled to vote were also required to file an objection or an opt-out form, but under the circumstances of this case, the Court does not find that requirement problematic.  Class 1 was not expected to have any claimants in it.  Class 2 was primarily or entirely the Internal Revenue Service, which filed an objection and opted out.  Classes 7-9 all consist of claims and interests held by the Debtors or their affiliates.

4. The Releases are limited to either estate fiduciaries, parties providing substantial consideration under and in support of the Plan, or affiliates of such parties.

5. The Plan and the settlement embodied in it were the product of significant negotiations, including a multi-day Mediation in which the interests of the unsecured creditors were represented by the Committee, which itself constituted a cross-section of creditors and was represented by sophisticated Chapter 11 counsel and an experienced Chapter 11 financial advisor, both of whom are familiar with the types of causes of actions that creditors might hold and had available the necessary litigation mechanisms and professional assistance to evaluate the merits and collectability of such claims if they were not to be settled.

6.  The Release is an integral part of the Plan and the settlement on which it is based, and the creditors affected by the Release are receiving substantial consideration in exchange for the Release.  The evidence presented at the Confirmation Hearing further satisfies the Court that the claims likely held by these parties are (i) mainly derivative claims that are otherwise being settled by the Debtors in the Plan, (ii) would present substantial logistical challenges simply to endeavor to pursue, and (iii) to the extent they have any value, they do not have sufficient likely recoverable value, given the significant secured and priority claims in these cases, to provide a better return to unsecured creditors than this settlement, as confirmed by the investigations conducted in this case by both the Committee and the Independent Manager (as defined in the Plan).  In particular, the Committee investigated these claims and determined on behalf of the unsecured creditors that the consideration provided by the Plan pursuant to this settlement resulted in the best payout to unsecured creditors that could be achieved, all things considered.

7.  The Plan, the global settlement, and the opt out Release are supported by the major constituents in this case, including the Debtors' secured lenders, their landlords, and the Committee, and the Plan was accepted by a majority of voting creditors by number and the vast majority by dollar amount.

Under these facts, the Plan and the solicitation procedures approved in connection with that Plan provided a simple and conspicuously disclosed mechanism for creditors to opt out of the third-party Release in this case.  Over 400 creditors and interest-holders followed the simple procedures and opted out of the Release and will not be bound by it.  For those that voted for the Plan, and for those who voted against the Plan or submitted a ballot abstaining from voting on the Plan (or a ballot that was not counted) and did not opt out, and for those who did not vote, object

or otherwise respond to the solicitation, the Court finds they have consented to the Release by their vote in favor of the Plan or their failure to timely opt out and will be bound by it, subject to the individual ability of those that did not vote, object or otherwise respond to the solicitation to vote to establish that their failure to opt out should not under their individual circumstances be considered consent.

Conclusion

The proper method for debtors to seek and obtain a consensual release from their creditors, including a release of non-debtor parties in cases like this one where the non-debtor parties provide substantial consideration at least in part to resolve potential claims against them associated with their relationship with the debtor, will no doubt continue to challenge bankruptcy (and ultimately higher) courts.

Based on the circumstances of this case, however, and for the reasons set forth herein and on the record at the Oral Ruling on November 22, 2024, it is hereby

**ORDERED** that the U.S. Trustee Objection to the Release is **OVERRULED** except to the extent provided in this Memorandum Decision.

**[END OF DOCUMENT]**

## Distribution List

LaVie Care Centers, LLC
c/o Ankura Consulting Group, LLC,
485 Lexington Avenue, 10th Floor,
New York, NY 10017
Attn: M. Benjamin Jones

Daniel M. Simon
McDermott Will & Emery LLP
1180 Peachtree Street NE, Suite 3350
Atlanta, GA 30309

Emily C. Keil
McDermott Will & Emery LLP
444 West Lake Street, Suite 4000
Chicago, IL 60606

Kurtzman Carson Consultants LLC d/b/a Verita Global
222 N. Pacific Coast Highway, 3rd Floor
El Segundo, CA 90245

Jonathan S. Adams
Office of the United States Trustee
362 Richard Russell Federal Building
75 Ted Turner Drive, SW
Atlanta, GA 30303

John A. Anthony
Anthony & Partners, LLC
100 S. Ashley Drive, Suite 1600
Tampa, Florida 33602